IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 1:05-cv-1184 T
(Judge Hodges)

LOCUS TELECOMMUNICATIONS, INC.,

Plaintiff

v.

THE UNITED STATES,

Defendant

**PROPOSED FINDINGS OF UNCONTROVERTED FACTS**
**IN SUPPORT OF**
**MOTION FOR SUMMARY JUDGMENT**

Pursuant to RCFC 56(h)(1), Plaintiff, Locus Telecommunications, Inc. (hereinafter, "Plaintiff" or "Locus") submits its Proposed Findings of Uncontroverted Facts in support of its Motion for Summary Judgment.

**UNCONTROVERTED FACTS**

**A. Amount of Existing Claim**

1. On November 9, 2005, Plaintiff filed its Complaint in the above-captioned case claiming refunds of FET it paid for 2001 through April 2005 (hereinafter the "Claims Period") in the amount of $17,898,889.32. Affidavit of Jason Chon ("Chon Aff.") at ¶ 3.

2. Locus amended its original complaint limiting its claims for refunds to the 2001-2003 periods of the Claims Period and on April 4, 2006 filed a second complaint to cover the 2004 and first quarter 2005 periods of the Claims Period, *Locus Telecommunications, Inc. v. United States*, 1:06-cv-00277 T VJW. On August 6, 2008, Case No. 1:06-cv-0277T VJW was transferred by Order

and reassigned to Senior Judge Robert H. Hodges, Jr. *Id.* at ¶ 4.

3. In December 2007, the Internal Revenue Service ("IRS"), through its administrative process, issued refunds to Locus in the amount of $14,723,329.98, plus $2,658,632.13 in interest. *Id.* at ¶ 5.

4. With the refunds and credits awarded by Defendant IRS, the balance of Locus' claim is $3,150,243.17. *Id.* at ¶ 6.

5. On January 22, 2008, Locus and Defendant filed a Joint Stipulation for Partial Dismissal of Proceedings in both cases pursuant to which Locus voluntarily dismissed that portion of its refund claims that totaled $14,723,329.98. *Id.* at ¶ 7.

6. On January 25, 2008 the Court issued its Order dismissing that portion of Locus' refund claims that totaled $14,723,329.98. *Id.* at ¶ 8.

7. The amount in controversy remaining before the court totals $3,150,243.17. *Id.* at ¶ 9.

8. The amount remaining in controversy set forth by tax quarter is:

| | |
|---|---|
| 200103 | $320,379.39 |
| 200106 | $285,338.92 |
| 200109 | $268,803.49 |
| 200112 | $ 24,293.82 |
| 200203 | $ 22,768.55 |
| 200206 | $ 29,804.37 |
| 200209 | $ 27,991.14 |
| 200212 | $ 25,311.60 |
| 200303 | $ 21,100.80 |
| 200306 | $ 25,902.69 |
| 200309 | $126,609.95 |
| 200312 | $ 27,941.48 |
| 200403 | $ 85,131.71 |
| 200406 | $207,019.78 |
| 200409 | $369,878.03 |
| 200412 | $426,600.30 |
| 200503 | $880,683.40 |
| Less IRS Credits | (25,316.25) |
| Total Existing Claim | $3,150,243.17 *Id.* at ¶ 10. |

**B. Taxpayer Subject to Federal Regulation**

9. Locus is a prepaid calling card provider that has been providing cards since 1994. *Id.* at ¶ 11.

10. Locus purchases communications from facilities based carriers or network providers at wholesale and resells those communications to Locus' customers. Affidavit of Sam Lee, Director of Accounting, Locus Telecommunications, Inc. ("Lee Aff.") ¶ 10. *See* TAB 3D.

11. Locus' resale of communications to its customers is regulated by the Federal Communications Commission, Washington, D.C. ("FCC"). *See* TAB 1A, FEDERAL REGULATION, behind which is a copy of the FCC notice of the grant of Locus' application for a Certificate of Public Convenience and Necessity Pursuant to Section 214 of the Communications Act of 1934, 47 U.S.C. § 214, as amended (1996) ("214 Certificate"); Lee Aff. at ¶ 9.

