IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 1:05-cv-1184 T (RHH)

LOCUS TELECOMMUNICATIONS, INC.,

Plaintiff

v.

THE UNITED STATES,

Defendant

**Table of Contents**

I. STATEMENT OF QUESTIONS PRESENTED .......... 1
II. STATEMENT OF THE CASE .......... 2
III. ARGUMENT .......... 4
1. BACKGROUND FACTS .......... 4
A. Change in the Law .......... 4
B. Locus Payments of the FET and its Refund Claims .......... 5
C. IRS Partial Refund and Partial Dismissal of Locus' Claim in this Case .......... 6
D. Substantiation of Proof that Locus Paid the FET and Had Not Passed the Tax On To Its Customers .......... 6
2. SUMMARY JUDGMENT STANDARD OF REVIEW .......... 7
3. STANDING .......... 7
A. The Party that Paid the Tax Has Standing to Sue For A Refund .......... 7
B. Locus Bore the Economic Burden of the FET .......... 8
4. BURDEN OF PROOF – ECONOMIC BURDEN .......... 13
A. Preponderance of the Evidence .......... 13
B. Burden May Not Be "Impossible" .......... 13
C. Supporting Precedents Are Numerous and Supportive .......... 14
5. LOCUS BORE THE BURDEN OF THE FET .......... 15
A. The FET Was Not a Cost Component of Locus' Pricing .......... 15
B. Locus' Consistent Business Practices and Course of Dealings on the FET .......... 16
C. FCC Filings And Tax Returns Corroborate Locus Paid FET .......... 19
6. ADDITIONAL PROOFS OF ECONOMIC BURDEN .......... 22
A. Locus' Pricing Methodology Never Changed .......... 23
B. Locus Made No Rebates .......... 23
C. Invoices and Other Company Literature Contain No FET or Other Taxes .......... 24
D. Locus' Contracts Are Evidence That Locus Bore the FET Burden .......... 24
E. Locus' Accounting Shows It Bore the FET Burden .......... 24
F. Taxpayer's Profitability Irrelevant .......... 26
G. The IRS Recognized Locus as the "Taxpayer" .......... 27
H. Locus Bore the Economic Burden on End User Recharges .......... 28
7. TO LOCUS' KNOWLEDGE NO EVIDENCE EXISTS THAT CONTRADICTS LOCUS' EVIDENCE .......... 30
IV. CONCLUSION .......... 31

## Table of Authorities

### Cases

*Abbott, et al., v. United States,* 175 F. Supp. 917, 146 Ct. Cl. 272 (1959) .............................. 9, 10

*America Online, Inc. v. United States*, 64 Fed.Cl. 571 (2005) ...................................................... 4

*American Bankers Insurance Group v. United States*, 408 F.3d 1328 (11th Cir. 2005) ................ 4

*Ammex, Inc. v. United States,* 56 Fed. Cl. 1 (Ct. Cl. 2003) .......................................................... 9

*Anderson Co. v. United States*, 69-2 U.S. Tax Cas. (CCH) ¶ 15,902, at 86,209 (N.D. Inc. 1969), *aff'd* 447 F. 2d 41 (7th Cir. 1971) .......................................................................................... 13

*Anniston Mfg. v. U.S.*, 301 U.S. 337 (1937) ........................................................................ 13, 14

*B&M Company v. United States*, 452 F.2d 986 (5th Cir. 1972) ........................................ 13, 19, 26

*Bruce v. United States,* 1984 WL 696 (N.D. Cal.) ........................................................................ 8

*C.B. Cones & Son Mfg. Co. v. U.S.,* 123 F.2d 530 (7th Cir. 1941) .............................................. 30

*Cactus Heights Country Club v. US,* 280 F.Supp. 534 (D.S.D. 1967) .................................... 9, 11

*Clauson Mfg. Co. v. United States,* 74-2 U.S. Tax cas. (CCH) ¶ 16,153 at 85,901 (W.D. Ky. 1974) ........................................................................................................................... 15

*Commissioner v. Danielson,* 378 F.2d 771 (3d Cir. 1967) .......................................................... 24

*Davis v. United States*, 235 F.2d 174 (5th Cir. 1956) ............................................................... 8, 9

*DuPont Glore Forgan Inc. v. American Telephone & Telegraph Co*., 428 F.Supp. 1297 (S.D.N.Y.1977), aff'd, 578 F.2d 1367 (2d Cir.), cert. denied, 439 U.S. 970 (1978) ................ 12

*Epstein v. United States,* 174 Ct. Cl. 1158, 357 F.2d 928 (1966) ............................................ 9, 12

*F & D Trading Corp. v. United States,* 580 F.2d 414, 217 Ct.Cl. 472 (1978) ................. 23, 25, 30

*First National Bank of Fort Worth v. United States,* 633 F.2d 1168 (5th Cir. 1981) ...................... 8

*Fortis, Inc. v. United States,* 420 F.Supp.2d 166 (S.D.N.Y.,2004) ................................................ 4

*GorDag Indus., Inc. v. United States,* 63-2 U.S. Tax Cas (CHH), ¶ 15,532 at 90,565 (D. Minn. 1963) ........................................................................................................................... 15

*Gray Line Co. v. Granquist*, 237 F.2d 390 (9th Cir. 1956) ..................................................... 9, 11

*Gumpert v. U. S*., 296 F.2d 927, 155 Ct. Cl. 721 (1961) ........................................... 9, 10, 11, 12

*Holmes Limestone Co. v. United States,* 946 F. Supp. 1310 (N.D. Ohio 1998) .......................... 26

*Honeywell Int'l, Inc. v. United States*, 64 Fed. Cl. 188 (2005) ...................................................... 4

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574 (1986) ..................................... 7

*McCoy Mfg. & Sales Co. v. United States,* 68-2 U.S. Tax Cas. (CCH), ¶ 15,871, at 88,510 (S.D.Iowa 1968) ............................................................................................................... 13

*McGowan v. United States,* 195 F. Supp. 201 (D.C. Fla. 1961) ................................................ 8, 9

*McGowan v. United States,* 222 F. Supp. 329 (D.C. Fla. 1969) ................................................... 9

*McGowan v. United States*, 296 F. Supp. 252 (5th Cir. 1961) .......... 8, 10, 11
*National R.R. Passenger Corp. v. United States*, 338 F.Supp.2d 22 (D.D.C. 2004) .......... 4
*Norris Dispensers, Inc. v. United States*, 325 F.2d 140 (8th Cir. 1963) .......... 13
*OfficeMax, Inc. v. United States*, 428 F.3d 583 (6th Cir. 2005) .......... 4
*Proulx v. United States*, 594 F.2d 832, 219 Ct. Cl. 363 (1979) .......... 24
*Reese Bros, Inc. v. United States*, 2004 WL 2901579 (W.D. Pa.) .......... 4
*Royce v. Squire*, 168 F.2d 250 (9th Cir. 1948) .......... 9, 11
*Scanlon v. United States*, 330 F.Supp. 269 (E.D. Mich. 1971) .......... 7, 8
*Smith v. United States*, 242 F.2d 486 (5th Cir. 1957) .......... 8
*T.S. & M. Co. v. United States*, 75-1 U.S. Tax Cas. (CCH) ¶ 16,175, at 87,498 (E.D.N.Y.1974)25
*Tenneco, Inc. v. United States*, 17 Cl. Ct. 345 (1989), *aff'd* 899 F.2d 1227 (Fed. Cir. 1990) passim
*Thompson v. United States*, 429 F.Supp. 13 (E.D. Pa. 1977) .......... 7, 8
*United States v. Gilbert*, 478 F. Supp. 306 (S.D.N.Y. 1979) .......... 7, 8
*United States v. Jefferson Electric Mfg. Co.*, 291 U.S. 386 (1934) .......... 12, 13, 30
*United States v. Spokane Rodeo, Inc.*, 254 F.2d 377 (9th Cir. 1958) .......... 9, 11
*United States v. Walker*, 234 F.2d 910 (5th Cir. 1956) .......... 8, 12
*Vogel v. Knox*, 147 F. Supp. 10 (D. Minn. 1957) .......... 23

**Statutes**

26 U.S.C. § 4252(b) .......... 2, 3
26 U.S.C. § 6415 .......... 8, 9, 11, 12
26 U.S.C. § 6416 .......... 9
26 U.S.C. § 7422(a) .......... 3
47 U.S.C. § 202(a) .......... 29
47 U.S.C. § 202(c) .......... 29
47 U.S.C. § 206 .......... 29
47 U.S.C. § 207 .......... 29

**Regulations**

*IRS Notice 2006-50*, 2006 I.R.B. 25 .......... 7, 8

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

Nos. 1:05-cv-1184 T (RHH)

LOCUS TELECOMMUNICATIONS, INC.,

Plaintiff

v.