12. Locus resells approximately 97% of the communications it purchases at wholesale in the form of prepaid phone cards to distributors (agents) who in turn sell the cards to retail outlets and/or end using members of the public. TAB 3D

13. Locus is required to report its gross revenues from the sale of its prepaid cards on FCC Form 499, line 416. TAB 1B (copy of Locus' FCC Form 499 filings); Lee Aff. ¶ 130.

14. FCC Instructions for completing Form 499 requires that any taxes paid on the communications services sold for the year reported be excluded from the total of gross revenues reported on line 416. *See* TAB 1C, page 18 of the FCC Instructions for completing FCC Form 499; Lee Aff. at ¶ 131.

15. Although Locus was required to file FCC Form 499s for 2001, 2002, 2003 and 2004, it did not do so due to a lack of understanding of the FCC requirements. Lee Aff. ¶ 132.

16. Having retained counsel that practices before the FCC, Locus negotiated and entered into a Consent Decree with the FCC that cured its failures to file. TAB 1D (copy of the Consent Decree adopted by the FCC and agreed to by Locus); Lee Aff. ¶ 133.

**C. Locus' Tax Obligation on Purchases of Communications at Wholesale**

17. Locus purchased network capacity at wholesale through contracts with facilities based carriers such as MCI Communications (now Verizon). Affidavit of Henry Park ("Park Aff.") at ¶ 7; TAB 2A-1 (listing wholesale suppliers by name and amount of wholesale services provided); *see also,* TAB 2A-2 (sample copy of a wholesale supplier contract – MCI).

18. Pursuant to the express terms of these wholesale supplier contracts the burden of paying taxes and surcharges associated with the wholesale communications capacity provided is imposed on Locus. *See* memorandum summarizing the contract provisions imposing tax obligations on Locus, TAB 2A-3; Park Aff. at ¶ 8.

19. The express terms of these wholesale supplier contracts provide that Locus agreed to bear the burden of all taxes and surcharges, including the FET. Park Aff. at ¶ 9.

20. The wholesale supplier contracts expressly provide that Locus would not be billed or required to pay taxes to the wholesale supplier if Locus furnished a tax exemption certificate. *Id.* at ¶ 10; TAB 2B-1 (sample tax exemption certificates provided by Locus to its suppliers).

21. Locus furnished tax exemption certificates and was not invoiced and did not pay any taxes to its wholesale suppliers. Park Aff. at ¶ 11; TAB 2B-2 (sample wholesale supplier invoices showing that Locus was not invoiced for any taxes).

22. These contractual provisions and practices concerning the obligation for taxes on the wholesale purchase and sale of telecommunications to be used for resale are standard throughout the industry. Park Aff. at ¶ 12.

23. Once a course of dealings was established between Locus and its wholesale suppliers, including the furnishing of tax exemption certificates, annual or repeated submissions of such certificates were not required. Park Aff. at ¶ 13.

**D. Locus Did Not Bill or Collect FET from Its Distributors**

24. Locus' contracts with its distributors represent approximately 97% of its prepaid phone cards sales/revenues. Lee Aff. at ¶ 55; TAB 2C-1 (sample copies of Locus' distributor customer contracts).

25. Locus' contracts with its distributors impose no contractual obligation on them to pay any taxes to Locus. TAB 2C-2. Lee Aff. at ¶ 56.

26. Pursuant to the contract's terms, Locus' distributor customers were obligated to pay any taxes to the taxing authority that levied the tax. TAB 2C-2 (memorandum summarizing the contractual provisions on Locus' distributor customers' obligations for taxes and showing that such contracts contain no provisions requiring that the distributors furnish tax exemption certificates to Locus); Lee Aff. at ¶ 57.

27. Locus' invoices to its distributors contain no line items for FET or any other tax, but only contain its charges for its services. Lee Aff. at ¶ 58; TAB 2D-1 (sample copies of Locus' invoices to its distributor customers).

28. Locus' corporate policy was not to pass through to its distributors the FET on the communications services sold them. Lee Aff. at ¶ 59.

29. Locus' contracts and invoices show that Locus followed its established policy and did not pass through the FET to its distributors. Lee Aff. at ¶ 58; TAB 2D-1.

30. Locus sought and obtained sample copies of two of its distributor customers' corporate tax returns. Lee Aff. at ¶¶ 98- 99.