THE UNITED STATES,

Defendant

**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Locus Telecommunications, Inc., ("Locus"), submits this Memorandum of Law and Proposed Findings of Uncontroverted Facts in support of the Motion for Summary Judgment that the $3,150,243.17 Locus paid in Federal Excise Tax in 2001 through and including the first quarter of 2005, must be refunded to Locus as a matter of law.

## I. STATEMENT OF QUESTIONS PRESENTED

(1) Whether, as a matter of law, under Sections 6402(a) and 6415 of the Internal Revenue Code, Locus is entitled to a refund in the amount of $3,150,243.17 for communications excise taxes Locus paid in 2001 through and including the first quarter of 2005 (the "Claims Period")?

(2) Whether, as a matter of law, Locus has met its burden of proof through its submission of affidavits, documents, records and analysis, of showing, by a preponderance of evidence, that it is entitled to a refund in the amount of $3,150,243.17?

(3) Whether entry of summary judgment awarding Locus its tax refund in the amount of $3,150,243.17 is dispositive of all claims in involving the FET paid by Locus during the Claims Period?

## II. STATEMENT OF THE CASE

Locus purchases communications services from facilities-based carriers at wholesale prices ("Wholesale Carriers" or "Carriers"), embeds allocated portions of these services into prepaid card units ("Cards") and sells the Cards at a discount in various size batches to entities that distribute the cards to third parties ("Distributors"), primarily members of the public ("end users") who use the Cards for to make telephone calls. In addition, Locus recharges a small portion of the Cards held by end users that allows reuse of the Cards recharged. *See* TAB 3D, Affidavit of Sam Lee, Director of Accounting, Locus Telecommunications, Inc. ("Lee Aff.") at ¶ 11. From 2001 through and including the first quarter of 2005, (the "Claims Period"), following its sales of prepaid cards to Distributors and recharges to end users, each calendar quarter Locus filed IRS 720 Forms and the paid the federal telephone excise tax on the sales of its prepaid cards and recharges.

The Federal Excise Tax ("FET") at issue was imposed under the Internal Revenue Code on amounts paid for "toll" (long distance) telephone services ("Services") the charges for which varied in amount with the distance and duration of each call. 26 U.S.C. § 4252(b). The FET Locus paid was paid on Services the charges for which were based only on call duration and not distance. Locus paid the FET throughout the Claims Period not realizing that the FET did not apply to its Services. When Locus determined that the FET did not apply to its Services Locus filed for refund of the FET it had paid. When it was determined that Internal Revenue Service ("IRS") would not act on Locus' refund claims, Locus filed a Notice of Complaint with the

Secretary of the Treasury pursuant to 26 U.S.C. § 7422(a). Complaint at Exhibit 6, Tab 5. When it was made known that no action would be taken by the Secretary, Locus filed a Complaint with this Court to recover the refund due it.

While Locus' Complaint was pending, the IRS issued an official Notice, IRS Notice 2006-05, 2006 I.R.B.25, officially notifying taxpayers that 26 U.S.C. §4252(b) did not authorize the collection of the FET on long distance telephone services the charges for which were based only on call duration. Because Locus' charges were based only on call duration, Locus became entitled to a refund of the FET Locus paid during the Claims Period.

Locus is entitled to a refund of $3,150, 243.17 under the general refund provisions of Section 6402(a) and Section 6415. Locus bore the economic burden of the tax by paying the tax from its own funds. It did not pass through the FET to its Distributors or end users receiving recharges in its charges for its Services. The testamentary and documentary evidence submitted herewith shows, for example, that:

- Locus' assumed the liability of the FET, paid the FET on its Services as a corporate expense, did not include the FET as part of its charges and hence did not pass it on to its customers. TAB 2.
- Locus' contract and invoices show that Locus did not pass through the FET to its Distributors. TAB 2-D.
- Locus bills/invoices show it billed and collected its charges in lump sums based on the price of its Services. Choi Aff. ¶¶ 5-6.
- Locus' sales price was based on a methodology that provided no room for the inclusion of the FET in its sales prices. Lee Aff. ¶¶ 21-39.
- Locus paid the FET on a quarterly basis as a liability associated with its sale of its Services, accounted for all revenues received from its sales as gross revenues to which it applied and then paid the 3% FET. *Id.* at ¶¶ 44-46.
- Locus' customers did not report the FET in their returns. *Id.* at ¶¶ 99-100.
- Locus' corporate tax returns for the Claims Period consistently reported FET as corporate overhead and not as part of its Cost of Goods Sold. *Id.* at ¶¶ 110-114.
- Locus' financial statements prepared by its outside accounting firm, KPMG, recognized and approved Locus' accounting treatment of the FET as corporate overhead. *Id.* at ¶¶ 49-54, 115-131.

The foregoing summary of points is for illustrative purposes only and is not intended to be and is

not an exhaustive presentation of proofs that Locus paid the FET itself. Nevertheless, they show that Locus paid the FET and bore the economic burden of the tax, entitling it to a refund in the amount of $3,150,273.17.

## III. ARGUMENT

### 1. BACKGROUND FACTS

#### A. Change in the Law

When amended in 1965, the Internal Revenue Code imposed an excise tax of three percent (3%) on toll telephone service defined as that for which "there is a toll charge [paid in the United States] which varies in amount with the distance and elapsed transmission time [call duration] of each individual communication ..." 26 U.S.C. § 4252(b) (emphasis added).

Because of competition, advances in network technologies, and other industry developments and changes, service providers ceased charging for "toll" (long distance) services based on the distance a call traveled. Large corporate users became aware that they were no longer liable for the FET since the long distance service charges they were paying no longer contained a charge for the distance their calls traveled, but only on the duration of their calls. Several corporate users instituted litigation to recover the FET they had paid and eventually were successful in establishing their rights to recover the FET they had paid.[1] The IRS finally conceded the point and on May 25, 2006 issued *IRS Notice 2006-50*, 2006 I.R.B. 25:

---

[1] *See American Bankers Insurance Group v. United States*, 408 F.3d 1328 (11th Cir. 2005); *America Online, Inc. v. United States*, 64 Fed.Cl. 571 (2005); *Honeywell Int'l, Inc. v. United States*, 64 Fed. Cl. 188, 202 (2005); *Reese Bros, Inc. v. United States*, 2004 WL 2901579, at *15 (2004); *National R.R. Passenger Corp. v. United States*, 338 F.Supp.2d 22, 30 (D.D.C. 2004); *Fortis, Inc. v. United States,* 420 F.Supp.2d 166 (S.D.N.Y.,2004); *Office Max, Inc. v. United States*, 309 F.Supp.2d 984, 1007 (N.D. Ohio 2004). In each of these cases, the courts found, for the tax to apply, the plain meaning of Section 4252 "unambiguously requires that a toll charge vary in amount according to both the distance and duration of calls." *AOL v. United States*, at *5 (emphasis added).

> [...] the Internal Revenue Service will follow the holdings ... that a telephonic communication for which there is a toll charge that varies with elapsed transmission time and not distance (time-only service) is not taxable toll telephone service as defined in § 4252(b)(1) of the Internal Revenue Code. As a result, amounts paid for time-only service are not subject to the tax imposed by § 4251. [....] (emphasis added). Hereinafter referred to as "IRS Notice 2006-50".

### B. Locus Payments of the FET and its Refund Claims

During the Claims Period, Locus filed IRS Form 720 each calendar quarter and paid from its own gross revenues the FET on the long distance services it sold to its Distributors and recharging end users and did not pass on the FET to its customers. *See* Affidavit of Sam Lee, Director of Accounting, Locus Telecommunications, Inc. at ¶ 110-114 (hereinafter "Lee Aff."). Upon learning of the numerous court decisions holding that the FET did not apply to the services Locus was selling, Locus filed IRS Forms 8849 for refunds of the FET it had paid. *See* Complaint at Exhibit 1. As indicated above, when it became clear that the IRS would not process its claims administratively, this litigation was instituted on November 9, 2005 by Complaint in this case claiming refunds of FET it paid for 2001 through April 2005 in the amount of $17,898,889.32.[2] When on May 25, 2006, the IRS issued its Notice 2006-50, the parties sought a suspension in an effort to settle the "damages" portion of the case.[3]

---

[2] For reasons not relevant here, Locus amended its original Complaint limiting its claims for refunds to the 2001-2003 periods of the Claims Period and on April 4, 2006 filed a second complaint to cover the 2004 and first quarter 2005 periods of the Claims Period, *Locus Telecommunications, Inc. v. United States*, 1:06-cv-00277 T VJW. On August 6, 2008, Case No. 1:06-cv-0277T VJW was transferred by Order and reassigned to Senior Judge Robert H. Hodges, Jr.