31. These distributor tax returns show no entry for payment of FET taxes. TAB 2D-2.

32. To obtain further corroborating evidence that Locus did not pass through the FET to its distributors, Locus sent a notice to its distributor customers that it had filed suit to recover the FET paid and requested their consents to its recovery based on their knowledge that they had not been charged and did not pay FET to Locus. *See* TAB 2D-4; *see* TAB 2D-3 (copies of the consents received); *see also,* Lee Aff. at ¶ ¶ 91-97.

**E. Taxpayer Did Not Pass Through The FET on the Prepaid Cards Sold Directly To End Using Members of the Public**

33. Locus' sale of prepaid phone cards to the public is subject to regulation by the FCC under Title II of the Communications Act of 1934, as amended (1996). ("Act"). Lee Aff. at ¶ 100.

34. It is a violation of Section 202(a) of the Act for a regulated telecommunications provider to engage in undue discrimination or to provide undue preferences in providing its services. 47 U.S.C. § 202(a). *Id.* at ¶ 101; 47 U.S.C §202(a).

35. Under Section 202(a), Locus is required to apply its corporate policy not to charge or collect FET from its distributor customers to the end using members of the public to whom Locus sold its prepaid cards directly (through recharging of cards after initial decrementing or expiration). Lee Aff. at ¶ 102; Choi Aff. at ¶ 21.

36. If Locus did not follow the same corporate policy and refrain from charging or collecting FET from its end using members of the public, it would be subject to a complaint for violating Section 202(a) of the Act pursuant to either Section 207 or 208 of the Act. 47 U.S.C. §§ 207, 208. Lee Aff. at ¶ 103.

37. Should Locus be found to have violated Section 202(a) in a complaint proceeding, it would be subject to damages, including attorneys' fees under Section 206 of the Act, 47 U.S.C.

§206, and to fines and forfeitures under Sections 501 and 503 of the Act. 47 U.S.C. §§ 501, 503. Lee Aff. at ¶ 104; Choi Aff. at ¶ 21.

38. In part, Locus met its obligations not to discriminate against end using members of the public through its advertising and the information imprinted on its prepaid phone cards. Lee Aff. at ¶ 105.

39. Locus' advertising materials, card artwork and usage instructions advise that the face value of each card is decremented by applicable per minute usage rates and fixed charges, but no taxes. *Id.*; TAB 2E-1 (sample Locus ads); TAB 2E-2 (photos of sample prepaid cards).

40. Locus made no FET rebates to its distributor customers. Lee Aff. at ¶ 106.

**F. Locus Paid the FET**

41. Locus prepared and filed the IRS Form 720s and paid the FET for all tax periods in the Claims Period. TAB 2F-1 (Locus' 720 Forms); TAB 2F-2 (Locus' records showing its payments of the FET to IRS); TAB 2F-3 (examples of Locus and IRS records showing routine processing and treatment of Locus' FET filings and payments, including IRS issuance of credits for overpayment).

**G. IRS Has Recognized Locus as Taxpayer**

42. The IRS audited Locus' corporate tax return in 2000. Lee Aff. at ¶ 63.

43. In 2000 tax return, Locus listed the FET and other taxes as expenses on line 17 of its 1120 form. *Id.* at ¶ 64.

44. Listing the FET as expenses was consistent with Locus' accounting practices. *Id.* at ¶ 69.

45. The IRS did not question Locus's reporting the FET along with other taxes on line 17 at any time during the audit. *Id.* at ¶ 65.

46. Upon the conclusion of the IRS' audit, it did not require any change in the manner in

which Locus reported its FET as an expense on line 17 of its 1120 form. *Id.*

47. By reporting its FET on line 17 of its 1120 form, the FET was not and could not be included in Locus' cost of goods sold ("COGS") as reported on line 2 of its 1120 form. *Id.* at ¶ 66.

48. Locus reported the FET on line 17 as an expense that it bore and a tax liability that it assumed. *Id.* at ¶ 67.

49. Locus' reporting indicates that it did not recover the FET by passing it on to its customers in its COGS. *Id.*

50. Locus consistently reported its FET on line 17 of the 1120 returns for all the years of the Claims Period. *Id.* at ¶ 69.

51. The IRS audit and its results show that the IRS recognized Locus as the taxpayer of the FET, as it did in regard to the other taxes Locus paid. *Id.* at ¶ 68.