[3] During the period of time that Locus and the Defendant were attempting to the settle the damages portion of this case Locus, in an effort to partially satisfy its burden of proof, obtained the consents of most of its largest customers, its distributor customers. Locus sought these consents and obtained them because Locus' distributors knew that they had not been charged and did not pay the FET to Locus. *See* TAB 2D-4. Locus submitted these consents as further evidence that it paid the FET, and not as satisfaction of the alternative justification provided in Section 6415 of the Code. Obtaining consents from all of Locus's customers is not possible due to circumstances beyond Locus's control. For example, some distributor customers were no

### C. IRS Partial Refund and Partial Dismissal of Locus' Claim in this Case

In May 2007, the IRS contacted Locus offering to use its administrative process to refund Locus' FET claims for that portion of the claims for which Locus had obtained consents from its largest Distributors. Upon gaining assurance that using the IRS' administrative processes would not prejudice the claims for refunds not based on consents, Locus commenced the IRS administrative process. In December 2007, the IRS issued refunds to Locus in the amount of $14,723,329.98, plus $2,658,632.13 in interest. As a result, the majority of Locus' claims were settled through the administrative process of the IRS.

On January 22, 2008, joint stipulations of partial dismissal were filed by the parties withdrawing, with prejudice, those amounts of Locus' total FET payments made during the Claims Period for which it had received consents. With the refunds and credits awarded by Defendant IRS, the balance of Locus' claim before this Court is $3,150,273.17. *See* Affidavit of Jason Chon at ¶¶ 7-9 ("Chon Aff.").

### D. Substantiation of Proof that Locus Paid the FET and Had Not Passed the Tax On To Its Customers

In support of Locus' claim that it is entitled to the remaining $3,150,273.17, Locus submits with this filing and in accordance with the Court's Rules, evidentiary proofs consisting of documents and sworn affidavits that support the fact that Locus paid all the FET covered by the Claims Period, did not pass the tax on to its customers, has therefore borne the economic burden of the tax and is entitled to a full refund of the remaining balances of the FET paid during the Claims Period.

---

longer in business. The small percentage of customers that buy prepaid cards for their own communications purposes make their purchases without providing their names or addresses or other identifying information. More importantly, Locus limited its use of consents to large customers because its purpose was not to rely on such consents but as evidentiary corroboration that Locus paid the FET and did not pass it on. *See* Lee Aff. at ¶ 97.

**2. SUMMARY JUDGMENT STANDARD OF REVIEW**

Summary judgment is required "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

As is shown by Locus' Proposed Findings of Uncontroverted Facts, there are a number of material facts in this case. All of these facts are in Locus' possession and all support Locus' claims for refund. On the other hand, there are no documents, exhibits, studies, compilations or sworn statements that can be offered to dispute the uncontroverted facts presented by Locus that it bore the economic burden and paid the excise taxes on telecommunications services it sold to its Distributors and recharging end users. Having paid the FET on telecommunications services that Locus had no legal obligation to pay, its payments must be refunded as a matter of law.

**3. STANDING**

**A. The Party that Paid the Tax Has Standing to Sue For A Refund**

The Secretary of the Internal Revenue is authorized to pay refunds only to "the person who made the overpayment." Therefore, only the person or entity who has actually paid the tax has standing to sue for a refund. *See* 26 U.S.C. § 6402(a); *Scanlon v. United States,* 330 F.Supp. 269, 270-71 (E.D. Mich. 1971); *Thompson v. United States*, 429 F.Supp. 13 (E.D. Pa. 1977); *United States v. Gilbert*, 478 F. Supp. 306, 318-19 (S.D.N.Y. 1979). Because Locus paid the FET its standing to sue for a refund under Section 6402(a) is clear.

Section 6402(a) of the Internal Revenue Code provides in pertinent part:

> In the case of any overpayment, the Secretary ... may credit the amount of such overpayment, including any interest allowed thereon, against any liability in respect of an internal revenue tax on the part of **the person who made the overpayment and shall refund any balance to such person.** 26 U.S.C. § 5402(a) (emphasis added).

Courts have interpreted the language of Section 6402 as authorizing a refund to a person

who has assumed the liability for the tax, even if such a person was not "subject" to the tax. *See First National Bank of Fort Worth v. United States,* 633 F.2d 1168, 1171 (5th Cir. 1981); *United States v. Gilbert,* 478 F.Supp. 306, 318-19 (S.D.N.Y. 1979) ("it is neither the taxpayer, nor the actual transferor, per se, who is entitled to the refund; rather, we must look to the assumption of liability to determine proper entitlement"); *Scanlon v. United States,* 330 .Supp. 269 (E.D. Mich. 1971) (employer who paid employee's tax was entitled to refund); *Thompson v. United States,* 429 F.Supp. 13 (E.D. Pa. 1977) (bailee who paid taxpayer's tax); *Bruce v. United States,* 1984 WL 696 (N.D. Cal.) (finding the reasoning of *Scanlon*, *Thompson*, and *Gilbert* to be a sound interpretation of the statutes, especially in view of the changes made in the 1954 Code).

### B. Locus Bore the Economic Burden of the FET

In addition to the fact that Locus is entitled to the refund under the general refund provision of § 6402(a), it is also entitled to the refund under Section 6415 because it bore the economic burden of the tax by having paid the tax. Section 6415 expressly provides that the party who collects and pays over an excise tax may recover a refund if it is shown that (1) repayment has been made to the persons from whom they were collected; or, (2) that the consent of such persons has been obtained for the party that collected and paid over the excise tax to receive the refund.

The courts have consistently held however that where these two express statutory requirements are not or cannot be met, if the party claiming the refund shows it paid the excise tax itself it will have shown that it bore the "economic burden of the tax" and is thereby entitled to the refund of the excise tax it paid.[4] Locus' evidence shows that it paid the tax, that it bore the

[4] *Smith v. United States,* 242 F.2d 486 (5th Cir. 1957); *Davis v. United States*, 235 F.2d 174 (5th Cir. 1956); *United States v. Walker*, 234 F.2d 910 (5th Cir. 1956); *McGowan v. United States,* 195 F. Supp. 201 (D.C. Fla. 1961); *McGowan v. United States*, 296 F. Supp. 252 (5th Cir. 1961);

economic burden of the tax. As such, Locus is the only party with standing and the right to the refund.

Section 6415 differs from its sister provision, §6416, in that section 6415 does not explicitly provide that a refund may be allowed when the taxpayer shows it bore the economic burden as does section 6416. The Courts have nonetheless consistently held that a refund of an excise tax under §6415 of the Code is required without having made a refund to others or having obtained their consents.[5]

In *Ammex, Inc. v. United States,* 56 Fed. Cl. 1 (2003), this Court relying in part on its earlier decision in *Gumpert v. United States* noted the similarities between the two sections:

> [T]he federal excise tax claim involved §4262, an exception to the tax imposed under §4261, and required the application of §6415(a), a provision similar to §6416(a).

*Id.* at 11. (Emphasis added.)[6]

In *McGowan v. United States,* 195 F. Supp. 201 (D.C. Fla. 1961), while the District Court found that the taxpayer, a sightseeing company, had not satisfied the two express requirements of §6415(a), it also rejected the taxpayer's showing it had borne the economic burden of the tax rather than passing it on to its sightseeing passengers. *Id.* at 202.[7] McGowan appealed and the

---

*McGowan v. United States,* 222 F. Supp. 329, 331 (D.C. Fla. 1969); *Epstein v. United States,* 174 Ct. Cl. 1158, 1174, 357 F.2d 928 (1966); *Gumpert v. U. S.,* 296 F.2d 927, 155 Ct. Cl. 721 (1961); *Cactus Heights Country Club v. US,* 280 F.Supp. 534 (D.S.D. 1967); *Abbott, et al., v. United States,* 175 F. Supp. 917, 146 Ct. Cl. 272 (1959); *United States v. Spokane Rodeo, Inc.,* 254 F.2d 377 (9th Cir. 1958); *Royce v. Squire*, 168 F.2d 250 (9th Cir. 1948); *Gray Line Co. v. Granquist*, 237 F.2d 390 (9th Cir. 1956); *Ammex, Inc. v. United States,* 56 Fed. Cl. 1 (Ct. Cl. 2003);

[5] *See* Note 4, *supra.*

[6] *See also, Epstein v. United States,* 174 Ct. Cl. 1158, 1174 (1966), a § 6415 case that relies on *Gumpert.* Here, the court made plain that " ...recovery may be had only if plaintiff can show that he himself had borne the economic burden of the taxes by paying them out of his own pocket and had not collected them from members." Emphasis added.

[7] *See also, Smith v. United States,* 242 F.2d 486 (1957); *Davis v. United States*, 235 F.2d 174 (1956); *United States v. Walker*, 234 F.2d 910 (1956).

District Court's decision was reversed and remanded.[8] On remand, it was held "that [while] Plaintiff's evidence just barely preponderates, the Court finds that Plaintiff did bear the economic burden of the tax." *McGowan v. United States,* 222 F. Supp. 329, 331 (D.C. Fla. 1969). Thus the Plaintiff was granted the refund based on having borne the economic burden of the tax regardless of not having met the express conditions of section 6415.