52. The IRS refunded certain FET payments made by Locus directly to Locus. *Id.* at ¶ 70.

53. The IRS made these refunds to Locus without requiring a showing that Locus had refunded the FET to its customers or obtained their consents. *Id.* at ¶ 71.

54. The IRS accepted Locus as the taxpayer because Locus assumed the tax liability and paid the FET. *Id.* at ¶ 70.

55. At the bottom of the IRS notice of the refund the IRS identifies its intercept program pursuant to which any validly established tax refunds are to be offset by other debts owing by the taxpayer to the U.S. Government. *Id.* at ¶ 72.

56. No offset was required because Locus did not at the time of the refund have any outstanding debts owing to the U.S. Government. *Id.* at ¶ 73.

57. The IRS had authority to offset Locus's FET refunds against other of its debts to the

U.S. Government because the IRS recognized Locus as the taxpayer of the FET. *Id.* at ¶ 74; 26 U.S.C § 6402(a).

58. The IRS has no authority to use tax refunds due to a taxpayer to offset other debts owed the U.S. Government by another taxpayer. Lee Aff. at ¶ 75; 26 U.S.C. § 6402(a).

59. The IRS had no authority to offset Locus' other debts to the U.S. Government by using the FET refunds if the IRS did not recognize Locus as the party that assume the liability of the FET. Lee Aff. at ¶ 76.

**H. Tax Accounting Treatment - FET Not Part of Cost of Goods Sold**

60. Locus' documents show that for the years during the Claims Period, it prepared and filed its corporate tax returns reporting payment of all taxes, including expressly the FET, on line 17 of its 1120 Form. *See* TAB 2G, CORPORATE TAX RETURNS including:

| | |
|---|---|
| TAB 2G-1 | Locus' 1120 Return for 2001 and Statement 2, line 17 itemizing its tax payments expressly listing the FET. |
| TAB 2G-2 | Locus' 1120 Original Return for 2002 and Statement 2, line 17 itemizing its tax payments expressly listing the FET. |
| TAB 2G-3 | Locus' 1120 Amended Return for 2002 and Statement 2, line 17 itemizing its tax payments expressly listing the FET. |
| TAB 2G-4 | Locus' 1120 Original Return for 2003 and Statement 2, line 17 itemizing its tax payments expressly listing the FET. |
| TAB 2G-5 | Locus' 1120 Amended Return for 2003 and Statement 2, line 17 itemizing its tax payments expressly listing the FET. |
| TAB 2G-6 | Locus' 1120 Return for 2004 and Statement 2, line 17 itemizing its tax payments expressly listing the FET. |
| TAB 2G-7 | Locus' 1120 Return for 2005 and Statement 4, line 17 itemizing its tax payments expressly listing the FET. |

**I. Accounting Records Record FET as Corporate Expense**

61. Locus' accounting records show the company accounted for the FET on its services/sales as a corporate expense. TAB 2H, TAXPAYER ACCOUNTING RECORDS include:

| | |
|---|---|
| TAB 2H-1 | Representative General Ledger Entries (10/04) and Payment Voucher recording FET as Locus corporate overhead and showing approval for and payment of FET by |

| | |
|---|---|
| | Locus |
| TAB 2H-2 | Representative General Ledger Entries (11/04) and Payment Voucher recording FET as Locus corporate overhead and showing Locus approval for and payment of FET by Locus |
| TAB 2H-3 | KPMG Auditor's Review of Financial Statements 2001 and 2002 |
| TAB 2H-4 | KPMG Auditor's Restated Review of Financial Statements 2003 making the Financial Statements for 2001 and 2002 obsolete and inoperative |
| TAB 2H-5 | KPMG Auditor's audited Financial Statements 2004 |
| TAB 2H-6 | KPMG Auditor's audited Financial Statements 2004 and 2005 |

**J. Gross Revenues As Reported On 1120 Tax Return and FCC 499 Form Prove FET Not Passed Through to Customers**

62. In 2006, Locus filed its 499-A report with the FCC reporting on total revenues for 2005. TAB 1-B; Lee Aff. at ¶ 134.

63. The Instructions for completing the FCC 499-A forms provide that all gross revenues are to be reported on line 416 of the form, stating:

> Gross revenues also should include any surcharges on telecommunications services that are billed to the customer and either retained by the filer or remitted to a non-government third party under contract. **Gross revenues should exclude taxes** and any surcharges that are not recorded on the company books as revenues but which instead are remitted to government bodies (emphasis added.) *See* TAB 1-C; Lee Aff. at ¶ 136.