*Gumpert v. U. S.* was another case in which the plaintiff (also a sightseeing company) had not refunded the tax nor obtained any consents. The Court held:

> Sections 3471 and 6415 of the 1939 and 1954 Internal Revenue Codes, respectively, allow a collector of the tax to seek a refund thereof only if he establishes that he has repaid the amount of such tax to the person from whom he collected it, or has obtained the consent of such person to the allowance of the credit or refund. However, plaintiffs do not allege that they made a refund to their passengers of the transportation taxes involved, or that they have obtained the consent of the passengers to the allowance of the refund sought in this suit. They admit that they have not complied with either of these provisions; instead they argue that these provisions are inapposite to their situation because they paid the tax themselves instead of collecting the tax from their passengers, hence plaintiffs contend that they bore the economic burden and are entitled to relief. In support of their position, plaintiffs cite *Abbott et al. v. United States,*[9] Cong. No. 5-57, decided July 13, 1959, Ct. Cl. 175 F. Supp. 917, wherein it was held that taxpayers were entitled to a refund on the theory that they had borne the economic burden of the tax where it was found as a fact that taxpayers had paid the tax out of their own pockets. *Gumpert v. U. S.*, 296 F.2d at 929 (emphasis added).

The Plaintiff in *Gumpert* was not awarded a refund because it failed to produce any evidence it had paid the tax. But the decision makes it was clear proof of paying the tax would have justified the refund irrespective of the express provisions of §6415.

> Where an operator is performing a service that is subject to a tax, and that tax is a flat percentage of the cost of the service, it is reasonable to presume that the cost of the service is increased by the amount of the tax. This is a rebuttable presumption, to be

---

[8] *McGowan v. United States*, 296 F. Supp. 252 (5th Cir. 1961).

[9] *Abbott, et al., v. United States,* 175 F. Supp. 917 (1959) (Action by operators of fishing boats to recover federal transportation tax on amounts they collected from their customers). The Court of Claims held that the plaintiffs were entitled to recover on the ground that they bore the economic burden of the tax.

> sure, but the burden is on the entrepreneur to show that he paid the tax out of his own pocket rather than to have passed this expense on to the customer. …Therefore, plaintiffs must show by the weight of the evidence that they have complied with the provisions of the statute, which admittedly plaintiffs have not done, or that they have borne the economic burden of the tax, which in this instance plaintiffs have failed to show. *Id.* (emphasis added).

In *Cactus Heights Country Club v. United States*[10] it was again recognized that a taxpayer had the right to show it bore the economic burden under §6415.

> [The court has] no jurisdiction to hear plaintiff's claim since no allegation has been made nor has it been shown that Cactus Heights Country Club 'repaid the amount of such tax' to the persons from whom it was collected, or obtained the consent of such persons 'to the allowance of such credit or refund.' 26 U.S.C.A. § 6415. It is well recognized that without such proof plaintiff has no standing to bring this suit. This all assumes, of course, that it was not Cactus Heights which bore the economic burden of the tax in the first instance. *Id.* at 538, *citing, McGowan v. United States*, 296 F.2d 252 (5th Cir. 1961); *Gumpert v. United States*, 296 F.2d 927 (1961) (emphasis added).

In *United States v. Spokane Rodeo, Inc.,*[11] the issue was whether "[Spokane Rodeo] has shown that it bore the burden of the federal admissions tax so as to entitle it to a refund of such taxes under §6415(a) of the Internal Revenue Code of 1954." *Id.* at 378. (Emphasis added.) Although the taxpayer failed to show proof of bearing the tax burden, three options, not two, were recognized:

> In the case of *Royce v. Squire*, 168 F.2d 250 (9th Cir. 1948), a case wherein a refund of transportation taxes illegally collected was sought, Judge Healy writing for this Court said: 'The taxpayers have no financial interest in the monies said to have been erroneously collected. They neither [1] bore the burden of the tax, [2] refunded the amounts collected, nor [3]obtained authority to sue from those who did bear the burden. They are … without standing to sue.'168 F.2d at 251. Such is the situation in the instant case. *See also Gray Line Co. v. Granquist*, 237 F.2d 390 (9th Cir. 1956). *Id.* at 379

---

[10] *Cactus Heights Country Club v. US,* 280 F.Supp. 534 (D.S.D. 1967).

[11] 254 F.2d 377 (9th Cir. 1958). The United States District Court for the Eastern District of Washington, entered judgment adverse to the government, and it appealed. The Court of Appeals, reversed the judgment and found that where nonprofit organization established that tax was erroneously collected, but failed to show that it repaid the amount of such tax to the person or persons from whom it collected the tax, and failed to show that it obtained authority to sue from persons from whom the tax was collected, and plaintiff did not bear the burden of such tax, it was without standing to sue for its refund.

(Emphasis added, numbering added).

In *Epstein v. United States,*[12] the issue was whether the excise tax on a country club's dues and annual locker rental charges were refundable under § 6415. It was held that –

> [Section 6415] permits a collector of a tax to seek recovery upon proof that he has repaid the amount of such tax to the person from whom he collected it, or has obtained the consent of such person to the allowance of the refund. Plaintiff does not allege, and the evidence does not show, that he, either individually or in his capacity of doing business as Club Del Mar, has made a refund to the club members or has obtained the consent of the members to the allowance of the refund sought in this suit. In such circumstances, recovery may be had only if plaintiff can show that he himself had borne the economic burden of the taxes by paying them out of his own pocket and had not collected them from members. *Id.* at 938-39 (emphasis added), *citing Gumpert v. United States,* 296 F.2d 927, 155 Ct. Cl. 721 (1961); *McGowan v. United States*, 296 F.2d 252 (5th Cir. 1961); *United States v. Walker*, 234 F.2d 910 (5th Cir. 1956) (emphasis added).[13]

The law on this point therefore is very clear. Notwithstanding that the taxpayer has not issued refunds or obtained consents, if the taxpayer shows it has borne the economic burden of the FET, it has standing to bring an action and to recover a refund under §6415.[14] Thus, under

---

[12] 357 F.2d 928 (1966).

[13] Note, this case involves the excise tax imposed on country club dues, section 4241 of the IRC. This section was subsequently repealed and is no longer referenced in the current version of Section 6415. This repeal has no impact on the import of the economic burden standard on standing in Section 6415 actions. "While precise form of this section [6415] differs from prior section, legislative history indicates that no substantive change in the law was intended." *DuPont Glore Forgan Inc. v. American Telephone & Telegraph Co.*, 428 F.Supp. 1297, 1304 (S.D.N.Y.1977), aff'd, 578 F.2d 1367 (2d Cir.), cert. denied, 439 U.S. 970 (1978).

[14] The cases discussed herein remain good law and are consistent with long-standing principles of equity and due process. The party that has borne the tax is one that should maintain the action for a refund. The goal of proof should be providing the court with a showing that "the money when refunded will go to the one who has borne the burden of the illegal tax, and therefore is entitled in justice and good conscience to such relief. This plainly is but another way of providing that the money shall go to the one who has been the actual sufferer and therefore is the real party in interest. [...] If the taxpayer has borne the burden of the tax, he readily can show it; and certainly there is nothing arbitrary in requiring that he make such a showing. If he has shifted the burden to the purchasers, they and not he have been the actual sufferers and are the real parties in interest..." and the party with standing to obtain the refund. *United States v. Jefferson Electric Co.*, 291 U.S. 386 (1934).

both §6402 and §6415, Locus is entitled to the refund of the FET it paid during the Claims Period.

### 4. BURDEN OF PROOF – ECONOMIC BURDEN

#### A. Preponderance of the Evidence

Locus' burden of proof is to show by a preponderance of the evidence that it absorbed the tax itself, meaning that it did not pass on the tax to its customers as part of its charges, and that it therefore bore the economic burden of the tax.[15]

#### B. Burden May Not Be "Impossible"

In judging whether the taxpayer has carried its burden of proof, a standard may not be used that is so exacting as to render impossible the ability to meet the burden. Were this not the rule, Constitutional issues would be raised. In *Anniston Mfg. v. U.S.*, 301 U.S. 337 (1937), it was acknowledged that the taxpayer paid the tax and had made a threshold showing that it had borne the burden of the tax.[16] The Supreme Court then considered whether the burden of the tax had been shifted to the taxpayer's customers. If the tax had been shifted, denying the refund would not be a denial of a constitutional right. *Id.* at 352; *see also, United States v. Jefferson Electric Mfg. Co.,* 291 U.S. 386 (1934). The central question was whether Congress had established that the degree of proof needed to show a right of recovery was so absolute and exacting, that denial

---

[15] *See Tenneco* at 350 (finding that neither the statute nor the "regulations prescribed by the Secretary" impose a burden beyond the traditional "preponderance of the evidence" standard.");[15] *Worthington,* 122 F. Supp at 846 (the traditional preponderance of the evidence standard of proof must be applied; *GorDag Indus., Inc. v. United States,* 63-2 U.S. Tax Cas (CHH), ¶ 15,532 at 90,565 (D. Minn. 1963) (same); *Anderson Co. v. United States*, 69-2 U.S. Tax Cas. (CCH) ¶ 15,902, at 86,209 (N.D. Inc. 1969), *aff'd* 447 F. 2d 41 (7th Cir. 1971)(same); *McCoy Mfg. & Sales Co. v. United States,* 68-2 U.S. Tax Cas. (CCH), ¶ 15,871, at 88,510 (S.D.Iowa 1968) (using the customary "preponderance of the evidence" standard to determine whether or not the Plaintiff bore the economic burden of the tax); *see also, B&M Co. v. United States*, 452 F.2d 986, 990 (5th Cir. 1971); *Norris Dispensers, Inc. v. United States,* 325 F.2d 140, 142 (8th Cir. 1963) (simply noting that the taxpayer has the burden of proving it bore the tax.).