64. Locus' sales revenues reported on line 1 of its 1120 Form for 2005 is nearly identical with the gross revenues reported on its 2006 499-A form reporting revenues for 2005. TAB 2G-7; TAB 1B; Lee Aff. at ¶ 137.

65. The nearly identical reports on gross revenues confirm that Locus' gross revenues did not include the 3% FET. Lee Aff. at ¶ 138.

66. The IRS 1120 Tax Return form for 2005 shows gross revenues of $278,715,333. TAB 2G-7; Lee Aff. at ¶ 139.

67. Locus' FCC Form 499-A for 2006, line 416 reports grossed billed revenues from all sources for 2005 as $278,567,482. TAB 1-B; Lee Aff. at ¶ 140.

68. The difference is $157,851. TAB 1B, 2G; Lee Aff. at ¶ 141.

69. On line 421 of FCC 2006 499-A, bad debt/uncollectible revenues of $12,292 is shown. TAB 1B; Lee Aff. at ¶ 142.

70. Adding this $12,292 to the $157,851 difference makes the difference $170,143.00 self-evident. Lee Aff. at ¶ 143.

71. In 2004, Locus' total FET payments equaled $5,988,079, a quarterly average of $1,497,020 and a monthly average of $499,007. *Id.* at ¶ 144.

72. In Quarter 1 for 2005, total FET payments equaled $2,308,333, a monthly average of $769,444. *Id.* at ¶ 145.

73. For the first month of Quarter 2 for 2005, April, the total FET paid was $469,000. *Id.* at ¶ 146.

74. The differences between total gross revenues as reported for 2005 on the 1120 and the grossed billed revenues reported on the FCC 499-A form of $157,581 cannot result from deducting FET from the revenues reported to the FCC. *Id.* at ¶ 147.

75. The correct amount for comparison is $157,581 because the higher figure of $170,143 results from bad debt. *Id.* at ¶ 148.

76. The $157,851 represents only 34% of the FET paid for April for Q2 2005. *Id.* at ¶ 149.

77. The $157,851 represents less than 21% of the monthly FET paid for Q1 2005. *Id.* at ¶ 150.

78. The $157,851 represents less than 32% of the average monthly FET paid for all of 2004. *Id.* at ¶ 151.

79. Had Locus excluded the FET paid from the revenues it reported on its FCC Form

499-A for 2005, its gross revenues from all sources would be $275,790,149. *Id.* at ¶ 152.

80. It is impossible for the difference between the gross revenues reported on the 1120 and the 499-A to be attributed to FET. *Id.* at ¶ 153.

81. The inconsequential difference is due to the accounting and filing practices that were followed at the time. *Id.* at ¶ 154.

82. For 2005, the audit papers of Locus' outside accounting firm, KPMG, recorded gross revenues of (rounding off) $278,715,000. *Id.* at ¶ 155.

83. Locus' 1120 Tax Return for 2005 prepared by KPMG listed the same gross revenue amount of $278,715,000. Lee Aff. at ¶ 156; TAB 2G-7.

84. Locus' 2006 FCC Form 499-A reporting 2005 revenues reported gross revenues of $278,546,000, only a .06% (.0006) difference. Lee Aff. at ¶ 157; TAB 1B.

85. The miniscule difference is caused by (1) the timing of the various filings; and (2) Locus' accounting practice. Lee Aff. at ¶ 158.

86. The due date for the tax return is March 15, 2005. *Id.* at ¶ 159.

87. Locus obtained an extension to file until September 15, 2005 in order to start its annual audit which is routinely commenced in either April or May. *Id.*

88. The 499-A filing is due by April of each year. *Id.* at ¶ 160.

89. The order of work in 2005 was 1st the 499-A, 2nd the annual audit and 3rd the 2005 tax return with the filing extension. *Id.* at ¶ 161.