[16] In this case, Locus has proved it paid the FET during the Claims Period.

was required when the specific circumstances of a taxpayer's operations made the burden one it could not possibly meet.

The Supreme Court ruled:

> When the Congress requires the claimant, who has paid the invalid tax, to show that he has not been reimbursed or has not shifted its burden, the provision should not be construed as demanding the performance of a task, if ultimately found to be inherently impossible, as a condition of relief to which the claimant would otherwise be entitled. There is ample room for the play of the statute within the range of possible determinations. Impossibility of proof may not be assumed. It cannot be doubted that the requirement has appropriate and valid effect in placing upon the claimant the duty to present fully all the facts pertaining to the question of the shifting of the burden of the tax and in denying relief where the facts justify a conclusion that the burden has been shifted from the claimant to others. *Id.* at 352.

The Court explained that "impossibility of proof" meant that if, after all the facts had been placed in the record, the proof they provided left the matter indeterminate, a taxpayer cannot be statutorily barred from prevailing.

As applied here, the Supreme Court's holding means Locus does not have to prove that no theoretical possibility exists that the FET it paid was not included in its charges, *i.e.*, the burden here is the preponderance of the evidence and not proof beyond a reasonable doubt. However articulated, it is clear that Congress cannot and did not intend to require a taxpayer to produce facts that leave no doubt that it did bear the economic burden of an improper tax or facts that remove every theoretical possibility that it did not bear the burden.

### C. Supporting Precedents Are Numerous and Supportive

Numerous decisions by this Court address the showings required to prove a taxpayer has borne the economic burden of a tax. In *Tenneco, Inc. v. United States,* 17 Cl. Ct. 345 (1989), *aff'd* 899 F.2d 1227 (Fed. Cir. 1990), this Court provided an analytical framework for the application of Section 6415's sister statute, Section 6416(a)(1), in excise tax refund cases.

In *Tenneco*, the plaintiff claimed an excise tax refund on manufactured replacement

motor parts and accessories. The taxpayer hadn't refunded the tax to its customers, nor had it obtained their consents for the taxpayer to claim the refund. The Court phrased the issue as follows:

> Based on these facts, this court must determine whether plaintiff included federal excise taxes in the price of manufactured replacement parts for which it claims a refund. In other words, this court must decide whether plaintiff bore the burden of the excise taxes or shifted that burden to its customers." *Id.* at 348.

The Court then focused on the taxpayer's method of setting prices. It held that the pricing methodology directly affected the nature of proof necessary to establish that the prices lacked an excise tax component. Two methods of setting prices were identified - (1) market or competitive pricing; or (2) cost-based pricing, *i.e.*, production costs plus a profit margin.

The Court next reviewed what must be examined when applying these methods. The Court observed that when a taxpayer uses cost-based pricing, the court must ascertain if excise taxes are one of the cost components of the final price. *See, e.g., Clauson Mfg. Co. v. United States,* 74-2 U.S. Tax Cas. (CCH) ¶ 16,153 at 85,901 (W.D. Ky. 1974). When a taxpayer uses competitive pricing, the court must ascertain if market prices include an excise tax component. *See e.g., Riviera,* 307 F. Supp. at 917-18; *GorDag,* 63-2 U.S. Tax Cas. (CHH) at 90,566.

> In simple terms, if the taxpayer bases prices on costs, did those costs include excise taxes? If the taxpayer bases prices on the market, did the market include excise taxes within its prices? Again, plaintiff has the burden of providing evidence to answer the question that applies to its pricing method. [And] when a [vendor] uses cost-based pricing, the court must ascertain if excise taxes are one of the cost components of the final price." *Tenneco,* 17 Cl. Ct. at 350, 352.

Locus' evidence shows that it uses a cost-based pricing methodology and that the FET was not a cost component of its pricing.

## 5. LOCUS BORE THE BURDEN OF THE FET

### A. The FET Was Not a Cost Component of Locus' Pricing

The pricing methodology Locus uses excludes FET as a cost component. Locus' charges (prices) for its services are based solely on its direct operating costs, the largest of which are its network costs, *i.e.*, wholesale carrier charges and local loop charges, plus general and administrative overhead but no taxes. Lee Aff. at ¶¶ 19-37, 47-48 (supported and affirmed by the Affidavit of Locus' Vice-President of Sales, Mr. Jae Hong Choi and by the Affidavit of Locus' President and CEO, Mr. Jason Chon); TABS 3A, 3B and 3C.

At one or more times a year, determinations are made about what wholesale services are to be purchased from which suppliers for particular markets and/or destinations. *See* Lee Aff. at ¶ 23. The dominant factor in setting its prices is the network costs. Pricing is driven by Locus' customers' demand for specific call destinations (country or global area) that in turn depends on the network costs to transport the calls to such destinations. *Id.* at ¶ 24. Locus's Financial Statements prepared by its independent Auditor, KPMG LLC, New York, New York, attest to the fact that Locus used the cost-based methodology at all times during the Claims Period. *Id.* at ¶¶ 38-39, *see* TAB 2H-3; TAB 2H-6. In its audit of Taxpayer's 2004 Financial Statements, KPMG opined –

> Cost of telecommunications services represents direct charges from vendors that the Company incurs to deliver service to its customers. These primarily consist of rate-per-minute charges from other carriers that carry traffic on behalf of the Company. *KPMG Audited Financial Statements 2004*, at 8 (TAB2H-5) and see, *KPMG Review of Financial Statements 2003* at 7 (TAB 2H-4), *KPMG Review of Financial Statements 2002-2001* at 7 (TAB 2H-3), and *KPMG Audited Financial Statements 2005 and 2004*, at 8 (TAB2H-6).

### B. Locus' Consistent Business Practices and Course of Dealings on the FET

Locus' cost-based pricing methodology arises from its established corporate policy not to pass through the FET to its customers. That Locus followed this policy is shown by numerous different, but related, facts as summarized here.

(1) Locus assumed the burden for all taxes by providing tax exemption certificates to its wholesale providers. Lee Aff. at ¶ 42; TAB 2A-2; TAB 2B-1; TAB 2G-1, 2.

(2) Locus filed all the IRS 720 Forms for each calendar quarter for the entire Claims Period and its accounting records show that it paid the tax due for each quarter. *Id.* at ¶ 43; TAB 2F-1.

(3) Locus' invoices do not contain a line item for the FET or any taxes. *Id.* at ¶ 58.

(4) There is no evidence of any kind that Locus' Distributors filed any 720 Forms or have any accounting records of payments of the FET to the IRS during the Claims Period. *Id.* at ¶¶ 98-99.

(5) Locus does not have any tax exemption certificates from its Distributors because they were not asked to furnish and did not furnish such exemption certificates. *Id.* at ¶¶ 57, 90.

(6) Locus' Distributors were not requested to furnish and did not furnish tax exemption certificates because Locus' contracts with them expressly imposed the obligation on them to pay any taxes applicable to their purchases of Locus' service to the proper taxing authority. *Id.* at ¶¶ 56-57; TAB 2C-2.

(7) Locus' cost of goods sold does not include any taxes as is shown by its listing taxes it paid as an expense on line 17 and Schedule 2s on its 1120 Tax Returns for each of the years in the Claims Period. *Id.* at ¶ 64.

(8) In Locus' outside accounting firm's annual audits listing the elements of its costs to provide its services, no taxes are listed or mentioned. *Id.* at ¶¶ 39-40.

(9) Locus' pricing methodology shows that there is no room for the excise tax to be included as a cost component. *Id.* at ¶¶ 25-37.

(10) Locus' Form 499 for 2006 reporting gross revenues for 2005 reported gross

revenues nearly identical to the gross revenues reported by Locus on its 1120 tax returns for 2005. *Id.* at ¶ 166.