90. Had Locus not obtained the extension on its tax return filing, the order of work would have been 1st the 1120 for 2005, 2nd that 499-A and 3rd the annual audit. *Id.* at ¶ 162.

91. The timing and order in which these reports/filings are addressed and completed affects the final gross revenue figures each contains due to such normal variances in reported

amounts caused by the amounts of sales returns and other adjustments that exist as of the time the particular report is being completed. *Id.* at ¶ 163.

92. Accounting treatments for such matters including the valuation of inventory and investment, revenue recognition associated with the natures of different products, decisions on when to cut-off further recognition of revenues and accounting for stock compensation expenses all contribute to the cause of the small difference in the figures. *Id.* at ¶ 164.

93. If the 2006 FCC Form 499-A report on 2005 revenues were filed after the annual audit statement, total revenue would be the same in all three reports. *Id.* at ¶ 165.

94. Even filed before the audit is complete, there is only a 0.06% deviation that is not relevant to the FET issue. *Id.* at ¶ 166.

95. The fact that the total revenue reported on the 2006 FCC Form 499-A reporting 2005 revenues is nearly identical with the gross revenues reported on Locus' 2005 1120 and in the annual audit for 2005 shows that Locus could not have recovered the FET as part of its charges. *Id.*

**K. Locus's Pricing Methodology Could Not Accommodate FET**

96. Locus' pricing analysis exemplifies its standard practice of pricing its prepaid services. *Id.* at ¶ 25 and attached Exhibit A.

97. The targeted markets for sales are identified, in this analysis, the states of Rhode Island, Massachusetts and New Hampshire. *Id.* at ¶ 26.

98. The name of the proposed distributor is provided, in this case, referred to in short hand as "Voice." *Id.* at ¶ 27.

99. The destination markets are identified, in this case, Brazil, Dominican Republic, Columbia, Mexico, El Salvador, Guatemala and Vietnam. *Id.* at ¶ 28.

100. The analysis provides estimates of anticipated revenues, minutes of use and expected

margins, in this case, as follows:

Gross Revenues - $112,887
Gross Minutes – 1,878,234
Gross Margin $: (-$9,295)
Gross Margin %: (-8.23%) *Id.* at ¶ 29.

101. The discount % to the distributor is established, in this case it was 32%. *Id.* at ¶ 30.

102. Locus then identifies its costs of goods sold ("COGS"). *Id.* at ¶ 31.

103. In this analysis, Locus' COGS primarily consist of the per-minute wholesale charges by Locus's wholesale carriers that vary by call destination and its local loop costs. *Id.* at ¶ 32.

104. Locus' analysis next lists its anticipated revenues, listing the per-minute decrements on the cards that vary by call destination and local loop costs, plus other costs imposed on it or resulting from its internal operations, here identified as service fees. *Id.* at ¶ 33.

105. In this case, other than wholesale carrier and local loop costs, Locus had to account for exogenous costs that Locus recouped by adding a surcharge of $0.69 every 15 days after first usage and the costs it incurs under FCC regulations to compensate payphone service providers whenever a call is made using a pay-phone which Locus recoups by a $0.99/call surcharge. *Id.* at ¶ 34.

106. In columnar form Gross Revenues and Gross Costs may be calculated.

| | | |
|---|---|---|
| Costs: | | |
| | Per minute wholesale charges: | $113,682 |
| | Local Loop Charges: | 8,500 |
| | Total Costs: | $122,182 |
| Revenues: | | |
| | Per minute decrement charges: | $ 96,146 |
| | Surcharges ("Services") | 16,741 |
| | Total Revenues | $112,887 *Id.* at ¶ 35. |

107. Gross margin is calculated by subtracting Gross Cost from Gross Revenues, the result being Locus' Gross Margin, i.e., COGS of $122,182 - Gross Revenues of $112,887 = a negative

gross margin of $9,295. *Id.* at ¶ 36.

108. Under Locus' pricing analysis, there is no place to include taxes of any kind, including FET. *Id.* at ¶ 38.

Respectfully submitted,
Locus Telecommunications, Inc.

By: ______________________
Charles H. Helein
Its Counsel

Helein & Marashlian, LLC
1483 Chain Bridge Road, Suite 301
McLean, VA 22102-5703
703-714-1301
703-714-1330 (fax)
chh@commlawgroup.com