(11) The FCC Form 499 Instructions for reporting gross revenues require that all taxes be excluded from the amount reported. *Id.* at ¶¶ 131; TAB 1C, pg. 18.

(12) The difference in the amount of gross revenues reported by Locus on its 1120 tax returns for 2005 and the amount of the gross revenues reported by Locus to the FCC on FCC Form 499 for the same year shows that it is much smaller than 3%. *Id.* at ¶ 157.

(13) If Locus had included the FET in the charges for its services, the amount of the gross revenues reported on its 1120 tax return for 2005 would be 3% higher than the amount of revenues Locus reported on its FCC Form 499 for that year. *Id.* at ¶¶ 152-153.

(14) The reasons for the small difference between the gross revenues reported on the tax return and the FCC Form 499 are shown to arise from accounting practices having no relationship to Locus' handling of the FET in connection with its services. *Id.* at ¶¶ 158-164.

(15) As part of its collection of evidence to prove it did not pass on the FET to its customers, Locus obtained the tax returns of two of its large distributor customers as proof that they did not pay the FET. *Id.* at ¶¶ 98-99.

(16) As part of its collection of evidence to prove it did not pass on the FET to its customers, Locus obtained the consents of its distributors that Locus receive the refunds knowing they had not been charged and did not pay Locus the FET on the services they purchased from Locus. *Id.* at ¶¶ 92-97.

(17) At all times relevant hereto, Locus believed and acted as though it was the

responsible entity for the payment of the § 4251 excise tax.[17] Chon Aff. at ¶ 30.

These facts are uncontroverted. No evidence exists or can be produced showing the contrary.

### C. FCC Filings And Tax Returns Corroborate Locus Paid FET

Importantly, corroboration that Locus did not pass on the FET is provided by Locus' officially filed 2006 FCC Form 499-A report ("Locus' 499"). Locus' 499-report identifies Locus' total revenues for 2005. TAB 2I-1. Pursuant to the Instructions for completing the FCC Form 499-A, all gross revenues are to be reported on line 416 of the form. The instructions to the FCC Form 499 explicitly provide:

> Gross revenues also should include any surcharges on telecommunications services that are billed to the customer and either retained by the filer or remitted to a non-government third party under contract. **Gross revenues should exclude taxes** and any surcharges that are not recorded on the company books as revenues but which instead are remitted to government bodies. *Id.,* Instructions at p. 18 (Emphasis added).

Further, a comparison of Locus' gross sales revenues reported on line 1 of its 1120 Form for 2005 with its gross revenues reported on its FCC Form 499-A for 2005 confirms that Locus' gross revenues did not and could not include the 3% FET. TAB 2I-1; TAB 2I-4; *generally,* Lee Aff. at ¶¶ 137-166.

The courts have recognized that one starting point in an economic burden analysis is the taxpayer's gross revenues. For instance, in the *B&M Company v. United States*[18] case, the court's decision contained the following analysis:

---

[17] There is widespread acceptance that organizations typically operate in a repetitive manner. As a result, there is some assurance of the reliability of organization routine as proof that a particular act was performed in a given instance because responsible people perform their tasks in a consistent manner. Hence organization routine may be shown as proof of conduct under Federal Rule of Evidence 406. Further, this evidence alone should suffice to show no-passing-on. *Tenneco; F & D Trading Corp., supra.*

[18] 452 F.2d 986, 989 (5th Cir. 1972).

John Watkins, a member of the American Institute of Certified Public Accountants and the Mississippi Society of Certified Public Accountants, testified that he examined the Taxpayer's records for the period in question to determine the manner in which the excise tax was computed. This tax account is classified as "other expenses" on the account chart and in the general ledger of the corporation... It was his conclusion that the excise tax had not been passed on to the customers. It was significant to him in reaching this conclusion that the excise tax was not shown on the invoices and that the records of the corporation reflected no accounts for excise tax liability. If the tax had been passed on to the customer it would have been included in the sales price. In preparing Taxpayer's federal income tax returns … Watkins said that he considered the excise tax to be a tax borne by Taxpayer. When asked what he believed would have been the proper accounting method if he had considered the excise tax to have been collected from Taxpayer's customers, he said:

> If it had been included in the invoice separately stated thereon, and if the liability account had been established at the time the entries were recorded, then it would not appear at all on the income statement of the corporation. <u>If it is considered as being passed on, then, in my opinion, the proper classification would be to deduct it from the gross sales of the corporation in arriving at net sales.</u> *Id.* (Emphasis added).

Locus' IRS 1120 Tax Return form for 2005 shows gross revenues of $278,715,333. Lee Aff. at ¶ 139; TAB 2I-4. The FCC 2006 499-A, line 416 reports grossed billed revenues from all sources for 2005 as $278,567,482. TAB 2I-1. The difference is $157,851. *Id.*; TAB 2I-4. Line 421 of the 2006 FCC Form 499-A shows the bad debt/uncollectible revenues as being $12,292. TAB 2I-2. Adding this 'bad debt' amount of $12, 292 to the $157,851 difference makes the difference $170,143. *Id.*; Lee Aff. at ¶¶ 142-143.

In 2004, total FET payments equaled $5,988,079, a quarterly average of $1,497,020 and a monthly average of $499,007. Lee Aff. at ¶ 144. In Q1 for 2005, total FET payments equaled $2,308,333, a monthly average of $769,444. *Id.* at ¶ 145. For the first month of Q2 for 2005 (April), the total FET paid was $469,000. *Id.* at ¶ 146. It is clear that the differences between the total gross revenues as reported for 2005 on the 1120 and the grossed billed revenues reported on the FCC Form 499-A of $157,581 cannot result from deducting FET from the revenues reported to the FCC. *Id.* at ¶ 147. The amount of $157,581 is the correct amount for

comparison because it is known that the higher figure of $170,143 results from bad debt. *Id.* at ¶ 148.

The $157,851 represents only 34% of the FET paid for April for Q2 2005. *Id.* at ¶ 149. The $157,851 represents less than 21% of the monthly FET paid for Q1 2005. *Id.* at ¶ 150. The $157,851 represents less than 32% of the average monthly FET paid for all of 2004. *Id.* at ¶ 151. Stated another way, had Locus excluded the FET paid from the revenues it reported on its FCC Form 499-A for 2005, its gross revenues from all sources would be $275,790,149. *Id.* at ¶ 152. It is therefore impossible for the difference between the gross revenues reported on the 1120 and the FCC Form 499-A to be attributed to the FET. *Id.* at ¶ 153.

In addition, however, it can be shown that the inconsequential difference is due to the accounting and filing practices that were followed at the time. First, for 2005, the audit papers of Locus' outside accounting firm, KPMG, recorded gross revenues of (rounding off) $278,715,000. *Id.* at ¶ 155. Indeed, Locus' 1120 Tax Return for 2005, prepared by KPMG, listed the same gross revenue amount of $278,715,000 and Locus' 2006 FCC Form 499-A - reporting 2005 revenues - reported gross revenues of $278,546,000, only a .06% (.0006) difference. *Id.* at ¶¶ 156-157; TAB 21-4; TAB 21-1. The miniscule difference is explained by two main factors. One is the timing of the various filings and the other is accounting practice. Lee Aff. at ¶ 158.

First, on the timing: the due date for the tax return is March 15, 2005. *Id.* at ¶ 159. Locus, however, obtained an extension to file until September 15, 2005, in order to start its annual audit that is routinely commenced in either April or May. *Id.* The FCC Form 499-A filing is due by April of each year. *Id.* at ¶ 160. Therefore, the order of work in 2005 was 1st the 499-A, 2nd the annual audit and 3rd the 2005 tax return with the filing extension. *Id.* at ¶ 161.

Had Locus not obtained the extension on its tax return filing, the order of work would have been 1st the 1120 for 2005, 2nd that 499-A and 3rd the annual audit. *Id.* at ¶ 162. The timing and order in which these reports/filings are addressed and completed affects the final gross revenue figures each contains due to such normal variances in reported amounts caused by the amounts of sales returns and other adjustments that exist as of the time the particular report is being completed. *Id.* at ¶ 163.

Another reason for the small difference arises from accounting treatments for such matters as the valuation of inventory and investment, revenue recognition associated with the natures of different products, decisions on when to cutoff further recognition of revenues, accounting for stock compensation expenses, etc. *Id.* at ¶ 164. By way of further illustration, if the FCC's 2006 499-A report on 2005 revenues were filed after the annual audit statement, total revenue would be the same in all three reports. But even filed before the audit is complete, there is only a 0.06% deviation that is not relevant to the FET issue. *Id.* at ¶ 165. Therefore, because the total revenue reported on the 2006 FCC Form 499-A reporting 2005 revenues is nearly identical with the gross revenues reported on Locus' 2005 1120 filing and in the annual audit for 2005, it is clear that Locus did not recover and could not have recovered the FET as part of its charges. *Id.* at ¶ 166.

### 6. ADDITIONAL PROOFS OF ECONOMIC BURDEN

The *Tenneco* decision set forth other factors pertinent to the consideration of whether a taxpayer's prices -- of necessity -- included an excise tax: 1. The correlation between price changes and application of the tax; 2. Refunding the tax to exempt purchasers; 3. Reference to taxes in invoices or sales literature; 4. The existence of negotiated contracts including excise taxes; 5. The methods of accounting for the tax; 6. Who is the "taxpayer?"; and 7. The

correlation between prices for taxable domestic sales and exempt foreign sales.[19]

**A. Locus' Pricing Methodology Never Changed**

Locus used the same cost-based pricing during the entire Claims Period and continues to use that methodology today. Lee Aff. at ¶ 60. Locus' methodology never included the FET. *Id.* at ¶ 61. Further, after the FET was declared to have been invalidly applied to Locus' services, Locus did not change its pricing methodology nor its prices relative to its costs. *Id.* at ¶ 62.

The Fifth Circuit has held that "[a] failure to increase prices following the imposition of an assessment for excise tax is a factor to be considered in determining whether taxpayer has satisfied the requirement of the statute allowing refunds." *B&M Co. v. U.S.* 452 F.2d at 988 n.3 (citations omitted). The fact that there is no correlation between changes in Locus' prices and the application of the tax also supports the conclusion that Locus never passed-on the economic burden of the FET. See *F & D Trading Corp. v. United States, supra.*

**B. Locus Made No Rebates**

Another factor the "[c]ourts have considered [was] a taxpayer's willingness to rebate that portion of its sales price attributable to excise taxes as a factor possibly indicating that the price included a tax component, ..." and that a taxpayer's "practice of granting rebates tends to show that it believed its prices included excise taxes." *Tenneco*, 17 Cl. Ct. at 352-53; *see also Vogel v. Knox,* 147 F. Supp. 10 (D. Minn. 1957). Locus has made no FET rebates to its distributors. Lee Aff. at ¶ 106. To do so would contradict its own Distributor contracts that imposed the duty on them to pay any tax applicable to their purchase of Locus' services directly to the proper taxing authority; and Locus' consistent business practice and course of dealings that Locus assumed the obligation for the tax and paid it out of its own pocket. *Id.* at ¶ 107.

---

[19] This factor is not relevant and is not addressed herein.

### C. Invoices and Other Company Literature Contain No FET or Other Taxes

In *Tenneco,* plaintiff's price lists, sales literature, and invoices referenced the inclusion of excise taxes. *See Tenneco* at 353. Locus' invoices, contain no line item for federal, state sales or excise taxes. TAB 2D-1; Lee Aff. at ¶ 58; Choi Aff. at ¶ 8. Locus' invoices to its distributors contain only charges for its services. Lee Aff. at ¶¶ 19-24. Additionally, Locus' sales literature, instructions and other company literature contain no references to the FET. TAB 2E-1; TAB 2E-2.

### D. Locus' Contracts Are Evidence That Locus Bore the FET Burden

As shown above, Locus' contracts with its facilities-based carriers show that the burden of paying taxes and surcharges associated with the wholesale communications capacity provided is imposed on Locus. *See supra*, *generally,* Park Aff. at ¶¶ 5 –16. Locus' contracts with its distributors of its prepaid phone cards imposed no contractual obligation on them to pay any taxes to Locus. TAB 2C; Lee Aff. at ¶¶ 56. Rather, the distributor customers were obligated to pay any taxes to the taxing authority that levied the tax. TAB 2C-2; Lee Aff. at ¶ 57. Of course, the FET was not levied on the distributors by any taxing authority, thus, they didn't pay the FET. The corporate tax returns of Locus' distributors further support that the terms of the parties' contracts were adhered to.[20] Lee Aff. at ¶ 100, TAB 2D-5.

### E. Locus' Accounting Shows It Bore the FET Burden

The *Tenneco* decision recognized that "[s]ome courts have given weight to the taxpayer's

---

[20] In sharp contrast, in *Tenneco,* the taxpayer entered into sales contracts that dictated the federal excise tax consequences of the bargain. In particular, the Tenneco contracts state that the price included excise tax where applicable. "Because contained in a contractual agreement, rather than merely price lists or sales literature, the statement including excise taxes in the price has significant weight." *Tenneco* at 353, *citing, Commissioner v. Danielson,* 378 F.2d 771, 775 (3d Cir. 1967); *see also, Proulx v. United States,* 594 F.2d 832, 836, 219 Ct. Cl. 363, 371-72 (1979).

method of accounting, *see, e.g., T.S. & M. Co. v. United States,* 75-1 U.S. Tax Cas. (CCH) ¶ 16,175, at 87,498 (E.D.N.Y.1974); *F&D Trading,* 580 F.2d at 421-22; others have given it little weight. *Anderson,* 69-2 U.S. Tax Cas. (CCH) at 86,210." *Tenneco* at 353. However, the *Tenneco* court found persuasive that:

> Because the Claims Court's predecessor gave weight to this argument, *F&D Trading,* 580 F.2d at 421-22, this court appropriately considers this among other factors. The Court of Claims stated 'Neither F & D nor Great Empire ever collected any dollars that were identified in any way as manufacturer's excise tax, nor did they keep any account of manufacturer's excise tax liability on their books.' 580 F.2d at 421. The taxpayer in *F & D Trading* was a small business which negotiated each sale one at a time. After the sale, the company would multiply its gross sales by the tax rate to compute its liability. Thus, the tax became a cost element in each transaction. The Court of Claims concluded that the taxpayer in *F & D Trading* absorbed the tax liability as a cost of doing business. *Tenneco* at 353.

Locus' accounting records prove it did not pass on the FET. Locus accounted for the FET by simply multiplying its sales by the FET 3% levy and reporting this figure on its corporate tax returns for the Claims Period. *See* TABs 2G-1 through 2G-7. Locus then paid the FET each calendar quarter throughout the Claims Period. *See* TABs 2F-1 through 2F-3.

Locus' accounting for its payment of the FET as part of its corporate overhead is clearly shown by its audited financial statements. *See e.g., KPMG Audited Financial Statements 2004* at 2 (Balance Sheet) listing "Sales and excise taxes payable" under "Liabilities and Stockholders Equity," and at 5 (Statement of Cash Flow) listing "Sales and excise taxes payable" under "Changes in operating assets and liabilities"; Lee Aff. at ¶ 50; TABS 2H-1, 2H-2 and 2H-5. Importantly, Locus' accounting treatment for its payment of the FET was reviewed and audited and found to be consistent with good accounting practice by Locus' Auditor. For example, in the July 11, 2006, "Independent Auditor's Report" of KPMG, it is reported –

> In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Locus Telecommunications, Inc. and

subsidiaries as of December 31, 2004, and the results of their operations and their cash flows for the year then ended in conformity with accounting principles generally accepted in the United States of America. *See* TAB 2H-5.[21]

**F. Taxpayer's Profitability Irrelevant**

It was recognized in *Tenneco* that a profitability "...factor is probably the least important in showing tax absorption or shifting." *Tenneco,* at 354. This is because a profit does not imply a pass-through. *See Holmes Limestone Co. v. United States,* 946 F. Supp. 1310 (N.D. Ohio 1998). In *Holmes,* the court -

> Decline[d] the Government's invitation to interpret Section 6416 as a directive that any company which profits has necessarily passed through its excise costs to its customers ... (limiting refunds to businesses which suffer losses unreasonably extends the statute's provisions by implication). Rather, a plaintiff's profits are but one factor to be considered in determining whether the excise tax was included in the price at which they sold their product. *Id.* at 1315 (citations omitted).

This echoes the sentiment of the court in *B&M Co. v. United States,* where it intuitively explains the fallacy underlying the trial court's inference that a profitable enterprise must be found to have passed on the excise tax:

> [T]he Court failed to take into consideration the uncontradicted evidence showing that there was sufficient gross profit realized from the sale of the jointed fishing poles as well as from other nontaxable merchandise, to take care of all expenses including excise taxes, without the necessity of Taxpayer passing on the tax burden to its customers. We disagree with the Trial Court's inference for its import is that any taxpayer conducting a profitable business is

---

[21] The court's decision found:

> If the tax had been passed on to the customer it would have been included in the sales price. In preparing Taxpayer's federal income tax returns for the period in question, Watkins said that he considered the excise tax to be a tax borne by Taxpayer. When asked what he believed would have been the proper accounting method if he had considered the excise tax to have been collected from Taxpayer's customers, he said: If it had been included in the invoice separately stated thereon, and if the liability account had been established at the time the entries were recorded, then it would not appear at all on the income statement of the corporation. If it is considered as being passed on, then, in my opinion, the proper classification would be to deduct it from the gross sales of the corporation in arriving at net sales. *See B&M Company* discussed at pp 19-20, *supra*.

> deemed to have passed on the economic burden of the excise tax to its customers. If this were so, the statute providing for refunds for overpayment of excise taxes could be successfully invoked only by taxpayers suffering a loss in such business. Such an interpretation of the statute unreasonably extends its provisions by implication.

*B&M*, 452 F.2d at 990. Therefore, the fact that Locus has sustained a profit over the years has no bearing on the fact that Locus bore the economic burden of the tax.

### G. The IRS Recognized Locus as the "Taxpayer"

Additional support is found from the fact that the IRS itself has recognized Locus as the taxpayer. The IRS audited Locus' corporate tax return in 2000. Lee Aff. at ¶ 63. In its return for 2000, consistent with its accounting practices listed the FET and other taxes as expenses on line 17 of its 1120 form. *Id.* at ¶ 64. The IRS did not question Locus' reporting the FET along with other taxes on line 17 at any time during the audit and upon its conclusion did not require any change in the manner in which Locus reported its FET as an expense on line 17 of its 1120 form. *Id.* at ¶ 65.

By reporting its FET on line 17 of its 1120 form, <u>the FET was not and could not be included in Locus' cost of goods sold</u> ("COGS") as reported on line 2 of its 1120 form. *Id.* at ¶ 66. Locus reported the FET on line 17 as an expense that it bore. *Id.* at ¶ 67. Such reporting indicates that Locus did not recover the FET by passing it on to its customers in its COGS. *Id.* Locus consistently reported its FET on line 17 of the 1120 returns for all the years of the Claims Period 2001-2005. *Id.* at ¶ 68.

The IRS audit and its results were understood by Locus to mean that the IRS recognized Locus as the taxpayer of the FET, as would be true in regard to the other taxes Locus paid. *Id.* at ¶ 68. Locus' understanding that the IRS recognized Locus as the taxpayer is strengthened by the fact that the IRS refunded certain FET payments made by Locus directly to Locus. *Id.* at ¶ 70. Locus' understanding that the IRS regarded it as the taxpayer is further strengthened by the fact

that the IRS made these refunds without requiring a showing that Locus had refunded the FET to its customers or obtained their consents warranting the conclusion that the IRS accepted Locus as the taxpayer. *Id.* at ¶ 71. Locus' understanding therefore was correct.

At the bottom of the IRS notice of the refund the IRS identifies its intercept program. Under this program any validly established tax refunds are to be offset by other debts owing by the taxpayer to the U.S. Government. *Id.* at ¶ 72. No offset was required in Locus' case because Locus did not, at the time of the refund, have any outstanding debts owing to the U.S. Government. *Id.* at ¶ 73. The IRS had no authority to offset Locus' FET refunds against other debts it owed to the U.S. Government, unless, the IRS recognized Locus as the taxpayer of the FET. *Id.* at ¶ 74. The IRS had no authority to use tax refunds due one taxpayer to offset other debts owed the U.S. Government by another taxpayer. *Id.* at ¶ 75. The IRS had no authority to offset Locus' other debts to the U.S. Government by using the FET refunds if the IRS did not recognize Locus as the FET taxpayer. *Id.* at ¶ 76.

### H. Locus Bore the Economic Burden on End User Recharges

End users, the members of the public purchase the Cards from Locus' Distributors, either directly, through various retail outlets or other vendors. When a Card expires or is exhausted, some end users recharge them, *i.e.*, the user calls into Locus' customer service and refreshes the Card to obtain new calling capacity. When the Cards are recharged, Locus charges the end user the amount only for the amount of services provided, no taxes of any kind.

Unlike its dealings with Distributors that account for the vast majority of its sales (up to 97%), there are no contracts or other documentary evidence that Locus did not pass on the FET to these recharge customers. The proof that Locus did not do so arises however by operation of

law. Locus is a regulated carrier subject to the Communications Act of 1934, 47 U.S.C. §151 *et seq.*, as amended (1996) ("Act") and the regulations of the FCC.

Section 202(a) provides:

> It shall be unlawful for any common carrier to make any unjust or unreasonable discrimination in charges, practices, classifications, regulations, facilities, or services for or in connection with like communication service, directly or indirectly, by any means or device, or to make or give any undue or unreasonable preference or advantage to any particular person, class of persons, or locality or to subject any particular person, class of persons, or locality to any undue or unreasonable prejudice or disadvantage. 47 U.S.C. §202(a).

Section 202(c) provides:

> Any carrier who knowingly violates the provisions of this section shall forfeit to the United States the sum of $6,000 for each such offense and $300 for each and every day of the continuance of such offense. 47 U.S.C. § 202(c).

Had Locus included the FET in the charges to recharge end users' Cards, while not doing so for its Distributors, it would have violated Section 202(a) and become liable to the forfeiture provisions of Section 202(c). Lee Aff. at ¶¶ 100-105; Choi Aff. at ¶¶ 20-21.

In addition, each end user would have the right to file a complaint either with the FCC for damages sustained as a result of such violation against Locus under Section 208 of the Act or in Federal court under Section 207 of the Act. In addition, Section 206 of the Act provides:

> In case any common carrier shall do, or cause or permit to be done, any act, matter, or thing in this Act prohibited or declared to be unlawful, or shall omit to do any act, matter or thing in this Act required to be done, such common carrier shall be liable to the person or persons injured thereby for the full amount of damages sustained in consequence of any such violation of the provisions of this Act, together with a reasonable counsel or attorney's fee, to be fixed by the court in every case of recovery, which attorney's fee shall be taxed and collected as part of the costs in the case.

Locus would risk such liability, subject itself to complaints before its regulatory agency, the FCC, or in federal court for individual suits or class actions by including the FET in the recharge prices for end users and it did not do so. Lee Aff. at ¶¶ 103-104; Choi Aff. at ¶¶ 20-24. Locus is

entitled to the presumption that it conducted its legitimate business activities in compliance with applicable laws. In fact, it did so warranting the finding that Locus also bore the economic burden of the FET on its sales to recharge customers.

### 7. TO LOCUS' KNOWLEDGE NO EVIDENCE EXISTS THAT CONTRADICTS LOCUS' EVIDENCE

To the best of Locus' knowledge, there is no evidence that exists or can be introduced that affirmatively shows that Locus charged any tax to its customers. *See United States v. Jefferson Elec. Mfg. Co.*, 291 U.S. 386 (1934). Instead, what the sworn testimony and documentary evidence affirmatively show is that Locus neither invoiced, nor passed on the amount of tax to its customers. *See F & D Trading Corp. v. United States*, 580 F.2d 414, 217 Ct. Cl. 472 (1978). *See also, C.B. Cones & Son Mfg. Co. v. U.S.*, 123 F.2d 530 (7th Cir. 1941) ("*Cones").* In *C.B. Cones*, the following factors were conclusive in proving that the taxpayer had borne the burden of the tax and not passed it on to its customers:

> The taxpayer in *Cones* provided testimony of its General Manager who "testified unequivocally that no part of this [excise tax] was passed on to its vendees." Exhibits provided corroborated this testimony. Locus has provided sworn testimony of its officers and managers backed by copious documentation.
>
> In *Cones*, that the taxpayer had no records that directly traced the cost of the raw materials used to manufacture the end product on which the taxpayer established its selling price the court was not relevant. Here, Locus has shown that its costs incurred to supply its services to its customers were exclusive of the FET.
>
> In *Cones*, that from an accounting standpoint it was impossible to trace the material from its raw form into the finished product and that a system by which such proof might have been obtained was prohibitively expensive the court found were not relevant in deciding whether the taxpayer could prove it carried the tax burden. Here, Locus' accounting treatment and records demonstrate without doubt that it carried the burden as a corporate expense that it paid for directly.
>
> In *Cones,* that the taxpayer had provided the government with access to its records, correspondence and files and cooperated in every way with the government was viewed by the Court to support the taxpayer's right to the refund of the taxes paid. Here, Locus has provided its records and access to them

The decisive factors underscored in the quotes from *Cones* parallel the proofs submitted by Locus.

## IV. CONCLUSION

The documentation and sworn statements of the officers and managers of the Locus are convincing evidence that Locus bore the economic burden of the FET and did not pass that burden on to its customers. Indeed, a taxpayer may not be denied a refund even in situations in which it may appear to be impossible to prove that it bore the economic burden without risking violation of the taxpayer's constitutional right to due process. Here, Locus has unquestionably established its rights by the factual evidence it has submitted. As a result, Locus is entitled to a refund for the tax paid during the Claims Period.

Respectfully submitted,
Locus Telecommunications, Inc.

By ______________________
Charles H. Helein
Its Counsel

Helein & Marashlian, LLC
1483 Chain Bridge Road, Suite 301
McLean, VA 22102-5703
703-714-1301
703-714-1330
chh@commlawgroup.com