# TAB 2

## PROOF SUPPORTING LOCUS' ASSUMPTION OF THE TAX LIABILITY

A WHOLESALE SUPPLIER CONTRACTS
- A-1 List of carriers that Locus contracted with during the Claims Period
- A-2 Sample copy of supplier contract with MCI
- A-3 Memorandum summarizing supplier contract provisions imposing tax obligations on Locus

B TAX EXEMPTION CERTIFICATES
- B-1 Tax Exemption Certificates
- B-2 Sample carrier invoices showing Locus was not invoiced for any taxes

C CUSTOMER (DISTRIBUTOR) CONTRACT
- C-1 Locus' contracts with its Distributor customers
- C-2 Memorandum summarizing the contractual provisions on Locus' Distributors for taxes and that contracts do not require Distributors to furnish tax exemption certificates

D LOCUS' CUSTOMER (DISTRIBUTOR) INVOICES
- D-1 Locus' invoices to its Distributor customer
- D-2 Distributor tax returns showing they did not report any
- D-3 Distributor Customer Consents
- D-4 Letter to Distributors informing them that Locus filed claims to recover the FET it paid

E LOCUS' CUSTOMER (END USER) DOCUMENTS
- E-1 Sample Locus ads
- E-2 Photos of sample prepaid cards

F LOCUS' RECORDS OF TAX PAYMENTS
- F-1 IRS Forms 720 prepared and filed by Locus
- F-2 Locus' records showing its payments of the FET to the IRS
- F-3 Examples of Locus and IRS records showing routine processing of Locus' FET filing and payments and IRS issuance of credits for overpayments

G LOCUS CORPORATE TAX RETURNS
- G-1 Locus' 1120 Return for 2001 and Statement 2, line 17 itemizing its tax payments expressly listing the FET.
- G-2 Locus' 1120 Original Return for 2002 and Statement 2, line 17 itemizing its tax payments expressly listing the FET.
- G-3 Locus' 1120 Amended Return for 2002 and Statement 2, line 17 itemizing its tax payments expressly listing the FET.

G-4 Locus' 1120 Original Return for 2003 and Statement 2, line 17 itemizing its tax payments expressly listing the FET.
G-5 Locus' 1120 Amended Return for 2003 and Statement 2, line 17 itemizing its tax payments expressly listing the FET.
G-6 Locus' 1120 Return for 2004 and Statement 2, line 17 itemizing its tax payments expressly listing the FET.
G-7 Locus' 1120 Return for 2005 and Statement 4, line 17 itemizing its tax payments expressly listing the FET.

H LOCUS ACCOUNTING RECORDS
H-1 Representative General Ledger Entries (10/04) and Payment Voucher recording FET as Locus corporate overhead and showing approval for and payment of FET by Locus
H-2 Representative General Ledger Entries (11/04) and Payment Voucher recording FET as Locus corporate overhead and showing Locus approval for and payment of FET by Locus
H-3 KPMG Auditor's Review of Financial Statements 2001 and 2002
H-4 KPMG Auditor's Restated Review of Financial Statements 2003 making the Financial Statements for 2001 and 2002 obsolete and inoperative
H-5 KPMG Auditor's audited Financial Statements 2004
H-6 KPMG Auditor's audited Financial Statements 2004 and 2005

# A

# A-1

**Supplemental Information**
**Locus Telecommunications, Inc. v. United States**

**List of Underlying Carriers 2001-2005**

Attached hereto is a list of all carriers Locust Telecommunications, Inc. ("Taxpayer") has used from 2001-2005, covering therefore all tax periods at issue.

Please note that more than 80% of Taxpayer's purchases of wholesale services was made with 20 carriers and 95% with 40 carriers

The purpose of this information is to show that in all cases, all carriers that required tax-exempt certificates were provided with them. Foreign carriers would not of course require such certificates.

Transactions with these carriers as reflected in the list are based on year end (December) in each year. For example, transactions shown in 2004, but not 2005, see Fusion Telecommunications, International, Inc. (41st carrier listed), indicates that there were transactions in December 2004 and may have been some in 2005, but these did not continue through December 2005. Only call traffic as of December of each year was checked because the purpose of this list is simply to provide complete information on all wholesale carriers used and that in cases of U.S. carriers, tax exemption certificates were provided to each.

Contracts with these carriers, as well as their invoices showing no charges for FET is contained in a CD. This Cd will be submitted if requested. In the meantime, representative contracts are attached and representative invoices may be found at TAB 2B-2.

| | CODE | CARRIER NAME | BUSINESS 2001 | 2002 | 2003 | 2004 | 2005 | CONTRACT | INVOICE | To Locus Resale Certificate | To Locus FET Exemption | By Locus Resale Certificate | By Locus FET Exemption |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | MCI | MCI Worldcom Communicatins, Inc. | X | X | X | X | X | A | A | | | | |
| 2 | PRO | Operadora Protel, S.A. De C.V. (Latino) | X | X | X | X | X | A | A | | | | |
| 3 | BAS | iBasis Global, Inc. | X | X | X | X | X | A | A | | | | |
| 4 | PRI | Primus Telecommunications, Inc. | X | X | X | X | X | A | A | | | A | A |
| 5 | NVL | Novolink Communications, Inc | X | X | X | X | X | A | A | | | A | A |
| 6 | SAL | El Salvador Telecom S. A. de C.V. | | | X | X | X | A | A | | | | |
| 7 | LNO | Latin Node, Inc. | | | | X | X | A | A | | | | |
| 8 | QWE | Qwest Communication Corporation | X | X | | X | X | A | A | | | | |
| 9 | BRD | Broadwing Communications Services Inc. | X | X | X | | | A | | | | | |
| 10 | SNR | Sonera Corportaion U.S. | X | X | | | | A | A | A | | A | A |
| 11 | IXC | ITXC.Net Services | | | X | X | X | A | A | | | | A |
| 12 | TGB | Teleglobe USA Inc. | | | | X | X | A | A | | | | |
| 13 | IDT | IDT Domestic Telecom, Inc. | X | X | X | X | X | A | A | | | | |
| 14 | ITA | Telecom Italia Sparkle of North America, Inc. | | X | X | X | | A | A | | A | | |
| 15 | GLX | Global Crossing Bandwidth, INC | X | X | X | X | X | A | A | | A | | |
| 16 | ATL | Atlas Communications, LTD. | X | | | | X | A | | | | | |
| 17 | NZL | Telecom New Zealand USA Limited | X | X | X | X | X | A | A | | | | |
| 18 | DYN | Dynalink Telecom, Inc. | X | | | | | A | | | | | |
| 19 | NOV | NovaTel Ltd. | | | X | X | X | A | A | | | A | A |
| 20 | BST | Bestel | | | X | X | X | | A | A | A | A | A |
| 21 | WAV | WaveCrest Communications LLC | | | X | X | X | A | A | | A | | |
| 22 | GEO | Geotel International, LLC | | | | X | X | A | A | | | | |
| 23 | TC2 | TouchTone Communications of NJ, Inc. | | X | X | | | A | | | | | |
| 24 | STT | Startec Global Communictions Corporation | X | X | X | X | X | A | A | | | | |
| 25 | DCM | Dacom America Inc. | X | X | X | X | | A | | | | | |
| 26 | FVL | Forval International Telecom, Inc. | X | X | X | X | X | A | A | | | | |
| 27 | TCT | TouchTone Communications of NJ, Inc. | X | X | | X | X | A | A | A | A | A | A |
| 28 | SWC | Swisscom North America, Inc. | | X | X | X | | A | A | | | A | A |
| 29 | PDT | Phillippine Long distance Telephone Co. | | X | X | | | A | A | | | | |
| 30 | SYM | Symphony | | | | X | X | | A | | | | |
| 31 | PGT | Progressive Telecom Inc. | | X | | | | A | | | | | |
| 32 | EDC | Edco/USA LLC | X | | | | | A | | | | | |
| 33 | ATT | AT&T Corp | | | | X | X | A | | | | | |
| 34 | ONE | ONSEnet America, Inc. | | X | X | X | X | A | A | | A | A | A |
| 35 | SPR | Sprint Communications Company L.P | | | | X | X | A | A | | | | |
| 36 | SNG | Singapore Telecom USA, Inc. | | X | X | X | X | A | A | | | | |
| 37 | TDK | TeleDanmark | X | X | X | X | X | A | A | | | A | A |
| 38 | MAX | Gateway, Not a carrier | X | X | | | | | | | | A | A |
| 39 | CMT | Comtech International Corporation | X | X | X | | | A | | | A | A | A |
| 40 | CTI | Communication Technologies Inc. | | X | | | | A | | A | A | A | A |
| 41 | FUS | Fusion Telecommunictions Int'l Inc. | X | X | X | X | | A | A | | | | |
| 42 | TLI | Telia International Carrier Inc. | | X | | | | A | | | | | |
| 43 | STM | Storm Telecommunictions, Inc | X | | | | | A | | | | | |
| 44 | WIL | WilTel Communications, LLC | | | | X | X | A | A | | | | |
| 45 | TRM | Tricom USA, Inc. | X | X | X | X | | A | | | | | |
| 46 | CAM | Calmtel Korea, Inc | | | | X | X | A | A | | | | |
| 47 | TOT | TotalTel Communications, Inc. | X | X | | | | A | | | | | |
| 48 | TEC | Telecommunicaciones de America | | | | | X | A | A | | | | |
| 49 | GAI | Global Access International, Inc. | | | | | X | A | A | | | | |
| 50 | SKN | Sakon | X | | | | | | | | | | |
| 51 | ARG | American Resources Group Inc. | | | | X | | A | A | | | | |
| 52 | ION | Ionosphere, Inc. | X | X | | | X | A | A | | | | |
| 53 | TWS | Teleworks Wholesale Services, LP | | | | X | X | A | A | | | | |
| 54 | KDD | KDDI America, Inc. | | | | X | X | A | A | | | | |
| 55 | BNW | Bellsouth Long Distance, Inc | X | X | | | | A | A | | | | |
| 56 | NGT | New Global Telecom, Inc. | | | X | X | | A | | | | | |
| 57 | BSL | Bellsouth Long Distance, Inc | X | X | | | | A | A | | | | |
| 58 | TSY | T-Systems USA, Inc. | | | X | X | X | A | A | | | | |
| 59 | ITC | ITC Inc. (TeckTel Inc.) | X | X | X | | | A | A | | | A | A |
| 60 | NXT | Nextcarrier Telecom Inc. | | | | | X | A | A | | | | |
| 61 | FNY | Focal Communictions of New York | X | X | X | X | | A | | | | | |
| 62 | ANC | Asia Netcom Asia Pacific Commercial | | | | | X | A | A | | | | |
| 63 | RC2 | Roadway Communications, Inc. | | | | | X | A | A | | | | |
| 64 | CLR | Clarent | X | X | X | | | | | | | | |
| 65 | TLC | Telic communications, Inc. | X | | | | | A | | | | | |
| 66 | FON | Fonetel Inc. | | | | X | | A | A | | | | |
| 67 | GTR | Globaltron Communications Corporation | X | | | X | X | A | | | | | |
| 68 | GTG | | | | | x | X | | | | | | |
| 69 | TNV | Telenova Communications Corporation | X | | | | | A | A | | | | |
| 70 | UBL | Universal Brokers Limited | | X | X | X | X | A | A PURCHASE | | | | |
| 71 | PRA | Paratel | | X | | | | | A | | | | |
| 72 | DTI | DTI | | | | X | | | | | | | |
| 73 | WOL | WorldLink Telecom | X | | | | | A | | | | | |

COMMENTS:
1. TOP
2. TOP
3. "X" m
as of De
4. "A" m
5. If nec

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 74 | IMT | Intermetro Communications, Inc. | | | | | X | A | A | | | | |
| 75 | DCY | Discovery Tel Inc. | | | | | X | A | A | | | A | A |
| 76 | TFC | Telefonica del Peru S.A.A. | | | | | X | A | A | | | | |
| 77 | IMP | Impsat | | | | X | | | A | | | | |
| 78 | HRZ | Horizon Telecom Network, LLC | | | | X | X | A | A | | | | |
| 79 | COM | Comsolo | | | | | X | A | A | | | | |
| 80 | GRD | Grande Communications Network, Inc. | | | X | X | | A | A | | | A | A |
| 81 | POX | PoxTelecom, Inc | | | | | X | A | A | A | A | A | A |
| 82 | AAT | Asia Access Telecom Inc. | | | | X | X | | A | | | A | |
| 83 | ICS | International Carrier Services, Inc. | | | | | X | A | A | | A | | A |
| 84 | ANU | Anuera | | | | X | | | A | | A | | A |
| 85 | VSI | High Vista Enterprises, Inc. | | | | | X | A | A | | | | |
| 86 | CTT | Contactel | | | | | X | A | A | A | | A | A |
| 87 | XLO | Xylo Communications | | | | X | | A | | | | | |
| 88 | FRA | France Telecom Long Distance USA, LLC | | | X | X | X | A | A | | | A | A |
| 89 | INN | Innocom Telecom, LLC | | | X | X | | A | A | | | | |
| 90 | COR | Cordial | | | | | X | | A | | | A | A |
| 91 | ORM | Ormeño Comunicaciones S.A. | | X | | | | A | | A | A | A | A |
| 92 | CPT | Computer-Tel, Inc. | | | | | X | A | A | | | A | A |
| 93 | AGC | Advance Global Communications | | | | | X | A | A | | | A | A |
| 94 | RAI | RAI Telecom Inc. | | | | | X | A | A | A | A | A | A |
| 95 | REL | Reliant Enterprises | | | | X | | | A | | | A | A |
| 96 | WTC | WholeSale Telecom Corporation | X | | | | | | | | | | |
| 97 | BTN | BTN Access Group Company | | | | X | | A | A | | | | |
| 98 | RCI | Roadway Communications, Inc. | | | | | X | A | A | | | | |
| 99 | TSN | Trisun Communications Corporation | | | | | X | A | A | | | A | A |
| 100 | GNT | Global Net Holdings, Inc. | | X | X | | | A | | | | | |
| 101 | GRN | Graphnet | X | | | | | | | | | | |
| 102 | ECT | Economitel C. Por A. | | | | X | X | A | A | | | | |
| 103 | INT | Intone Networks, Inc. | | | | X | | A | A | | | | |
| 104 | CHM | CM TEL (USA) LLC | | | | | X | A | A | | | | |
| 105 | CN2 | CNM | | | X | | | | | | | | |
| 106 | CNM | CNM | | | X | | | | A | | | | |
| 107 | FN1 | Future Telecomm | | | X | | | | | | | | |
| 108 | ITI | Integrated Telecommunications Inc. | | | X | | | A | | | | | |
| 109 | IVY | Ivy Solutions S.L. | | | X | | | A | A | | | | |
| 110 | LAT | Latino Communications Corp. | | | X | | | A | A | | | | |
| 111 | NF2 | Natfeed S. A. Live Technologies | | | X | | | A | A | | | | |

PURCHASE

# A-2

# WHOLESALE SOLUTIONS SWITCHED SERVICES AGREEMENT

THIS AGREEMENT (the "Agreement") is entered into by and between SPRINT COMMUNICATIONS COMPANY L.P. ("Sprint"), and LOCUS TELECOMMUNICATIONS INC ("Customer"). Sprint and Customer are "Parties" hereto.

In consideration of the mutual promises contained herein, the Parties agree as follows:

1. DEFINITIONS. Capitalized terms appearing in bold print are defined in **Exhibit 1**.

2. CONFIDENTIALITY. During the **Term** and thereafter, neither Party shall disclose any terms of this Agreement, including pricing, or **Proprietary Information** of the other Party. **Proprietary Information** shall remain the property of the disclosing Party. A Party receiving **Proprietary Information** shall: (i) use or reproduce such information only when necessary to perform this Agreement; (ii) provide at least the same care to avoid disclosure or unauthorized use of such information as it provides to protect its own **Proprietary Information;** (iii) limit access to such information to its employees or agents who need such information to perform this Agreement; and (iv) return or destroy all such information, including copies, after the need for it has expired, upon request of the disclosing Party, or upon termination of this Agreement.

Because of the unique nature of **Proprietary Information**, a breach of this paragraph may cause irreparable harm for which monetary damages may be inadequate compensation. Accordingly, in addition to other available remedies, a Party may seek injunctive relief to enforce this paragraph.

3. TERM. The **Term** is specified in **Attachment** A and will begin on the **Commencement Date**. **"Commencement Date"** means the first day of the first billing month after the Parties sign this Agreement, if Customer signs and returns this Agreement to Sprint's Wholesale Market and Business Analysis Group by the 8th day of the current billing month. If the parties meet the requirements of the preceding sentence, the Agreement's pricing will be effective on the later of: (a) the date Customer signs this Agreement; or (b) the date that is 45 days before the Commencement Date. Pricing on invoices may be reflected as a credit(s) for any usage prior to systemic billing implementation. Except for pricing, all other arrangements under this Agreement will take effect on the **Commencement Date**. If Customer fails to sign and return this Agreement to Sprint by the 8th day of the current billing month, the **Commencement Date** will be the first day of the second billing month following the month in which Sprint executes this Agreement.

4. TERMINATION FOR CAUSE.

4.1. A Party may terminate this Agreement upon the other Party's failure to cure any of the following within 30 days following written notice thereof: (a) the (i) insolvency, corporate reorganization, arrangement with creditors, receivership or dissolution of the other Party; or (ii) institution of bankruptcy proceedings by or against the other Party; (b) Customer's assignment or attempted assignment of the Agreement or any interest therein, except as permitted by Paragraph 24 hereof; (c) change in majority ownership of Customer without Sprint's prior written consent, which consent shall not be unreasonably withheld; (d) a final order by a government entity with appropriate jurisdiction that a **Service** or the relationship hereunder is contrary to law or regulation; or (e) material breach of any other provision of this Agreement not otherwise referred to in Paragraph 4.

4.2. If Customer fails to cure a breach as provided in Paragraph 8 or if Customer breaches a provision of Paragraph 17 or 18, Sprint may, at its option and in addition to other remedies available in law or equity, take one or more of the following steps: (i) refuse to accept additional orders for **Service**; (ii) refuse to install new **Service** types or **Service** locations; (iii) disconnect or block **ANIs**, circuits, or other **Service Elements**; (iv) discontinue **Promotional Discounts** and or international discount rates for **Services** provided until such time as Customer is in full compliance with this Agreement; and/or (v) terminate this Agreement without notice.

4.3. Customer may terminate the Agreement upon 30 days written notice if Sprint fails to cure any non-compliance with subparagraph 16.2 of this Agreement.

4.4. Upon termination of this Agreement a Party may recover from the other all sums it is owed at the time of termination.

5. TERMINATION WITHOUT CAUSE; EARLY TERMINATION CHARGE.

5.1. Customer may terminate this Agreement at any time without cause upon 90 days prior written notice to Sprint and payment to Sprint of the **Early Termination Charge** described in Subparagraph 5.2. **Service** will be discontinued the first business day of the fourth month after such notice of termination.

5.2. **Sprint Wholesale Solution** Base Rates and **Promotional Discounts** are based on Customer's agreement to purchase **Service** for the entire **Term**. It is difficult if not impossible to calculate Sprint's loss if Customer terminates the Agreement pursuant to Subparagraph 5.1 or breaches the Agreement prior to the end of the **Term**. Therefore, to compensate Sprint for such loss, and not as a penalty, Customer shall pay Sprint an **Early Termination Charge** in the event of such termination or breach. The **Early Termination Charge** shall equal 50% of the sum of the **Minimum Commitment** for each month remaining in the **Term** when Service is discontinued pursuant to Subparagraph 5.1 or terminated due to Customer's breach. The **Early Termination Charge** shall be paid within 30 days after the notice provided pursuant to Subparagraph 5.1.

6. APPLICATION OF TARIFFS AND SPRINT SCHEDULES; INTERSTATE ADJUSTMENT.

6.1. Interstate and international **Service** shall be provided pursuant to this Agreement and **Sprint Schedules**. The Parties intend for the terms and conditions of this Agreement and the **Sprint Schedules** to be consistent with one another, and any interpretation should be made so as to avoid any inconsistency to the extent possible. In the event of a conflict, between this Agreement's terms and conditions and the **Sprint Schedules**, this Agreement's terms and conditions will control. The fact that a condition, right, obligation or other term appears in this Agreement's terms and conditions, or in the **Sprint Schedules**, but not in each, will not be interpreted as, or be deemed grounds for finding, a conflict.

6.2. Intrastate **Service** is provided pursuant to **Tariff** in every respect. **Promotional Discounts** will not apply to intrastate **Service**. An **Interstate Adjustment** may be applied based on intrastate usage as provided in **Attachment** D. The **Interstate Adjustment** shall be based on intrastate usage at the **Product Hierarchy Level** and will equal the difference between (a) such usage priced at **Tariff** less **Tariff** discounts and (b) such usage priced at the **Interstate Adjustment Rate** in **Attachment D** less **Discount One** discounts. The **Interstate Adjustment** for a given month shall not exceed interstate billing for such month.

6.3. Customer shall pay all applicable **Tariff** and **Sprint Schedule** charges including, but not limited to, fixed charges, feature charges, enhanced Toll Free charges, access facility charges, and installation and other non-recurring charges. Additionally, Customer will pay, in

accordance with applicable **Tariffs** and **Sprint Schedules**, any taxes, levies, surcharges, or other costs that Sprint is obligated to pay to any governmental entity or other third party, provided that (i) such obligation is imposed by valid and lawful legislation or regulation, and (ii) such obligation arises out of the use of Sprint's services.

6.4. Sprint may modify or withdraw **Tariffs** or **Sprint Schedules** from time to time, which may include discontinuation of any Service without Sprint's liability. In the event that a Service is discontinued and such discontinuation materially and adversely affects Customer's ability to do business as anticipated in this Agreement, then Customer may terminate this Agreement upon thirty (30) days written notice to Sprint without liability for the **Early Termination Charge**, but must repay to Sprint a prorata

portion of any credits issued under this Agreement, based on the number of months remaining in the **Term**.

6.5. In the event Sprint withdraws its filed **Tariffs** or **Sprint Schedules** the **Tariff** or **Sprint Schedules** (as applicable) terms and conditions in effect on the date of such withdrawal will continue to apply to this Agreement. After withdrawal of the applicable **Tariffs** or **Sprint Schedules**, the terms of this Agreement will control over any inconsistent provision in the former **Tariffs** or **Sprint Schedules**, subject to standard contract interpretation rules. **Tariffs** or **Sprint Schedules** not withdrawn shall continue to have the same force and effect.

7. RELATIONSHIP OF PARTIES. Neither this Agreement nor the provision of **Service** may be construed to constitute or create an association, joint venture, partnership or other form of legal entity or business enterprise between Customer and Sprint, its agents, employees and/or affiliates. Customer is the service provider with respect to **End Users**. Sprint is merely a supplier to Customer with no relationship to **End Users**.

8. USE OF NAME AND MARKS.

8.1 This Agreement confers no right to use the name, service marks, trademarks, copyrights, patents or CIC of either Party except as expressly provided herein. Neither Party shall take any action which would compromise the registered copyrights or service marks of the other. Sprint's name is proprietary and nothing herein constitutes a general license authorizing its use. Customer may not: (a) promote or advertise Sprint's name or capabilities to **End Users** or prospective **End Users**; (b) attempt to sell its service using Sprint's name; or (c) represent to **End Users** or prospective **End Users** that they would be Sprint customers or that they may obtain Sprint service from Customer.

8.2 Sprint shall provide Customer written notice of a breach of this paragraph. Customer shall use its best efforts to immediately cure such breach, advising Sprint of such corrective action. If, in Sprint's opinion, Customer fails to effect a cure within 15 days of Sprint's notice, then Sprint may, at its option, terminate the Agreement pursuant to Subparagraph 4.2.

8.3 Sprint's provision of Switched Outbound **Service** may result in **End Users** being notified by their **LEC** that Sprint is their designated **PIC**. Therefore, to avoid confusion and potential "slamming" complaints, Sprint hereby authorizes Customer to use Sprint's name under the following conditions to provide **End Users** from whom Customer has obtained a **PIC Authorization** with a fulfillment piece containing the following Notice (the "Notice"):

> We want to affirm how ___ will provide your long distance service. Although ___ will provide your invoice and customer service, we use major national carriers to actually carry your long distance calls.
>
> After subscribing to our service, you may receive a notice from your local phone company which says that your long distance "Carrier of Choice" is Sprint. ___ has selected Sprint as the long distance network provider it will use to handle your calls. That selection was based on your quality and price requirements. If you have any questions about your order, please call our toll free customer service number, 1-___-___.

8.4 If Customer subscribes to Switched Outbound, calls placed by **End Users** to the Sprint access number will be answered "Sprint operator." This may cause confusion if the **End User** does not know its calls are being carried on the Sprint network. Therefore, to avoid such confusion, Sprint hereby authorizes Customer to provide **End Users** who use Sprint Express with a fulfillment piece containing the following notice (the "Sprint Express Notice"): "International call origination may be provided by a Sprint operator." Sprint may withdraw consent to use the Sprint Express Notice upon 10 days written notice.

9. SERVICE. **Services** provided hereunder are described in **Exhibit** 2.

10. LEGAL COMPLIANCE; REMEDIES FOR NON-COMPLIANCE.

10.1 Customer represents and warrants that (a) it has obtained appropriate certificates of public convenience and necessity, licenses and all required regulatory approvals and that it is legally authorized to provide service as contemplated under the terms and conditions of this Agreement and (b) it will immediately notify Sprint in the event such certificates of public convenience and necessity, licenses or other required regulatory approvals should be revoked, suspended or, for whatever reason, cease to be effective.

10.2 Customer's failure to comply with paragraph 10.1 above will constitute a material breach of this Agreement and Sprint may reject **End User ANIs** submitted by Customer for placement under its account and/or terminate this Agreement immediately. Sprint will resume accepting **ANIs** only after Customer produces evidence satisfactory to Sprint that it is in compliance with paragraph 10.1.

11. CUSTOMER DUTIES, OBLIGATIONS AND RESPONSIBILITIES.

11.1 Customer will not be relieved of any duty, obligation or responsibility hereunder due to the fact that Service is ultimately provided to **End Users**.

11.2 Customer represents and warrants that it will comply with all applicable laws and applicable rules and regulations promulgated by federal and state regulatory agencies, including, but not limited to, those concerning interexchange carrier selection. Customer represents and warrants that it will not submit to Sprint an **End User ANI** for activation without obtaining and maintaining a proper **PIC Authorization** that complies with all applicable federal and state laws, rules and regulations. Customer shall produce for Sprint's inspection, at Customer's expense, any **PIC Authorization** within 48 hours after Sprint's oral or written request, or within any shorter period required by a **LEC** or regulatory agency.

11.3 Customer's failure to comply with paragraph 11.2 above will constitute a material breach of this Agreement and Sprint may refuse to activate additional **ANIs** under Customer's account and/or terminate this Agreement immediately. Sprint will resume accepting **ANIs** only after Customer produces evidence satisfactory to Sprint that it is in compliance with paragraph 11.2.

11.4 Customer will reimburse Sprint for any charge assessed by a **LEC** for processing a **PIC** change due to a Customer initiated dispute.

11.5 Customer will defend at Sprint's request, indemnify and hold harmless Sprint and each of its officers, directors, employees and agents against and in respect of any loss, debt, liability, damage, obligation, claim, demand, judgment or settlement of any nature or kind, known or

unknown, liquidated or unliquidated, including without limitation, all reasonable costs and expenses incurred (legal, accounting or otherwise) (collectively, "Damages") arising out of, resulting from or based upon any pending or threatened complaint, claim, action, proceeding or suit by any third party (a "Claim") alleging Customer's violation of any law or any rule or regulation of a federal or state regulatory agency, including, but not limited to, those laws, rules and regulations with respect to the unauthorized switch of an **End User's** preferred interexchange carrier ("slamming").

11.6 Customer will be solely responsible for **End User** solicitation, service requests, creditworthiness, customer service, billing and collection. Customer remains responsible for compliance with all terms and conditions of this Agreement, including, but not limited to, payment responsibilities, without regard to Customer's ability to charge for **Services** used by **End Users** or to collect payment from **End Users**.

11.7 Customer will be financially responsible for usage generated by each **End User ANI** activated by Sprint until such **ANI** is presubscribed to another **IXC**. Customer may request Sprint to block **Network Extension Service** to an **ANI** upon the **End User's** failure to pay Customer, subject to Customer's prior certification to Sprint that it has given the **End User** any notice required by any applicable statute, rule or regulation. Customer will reimburse Sprint for expenses incurred to block an **ANI**.

11.8 Customer will be solely responsible for amounts it cannot collect from **End Users**, including all fraudulent charges and for billing adjustments it grants **End Users**, including adjustments for fraudulent charges, directory assistance or any other form of credit.

11.9 Customer will comply with Sprint's network interface procedures when it orders it own access facilities.

11.10 The minimum installation and disconnect intervals for switched **Service Elements** is 15 calendar days and for dedicated **Service Elements** is 35 calendar days.

12. <u>SERVICE ACTIVATION</u>. Sprint will use reasonable efforts to provide switched **Service** within 15 days, and dedicated **Service** within 30 days, following Customer's order, or the requested delivery date, whichever is later. These installation objectives will be extended by the time it takes to address activation errors or obtain from Customer a complete and accurate order or **PIC Authorization**. Customer shall reimburse Sprint for **LEC** imposed fees resulting from a request to expedite **Service**.

13. <u>PRICING; FORWARD PRICING; GENERAL CONDITIONS</u>.

13.1. <u>Pricing</u>. **Sprint Wholesale Solution Base Rates** and **Promotional Discounts** are contained in the **Attachments** hereto.

13.2. <u>Prices in Lieu of Other Discounts</u>. **Sprint Wholesale Solution Base Rates** and **Promotional Discounts** are extended in lieu of any other **Tariff**, **Sprint Schedule** or contractual discount, special pricing, or discount term plan. Discounts upon discounts are only permitted if expressly provided for herein.

13.3. <u>Prices Contingent on Performance</u>. **Sprint Wholesale Solution Base Rates** and **Promotional Discounts** are contingent on Customer's full performance of all terms of the Agreement. If Customer fails to pay the undisputed portion of an invoice pursuant to Paragraph 17, Sprint may, at its option and in addition to other remedies available in law or equity, take one or more of the following steps: (i) refuse to accept additional orders for **Service**; (ii) refuse to install new **Service** types or **Service** locations; (iii) disconnect or block **ANIs**, circuits, or other **Service Elements** for which full payment has not been made; and/or (iv) discontinue **Promotional Discounts** for **Services** provided until such time as Customer is in full compliance with Paragraph 17 of this Agreement.

13.4. <u>Per Minute Charges</u>. **Sprint Wholesale Solution Base Rates** are invoiced based on **Per Minute Charges** utilizing the **Rate Periods** and **Billing Increments** in **Attachment** B.

13.5. <u>Non-Bell Switched Origination, Termination and Toll Free Origination Charges</u>. Customer shall pay the charges specified in **Attachment** B for each originating minute and each terminating minute of an interstate call that originates and/or terminates in a **Non-Bell Service Area**.

13.6. <u>Switched Origination, and Termination Charges</u>. Customer shall pay the charges specified in **Attachment** B for each originating minute and each terminating minute of an interstate call.

13.7. <u>Promotional Pricing Levels</u>. Customer will receive **Discount One** and **Discount Two** discounts applied only to **Rate Elements** as provided in **Attachments** C and D.

13.8. <u>Forward Pricing</u> As a transition to the pricing hereunder, **Discount Two** discounts may be based for a period of time on the greater of Customer's actual **Discount Two Monthly Volume of Service** or a specified **Forward Pricing Volume of Service**. The **Forward Pricing Volume of Service** and the period during which it may be applied are specified in **Attachment** A.

14. <u>SURCHARGES</u>.

14.1. <u>Minimum Commitment Surcharge</u>. For any period during which Customer fails to meet the **Minimum Commitment** stated on **Attachment** A, Customer shall pay a surcharge for **Service** provided during such period equal to 25% of the difference between the **Minimum Commitment** for such period and Customer's actual **Net Usage** during such period. Customer's satisfaction of the **Minimum Commitment** shall not relieve Customer of any credit or security obligations set forth in this Agreement.

14.2. <u>LEC Cap Surcharge</u>. Any month Customer exceeds the **Maximum Non-Bell Traffic Percentage** specified in **Attachment** B for any **Service** type, Customer shall pay Sprint the per minute surcharge for such **Service** specified in **Attachment** B for each minute above the **Maximum Non-Bell Traffic Percentage** that originates from or terminates to a **Non-Bell Service Area**. **Maximum Non-Bell Traffic Percentages** will be calculated independently for originating and terminating minutes at each **Product Hierarchy Level**.

14.3. <u>Minimum Average Time Requirement Surcharge</u>. Any month Customer fails to equal or exceed the **Minimum Average Time Requirement** specified in **Attachment** B for **Services** specified in **Attachment** B, then Customer shall pay Sprint a per minute surcharge on such usage equal to (a) the per minute surcharge specified in **Attachment** B multiplied by (b) the difference between (i) the number of minutes the **Service** was used and (ii) the number of calls using the **Service** multiplied by the **Minimum Average Time Requirement**. This surcharge shall be calculated at each **Product Hierarchy Level**.

14.4. <u>Noncomplete Call Surcharge</u>. Any month Customer exceeds the **Maximum Noncomplete Toll Free Call Percentage** for interstate Dedicated Toll Free, Toll Free Extension, and/or interstate Switched Toll Free traffic as stated on **Attachment** B, Customer shall pay Sprint a surcharge equal to the amount stated in **Attachment** B for each **Noncomplete Toll Free Call** in excess of the **Maximum Noncomplete Toll Free Call Percentage**. This surcharge shall be calculated at each **Product Hierarchy Level**.

14.5. <u>Minimum Port Usage Surcharge</u>. Any month Customer fails to equal or exceed the **Minimum Port Usage** per **Active Dedicated Outbound Port** (calculated as Customer's actual **Net Usage** for Dedicated Outbound **Service** divided by Customer's total number of

Active Dedicated Outbound Ports at each Product Hierarchy Level) as stated on Attachment A, Customer shall pay Sprint a surcharge on its Dedicated Outbound Service usage equal to the difference between (a) Customer's actual Net Usage for Dedicated Outbound Service and (b) the Minimum Port Usage multiplied by the total number of Active Dedicated Outbound Ports.

15. SERVICE CHARGES.

For each End User ANI or Toll Free number Customer submits for activation that requires Sprint to disconnect or transfer such ANI or Toll Free number from Sprint's data base before placing it within Customer's CTIS hierarchy, Customer will pay to Sprint a service charge of $25.00. Notwithstanding the foregoing, the service charge described in this paragraph 15 will be waived if such ANIs, or Toll Free numbers do not exceed 15% of the total ANIs or Toll Free numbers submitted by Customer during the immediately preceding ninety (90) days.

16. SPECIAL RATE ADJUSTMENTS.

16.1. Sprint may adjust the price of Service provided hereunder to reflect changes in international cost of service or currency exchange rates. Price decreases will be effective as stated in notice to Customer or immediately upon notification if no specific effective date is noted. Price increases will be effective upon 5 days' notice to Customer.

16.2. Sprint will unilaterally amend Attachment B switched origination and switched termination access charges effective on the first day of January and July. The adjustment will consider increases and/or decreases in statewide average minute of use originating and terminating interstate LEC access charges imposed on Sprint during a measurement period ending approximately ninety (90) days prior to the effective date of the amendment. Customer will pay amended Attachment B charges for Service usage beginning on the effective date of the amendment until the effective date of the succeeding amendment. Attachment B charges apply only to those Services identified in Attachment B, paragraph B.13.6.

17. PAYMENT FOR SERVICE.

17.1. Payment Obligation. Customer shall pay Sprint for Service pursuant to the terms of this Agreement and applicable Tariffs and Sprint Schedules.

17.2. Call Detail. Sprint will provide Customer with a Carrier Transport Call Detail Record file containing Customer's Service usage. Sprint may, at its option and without liability to Customer, modify the format of the Carrier Transport Call Detail Record file upon sixty (60) days written notice to Customer.

17.3. Payment Procedure. Sprint will invoice Customer monthly for Services provided hereunder. Invoices shall be due and payable upon thirty days from invoice date. All undisputed charges for Services provided that remain unpaid by Customer for a period of thirty (30) days or more after the date of the invoice will be subject to interest from the date of the invoice at a rate of up to one and one-half percent (1-1/2%) per month, or the maximum rate allowable by applicable law. If Customer fails to pay for services in accordance with the terms set forth in this Section, Sprint may, at its option and in addition to other remedies available in law or equity, take one or more of the following steps: (i) refuse to accept additional orders for Service; (ii) refuse to install new Service types or Service locations; (iii) disconnect or block ANIs, circuits, or other Service Elements for which full payment has not been made; and/or (iv) discontinue Promotional Discounts for Services provided until such time as Customer is in full compliance with this Paragraph 17. The price of Service is exclusive of applicable taxes. Resale Solution Base Rates and Promotional Discounts are contingent on Customer providing Sprint with certificates from appropriate taxing authorities exempting Customer from taxes that would otherwise be invoiced hereunder.

17.4. Billing Disputes. In the event Customer, in good faith, disputes Sprint's computation of amounts due and owing within all applicable legal periods of limitation, Customer may withhold payment of the disputed amount. Customer must pay all charges which are not in dispute in accordance with the payment terms set forth in this Section. An amount will not be considered "in dispute" until Customer has provided Sprint with written documentation explaining the disputed amount and describing the factual and legal basis of the dispute. Customer must cooperate with Sprint to resolve any dispute expeditiously. All disputed amounts are due and payable immediately upon Sprint's written denial of the dispute.

18. PAYMENT SECURITY. Provision of Service is contingent on credit approval by Sprint. Upon request by Sprint, Customer shall provide Sprint with financial statements or other indications of Customer's financial and business circumstances. If Customer's financial or business circumstances or payment history is or, during the Term, becomes unacceptable to Sprint, then Sprint may require a deposit, irrevocable letter of credit or other form of security acceptable to Sprint. Customer's failure to provide such security within 10 days following Sprint's reasonable request shall constitute a default under Subparagraph 4.2.

19. PROPERTY AND PERSONAL INJURY INDEMNIFICATION. Each Party agrees to indemnify, hold harmless, and defend the other Party, its directors, officers, employees, agents and their successors and assigns from and against any and all claims, demands, causes of action, losses, damages, expenses or liabilities, including costs and reasonable attorney's fees, arising out of claims made by third parties for personal injury (or death) or loss or damage to personal property, arising out of or related to the negligent or willful misconduct, errors or omissions, of the indemnifying Party or its subcontractors, directors, officers, employees, agents or representatives. Claims made by employees of a Party which are covered under applicable workers' compensation laws are not indemnified hereunder.

20. PROPRIETARY RIGHTS INDEMNITY. If Customer is made the subject of any claim or lawsuit by reason of its use of the Services provided hereunder based on the allegation that the Service as provided by Sprint constitutes an infringement of any third party patent, copyright or trade secret, enforceable in countries ratifying the Berne Convention, Customer will promptly notify Sprint thereof in writing. Sprint will defend and indemnify Customer against all such claims, demands, and causes of action based on the actual or alleged infringement of any such third party right. The indemnities set forth in this Section will include, without limitation, all penalties, awards and judgments, all court and arbitration costs, attorney's fees and other out-of-pocket costs reasonably incurred in connection with such claims, demands and causes of action. Sprint will have sole discretion to settle or compromise such claim or lawsuit without the written consent of Customer provided that such settlement or compromise does not require Customer to make any payment not indemnified. Sprint will have the sole right to retain and select counsel to represent its interests in defending any such claim or litigation as part of its indemnification obligation hereunder. Sprint will not reimburse Customer for its attorneys' fees and costs in connection with Customer's separate retention of counsel, unless Sprint will have wrongly failed to defend and indemnify Customer.

If any action results in a final injunction against Customer with respect to the Services provided pursuant to this Agreement, Sprint agrees that it will at its option and its sole expense, either (1) procure for Customer the right to continue using the infringing Services or (2) replace or modify the same so that it becomes non-infringing or (3) substitute for the Services non-infringing replacement Services having a capability equivalent to the Services provided herein. If none of the foregoing alternatives is reasonably available to Sprint, then Customer will have the right to terminate the affected portions of this Agreement. Sprint will have no liability under this indemnity provision to the extent the claim is based

on a use, a modification, or a combination of Sprint Services with products, goods or services not directly provided by Sprint.

21. LIMITATION OF LIABILITY.

21.1 SPRINT'S ENTIRE LIABILITY RESULTING FROM ITS FAILURE TO PERFORM ANY OF ITS OBLIGATIONS UNDER THIS AGREEMENT IN NO EVENT WILL EXCEED AN AMOUNT EQUAL TO THE NET USAGE CHARGES PAID TO SPRINT BY CUSTOMER DURING THE THREE (3) MONTHS IMMEDIATELY PRECEDING THE EVENT OUT OF WHICH THE LIABILITY AROSE. SPRINT WILL NOT BE LIABLE FOR ANY UNAVOIDABLE DAMAGE TO CUSTOMER'S PREMISES.

21.2 IN NO EVENT WILL SPRINT BE LIABLE FOR ANY CONSEQUENTIAL, INCIDENTAL OR INDIRECT DAMAGES FOR ANY CAUSE OF ACTION, WHETHER IN CONTRACT OR TORT. INCIDENTAL, CONSEQUENTIAL, OR INDIRECT DAMAGES INCLUDE, BUT ARE NOT LIMITED TO, LOST PROFITS OR REVENUES AND LOSS OF BUSINESS OPPORTUNITY, WHETHER OR NOT SPRINT WAS AWARE OR SHOULD HAVE BEEN AWARE OF THE POSSIBILITY OF SUCH DAMAGES.

21.3 WITH RESPECT TO THE SERVICES, MATERIALS AND EQUIPMENT PROVIDED HEREUNDER, SPRINT HEREBY DISCLAIMS ALL WARRANTIES, EXPRESS OR IMPLIED, NOT EXPLICITLY STATED IN THE AGREEMENT, AND IN PARTICULAR DISCLAIMS ALL WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

22. ARBITRATION. Any dispute arising out of or relating to the Agreement may, at the option of the Parties, be finally settled by arbitration. If the Parties elect arbitration, such arbitration will be in accordance with the rules of the American Arbitration Association. The arbitration will be governed by the United States Arbitration Act, 9 U.S.C. Sec. 1, et. seq., and judgment upon the award rendered by the arbitrator(s) may be entered by any court with jurisdiction. The arbitration will be held in the Kansas City, MO metropolitan area.

23. NOTICES. All notices or other communications required or permitted under this Agreement (excluding invoices) will be in writing and sent by: (a) facsimile with a copy sent by regular or overnight mail; or (b) certified mail; or (c) overnight mail; or (d) electronic mail, addressed to the Parties as follows:

If to Sprint: Sprint Communications Company L.P.
Attention: Vice President-Wholesale Services
12502 Sunrise Valley Drive
Reston, VA 20191-3438

With copy to: Sprint Communications Company L.P.
Attn: Law Dept. - Marketing & Sales (Business)
KSOPHT0101-Z2525
6391 Sprint Parkway
Overland Park, KS 66251-2525

If to Customer: Locus Telecommunications Inc
Attention: Carrier operations
111 Sylvan Ave. 2nd Fl.
Englewood Cliffs, NJ 07632
Email Address: Rates@locus.net

24. ASSIGNMENT. Customer may not assign or delegate its responsibilities, duties, rights or obligations under this Agreement to any person, corporation or other entity without the written consent of Sprint, such consent not to be unreasonably withheld.

25. EXCUSABLE DELAY.

25.1 Except for the performance of obligations set forth in Paragraphs 17 and 18 of this Agreement, Sprint and Customer agree that neither Party will be responsible for any delay, interruption or other failure to perform hereunder due to acts beyond the control of the responsible Party. Such acts include, but are not limited to, natural disasters such as lightening, earthquakes, hurricanes, floods or other like causes; war, riot, civil commotion; cable cuts; explosion or fire; embargoes, strikes or labor disputes; or decrees of governmental entities.

25.2 The affected Party will give notice to the other Party in the event of any of the foregoing occurrences. Upon such notice, Sprint may cancel or delay performance for as long as such performance is delayed by such occurrence or occurrences, and in such event will have no liability to Customer. Should such occurrence continue for more than 60 days and adversely and materially impact the other party, such other party may terminate this Agreement without liability upon payment for all Services delivered prior to the date of such termination, plus all other charges and costs then incurred.

26. HEADINGS. The headings set forth in this Agreement are for purposes of reference only and do not in any way limit or otherwise affect the meaning or interpretation of any of the terms of this Agreement.

27. CHOICE OF LAW. This Agreement and all claims relating to the relationship between Sprint and Customer, including all claims in tort, contract, at law or in equity will be governed by, construed, enforced and interpreted in accordance with the laws of the state of Kansas without regard to the choice of law principles thereof.

28. RULES OF CONSTRUCTION. No rule of construction requiring interpretation against the draftsman shall apply in the interpretation of this Agreement.

29. MODIFICATION OF AGREEMENT. This Agreement may be modified only by written amendment, executed by officers of Customer and Sprint. Any oral agreement contrary to the terms of any Service Agreement will not be admissible in any dispute, whether in a court of law or in arbitration.

30. WAIVER OF TERMS. If either Party fails, at any time, to enforce any right or remedy available to it under this Agreement, that failure will not be construed to be a waiver of the right or remedy with respect to any other breach or failure by the other Party.

31. PARTIAL INVALIDITY. In the event any of the provisions of this Agreement are held to be invalid, illegal, or unenforceable, the unaffected provisions of this Agreement will be unimpaired and remain in full force and effect. Sprint and Customer will negotiate to substitute for such invalid, illegal or unenforceable provision a mutually acceptable provision consistent with the original intention of the Parties

32. CUMULATIVE REMEDIES. Except as otherwise provided herein, the remedies provided for in this Agreement are in addition to any other remedies available at law or in equity.

33. ENTIRE AGREEMENT. This Agreement, including Exhibits, Attachments, and the documents and instruments referred to herein, constitutes the entire understanding between the Parties relating to its subject matter and supersedes all prior or contemporaneous negotiations or agreements, whether oral or written, relating to the subject matter hereof. Customer is not relying upon any representations or promises made by or on behalf of Sprint in entering into this Agreement.

34. EXPIRATION OF OFFER. Sprint's offer to enter into this Agreement shall be withdrawn if the Agreement is not executed by both

Parties within 45 days after the Proposal Date stated on Attachment A.

EXECUTED and made effective when signed below by both parties.

LOCUS TELECOMMUNICATIONS INC
(Customer)

By: _______________
HENRY PARK

Title: SENIOR DIRECTOR

Date: SEPT 9, 2003

SPRINT COMMUNICATIONS COMPANY L.P.

By: _______________
Art MacDowell
Vice President, Wholesale Services Group

Date: 9/16/03

APPROVED
SPRB
IS 9/16/03
MM 9/16/03

# EXHIBIT 1

DEFINITIONS

Capitalized terms appearing in bold print in the Agreement, its **Exhibits** and **Attachments** are defined as follows:

**"Active Dedicated Outbound Port"** means a Customer access port (DS-0 equivalent) connected to Sprint and activated as Dedicated Outbound Service.

**"ANI"** means a calling telephone number identification which is forwarded to an **IXC** by a **LEC** as a call is placed.

**"Associated Location"** means a physical premise to or from which Sprint provides **Service** which is: (a) owned or leased by Customer; (b) occupied by a business in which Customer has an equity interest of at least a 25%; or (c) occupied by a franchisee of Customer.

**"Attachment"** means a supplement attached to, and a part of, the **Agreement**.

**"Billing Increment"** means a Tariffed or **Sprint Scheduled** billing increment, unless otherwise stated in **Attachment B**.

**"Calling Card"** means a card issued to an **End User** in Customer's name containing an authorization code that the **End User** may use to originate calls over Sprint's network as provided in **Exhibit** 2.

**"CIC"** means an **IXC** carrier identification code.

**"CTIS"** means Sprint's Carrier Transport Invoicing System.

**"Day Rate Period"** means the Tariff or **Sprint Schedule** day rate period unless otherwise specified herein.

**"Discount One"** means a **Rate Element** specific discount that (1) is based on Customer's **Discount One Monthly Volume of Service** and (2) is applied to usage at the **Service Hierarchy Level** that has been priced at **Sprint Wholesale Solution Base Rates**.

**"Discount One Monthly Volume of Service"** means the volume of Customer's monthly usage, at each **Product Hierarchy Level**, for a specific **Rate Element** priced at **Sprint Wholesale Solution Base Rates**.

**"Discount Rate Period"** means the **Sprint Schedule** international discount rate period unless otherwise specified herein.

**"Discount Three"** means a **Rate Element** specific discount that (1) is based on Customer's **Discount Three Monthly Volume of Service** and (2) is applied at the **Product Hierarchy Level** or the **Service Hierarchy Level** to interstate or international usage to the **LATAs** or countries specified in **Attachment** C.

**"Discount Three Monthly Volume of Service"** means the volume of Customer's monthly usage, at the **Product Hierarchy Level** or **Service Hierarchy Level**, of interstate or international minutes to the specific **LATAs** or countries identified in **Attachment** C and priced based on the usage levels and **Rate Periods** specified in **Attachment** C.

**"Discount Two"** means a **Rate Element** specific discount that (1) is based on Customer's **Discount Two Monthly Volume of Service** and (2) is applied to usage at the **Service Hierarchy Level** that has been priced at **Sprint Wholesale Solution Base Rates** less **Discount One** discounts.

**"Discount Two Monthly Volume of Service"** means the volume of Customer's monthly usage, at the **Master Hierarchy Level**, of all **Resale Solution Services**, including directory assistance **Services**, priced at **Sprint Wholesale Solution Base Rates** after the application of **Discount One** discounts, but prior to the application of **Discount Two** discounts. **Discount Two Monthly Volume of Service** does not include **Sprint Wholesale Solution Service** charges that are not based on usage, Clearline Service charges, Private Line charges, any charge associated with access (dedicated or non-dedicated), facilities charges, any usage related fixed charge, any non-recurring charge such as installation charges, taxes, surcharges, transfer fees, or interest.

**"Early Termination Charge"** means the charge imposed for terminating the Agreement prior to expiration of the **Term** as provided in Paragraph 5 thereof.

**"Economy Rate Period"** means the **Sprint Schedule** international economy rate period.

**"End User"** means a customer of Customer to whom Sprint extends **Network Extension Service** at a **Non-Associated Location**.

**"Evening Rate Period"** means the **Tariff** or **Sprint Schedule** evening rate period unless otherwise specified herein.

**"Excusable Delay"** means any event that prevents a Party from performing its obligations hereunder and that is beyond the reasonable control and without the fault or negligence of such Party.

**"Exhibit"** means a supplement attached to, and a part of, the Agreement.

**"Forward Pricing Volume of Service"** means the volume of service specified in **Attachment A** upon which **Discount Two** discounts may be based as provided in Subparagraph 13.8 of the Agreement.

**"Interstate Adjustment"** means the adjustment under Subparagraph 6.2 to the invoice for interstate usage that is based on the level of intrastate usage.

**"Interstate Adjustment Rate"** means the rate identified in **Attachment D** that is used to determine the **Interstate Adjustment** as provided in Subparagraph 6.2.

**"IXC"** means interexchange carrier.

**"LEC"** means local exchange carrier.

**"Master Hierarchy Level"** means billing hierarchy level 1.

**"Maximum Noncomplete Toll Free Call Percentage"** means, for each month, for each **Service** type, the ratio, expressed as a percentage, of (i) the aggregate number of **Noncomplete Toll Free Calls** during such period divided by (ii) the aggregate number of Toll Free calls during such period. This percentage shall be calculated at each **Product Hierarchy Level**.

**"Maximum Non-Bell Traffic Percentage"** means, for each month, the ratio, expressed as a percentage, of (i) the number of minutes during such period that originate from, or terminate in, a **Non-Bell Service Area**, divided by (ii) the total number of minutes during such period. **Maximum Non-Bell Traffic Percentages** will be calculated independently for originating and terminating minutes at the **Product Hierarchy Level**.

**"Minimum Average Time Requirement"** means the minimum average call duration, expressed in minutes, for **Services** as specified in **Attachment B**. **Minimum Average Time Requirement** calculations will be made at each **Product Hierarchy Level**.

[redacted]

"**Minimum Commitment**" means the minimum monthly usage commitment stated on **Attachment A**. The calculation to determine whether Customer has met the **Minimum Commitment** shall be based on Customer's invoiced **Net Usage**.

"**Minimum Port Usage**" means the minimum **Net Usage** for **Dedicated Outbound Service** stated on **Attachment A** that Customer shall generate per **Active Dedicated Outbound Port**.

"**Network Extension Service**" means **Service** that Sprint extends to the **Non-Associated Location** of an **End User**.

"**Net Usage**" means the monthly amount invoiced for use of a **Service** net of **Discount One, Discount Two** and **Discount Three** discounts. **Net Usage** includes the following as they apply to particular **Services**: monthly per-minute usage charges invoiced under the Agreement; route advance charges; real time **ANI** charges; switched origination and termination charges; directory assistance charges; **Minimum Average Time Requirement** Surcharges; Noncomplete Call Surcharges; FONCard surcharges; and **LEC** Cap Surcharges.

"**Night/Weekend Rate Period**" means the **Tariff** or **Sprint Schedule** night/weekend rate period unless otherwise specified herein.

"**Noncomplete Toll Free Call**" means an attempted Switched Toll Free, Dedicated Toll Free, or Toll Free Extension call that is not completed to the called number for any reason.

"**Non-Associated Location**" means any physical premise to or from which Sprint provides **Service** that is not an **Associated Location**.

"**Non-Bell Service Area**" means the geographic service area of any "independent" **LEC** which is not a Bell Operating Company.

"**Off Peak Rate Period**" means (a) the **Evening Rate Period** and the **Night/Weekend Rate Period** for interstate traffic and (b) the **Discount Rate Period** and **Economy Rate Period** for international traffic.

"**Peak Rate Period**" means (a) the **Day Rate Period** for interstate traffic and (b) the **Standard Rate Period** for international traffic.

"**Per Minute Charge**" means the per minute charge for **Service** as set forth in **Exhibit C** based on **Rate Periods** and **Billing Increments** stated in **Attachment B**.

"**PIC**" means primary interexchange carrier

"**PIC Authorization**" means an **End User's** selection of a **PIC** that meets the requirements of federal and state law.

"**Primary Carrier**" means the **IXC** designated by Customer as its first routing choice and primary overflow carrier.

"**Primary Carrier Service**" means the **Service** specified in **Attachment A** for which Sprint shall be Customer's **Primary Carrier**.

"**Product Hierarchy Level**" means the fifth level in the Customer billing hierarchy, and is directly above the **Service Hierarchy Level** which ties like **Services** together for purposes of reporting. Each **Product Hierarchy Level** is considered independently for calculation and application of **Discount One, LEC** Cap Surcharges, **Minimum Average Time Requirement** Surcharges, **Noncomplete Toll Free Call** Surcharges and **Minimum Port Usage** Surcharges.

"**Promotional Discounts**" is a collective reference to **Discount One, Discount Two, Discount Three** and **Interstate Adjustments**.

"**Proposal Date**" means the date indicated on **Attachment A** that the Agreement is offered by Sprint to Customer.

"**Proprietary Information**" means (a) written information of a Party which is clearly and conspicuously marked as proprietary or confidential or which is accompanied by written notice that such information is confidential, or (b) a verbal communication which is subsequently confirmed in writing to the other Party as confidential or proprietary information which (i) is maintained in confidence and secrecy by the disclosing Party, (ii) is valuable to the disclosing Party because of such confidence or secrecy, and (iii) is subject to the disclosing Party's reasonable efforts to maintain such confidentiality and secrecy. **Proprietary Information** shall not include information which (1) is at any time in the public domain other than through wrongdoing on the part of an entity owing a duty of confidentiality to the disclosing Party, (2) is within legitimate possession of the receiving Party without obligation of confidentiality, (3) is lawfully received from a third party having rights therein without restriction of the right to disseminate the information, (4) is independently developed without breach of any obligation of confidentiality through parties without access to or knowledge of such **Proprietary Information**, (5) is disclosed with prior written approval of the other Party, (6) is transmitted after the disclosing Party has received written notice from the receiving Party that it does not desire to receive further **Proprietary Information**, or (7) is obligated to be produced under order of a court of competent jurisdiction.

"**Rate Element**" means a jurisdictional element of the rate for a particular **Service**. For example, Dedicated Outbound rates consist of separate **Rate Elements** for interstate, intrastate, Canada, Mexico domestic, Mexico international, other international, and directory assistance usage.

"**Rate Periods**" is a collective reference to the **Day Rate Period, Discount Rate Period, Economy Rate Period, Evening Rate Period, Night/Weekend Rate Period, Off Peak Rate Period, Peak Rate Period,** and **Standard Rate Period**.

"**Service**" means the service identified in the **Exhibits** and **Attachments** that Sprint shall provide and Customer shall purchase hereunder.

"**Service Element**" means any line, circuit or other unit of a Service. In the case of switched or virtual **Services**, '**Service Element**" means switched or virtual **Services** provided at a Customer location.

"**Service Hierarchy Level**" means the sixth and lowest level in the Customer's billing hierarchy.

"**Sprint Schedule(s)**" means the applicable schedule posted by Sprint on Sprint's web site at www.sprint.com/ratesandconditions, under "Rates for Business."

"**Sprint Wholesale FONCard Service**" means a Service consisting of a Sprint authorization code incorporated into Customer's **Calling Card** which, together with Customer's service enhancements, is provided to **End Users** for use in originating calls over Sprint's network as provided in **Exhibit 2**.

"**Sprint Wholesale Solution Base Rates**" means the prices provided herein for **Sprint Wholesale Solution Service**.

"**Sprint Wholesale Solution Service**" means switched Service purchased under the Agreement and invoiced under **CTIS**.

"**Standard Rate Period**" means the **Sprint Schedule** standard rate period for international Service unless otherwise specified herein.

"**Tariff(s)**" means any applicable tariff filed by Sprint with a state regulatory commission for intrastate **Service**. Should Sprint no longer file **Tariffs** in order to provide **Service**, then **Tariff** shall mean the standard rate tables and terms and conditions that replace such **Tariffs**.

"**Term**" means the term of the Agreement as provided in Paragraph 3 thereof.

# EXHIBIT 2

## SERVICES

The following Services are provided pursuant to the Agreement:

1. OUTBOUND SERVICE.

1.1. SPRINT WHOLESALE DEDICATED OUTBOUND AND SPRINT WHOLESALE OUTBOUND EXTENSION. Dedicated Outbound and Outbound Extension as further defined below are provided hereunder for switched outbound traffic with interstate or international termination that originates over dedicated special access (DS-1 or DS-3) circuits.

1.2. SPRINT WHOLESALE DEDICATED OUTBOUND (also referred to herein as Dedicated Outbound). Dedicated Outbound is Service subscribed to, and paid for, by Customer that originates from an **Associated Location**. Dedicated Outbound may be obtained only by a carrier with its own **CIC**.

1.3. SPRINT WHOLESALE OUTBOUND EXTENSION (also referred to herein as Outbound Extension). Outbound Extension is Service subscribed to, and paid for, by Customer but connected directly to a **Non-Associated Location**.

1.4. SPRINT WHOLESALE SWITCHED OUTBOUND (also referred to herein as Switched Outbound). Switched Outbound is provided hereunder for switched access outbound traffic utilizing Feature Group D protocol having interstate or international termination.

2. TOLL FREE SERVICE.

2.1. SPRINT WHOLESALE DEDICATED TOLL FREE and SPRINT WHOLESALE TOLL FREE EXTENSION. Dedicated Toll Free and Toll Free Extension as further defined below are provided hereunder for Customer switched inbound traffic with interstate or international origination that terminates over dedicated special access (DS-1 or DS-3) circuits.

2.2. SPRINT WHOLESALE DEDICATED TOLL FREE (also referred to herein as Dedicated Toll Free). Dedicated Toll Free is Toll Free Service subscribed to, and paid for, by Customer that terminates to an **Associated Location**. Dedicated Toll Free may be obtained only by a carrier with its own **CIC**.

2.3. SPRINT WHOLESALE TOLL FREE EXTENSION (also referred to herein as Toll Free Extension). Toll Free Extension is Toll Free Service subscribed to, and paid for, by Customer but connected directly to a **Non-Associated Location**.

2.4. SPRINT WHOLESALE SWITCHED TOLL FREE (also referred to herein as Switched Toll Free). Switched Toll Free is provided hereunder for switched inbound traffic, terminating on Feature Group D protocol, having interstate or international origination.

2.5. INTERNATIONAL TOLL FREE ORIGINATION. International Toll Free Service ("ITFS") shall be provided subject to availability. Because of a limited quantity of Toll Free numbers in some countries, Sprint may, as it deems appropriate, after 30 days notice, disconnect any ITFS number which does not generate at least 60 minutes of usage during any period of three consecutive months. ITFS traffic must be terminated directly in the continental U.S. If reorigination occurs, ITFS traffic is subject to foreign PTT interruption and is beyond Sprint's control. ITFS Service shall be provided pursuant to **Sprint Schedule**, including rates, discounts and Toll Free number charges, unless otherwise provided herein.

3. DIRECTORY ASSISTANCE.

3.1. INTERSTATE. Interstate directory assistance provided hereunder must have a domestic origination over Customer's circuits. Sprint may modify directory assistance prices provided in the Agreement to reflect changes in LEC directory assistance charges.

3.2. INTERNATIONAL. International directory assistance is provided pursuant to **Sprint Schedule**. International directory assistance must have a domestic origination over Customer's circuits and request numbers must be located in the countries listed in **Sprint Schedule No. 1**, Section 2.1. International directory assistance may be obtained by calling a Sprint operator who will request the number from the appropriate country's international operator. Sprint may modify directory assistance prices provided in the Agreement to reflect changes in directory assistance charges of other countries.

3.3. TOLL FREE DIRECTORY LISTINGS. Customer's Toll Free numbers shall not be eligible for any toll free directory listing at Sprint's expense.

4. SPRINT WHOLESALE FONCARD SERVICE.

4.1. **Sprint Wholesale FONCard Service** (also referred to herein as FONCard) consists of an authorization code issued by Sprint which Customer will incorporate into a **Calling Card**. The **Calling Card**, together with Customer provided service enhancements, will be provided in Customer's name to **End Users** who may use the card to originate calls over Sprint's network in the contiguous U.S. and selected countries. Sprint will transport Customer's **Calling Card** traffic with the same quality as Sprint FONCard traffic.

4.2. Availability. **Sprint Wholesale FONCard Service** is provided subject to (a) availability and compatibility of facilities, (b) Customer fulfillment, and (c) Toll Free access origination, which Customer agrees may be withheld by Sprint in certain LATAs because of facility constraints.

4.3. Activation. Sprint will provide Customer with activated authorization codes to be imprinted on Customer's **Calling Cards**. The codes will be provided within 30 days following Customer's request and notice to Sprint of Customer's fulfillment vendor.

4.4. Toll Free Access. Customer may elect **Calling Card** access to a Sprint operator using either a "Generic" or "Branded" Toll Free access number. The operator response to a Generic Toll Free call will be similar to: "Long Distance, may I help you?" Calls to a Branded access number will be answered by an operator assigned exclusively to Customer. Operator response to Branded access calls will be similar to: "(Customer) Long Distance Operator."

Customer shall pay a non-recurring charge for establishing account access as provided in **Attachment B**.

4.5. Service Representative. Sprint will designate a representative to provide Customer service. This representative will not be available for direct contact by End Users.

Attachment A - I

A.3. **Term of Agreement:** 24 months.

A.13.8. **Forward Pricing - Forward Pricing Volume of Service**

N/A

A.14.1. **Minimum Commitment:**

| Months | Carrier Transport Monthly Net Usage Commitment |
|---|---|
| 1-24 | $0 |

A.14.5. **Minimum Port Usage:** $100 Minimum Net Dedicated Outbound Usage Per Port

**Promotional ACF/COC/EFC Charges**

All ACF Charges will be per applicable tariff.
Monthly recurring COC charges will be $2.50 per port.
Monthly recurring EFC charges will be $5.50 per port when Customer utilizes Sprint's entrance facilities.

**Primary Carrier Requirement**

N/A

A.34 **Proposal Date:** August 28, 2003

# MCI WorldCom On-Net Service Agreement

Locus Telecommunications, Inc.
111 Sylvan Avenue

Englewood Cliffs, NJ 07632

**MCI WorldCom — Office Use Only**
Corp ID:
Segment: TE
Contract: 345858-02
Billing Code: O1|9701
Sales Rep: Stephen Lavender (973) 630-7674

**Locus Telecommunications, Inc.**

Jason Chon, President — 9/24/01 Acceptance Date

**MCI WORLDCOM Communications, Inc.**

Frank Gallo, Vice President of Marketing — 9-28-01 Acceptance Date

ACCEPTANCE DEADLINE: This Agreement shall be of no force and effect and the offer contained herein shall be deemed withdrawn unless this Agreement is executed by Customer and delivered to MCI WorldCom on or before October 19, 2001.

This Agreement for MCI WorldCom On-Net Services together with any attachments or amendments made part hereof ("Agreement") is made by and between MCI WORLDCOM Communications, Inc. on behalf of itself and its U.S.-based affiliates and successors ( "MCI WorldCom") and Locus Telecommunications, Inc. ("Customer") as of the Customer's signature date in this Agreement. MCI WorldCom or the providing affiliate shall provide to Customer the service(s) and associated equipment (the "Services") at the rates, discounts and other terms and conditions described in this Agreement. The rates, discounts, charges and credits set forth herein shall be effective the first day of the first full billing cycle following the acceptance and execution of this Agreement by MCI WorldCom ("Effective Date"). NOTICE: All notices or inquiries from Customer shall be sent to the Customer's WorldCom account representative or to MCI WorldCom Communications, Inc., 500 Clinton Center Drive, Building 4, 4th Floor, Clinton, MS 39056, Fax number: (601) 460-8377.

**DEFINITIONS**

1.1 "Base Rates" shall mean
- (i) For Services based on Tariff rates, the standard Tariff rates or the Tariff rates as reduced by the discounts (if any) provided to Customer pursuant to this Agreement,
- (ii) For non-Tariff Services, the MCI WorldCom rates as reduced by the discounts (if any) provided to Customer pursuant to this Agreement;

1.2 "Eligible Services" shall mean those Services whose Usage Charges contribute towards satisfying the volume commitment to which Customer has agreed to under this Agreement.

1.3 "Monthly Period" shall mean the monthly billing period for Services under this Agreement.

1.4 "Contract Year" shall mean each consecutive twelve (12) month period of the Term commencing on the Effective Date and ending on each anniversary thereof.

1.5 "Usage Charges" shall mean Customer's recurring usage charges for one or more Services provided under this Agreement calculated at Base Rates. Usage Charges exclude the following:
- (i) Taxes and tax related surcharges;
- (ii) Charges for equipment and collocation;
- (iii) Charges incurred for goods or services where MCI WorldCom or an MCI WorldCom affiliate acts as agent for Customer in its acquisition of goods or services;
- (iv) Standard non-recurring charges;
- (v) Calling card surcharges (except as otherwise expressly provided for herein);
- (vi) Other Tariffed charges, including, without limitation, Universal Service Fund charges, Primary Interexchange Carrier Charges, and Payphone Use charges and similar charges; and
- (vii) Other charges expressly excluded by this Agreement.

**TERMS AND CONDITIONS**

SERVICE PROVISIONING AND RECEIPT: MCI WorldCom will provide to Customer international, interstate, intrastate and local telecommunications service(s) pursuant to the applicable tariffs and price lists of MCI Telecommunications Corporation, MCI WorldCom, Inc., WorldCom Technologies, Inc.; MCI WORLDCOM Communications, Inc., MCI WorldCom Network Services, Inc., and their U.S.-based affiliates and successors, including the MCI WorldCom Tariff F.C.C. No. 1 , MFS FCC Tariff No. 2 and the applicable state tariffs (individually, a "Tariff" and collectively, the "Tariffs"), each as supplemented by this Agreement to the extent permitted by law. This Agreement incorporates by reference the terms of each such Tariff. MCI WorldCom may modify its Tariffs from time to time in accordance with law and thereby affect the services furnished to Customer. In the event of inconsistency between the Terms of the Tariff and this Agreement, the Tariff shall be deemed controlling. Capitalized terms not otherwise defined herein shall have the meaning given them in the Tariffs.

SERVICE CONSIDERATIONS: This Agreement is binding upon acceptance and execution by MCI WorldCom. Acceptance of this Agreement by MCI WorldCom is subject to Customer meeting the terms and conditions set forth in the Tariff and MCI WorldCom's standard credit terms and conditions which may be based on commercially available credit reviews to which Customer hereby consents.

COMMITMENT/TERM: Customer agrees to an Annual Volume Commitment ("AVC") of nine hundred thousand dollars ($900,000) and an initial service Term (the "Initial Term") that shall begin on the Effective Date and end upon the completion of twelve (12) months. The Agreement, however, will be


©1998, MCI WorldCom Group, Inc. All Rights Reserved.

# MCI WorldCom On-Net Service Agreement

automatically renewed for an equivalent term and volume commitment (individually a "Renewal Term" and collectively, the "Renewal Terms") upon expiration of the Initial Term or the immediately preceding Renewal Term, unless either party has delivered written notice of its intent to terminate the Agreement at least thirty (30) days prior to the end of the then current Term. "Term" shall mean the "Initial Term" and all "Renewal Terms" collectively.

RATES AND DISCOUNTS: Except as expressly provided to the contrary, the rates and discounts set forth in this Agreement are in lieu of, and not in addition to any discounts, promotions and/or credits (Tariffed or otherwise). In the event Customer receives services that are not the subject of rates, charges and discounts expressly set forth in this Agreement, Customer shall pay WorldCom's standard rates as set forth in the Tariff (if applicable) or in the Service Publication and Price Guide (referenced below) for those services. Further, for any services purchased after the expiration of the Term, Customer shall pay WorldCom's standard rates as set forth in the Tariff or Service Publication and Price Guide for those services.

The rates set forth in this Agreement do not include, and the discounts set forth in this Agreement do not apply to, the following: charges for MCI WorldCom Services other than those set forth in this Agreement; access or egress (or related) charges imposed by third parties; standard Tariffed non-recurring charges and monthly recurring non-usage charges; calling card surcharges (unless expressly provided for herein); taxes, tax-related or tax-like surcharges; and other Tariffed charges. Customer agrees to pay all these additional charges, to the extent applicable, in addition to the charges set forth in this Agreement. All references to "intrastate" and "interstate" contained herein refer to domestic U.S. Services only. Any rounding of rates and charges will be governed by the Tariff.

SERVICE ORDERS. Customer shall request the delivery of the Service by executing a service order in form and substance satisfactory to MCI WorldCom (the "Service Order"). The Service Order sets forth the place of delivery and other details. All Service Orders are subject to the terms and conditions of this Agreement, including the Tariffs. A separate Service Order must be completed for each circuit ordered. Each Service Order must have a minimum term of twelve (12) consecutive monthly billing periods.

The rates and discounts set forth in this Agreement are applicable to Service Orders dated after the Effective Date of this Agreement. Any services purchased under a Service Order, the duration of which extends beyond the expiration of the Term, shall continue to be provided for the term set forth in the Service Order and shall continue to be governed by the terms and conditions of this Agreement. Any service orders implemented prior to the Effective Date (if any) shall remain in full force and effect at the rates set forth therein. Existing Service Orders placed by Customer prior to the Effective Date that are subject to a term commitment will not be re-priced upon the effectiveness of this Agreement; provided, however, that (i) when the term of such existing Service Orders expires; or (ii) for existing Service Orders not subject to a term commitment, Customer may receive the rates set forth herein upon signing a new term commitment for such Service Orders. Notwithstanding a termination of a Service Order, the Agreement and other Service Orders will remain in full force and effect unless expressly terminated as permitted by this Agreement.

If Customer terminates a Service Order prior to the end of the Service Order term for reasons other than for Cause or if MCI WorldCom terminates a Service Order for Cause, then Customer will pay the monthly recurring charges for the remainder of the Service Order term within thirty (30) days after such termination; provided, however, that Customer may terminate a Service Order for circuit speeds equal to DS-1 or lesser without penalty, except for charges accrued but yet unpaid, if such termination occurs six (6) monthly billing periods after the date of the Service Order. Notwithstanding a termination of a Service Order, the Agreement and other Service Orders will remain in full force and effect unless expressly terminated as permitted by this Agreement.

PAYMENT TERMS: Customer agrees to pay MCI WorldCom for Services, including any applicable underutilization charges or early termination charges according to the terms of the Agreement. Amounts not paid within thirty (30) days after the date of invoice shall be considered past due. All amounts due for services shall be billed and paid in United States dollars. Customer agrees to pay to MCI WorldCom the lesser of an annual interest rate of 18% (or a monthly rate of 1.5%) or the maximum amount allowed by law on all accounts which are not paid on or before thirty (30) days from the billing date found on the invoice.

UNDERUTILIZATION AND EARLY TERMINATION CHARGES: Underutilization Charges: If at the end of any Contract Year, Customer's Eligible Services Usage Charges during such Contract Year fails to meet or exceed the AVC, Customer shall pay, in addition to all other charges under this Agreement, the difference between the AVC and Customer's Eligible Services Usage Charges during such Contract Year.

Early Termination Charges: If, 1) Customer terminates this Agreement prior to the expiration of any Term, for reasons other than (i) for "Cause" (as defined below) or ii) to take service under another arrangement with MCI WorldCom having equal or greater term and volume requirements; or 2) MCI WorldCom terminates this Agreement for Cause, Customer will be required to pay, in addition to all accrued but unpaid charges through the date of such termination, the difference between Customer's actual Eligible Services Usage Charges and the AVC for the year of termination. For each remaining year of the Term, Customer shall be required to pay fifty percent (50%) of the AVC.

As used herein, "Cause" shall mean a failure of the other party to perform a material obligation under this Agreement which failure is not remedied by the defaulting party within thirty (30) days of written notice thereof.

APPLICABLE SERVICES: This Agreement applies only to those Services selected by Customer and provided pursuant to the On-Net Services Attachment and applicable Tariffs for the following services: Access, IXC Private Line, Metro Private Line. Customer locations receiving Service under this Agreement will be as agreed by the parties from time to time via service orders or other written orders referencing the Customer ID assigned hereto.

TARIFF AND GUIDE: MCI WorldCom's provision of Services to Customer will be governed by MCI WorldCom's Tariffs and MCI WorldCom's Service Publication and Price Guide ("Guide"), each as supplemented by this Agreement. This Agreement incorporates by reference the terms of each such Tariff and the Guide. When any Tariff provisions are canceled, Services will continue to be provided pursuant to this Agreement, as supplemented by the terms and conditions contained in the Guide, which will contain MCI WorldCom's standard rates, product descriptions, terms and conditions that formerly had been tariffed. The Guide is incorporated herein by reference and will be available to Customer on MCI WorldCom's Internet website (www.worldcom.com) and at MCI WorldCom's offices during regular business hours at 500 Clinton Center Drive, Clinton, Mississippi 39056. The Company may modify the Guide from time to time, and any modification made will become effective and binding on Customer beginning on the first day of the next monthly billing cycle, provided that no change shall become effective and binding on Customer until it has been posted in the Guide for at least fifteen (15) calendar days. The contractual relationship between MCI WorldCom and Customer shall be governed by the following order of precedence: (a) Tariffs; (b) provisions in this Agreement that expressly apply in lieu of, or that apply in addition to, provisions contained in Tariffs and/or the Guide; and (c) provisions contained in the Guide. MCI WorldCom may adjust its rates and charges or impose additional rates and charges in order to


©1998, MCI WorldCom Group, Inc. All Rights Reserved.

# MCI WorldCom On-Net Service Agreement

recover amounts it is required or permitted by governmental or quasi-governmental authorities to collect from or pay to others in support of statutory or regulatory programs ("Governmental Charges"). Examples of such Governmental Charges include, but are not limited to, Universal Service funding, Primary Interexchange Carrier Charge cost recovery, and compensation payable to payphone service providers for use of their payphones to access MCI WorldCom's service. If MCI WorldCom makes any changes to the Guide or Governmental Charges which affect Customer in a material and adverse manner, Customer, as its sole remedy, may discontinue the affected Service without liability by providing MCI WorldCom with written notice of discontinuance within sixty (60) days of such change. Customer shall pay all charges incurred up to the time of Service discontinuance. MCI WorldCom may avoid Service discontinuance if, within thirty (30) days of receipt of Customer's written notice, it agrees to amend this Agreement to eliminate the applicability of the material and adverse change. If a Service is discontinued hereunder, the Customer's volume commitment will be reduced, as appropriate, to accommodate the discontinuance. A "material and adverse change" shall not include, nor be interpreted to include, the introduction of a new service or any new service feature associated with an existing service, including all terms, conditions and prices relating thereto.

CONFIDENTIAL INFORMATION: Customer will not disclose to any third party any of the terms and conditions of this Agreement. MCI WorldCom reserves the right to terminate this Agreement by giving written notice to Customer in the event of any impermissible disclosure hereunder.

ASSIGNMENT: This Agreement may not be assigned by Customer by operation of law or otherwise, except with the prior written consent of MCI WorldCom.

GOVERNING LAW: This Agreement shall be governed by and construed in accordance with the domestic laws of the State of New York without regard to its choice of law principles, except to the extent the Communications Act of 1934, as amended, applies.

USE OF SERVICE MARKS, TRADEMARKS AND NAME: Customer shall not: (i) use any service mark or trademark of MCI WorldCom or any third party of which MCI WorldCom is a licensee; or (ii) refer to MCI WorldCom in connection with any product, equipment, offering, advertising, promotion, press release or publication of Customer or a third party on behalf of or with the authorization of Customer, without MCI WorldCom's prior written approval. Customer agrees that: (i) any permitted use of MCI WorldCom's service marks or trademarks is for the exclusive benefit of MCI WorldCom; (ii) all good will resulting from use of such service marks or trademarks vests solely in MCI WorldCom; and (iii) Customer will neither have nor make any claim in or to such service marks or trademarks.

ENTIRE AGREEMENT: This Agreement, (and any attachments or amendments made hereto) together with the Tariffs, constitutes the entire agreement between the parties with respect to its subject matter and supersedes all other representations, understandings or agreements that are not expressed herein, whether oral or written (except for unpaid amounts owed by Customer to MCI WorldCom). Except for Tariff modifications initiated by MCI WorldCom, no amendment to this Agreement or the like, will be valid unless in writing and signed by both parties. No MCI WorldCom employee has any right to alter the terms of this Agreement. Customer represents that it has the authority to execute this Agreement

**Customer Premises Equipment ("CPE")**
Customer shall be responsible for obtaining, installing, connecting and maintaining the requisite CPE at Customer's sites and for obtaining any necessary licenses. Unless otherwise agreed, MCI WorldCom shall not be responsible for the performance or maintenance of any CPE. For Customer's US sites, Customer may obtain required CPE and related maintenance from MCI WorldCom under separate agreement or addendum. Customer shall remain liable for charges for the MCI WorldCom Service regardless of whether Customer is accessing and using the MCI WorldCom Service. Customer acknowledges and agrees that MCI WorldCom is not liable, either in contract or in tort, for any loss resulting from access to or alteration of, theft, destruction, corruption, or use of, facilities used in connection with the Service. Customer agrees to provide MCI WorldComand its subcontractors and their respective employees and agents access to Customer's sites where any Service is provided (including access to associated equipment) as necessary for MCI WorldCom and its subcontractors to perform the Service. CPE charges shall not contribute toward Customer's AVC or to Customer's discounts under this Agreement.

ADDITIONAL ATTACHMENTS: This Agreement incorporates the following Attachment(s):
Attachment A - Customer Profile
Attachment B - Promotions
Attachment C - Special Pricing


©1998, MCI WorldCom Group, Inc. All Rights Reserved.

# MCI WorldCom On-Net Service Agreement
# Attachment A

### *Customer Profile*
### *for Locus Telecommunications, Inc.*

## MCI WorldCom Commercial Customer Profile

**Sales Information**

| Sales Rep / ARM Name | Sales Rep ID | | |
|---|---|---|---|
| Stephen Lavender | | ☐ East ☐ West | ☐ National ☐ Agents |

East & National / Telecom: 6929 N. Lakewood Ave., Tulsa, OK 74117 (918-590-6000)
West & Agents: 20855 Stone Oak Parkway, San Antonio, TX 78258 (210-484-2454)

**Applicant Information**

| Complete Company Name (If incorporated, name shown on corporate charter) | | Taxpayer ID (Required) | Date Business Started |
|---|---|---|---|
| Locus Telecommunications, Inc. | | 223488343 | |
| Main Business Phone Number: 2015853600 | Type of Business (Required): Telecommunications Services | State of Incorporation: DE | Date of Incorporation: 01/01/1989 |
| Street Address — Line 1: 111 Sylvan Avenue | | | |
| Street Address — Line 2: | City: Englewood Cliffs | State: NJ | Zip + 4: 07632 |
| Billing Address — Line 1: 111 Sylvan Avenue | | | |
| Billing Address — Line 2: | City: Englewood Cliffs | State: NJ | Zip + 4: 07632 |

**Parent or Subsidiary Information**

| Check One | Name of Business | State of Incorporation | Percentage Owned |
|---|---|---|---|
| ☐ Parent ☐ Subsidiary | | | |

**Principal, Partner, and Major-Shareholder Information** *List the complete names of all principals, partners, and major shareholders.*

| Check One | | |
|---|---|---|
| ☐ Sole Proprietorship ☐ Partnership | Name of Owner: Jason Chon | Social Security Number: |
| ☐ LLC ☐ LLP | Name of Partner 1: | Social Security Number: |
| ☒ Private Corporation | Name of Partner 2: | Social Security Number: |
| ☐ Public Corporation Stock Symbol: | Name of Officer 1: Jason Chon | Title: |
| | Name of Officer 2: | Title: |

**References**

| Name of Bank | Phone | Fax |
|---|---|---|
| Chase Manhattan Bank, N.A. | 2019472372 | |
| Lending Officer: Ms. Lena Del'Rosso | Account Number: 7212521965 | |
| Previous or Existing Local-Service Provider: Worldcom/MFS | Previous or Existing Long-Distance Provider: WorldCom | |

**General Trade References** *List businesses with which the Applicant has traded within the last 12 months.*

| | Company | Name of Contact | Phone | Fax |
|---|---|---|---|---|
| 1 | RSL Communications | Dean J Anzalone | 8188887600 | 818992319 |
| 2 | Qwest Communications | Tom Bartnick | 7033634316 | 8885242070 |
| 3 | Startec Global | Sherry Hicks | 3013658959 | 3013651885 |

**Usage and Credit**

| Estimated Monthly Usage | Requested Credit Limit | Application Tracking ID |
|---|---|---|
| 150000 | | 172713 |
| Name of Person Providing Information: Jason Chon | Title of Person Providing Information: President | |

©1998, MCI WorldCom Group, Inc. All Rights Reserved.

# MCI WorldCom On-Net Service Agreement
# Attachment B

## *Promotions for Locus Telecommunications, Inc.*

**WORLDCOM FULL INSTALLATION WAIVER PROMOTION**
By enrolling in this promotion between April 1, 2001 and September 30, 2001, customers adding new circuits will receive a full waiver for the port start-up charge for eligible circuits. New circuits must be ordered by October 31, 2001 and installation must be complete by November 30, 2001.

**METRO PRIVATE LINE FULL INSTALLATION WAIVER**
Customers adding new Metro Private Line circuits are eligible to receive a waiver of the Metro Private Line Port start-up charge of $225 for a DS0, $250 for a DS1 and $300 for a DS3 circuit enrolled during the promotional period. Expedited orders are not eligible for this promotion.

| | BAN #: | CIRCUIT ID #: | IXPlus Account #: | Physical Street Address of Circuit Installed (Required) | State | ZIP |
|---|---|---|---|---|---|---|
| 1 | | | | | | |
| 2 | | | | | | |
| 3 | | | | | | |
| 4 | | | | | | |
| 5 | | | | | | |
| 6 | | | | | | |
| 7 | | | | | | |
| 8 | | | | | | |
| 9 | | | | | | |
| 10 | | | | | | |

**PRIVATE LINE 2 STEP RATE IXC PROMOTION**
Beginning April 1, 2001 and ending June 30, 2001, new and existing customers of WorldCom Private Line Service who enroll in this promotion and order new WorldCom DS-0 service or WorldCom DS-1 service under a new term of service with a minimum term commitment of one year will receive the Promotional rate set forth above and in the WorldCom Network Services, Inc. FCC Tariff No. 4, and any successor tariff(s). To be eligible to receive the benefits of this promotion, the new WorldCom DS-0 service or WorldCom DS-1 service must be ordered by July 31, 2001 and installed by Spetember 30, 2001. The promotional rate will be applied to the monthly recurring per-circuit charge for each new WorldCom DS-0 circuit or WorldCom DS-1 circuit ordered based on circuit type and route mileage as described above. The promotional discount will be applied in addition to all other discounts for which the Customer qualifies. Fractional DS1 and DS3 private line services are excluded. Expedited orders will not be eligible for this promotion.

| Miles | 1-499 | 500-1000 | 1001+ |
|---|---|---|---|
| DS0 | $400 | $500 | $600 |
| DS1 | $4,500 | $5,500 | $6,500 |

| | IX Plus ID (Required) | F&E ID (Required) | NPA-NXX (Required) | Street Address (Required) | State (Required) | ZIP (Required) |
|---|---|---|---|---|---|---|
| 1 | | | | | | |
| 2 | | | | | | |
| 3 | | | | | | |
| 4 | | | | | | |
| 5 | | | | | | |
| 6 | | | | | | |
| 7 | | | | | | |
| 8 | | | | | | |
| 9 | | | | | | |
| 10 | | | | | | |

**METRO PRIVATE LINE SERVICE INSTALLATION GUARANTEE**
If Customer enrolls in this Metro Private Line Service Installation Guarantee promotion and requests an order for installation of five (5) or fewer new Type 1 Metro Private Line Access Service Digital Data Service (DS-0), High Capacity Service (DS-1), Very High Capacity Service (DS-3) and/or Metro Private Line SONET Service at OC3 and OC12 circuits (the "New Service") on or before October 31, 2001, WorldCom guarantees installation of Customer's New Service within a Service Installation Period (as defined below) which does not exceed the longer of (i) the period specified for installation in the Customer's order for the service or (ii) the following number of days, excluding weekends and holidays, based on the circuit type (the "Service Installation Guarantee" or "SIG"):

| Circuit Type | Days |
|---|---|
| DS-0 | 14 |
| DS-1 | 14 |
| DS-3 | 20 |
| OC3 | 30 |
| OC12 | 30 |

As used herein, "Service Installation Period" means the span of time commencing on the date WorldCom accepts a completed Customer order for installation and ending on the date WorldCom completes installation of the New Service and the New Service becomes available for Customer's use. If WorldCom fails to satisfy the SIG, WorldCom will provide a credit equal to fifty percent (50%) of the monthly recurring charges for circuits installed one

©1998, MCI WorldCom Group, Inc. All Rights Reserved.

# MCI WorldCom On-Net Service Agreement
# Attachment B (Continued)

(1) to ten (10) business days after the SIG and one hundred percent (100%) of the monthly recurring charges for circuits installed more than ten (10) business days after the SIG. To receive a credit to which Customer is entitled under this promotion, Customer must make a written request for such credit to WorldCom within five (5) business days of the completed installation of the qualifying New Service. When making this credit request, Customer must provide WorldCom with the following information: (1) the date the Service Installation Period commenced; (2) the date specified for installation in the Customer order; (3) the date installation was completed; (4) the circuit ID for each circuit that was not installed within the SIG; and (5) the Customer's order number.

Calculations to determine a credit will not include time during which the SIG is not satisfied as the result of any of the following circumstances or conditions:

i) Any act or omission of Customer, its agents or vendors, including changing a previously accepted service order;
ii) Delays due to causes beyond the control of WorldCom;
iii) Delays resulting from an order suspension due to credit issues involving the Customer;
iv) Delays resulting from extension of the access circuit demarcation point;
v) Delays resulting from inaccurate or incorrect order information from the Customer;
vi) Force majeure events beyond the reasonable control of WorldCom, including, but not limited to, acts of God, government regulation, and national emergency;
vii) Labor strikes or work stoppages affecting service; or,
viii) Unavailability of Customer's premises, CPE or facilities required to install service.

This promotion does not apply to service requiring special construction or service provided under an individual cases basis or other special service arrangement.


©1998, MCI WorldCom Group, Inc. All Rights Reserved.

# MCI WorldCom On-Net Service Agreement
# Attachment C

## *Special Pricing*
## *for Locus Telecommunications, Inc.*

Metro Private Line Service.

(Type 1). In lieu of all other rates and discounts (Tariffed or otherwise), Customer will pay the monthly recurring charges per circuit set forth in Table 1 based on circuit type, circuit location, and mileage.

### Table 1 Monthly Recurring Charges per Circuit

| DS-3 Point to Point | | | | | | | |
|---|---|---|---|---|---|---|---|
| Mileage | Ameritech | Bell Atlantic | BellSouth | NYNEX | Pacific Bell | Southwestern Bell | U.S. West |
| 0 Mile | $1,575.00 | $2,820.00 | $1,575.00 | $1,575.00 | $1,575.00 | $1,575.00 | $1,575.00 |
| 1 Mile | $1,920.00 | $3,165.00 | $1,920.00 | $1,920.00 | $1,920.00 | $1,920.00 | $1,920.00 |
| Each Additional Mile | $45.00 | $45.00 | $45.00 | $45.00 | $45.00 | $45.00 | $45.00 |
| DS-3 Hubs | | | | | | | |
| Mileage | Ameritech | Bell Atlantic | BellSouth | NYNEX | Pacific Bell | Southwestern Bell | U.S. West |
| 0 Mile | $1,147.50 | $1,770.00 | $1,147.50 | $1,147.50 | $1,147.50 | $1,147.50 | $1,147.50 |
| 1 Mile | $1,492.50 | $2,115.00 | $1,492.50 | $1,492.50 | $1,492.50 | $1,492.50 | $1,492.50 |
| Each Additional Mile | $45.00 | $45.00 | $45.00 | $45.00 | $45.00 | $45.00 | $45.00 |
| DS-1 Endlinks | | | | | | | |
| Mileage | Ameritech | Bell Atlantic | BellSouth | NYNEX | Pacific Bell | Southwestern Bell | U.S. West |
| 0 Mile | $112.50 | $136.50 | $127.50 | $112.50 | $97.50 | $112.50 | $97.50 |
| 1 Mile | $162.00 | $184.50 | $175.50 | $168.00 | $136.00 | $162.00 | $145.50 |
| Each Additional Mile | $12.00 | $10.50 | $10.50 | $18.00 | $10.50 | $12.00 | $10.50 |

DS-3 MUX (Type 1). In lieu of all other rates and discounts (Tariffed or otherwise), Customer will pay a monthly recurring charge per DS-3 MUX equal to Three Hundred Fifty Dollars ($350).

DS-1 (Type 2). In lieu of all other rates and discounts (Tariffed or otherwise), Customer will pay the standard Incumbent Local Exchange Carrier Tariff rate less twenty-five percent (25%) or the MCI WorldCom off-net cost plus twenty-five percent (25%), whichever is greater.

DS-3 (Type 2). In lieu of all other rates and discounts (Tariffed or otherwise), Customer will pay the standard Incumbent Local Exchange Carrier Tariff rate less twenty-five percent (25%) or the MCI WorldCom off-net cost plus twenty-five percent (25%), whichever is greater.

©1998, MCI WorldCom Group, Inc. All Rights Reserved.

# GLOBAL BANDWIDTH SERVICES AGREEMENT

This Global Bandwidth Services Agreement (this "Agreement") is made as of the 26 day of MARCH, 2003 (the "Effective Date"), by and between **PRIMUS TELECOMMUNICATIONS, INC.**, a company organized and existing under the laws of Delaware, USA, having a business address at 1700 Old Meadow Road, McLean, Virginia 22102, USA ("PRIMUS") and **Locus Telecomunications, Inc.**, a company organized and existing under the laws of Delaware, having a business address at 111 Sylvan Avenue, Englewood Cliffs, NJ 07632 ("CUSTOMER"). CUSTOMER and PRIMUS may be referred to individually as a "Party" and collectively as the "Parties".

WHEREAS, PRIMUS is licensed to procure and provide telecommunication services, including bandwidth, as may be described in this Agreement and in Attachment A, attached hereto and made a part hereof; and

WHEREAS, CUSTOMER requests that PRIMUS provide it with certain telecommunication services and CUSTOMER agrees to accept and pay for said services pursuant to the terms hereof.

NOW, THEREFORE, in consideration of the premises, terms, and agreements contained herein, the Parties agree as follows:

1. <u>SERVICES.</u>

1.1 PRIMUS agrees to furnish to CUSTOMER, either directly or through its affiliates certain bandwidth services (the "Services"). The capacity, facilities, and technical specifications of the Services are set forth in this Agreement, including Attachment A. The Services shall, as far as commercially practicable, be available on a twenty-four hour a day, seven days a week (24/7) basis. PRIMUS shall provide all Services in accordance with standard industry practice as to quality and reliability.

1.2 The Services shall be provided, and shall be used by CUSTOMER, in accordance with the mode, speed and configuration specified in Attachment A. The Services shall be provided between the points stated in Attachment A. The CUSTOMER shall be responsible to provide, at it own risk and expense, the necessary facilities and/or equipment required to connect to the ports established by PRIMUS for the provision of the Services.

1.3 It is CUSTOMER'S responsibility to ensure that the technical characteristics of the CUSTOMER premises equipment, excluding equipment specifically approved by PRIMUS at the points of origin and destination, does not interfere with or otherwise degrade the Services. In cases where additional protective equipment is required, it shall be at the CUSTOMER'S own risk and expense.

1.4 PRIMUS reserves the right to cancel and/or temporarily suspend the Services if the CUSTOMER is engaging in activities which, in PRIMUS' opinion, actually or may potentially cause disruption or damage to PRIMUS' network. PRIMUS shall use reasonable efforts to provide the CUSTOMER with advance notice of such suspension and in any case shall endeavor to provide written confirmation of such action within a commercially reasonable time thereafter.

2. <u>TERM; RENEWAL.</u>

2.1 The term of this Agreement shall commence on the date this document is signed and will continue for a period of twelve (12) consecutive months from the Service Date. After the initial term, this Agreement will renew automatically on a month-to-month basis. The term "Term" as used herein refers to the initial term and any renewal thereof. Either Party may terminate the Agreement at the expiration of the initial Term or at any other time thereafter on thirty (30) days prior written notice.

2.2 The service date shall mean the date the Services' transmission facilities are ready for service (the "Service Date"). PRIMUS shall confirm the Service Date in writing. Unless otherwise agreed in writing, CUSTOMER shall be solely responsible to coordinate the provisioning of its respective (i.e. foreign-end matching) facilities and equipment by the Service Date and shall indemnify PRIMUS for any costs or charges incurred by PRIMUS as a result of CUSTOMER'S failure to do so.

3. <u>CHARGES, PAYMENT and DISPUTES.</u>

3.1 Commencing on the Service Date, CUSTOMER will be billed a monthly access charge for the provision of the Services (the "Monthly Access Charge"). An invoice for the Monthly Access Charge will be sent in advance and shall be due, without demand or setoff, prior to the first of each usage month (the "Due Date") regardless of the invoice date or receipt. The Monthly Access Charge includes the fees for the circuit between PRIMUS' access facilities and the Region that has been procured by PRIMUS in connection with this Agreement, along with access to the network. The Monthly Access Charge is based on the availability of capacity at current rates quoted by underlying suppliers of capacity and PRIMUS. Any non-recurring charges shall be invoiced in arrears as soon as practicable after the month to which such non-recurring charges relate.

3.2 CUSTOMER shall pay PRIMUS a one-time installation charge as set forth in Attachment A (the "Installation Fee"). The Installation Fee is due and payable upon CUSTOMER'S execution of this Agreement.

3.3 All Payments under this Agreement shall be in Untied States Dollars and shall be sent at CUSTOMER'S own risk and expense via electronic funds transfer (EFT):

Payment to: PRIMUS TELECOMMUNICATIONS, INC.
Bank: BANK OF AMERICA
Address: 10440 MAIN ST., FAIRFAX, VA 22102
Account #: 000011650478
Swift Code: BOFAUS3N
ABA Routing #: 051000017
Reference account and invoice numbers and date

3.4 The Monthly Access Charge and the Installation Fee are exclusive of Taxes, as defined hereinafter, which shall be assumed and paid promptly by CUSTOMER when due. PRIMUS is liable for any income taxes it may generate as a result of this Agreement.

3.5 Any amount not received by PRIMUS by the Due Date will be deemed past due. Any past due amounts are subject to a late charge in the amount of one and one-half percent (1.5%) per month compounded monthly, or the maximum rate allowable by law, whichever is less. In addition, CUSTOMER shall pay all reasonable attorney fees and any other costs of collection, if any are incurred by PRIMUS.





initial
initial

3.6 CUSTOMER agrees to provide financial statements and other related information to PRIMUS detailing CUSTOMER'S financial condition as the same may be reasonably required to evaluate credit worthiness.

3.7 CUSTOMER shall, at its own risk and expense, remit to PRIMUS a deposit in the amount of Two Hundred and 00/100 United States Dollars (US$200 .00) prior to the Service Date. PRIMUS reserves the right to require CUSTOMER to issue an additional deposit or payment security, acceptable to PRIMUS, if CUSTOMER'S payment history is or becomes unacceptable to PRIMUS. The initial deposit and any subsequent deposit or security payment is hereinafter referred to as the "Deposit." Upon receipt of PRIMUS' written request for additional Deposit, CUSTOMER shall have five (5) business days to provide or implement such Deposit. If CUSTOMER fails to comply with such request within said period, PRIMUS has the right to immediately suspend the Services and/or terminate this Agreement without further notice or demand. PRIMUS may apply the Deposit to any amounts past due under this Agreement. PRIMUS is entitled to cease providing Services until CUSTOMER replenishes the Deposit amount to a level acceptable to PRIMUS. PRIMUS shall not waive any of its rights or remedies by applying the Deposit to past due amounts. Upon termination of this Agreement, any portion of the Deposit remaining after payment and final settlement of all sums owed, shall be refunded to CUSTOMER without interest.

3.8 Notwithstanding the foregoing, if CUSTOMER in good faith disputes any invoiced amount, it shall submit to PRIMUS, within thirty (30) days following receipt of such disputed invoice, written documentation identifying the disputed items. CUSTOMER and PRIMUS shall exercise reasonable, good faith efforts to resolve disputes within sixty (60) days of PRIMUS' receipt of dispute notice. The failure to contest a charge in writing within thirty (30) days of invoice receipt shall create an irrefutable presumption of correctness of the charge.

4. <u>TAX EXEMPTION CERTIFICATE.</u>

CUSTOMER shall pay any and all applicable foreign, national, provincial, state and/or local taxes, including without limitation, all use, sales, value-added, surcharges, excise, franchise, property, commercial, gross receipts, license, privilege or other similar taxes, levies, surcharges, duties, fees, or other tax-related surcharges, whether charged to or against PRIMUS or CUSTOMER, with respect to the Services ("Taxes"). Should CUSTOMER claim an exemption from any such Taxes, CUSTOMER must provide PRIMUS with official documented or certified proof of such exemption. It is CUSTOMER'S responsibility to ensure its exempt status, and the proof thereof, remains current. In no event shall PRIMUS be liable for any Taxes due by CUSTOMER and CUSTOMER shall indemnify PRIMUS if any such claim for Taxes is made. PRIMUS will invoice CUSTOMER for Taxes not covered by a valid Tax exemption certificate that is properly filed with PRIMUS.

5. <u>CUSTOMER'S RESALE, END USERS AND RESPONSIBILITIES</u>

5.1 CUSTOMER is not authorized to enter into any agreements with its own customers (the "End Users") on behalf of PRIMUS. CUSTOMER is solely responsible for obtaining all licenses, approvals, and regulatory authority for its operation and the provision of the Services to its End Users.

5.2 If CUSTOMER resells the Services, CUSTOMER understands and agrees that it is solely responsible for all billing, billing adjustments/credits, customer service, creditworthiness and other service-related End User requirements. PRIMUS shall have no liability to End Users under this Agreement. CUSTOMER shall comply with all terms and conditions of this Agreement, including, but not limited to, its payment obligations, regardless of CUSTOMER'S ability to collect payments or charges from End Users, affiliates, agents, brokers or re-sellers. The failure of an End User to pay CUSTOMER or an End User's fraudulent or unauthorized use of the Services shall not relieve CUSTOMER of its obligation to pay PRIMUS as set forth herein.

5.3 CUSTOMER shall: (i) be liable to PRIMUS for any damages caused by any intentional or illegal acts of CUSTOMER in connection with its use, resale or reselling of the Services; and (ii) indemnify, defend and hold harmless PRIMUS from and against any third party/End User claims, actions, damages, liabilities, costs, judgments or expenses (including attorney fees) arising out of or relating to CUSTOMER'S and/or End User's use, resale or reselling of the Services.

5.4 In the event reporting obligations or requirements are imposed on PRIMUS by any third party or regulatory agency in connection with CUSTOMER'S or its End Users' use of the Services, CUSTOMER agrees to assist PRIMUS in complying with such obligations and requirements and to hold PRIMUS harmless for any failure by CUSTOMER in this regard.

5.5 CUSTOMER is solely responsible for providing, at its own cost and expense, its respective access facilities, software and equipment located within and/or outside the Region required to enable connectivity to the Service and shall indemnify PRIMUS for any costs incurred by PRIMUS as a result of CUSTOMER'S failure to do so. CUSTOMER is also solely responsible for the installation, operation and maintenance of such equipment, software and facilities in the Region.

6. <u>DISCLAIMER OF WARRANTIES.</u>

CUSTOMER understands and agrees that PRIMUS exercises no control over the content accessible on or through the Services. CUSTOMER assumes total responsibility for CUSTOMER'S use and the End Users' use of the Services, whether or not provided by PRIMUS. CUSTOMER and the End Users access the Services at their own risk. EXCEPT AS SPECIFICALLY SET FORTH HEREIN OR IN AN ATTACHMENT, THE SERVICES AND ANY RELATED SOFTWARE AND/OR HARDWARE PROVIDED BY PRIMUS ARE PROVIDED ON AN "AS IS" AND "AS AVAILABLE" BASIS WITHOUT WARRANTIES OF ANY KIND, EITHER EXPRESS, IMPLIED, WRITTEN, ORAL, OR STATUTORY, INCLUDING BUT NOT LIMITED TO WARRANTIES OF TITLE, NONINFRINGEMENT OR IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. PRIMUS DOES NOT WARRANT THAT THE SERVICES ARE COMPLETELY ERROR FREE OR WILL NOT OPERATE WITHOUT LOSS OR INTERRUPTION.

7. <u>LIMITATION OF LIABILITY</u> TO THE MAXIMUM EXTENT PERMITTED BY LAW, IN NO EVENT SHALL PRIMUS, ITS AFFILIATES, OR ANY OFFICERS, DIRECTORS, EMPLOYEES OR

AGENTS OF PRIMUS BE LIABLE FOR ANY INDIRECT, SPECIAL, PUNITIVE, INCIDENTAL OR CONSEQUENTIAL DAMAGES, INCLUDING BUT NOT LIMITED TO LOST PROFITS OR REVENUES, LOST DATA OR COST OF PROCUREMENT OF SUBSTITUTE GOODS OR SERVICES RELATED TO THE SERVICES OR THIS AGREEMENT WHETHER FOR, AMONG OTHER THINGS, BREACH OF WARRANTY, AND WHETHER UNDER ANY THEORY OR CAUSE OF ACTION WHETHER IN TORT, CONTRACT OR OTHERWISE, REGARDLESS OF WHETHER THE PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. PRIMUS' TOTAL AGGREGATE LIABILITY HEREUNDER SHALL IN NO EVENT EXCEED AN AMOUNT EQUAL TO THE MONTHLY ACCESS CHARGES PAID TO PRIMUS BY CUSTOMER FOR THE AFFECTED SERVICE THAT GAVE RISE TO SUCH LIABILITY. CUSTOMER HEREBY WAIVES ANY CLAIM THAT THESE EXCLUSIONS DEPRIVE IT OF AN ADEQUATE REMEDY OR CAUSE THIS AGREEMENT TO FAIL OF ITS ESSENTIAL PURPOSE.

8. **INDEMNIFICATION.** CUSTOMER agrees to indemnify, defend, and hold harmless PRIMUS, its officers, directors, employees, agents, shareholders, licensors, and any third party providers or suppliers from and against all losses, damages or expenses of any kind, including reasonable attorneys' fees and costs of litigation, arising from claims of a third party (including claims, assertions and investigations of a governmental agency), which claims arise in whole or part from (i) the negligence or willful misconduct of CUSTOMER, its employees, or agents, or (ii) CUSTOMER'S breach of an obligation under this Agreement, (iii) the resale of the Services by CUSTOMER; (iv) infringement of any third party right arising from the use of any services, equipment and software not provided by PRIMUS.

9. **CONFIDENTIALITY STATEMENT.** Neither Party will disclose to any third party, the terms or conditions of this Agreement, and all plans, designs, drawings, trade secrets, business, and other proprietary or confidential information of the other Party disclosed during the Agreement's term, unless such disclosure is (i) necessary to satisfy the rules, requirements and/or regulations of any national, foreign, state or local governmental agency; (ii) otherwise required to be disclosed by law; (iii) necessary in any legal proceeding establishing rights and obligations under this Agreement or (iv) to a Party's accountants, auditors, and attorneys which are bound by the same confidentiality obligations set forth herein. Violation by either Party or its agents, of the foregoing provision shall entitle the other Party to seek an injunction or restraining order, in addition to any other remedies available at law or in equity. The restrictions and obligations imposed by this Section 9 shall continue in force and effect for a period of two (2) years from the Agreement's date of termination.

10. **EARLY TERMINATION OR SUSPENSION:**

10.1 CUSTOMER may terminate this Agreement prior to the expiration of the Term for (i) "Cause"; (ii) the filing of a bankruptcy petition by or against PRIMUS; (iii) PRIMUS dissolving or discontinuing business operations.

10.2 PRIMUS may terminate this Agreement at any time or, immediately and without notice, suspend any or all of the Services for (i) Cause; (ii) the failure of CUSTOMER to pay undisputed amounts or to comply with the Deposit obligations set forth in Section 3.7 (iii) the filing of a bankruptcy petition by or against CUSTOMER; (iv) CUSTOMER dissolving or discontinuing business operations; (v) PRIMUS is unable to obtain or maintain any governmental license, permit, waiver, consent, registration or approval needed to provide the Services; (vi) interruption or termination is necessary to prevent or protect against fraud or otherwise protect PRIMUS' personnel, agents, facilities or services; (vii) CUSTOMER fails to comply in all material respects with any foreign, federal, state or local law or regulation applicable to CUSTOMER'S resale of the Services; or (viii) CUSTOMER or End Users commits any illegal acts relating to the subject matter of this Agreement or (ix) a "Regulatory Modification" which is defined herein as a law or regulatory action prohibits, substantially impairs or makes impractical the provision of Service under this Agreement as determined by PRIMUS in its reasonable discretion.

10.3 For purposes of this Section 10, "Cause" shall mean a failure of the other Party to perform a material obligation under this Agreement which failure is not remedied by the defaulting Party within thirty (30) days after receipt of written notice thereof.

10.4 The termination of this Agreement shall not relieve CUSTOMER of its obligation to pay any charges incurred prior to such termination.

11. **EARLY TERMINATION LIABILITY.** In the case of early termination of this Agreement prior to the expiration of the Term by PRIMUS pursuant to Section 10.2, or by CUSTOMER for any reason other than a material breach solely attributable to PRIMUS, CUSTOMER shall remain liable to pay PRIMUS for the Monthly Access Charges for the remainder of the then-current Term.

12. **FORCE MAJEURE.** Except for payment obligations, neither Party shall be responsible for the performance of its obligations hereunder where such non-performance is due to causes beyond that Party's reasonable control, including without limitation acts of God, fire or other natural catastrophe, explosion, vandalism, strikes, labor disputes, cable cuts, outages, acts of any governmental body; national emergencies; insurrections; riots; wars; terrorism or any act or omission of any third party. The Parties agree that market conditions and/or fluctuations shall not be deemed force majeure events.

13. **USE OF NAME AND MARKS.** CUSTOMER shall not use any trademark, service mark, brand name, or any other intellectual property of PRIMUS in connection with marketing or providing its own services without the prior written approval of PRIMUS. PRIMUS' name is proprietary and nothing herein constitutes a license authorizing its use. In no event shall CUSTOMER: (i) attempt to sell or service its End Users using PRIMUS' name; (ii) represent to End Users that they will be PRIMUS customers or that they may obtain PRIMUS service from CUSTOMER; or (iii) represent or state to End Users or prospective End Users that CUSTOMER has any relationship with PRIMUS other than an agreement to purchase PRIMUS' Services on a wholesale basis. As a breach of this material obligation may cause irreparable harm for which monetary damages may be inadequate, in addition to other available remedies, PRIMUS may seek injunctive relief for any disclosure in violation hereof.

14. **WAIVER.** The delay or failure of PRIMUS to enforce or insist upon compliance with any of the terms or conditions of this Agreement or to exercise any remedy provided herein, the waiver of any term or condition of this Agreement, or the granting of an extension of any time for performance shall not constitute the permanent waiver of any term, condition, or remedy of or under this



APPROVED PRIMUS LEGAL

initial ______

Agreement, and this Agreement and each of its provisions shall remain at all times in full force and effect unless and until modified as provided herein.

15. **NOTICES.** All notices required by this Agreement shall be assumed to have been delivered when sent by either express or overnight delivery or registered or certified mail (return receipt requested) to each Party at the address on the Agreement's signature page.

16. **SURVIVAL.** The obligations of CUSTOMER to pay charges incurred under Section 3 (Charges and Payment) of this Agreement and the covenants and agreements of the Parties contained in Sections 7 (Limitation of Liability), 8 (Indemnification), and 9 (Confidentiality) of this Agreement shall survive any termination of this Agreement.

17. **SEVERABILITY.** In the event any provision of this Agreement conflicts with the law under which this Agreement is to be construed or if any such provision is held invalid by a court with jurisdiction over the Parties, such provision shall be deemed to be restated to reflect, as nearly as possible, the original intention of the parties in accordance with applicable law, and the remainder of this Agreement shall remain in full force and effect.

18. **HEADINGS.** Headings contained herein are provided for convenience and reference only. Headings in no way affect or limit the interpretation, contents, or terms of this Agreement.

19. **GOVERNING LAW AND CONSENT TO JURISDICTION.** This Agreement shall be construed and enforced in accordance with, and the validity and performance hereof shall be governed by, the laws of Virginia, without reference to conflicts of law principles. The Parties hereby consent to the jurisdiction of the courts of Virginia with respect to any dispute, controversy or other matter relating to or arising out of this Agreement.

20. **COUNTERPARTS.** This Agreement may be executed in counterparts and duplicate originals and shall be effective on the Effective Date. Each of such counterparts shall, for all purposes, be deemed to be an original but all together only one Agreement.

21. **THIRD PARTIES.** Nothing contained in this Agreement or in any instrument or document executed by any party in connection with the transactions contemplated hereby shall create any rights in, or be deemed to have been executed for the benefit of, any person or entity that is not a party hereto or a successor or permitted assign of a Party hereto.

22. **ADDITIONAL PROVISION.**

22.1 Nothing herein shall be construed as conveying any interest in any property of PRIMUS, and CUSTOMER shall not represent that such conveyance has occurred.

22.2 The provision of Services by PRIMUS is subject to the condition that the Services will not be used for any unlawful purposes.

22.3 This Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and permitted assigns. CUSTOMER shall not assign, sublet, delegate, or transfer any of its rights or obligations hereunder without the prior written consent of PRIMUS, which will not be unreasonably withheld.

22.4 The Parties prepared and executed the original version of this Agreement in the English language, which shall control over any translated versions.

23. **ENTIRE AGREEMENT.** This Agreement, along with Attachment A, represents the entire understanding between the Parties in relation to the matters dealt with herein and supersedes all previous covenants and representations made between the Parties, whether oral or written. This Agreement may only be modified if such modification is in writing and signed by a duly authorized representative of each Party hereto.

IN WITNESS WHEREOF, a duly authorized officer of each Party executes this agreement as of the Effective Date.

| PRIMUS TELECOMMUNICATIONS, INC. (PRIMUS): | Locus Telecomunications, Inc. (CUSTOMER): |
|---|---|
| By: [signature] 3/31/03<br>Signature date<br>Name: Neil L. Hazard<br>Title: Executive Vice President and COO<br>**CONTRACT NOTICES:**<br>Address: 1700 Old Meadow Road, 3rd Floor<br>McLean, VA 22102, USA<br>Attn: Contracts Manager, Legal Dept.<br><br>Phone No. +1-703- 902-2800<br>Fax No. +1-703- 902-2814 | By: [signature] 3/26/03<br>Signature date<br>Name: Dillon Kim<br>Title: Carrier Operations, Sr Mgr<br>**CONTRACT NOTICES:**<br>Address: 111 Sylvan Avenue<br>Englewood Cliffs, NJ 07632<br>Attn: Dillon Kim<br><br>Phone: 201-585-3682<br>Fax: 201-947-4082 |

APPR... PRIMUS LEGAL Brendan Murray 30 March 2003



initial ____
initial ____

## ATTACHMENT A

1. **SERVICE DESCRIPTION/TECHNICAL SPECIFICATIONS:**

**Services:**

T1 from Primus POP to Primus POP (local loops not included)

111 Pavonia Avenue
Suite 217, 2nd Floor
Jersey City, NJ 07310

to

624 S Grand Ave, suite 2810
Los Angeles, CA
213-622

2. **CHARGES**

Monthly Access Charge: Two Hundred and 00/100 United States Dollars (US$ 200.00)

Installation Fee: Two Hundred and Fifty and 00/100 United States Dollars (US$ 250.00)



initial ______
initial ______

primus

A fully-executed original Agreement is enclosed for your records.

If you have any questions, please contact:

Primus Telecommunications, Inc.
Attention: Brendan J. Murray
1700 Old Meadow Road
McLean, Virginia 22102 USA

Tel: +1-703-394-4523
Fax: +1-703-902-2814
bmurray@primustel.com

PRIVELEGED AND CONFIDENTIAL

The information enclosed is intended only for the use of the addressee. If the reader of this message is not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient(s), please note that any dissemination, distribution or copying of this communication is strictly prohibited. Anyone who receives this communication in error should notify Primus Telecommunications immediately by telephone or email and return the contents to Primus Telecommunications at the address noted above. Thank you.

WilTel COMMUNICATIONS

This **Telecommunications Services Agreement** is effective this 9th day of October, 2003 ("Effective Date"), by and between **WilTel Communications, LLC**, located at One Technology Center, 100 South Cincinnati, 13th Floor, Tulsa, Oklahoma, 74103, a Delaware limited liability company ("WilTel"), and **Locus Telecommunications, Inc.** located at 111 Sylvan Avenue, Englewood Cliffs, NJ 07632, a Delaware corporation ("Customer").

1. **Services**. Subject to the Customer placing orders and WilTel accepting such orders as contemplated herein, Customer agrees to purchase, and WilTel agrees to provide, the services described in the attached service schedule(s) ("Service Schedule(s)") as indicated in **Appendix A** (check as applicable) (the "WilTel Services"), and Third Party Services described in Section 17 (WilTel Services and Third Party Services, collectively or individually, the "Services"). WilTel Services may consist of any combination of WilTel's voice products and/or data products (each referred to as "Network Services"), video products (referred to as "Vyvx Services"), and/or professional services. All Services shall be provided according to the terms and conditions in this TSA (defined below) and as specified in an accepted order for Services placed by Customer contemporaneously herewith, subsequent hereto or in contemplation hereof ("Service Order(s)"). This Telecommunications Services Agreement ("TSA") is comprised of the general terms and conditions contained in Sections 1 through 23 herein (the "General Terms") together with any appendices, Service Schedules and Service Orders attached or incorporated by reference, and the foregoing shall be deemed one, integrated agreement and not as separate, severable contracts. The Service Schedules may be attached hereto, separately executed, or added by amendment. All Services are subject to availability and approval of Customer's credit by WilTel at the time of each Service Order.

2. **TSA Term**. The TSA (referring not to individual Services, which will each have their own term as described in Section 3 below) shall continue in effect for three (3) years from the Effective Date ("TSA Term"), and shall then automatically renew for successive one (1) year periods ("TSA Renewal Term(s)"), unless either party gives written notice to the other party of non-renewal, such notice to be delivered at least sixty (60) calendar days before the end of the TSA Term or the TSA Renewal Term. Notwithstanding the prior sentence, unless Customer is in Default, any Service being provided at the time of termination of this TSA shall continue upon the terms and conditions of this TSA until the end of the Service Term or any applicable Extension Period for Service as specified in the applicable Service Order or until such Service Order is terminated; provided, however, that Customer may not order any new Service until Customer and WilTel have entered into a new agreement or mutually agreed in writing to extend this TSA.

3. **Service Term.** Except as may be provided otherwise in a particular Service Schedule, the term for each Service as described in a Service Order shall be as indicated on the Service Order ("Service Term"): At the end of the Service Term for any Service, such Service shall continue on a month-to-month basis ("Extension Period") unless either party gives written notice to the other that the Service(s) shall be disconnected, such notice to be delivered at least sixty (60) calendar days before the end of the Service Term, or if during the Extension Period, then upon at least thirty (30) calendar days' prior written notice. Customer's charges for WilTel Service, as set forth in the Service Order, shall continue to apply to Customer's Service throughout any Extension Period, unless modified pursuant to the terms of this TSA. Notwithstanding the foregoing, if Customer disconnects Service and Customer has ordered its own local access service, Customer must provide WilTel written notification of Customer's disconnect with the local access service provider in the form of a disconnection firm order commitment ("DFOC") from the local access service provider.

4. **Payment Terms and Charges**. Customer agrees to pay recurring and non-recurring charges for WilTel Services, as set forth in applicable Service Order and/or quote ("Quote") referenced in such Service Order, and all charges for Third Party Services, if applicable. WilTel provides and charges for Services in U.S. Dollars, commencing on the date WilTel notifies Customer that the relevant Service is available for use by Customer. Usage sensitive charges are billed in arrears, fixed recurring charges are billed in advance, and fixed non-recurring charges are billed in arrears. Subject to Section 5 below, all amounts stated on each invoice are due and payable: (i) within ten (10) calendar days of the date of the invoice for WilTel data Services, and (ii) immediately upon receipt of the invoice for WilTel voice Services ("Due Date"). Customer agrees to accept delivery of invoices electronically via the Internet and agrees to remit payment via Automated Clearinghouse (ACH) or wire transfer to WilTel Communications, LLC in care of: Bank of Oklahoma, Tulsa, OK, ABA # 103900036, Account # 010649443 (WilTel Communications, LLC), or such other bank or account as WilTel may in writing direct Customer to remit payment. In the event Customer fails to make full payment of undisputed amounts by the Due Date, Customer shall also pay a late fee in the amount of the lesser of (i) one and one-half percent (1½ %) per month or (ii) the maximum lawful monthly rate under applicable state law, of the unpaid balance which amount shall accrue from the Due Date ("Late Fee"). WilTel may make billing adjustments for WilTel Services for a period of one hundred eighty (180) calendar days after the date a Service is rendered, and for Third Party Services at any time within two (2) months of WilTel's receipt of any invoice from the Third Party Provider (defined in Section 17 below), or any other time frame allowed by contract, law, or government rule or regulation, whichever is later.

5. **Billing Disputes**. **(a)** Upon disputing any charges, Customer shall: (i) pay all undisputed charges by the Due Date; (ii) present by the Due Date a written statement of amounts disputed in good faith in reasonable detail with supporting documentation; and, (iii) negotiate in good faith to resolve any bonafide dispute within sixty (60) calendar days from the Due Date. **(b)** Disputed charges resolved in favor of WilTel, with a Late Fee, are due and payable within ten (10) calendar days of WilTel's written notice denying the dispute. Disputed charges resolved in favor of Customer will be credited to Customer on the following month's billing cycle and no late fees shall apply.

6. **Right to Assurance**. If a Customer suffers a material adverse change in its financial condition, WilTel may: (i) request adequate assurance of Customer's performance per applicable law, and/or (ii) decline to accept or process a Service Order.

7. **Payment Default**. A "Payment Default" shall occur if Customer fails to make full and timely payment for all Services as required under this TSA (subject to Section 5 herein governing billing disputes) and such failure remains uncorrected for five (5)


Vyvx and WilTel are registered trademarks of WilTel Communications Group, Inc.
The WilTel logo is a service mark of WilTel Communications Group, Inc.

calendar days from the Due Date. In the event of a Payment Default, WilTel may, in addition to its rights available to it at law or in equity: (i) suspend any or all Services to Customer upon written notice; (ii) cease accepting or processing Service Orders; and/or (iii) terminate this TSA upon written notice. If this TSA is terminated because of a Payment Default, all Early Termination Charges (defined in Section 20 below) shall apply.

8. **Other Defaults, AUP Violation and Remedies.** An "Other Default" shall occur if either party fails to perform or observe any material term or obligation, excluding payment terms, contained in this TSA, and any such failure remains uncorrected for thirty (30) calendar days after written notice from the non-defaulting party. In the event of an Other Default by Customer, WilTel may, in addition to its rights available to it at law or in equity: (i) suspend any or all Services to Customer; (ii) cease accepting or processing Service Orders; and/or (iii) terminate this TSA. If this TSA is terminated because of an Other Default by Customer, all Early Termination Charges shall apply. In the event of an Other Default by WilTel, Customer's remedies are limited to its proven direct damages and the right to terminate any or all affected Service Orders or the TSA, unless this TSA provides for exclusive remedies in the applicable Service Schedule, in which case Customer's remedies are exclusively as described therein. If Customer uses the Services for any unlawful purpose or in any unlawful manner, or causes WilTel to violate any applicable law, WilTel shall have the right immediately to suspend and/or terminate any or all Services hereunder without notice to Customer. If Customer violates WilTel's Acceptable Use Policy ("AUP") posted on WilTel's AUP website at www.wiltelcommunications.com/customers/r_use_s.html, which is incorporated herein by reference, and if such activity is affecting WilTel's network, or other parties on WilTel's network, WilTel shall have the right immediately to suspend and/or terminate any or all Services hereunder and/or the TSA without notice to Customer. Customer affirms that it has reviewed and assented to the AUP. For any violations of WilTel's AUP that are not affecting either WilTel's network or third parties on WilTel's network, Customer shall, upon three (3) business days notice, have the opportunity to cure such violation prior to suspension or termination. For the purposes of this TSA, a Payment Default, an Other Default and/or a violation of WilTel's AUP may each be referred to individually as a "Default."

9. **Taxes and USF Charges.** (a) If any local, state, national, international, public or quasi-public governmental entity or foreign government or its political subdivision imposes any taxes (excluding taxes based on WilTel's net income or capital or any property taxes), fees, surcharges, or other charges or impositions on WilTel as a result of WilTel's sale of Services or Customer's use of Services, Customer shall pay any such impositions ("Additional Charges") and indemnify WilTel from any liability or expense associated with the Additional Charges. (b) In addition, if Additional Charges are assessable to support the federal Universal Service Fund ("USF") or any similar local, state, national, international, or foreign fund, WilTel may elect to calculate and charge Customer in accordance with applicable regulations of the government authority having jurisdiction ("USF Charges"), unless Customer is paying such Additional Charges directly or is otherwise exempt (as indicated by Customer in Appendix B). To the extent USF Charges apply to Services, Customer shall also pay WilTel an administrative fee equal to one percent (1%) of the total WilTel charges for such Services.

10. **Indemnity.** (a) Customer and WilTel will release, defend, indemnify and hold harmless the other from and against any loss, debt, liability, damage, obligation, claim, demand, judgment or settlement of any nature or kind, known or unknown, liquidated or unliquidated, of any third party, including without limitation all reasonable costs and expenses, such as reasonable litigation costs and attorneys' fees ("Claim"), relating to damage to tangible property or bodily injury, or wrongful death, to the extent such Claim arises out of the negligence or willful misconduct of the respective indemnifying party, its employees, agents, or contractors in connection with this TSA or the provision of Services hereunder. (b) Customer will release, defend, indemnify and hold harmless WilTel and its officers, directors, employees, contractors and agents from and against any Claim to the extent such Claim (i) is brought by a downstream customer of Customer or an end user and arises out of an alleged defect in or failure of Service, or (ii) arises out of failure by Customer or downstream customers of Customer or end users to obtain approval, consent, or authorization relating to the content transmitted over WilTel's network, including without limitation claims relating to any violation of copyright law, export control laws, or that such transmissions are libelous, slanderous, an invasion of privacy or illegal.

11. **Limitation of Liability. EXCEPT TO THE EXTENT A PARTY IS REQUIRED TO INDEMNIFY THE OTHER PARTY HEREUNDER, NEITHER PARTY SHALL BE LIABLE TO THE OTHER FOR ANY INDIRECT, CONSEQUENTIAL, SPECIAL, INCIDENTAL, PUNITIVE OR SIMILAR DAMAGES, INCLUDING BUT NOT LIMITED TO LOST PROFITS, ARISING OUT OF OR IN CONNECTION WITH SUCH PARTY'S PERFORMANCE OF OR FAILURE TO PERFORM ITS OBLIGATIONS HEREUNDER, EVEN IF THAT PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGE OR LOSS.**

12. **Warranties and Disclaimer of Warranty. WILTEL'S WARRANTY WITH RESPECT TO ANY SERVICE, IF ANY, IS SET FORTH ON THE APPLICABLE SERVICE SCHEDULE. WILTEL DISCLAIMS ALL OTHER WARRANTIES WHETHER EXPRESS OR IMPLIED INCLUDING WITHOUT LIMITATION IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE AND NONINFRINGEMENT. WILTEL MAKES NO WARRANTY WITH RESPECT TO ANY THIRD PARTY SERVICES.**

13. **Compliance with Law.** Customer's use of the Services and WilTel's provision of the Services shall be in accordance, and comply, with all applicable laws, regulations, and rules. Customer shall obtain all approvals, consents and authorizations necessary to conduct its business and initiate or conduct any transmissions over any facilities covered by this TSA. WilTel shall obtain all approvals, consents and authorizations necessary to conduct its business and to provide the Services covered by this TSA. Customer and WilTel will release, defend, indemnify and hold harmless the other from and against any Claim arising out of, resulting from or based upon the indemnifying party's violation of any law, rule or regulation.

14. **Force Majeure.** Either party may adjust or suspend its performance (other than the obligation to make payment) to the extent performance is beyond its reasonable control for reasons including, without limitation, acts of God, fire, explosion, atmospheric

conditions such as rain fade, cable cut caused by a third party, governmental action, national emergencies, war, riot, insurrection, terrorism, vandalism, or labor difficulties such as work stoppages, strikes, or lockouts. If the force majeure event continues for a period of thirty (30) calendar days, then either party may, without incurring liability, except for Customer's liability for any charges of a Third Party Provider, terminate the affected Services or circuits.

**15. Proprietary Information.** Except as required by law or stock exchange rule, the terms and conditions of this TSA and all proprietary information exchanged by the parties and all documents referenced herein (including invoices) are confidential and shall not be disclosed without prior written consent of the other party. Notwithstanding anything herein to the contrary, any party to this agreement (and each employee, representative, or other agent of such party) may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of the transaction and all materials of any kind (including opinions and other tax analyses) that are provided to the party relating to such tax treatment and tax structure.

**16. Interstate Service Representation.** WilTel and its Affiliates (defined in Section 23 below) shall not be obligated to make available intrastate Service, e.g., any Service on a circuit which originates/terminates at points both of which are situated within a single state, unless WilTel or its Affiliates specifically offer an intrastate Service, or an information Service as defined in 47 U.S.C. Section 153(20) or unless Customer represents in writing that such Service (other than switched voice services) or circuit shall be used to carry more than ten percent (10%) interstate or foreign telecommunications traffic. Customer hereby represents that more than ten percent (10%) of the transmissions on each circuit shall be interstate transmissions or foreign transmissions as those terms are defined in 47 U.S.C. Sections 153(17) and 153(22). If it is determined at any time that such Service or circuit is subject to regulation by a U.S. State regulatory agency, the Service or circuit may be provided by WilTel or its Affiliates pursuant to applicable state laws, regulations and applicable tariffs, or WilTel and its Affiliates may discontinue provision of the affected Service or circuit.

**17. Third Party Services.** In conjunction with WilTel Services, WilTel may, upon Customer's request, arrange for Services to be provided by a third party ("Third Party Services"), such as local access services, interexchange services, or international service. Local access services are also subject to Section 18 below. When Customer requests international service, WilTel may arrange for the foreign end of the Service or for a portion of the foreign end of the Service to be provided by a third party carrier licensed in the relevant foreign point. In some cases, WilTel may be unable, and Customer may be required, to arrange the foreign end of such Service with a foreign carrier. Although this TSA governs the terms of WilTel's arrangement of Third Party Services, the service level parameters and related warranties (if any), surcharges, outage credits, required commitments, termination liability, limitations, and other service-specific terms of the Third Party Service shall be those of the provider of the Third Party Services ("Third Party Provider"). All charges incurred by WilTel for such Third Party Service shall be invoiced to Customer and Customer shall be responsible for payment thereof.

**18. Ordering Local Access Service.** **(a)** In the event Customer requests that WilTel order local access service: (1) WilTel shall provision and coordinate the installation of the Service, and conduct the initial testing of an interconnection between the WilTel Service and the local access service; (2) WilTel will not begin billing Customer for local access services until related WilTel Services are turned up; (3) Customer shall pay all charges, including without limitation recurring charges, installation charges, non-recurring charges, or applicable termination/cancellation charges, of the local access provider(s); and (4) WilTel shall not be obligated to provision any local access service except in connection with a Service Order for WilTel Services. If WilTel is ordering local access service on Customer's behalf, Customer shall execute a letter of agency, in a form provided by WilTel, authorizing WilTel to interact directly with local access provider(s). **(b)** Customer may order its own local access services from a vendor who has established entrance facilities in a WilTel point of presence or other vendors with WilTel's prior written permission, and in such event: (1) Customer's provider shall directly bill Customer for such local access services; (2) WilTel shall charge Customer for any associated entrance facility or mileage charges if it provides CFA (carrier facility assignment) to Customer; and (3) Customer shall ensure that Customer-ordered local access services are turned up at the same time as the WilTel Services and shall be obligated to pay for WilTel Services regardless of whether Customer-ordered local access services are ready.

**19. Network Grooms.** If at the time a Service Order is placed WilTel lacks the capacity to fulfill the requested Service Order, WilTel will advise Customer whether or not WilTel has the ability to provision the circuit by means of a Third Party Provider in order to provide timely Service. Upon such notification, Customer may either elect to withdraw the Service Order, or agree to continue with such alternative provisioning. If Customer agrees to continue with such alternate provisioning, once WilTel gains the capacity to accommodate the circuits requested by Customer, WilTel may, at its option, move the circuits to the WilTel network ("Groom"). Customer agrees to cooperate with effectuating the Groom. In order to initiate the Groom process, WilTel will notify Customer sixty (60) calendar days prior to the scheduled Groom. WilTel will use reasonable efforts to perform such Groom within the planned network maintenance period set forth in the applicable Service Schedule. If at the end of sixty (60) calendar days after the original Groom notification was sent to Customer the Groom is not complete due to a delay by Customer, WilTel will pass through to Customer Third Party Provider costs, with an additional twenty percent (20%) administrative charge placed on those costs, associated with the applicable circuit.

**20. Early Termination.** Customer may disconnect any WilTel Service after installation by providing written notification to WilTel sixty (60) calendar days in advance of the effective date of the disconnection and paying to WilTel an "Early Termination Charge" in an amount equal to: (i) the recurring charges associated with the Service Term less any recurring charges already paid, (ii) any non-recurring charges not yet paid by Customer, (iii) installation charges discounted or waived at the time Service was installed, (iv) any termination liability associated with Third Party Services, and (v) the balance of any minimum commitments by Customer required under this TSA, if applicable. If Customer terminates any WilTel Service during an Extension Period as provided in Section 3 above, Customer shall only be responsible for any non-recurring charges not yet paid by Customer together with termination liability associated with Third Party Services. It is the express intent and understanding of the parties that, this

TSA and all Service Orders hereunder being one integrated agreement and not separate, severable contracts, Customer's right to early termination of any Service is not a right to "reject", on an individual basis, any Service or any Service Order pursuant to federal bankruptcy laws. In the event Customer orders its own local access service, Customer's written disconnection notice must also include a DFOC from the local access service provider as described in Section 3.

21. **Publicity.** The parties contemplate and agree that publication of information surrounding this TSA may occur through press releases, articles, interviews, marketing materials, online materials, and/or speeches ("Publicity"). Both parties must approve the content of any such Publicity prior to its publication, which approval shall not be unreasonably withheld. Routine references to the fact that Customer is a customer of WilTel including advising others of Customer's presence in a WilTel POP and the general nature of Services that Customer purchases under this TSA are not considered Publicity for purposes of this section, and Customer and WilTel each authorize the other, during the TSA Term, to make such references unless otherwise specified in a Service Schedule.

22. **Miscellaneous.** **(a)** Neither party shall assign or otherwise transfer its rights or obligations under this TSA without the prior written consent of the other party, which shall not be unreasonably withheld; provided, however, either party may freely assign this TSA, upon notice to the other party, to (i) an "Affiliate" (defined as an entity that controls, is controlled by or is under common control with Customer), or (ii) in the event of a sale of all or substantially all of its assets, to the purchaser of those assets, or (iii) in the event of a merger, acquisition or recapitalization of the assigning party, to the surviving entity (the sale of assets, merger, acquisition or recapitalization to be referred to as a "Change of Control"). For the purposes of this Section, "control" means to have more than a fifty percent (50%) ownership interest. In the event of an assignment by Customer to an Affiliate, the acquiring or surviving entity or assignee (as applicable) must be at least as creditworthy as Customer and no such assignment will release Customer from Customer's obligations herein, including, but not limited to payment, except to the extent that the acquiring or surviving entity or assignee meets its obligations under this TSA. **(b)** This TSA shall be governed by the laws of the State of New York without regard to choice of law principles. **(c)** No rule of construction requiring interpretation against the draftsman hereof shall apply in the interpretation of this TSA. **(d)** The provisions of this TSA are only for the benefit of the parties hereto, and no third party may seek to enforce or benefit from these provisions. **(e)** If any term or provision of this TSA shall, to any extent, be determined to be invalid or unenforceable by a court or body of competent jurisdiction, then (i) both parties shall be relieved of all obligations arising under such provision and this TSA shall be deemed amended by modifying such provision to the extent necessary to make it valid and enforceable while preserving its intent, and (ii) the remainder of this TSA shall be valid and enforceable. **(f)** The failure of either party to enforce any provision hereof shall not constitute the permanent waiver of such provision. **(g)** No termination of this TSA shall affect the rights or obligations of either party: (i) with respect to any payment for Services rendered before termination; or (ii) pursuant to other provisions of this TSA that, by their sense and context, are intended to survive termination of this TSA, including without limitation, indemnification, confidentiality and limitation of liability. **(h)** This TSA, including the General Terms and appurtenant appendices, Service Schedules and Service Orders (including Quotes referenced therein), any applicable tariff and WilTel's AUP Website, comprise all of the terms and conditions of the agreement between the parties relating to the Services and constitute the complete and exclusive statement of the understanding between the parties and supersedes all proposals and prior agreements (oral or written) between the parties relating to Services provided hereunder. **(i)** Customer acknowledges that the provisioning of interstate telecommunications services by WilTel to Customer is contingent upon Customer's submission to WilTel of a signed representation in the form set forth in **Appendix B** to this TSA either that Customer has properly registered with the Federal Communications Commission ("FCC"), pursuant to 47 CFR 64.1195 (and WilTel's confirmation of the same), or that Customer is not a telecommunications carrier subject to the FCC's registration requirements. **(j)** Without in any way diminishing the nature of these General Terms, appurtenant appendices, Service Schedules and Service Orders as one, integrated, non-severable agreement, in the event of any inconsistency between or among a Service Order or Quote referenced therein, a Service Schedule, the General Terms, WilTel's AUP website, and/or any applicable tariff, the following order of precedence shall prevail (from highest priority to lowest): the applicable tariff, if any, specific pricing contained in a Service Order or Quote referenced therein, the provisions contained in the applicable Service Schedule, the General Terms, WilTel's AUP website, the applicable Service Order (except pricing). **(k)** In the event of a Default, the prevailing party shall have the right to recover its reasonable expenses (including attorney and collection agency fees) incurred in the enforcement of its rights under the TSA. **(l)** This TSA may be executed in one or more counterparts each of which shall be deemed an original, but all of which together shall constitute one and the same TSA. **(m)** Facsimile signatures to this TSA shall be deemed to be binding upon the parties.

23. **Authorized Representatives.** The individuals named below who are executing this TSA on behalf of the parties are duly authorized to make the representations contained herein.

| **CUSTOMER:** | **WILTEL COMMUNICATIONS, LLC:** |
|---|---|
| By: [signature] | By: [signature] |
| Printed Name: HENRY PARK | Printed Name: Anthony A. Tomae |
| Title: SENIOR DIRECTOR | Title: Sr. VP Marketing |
| Date: 11/26/03 | Date of Signature: 11-26-03 |

| WilTel Services | | |
|---|---|---|
| Schedule 1 | ☐ | Private Line Service |
| Schedule 2 | ☐ | ATM Service |
| Schedule 3 | ☐ | Frame Relay Service |
| Schedule 4 | ☐ | International Private Line Service |
| Schedule 5 | ☐ | International Backhaul |
| Schedule 6 | ☐ | Optical Wave Service |
| Schedule 7 | ☐ | Switched Voice Service |
| Schedule 8 | ☐ | Carrier Voice Services |
| Schedule 8B | ☒ | Carrier Express Termination Service |
| Schedule 9 | ☐ | Intentionally Left Blank |
| Schedule 10 | ☐ | Colocation Service |
| Schedule 11 | ☐ | Intentionally Left Blank |
| Schedule 12 | ☐ | Intentionally Left Blank |
| Schedule 13 | ☒ | Direct Network Access |
| Schedule 14 | ☐ | Dedicated Internet Service |
| Schedule 15 | ☐ | Internet Protocol Virtual Private Network Service |
| Schedule 16 | ☒ | OneStop Service |
| Schedule 17 | ☐ | Managed Service |
| Schedule 18 | ☐ | Special Pay Terms – Progressive Payment |
| Schedule 19 | ☐ | Special Pay Terms – Pre-payment |
| Schedule 20 | ☐ | EWAN Service |
| Schedule 21 | ☐ | IP Video Service |
| Schedule 22 | ☐ | Dedicated Video Service |
| Schedule 23 | ☐ | Occasional Video Service |
| Schedule 24 | ☐ | Sports Package Service |
| Schedule 25 | ☐ | Teleport Service |
| Schedule 26 | ☐ | Occasional Video (On-Board Rewards) Service |

**Federal Universal Service Fund/ Attestation of Customer Status Form**

WilTel's determination regarding application of the Federal USF surcharge on the Services noted herein will be based upon the representation and information provided in all portions of this attestation form. This attestation form also allows WilTel to fulfill its obligation to verify that i Customers have either filed FCC Form 499-A or are not subject to that filing requirement. Customer is:

☐ A ***telecommunications carrier***[i] (including a reseller) that is using the Services to provide telecommunications service[ii] to the publi for a fee, and Customer:

☐ Will resell the Services in the form of telecommunications and will ***contribute directly*** to the Universal Service Administrato pursuant to FCC rules.

Customer's FCC Filer ID Number (6 digits beginning with "8") to be obtained and provided to WilTel.__________

☐ Will use the Services to provide services for which all revenues are from ***non-domestic*** (i.e., non-U.S. [iii]) end users, *and* Customer not required under FCC rules to file an FCC Form 499-A with the FCC.

☐ Qualifies for the ***de minimis exemption*** under FCC rules[iv], has met its obligation to file a FCC Form 499A, and is not making direc contributions to the USF but is making direct contributions to: ☐ LNP ☐ TRS ☐ NANPA (please mark all that apply).

Customer's FCC Filer ID Number (6 digits beginning with "8") __________

☐ An ***end user***, [v] purchasing Services for its own internal use and not for resale, including a carrier ordering these services for its ow administrative purposes or an ***information services provider***[vi] ***(ISP) or non-common carrier***[vii] ***telecommunications provider*** that is no making its own USF contributions and is not required under FCC rules to file an FCC Form 499-A with the FCC, and Customer is:

☐ A **domestic** (i.e., U.S.) ***end user***, purchasing Services for its own internal use and not for resale, including a carrier orderin these services for its own administrative purposes.

☐ A **domestic** (i.e., U.S.) ***information services provider (ISP) or non-common carrier telecommunications provider*** that is no making its own USF contributions and is not required under FCC rules to file an FCC Form 499-A with the FCC.

☐ A ***non-U.S.***[viii] ***end user, information services provider or non-common carrier***. To qualify as a non-U.S. end user, Custome must (1) not be a citizen or permanent resident of the U.S. if an individual and, if a legal entity, not be created under the laws of th United States, (2) not be qualified to transact business in the U.S. (e.g., through registration with a state secretary of state as a foreig company), (3) have a billing address outside the U.S.[ix], and (4) not use the Services for communications that both originate an terminate within the U.S.

Customer understands that if it designates that it is acting as a "telecommunications carrier, not contributing" under the de minim exemption, a "domestic end user," a "domestic information service provider," or "domestic non-common carrier," WilTel will apply th Federal Universal Service Fund surcharges to the appropriate revenues from these services and charge them to Customer along with an applicable administrative surcharge set forth in the written Agreement.

WilTel is relying upon the information provided by Customer in this representation and any subsequent amendments to determine whether US surcharges and administrative surcharges apply. If the information is determined to be incorrect or if it changes, Customer shall pay an applicable surcharges for any Service WilTel had provided or that it subsequently provides, in each case together with late-payment interest an any Customer indemnity obligation or other liability as set forth in the Agreement. If there is no applicable written service agreement betwee Customer and WilTel, WilTel's standard agreement form in effect at the time the Service Order is placed will apply. If, at any time, Customer representation above is no longer accurate, Customer shall notify WilTel within thirty (30) calendar days by completing and submitting a ne representation to WilTel at the address set forth on page 1 of the Agreement.

---

[i] "The term 'telecommunications carrier' means any provider of telecommunications services, except that such term does not include aggregators of telecommunicatio services." 47 U.S.C. § 153(44).

[ii] "The term 'telecommunications service' means the offering of telecommunications for a fee directly to the public, or to such classes of users as to be effectively availab directly to the public, regardless of the facilities used." 47 U.S.C § 153(46). "The term 'telecommunications' means the transmission, between or among points specifie by the user, of information of the user's choosing, without change in the form or content of the information as sent and received." 47 U.S.C. § 153(43).

[iii] "U.S." and "United States" means the United States of America, its possessions, territories, states, districts, and commonwealths, including, without limitation, Guam Puerto Rico, and the U.S. Virgin Islands.

[iv] 47 CFR § 54.708.

[v] A customer obtaining service for use in its own broadcast operations is an end user.

[vi] "The term 'information service' means the offering of a capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making availab information via telecommunications, and includes electronic publishing, but does not include any use of any such capability for the management, control, or operation of telecommunications system or the management of a telecommunications service." 47 U.S.C. § 153(20).

[vii] Refer to Instructions to the Telecommunications Reporting Worksheet, Form 499-A, (www.fcc.gov/formpage.html) for definitions.

[viii] See footnote 3.

[ix] WilTel will waive this requirement if Customer demonstrates that use of a U.S. billing address is solely to facilitate payment by an agent acting on Customer's beha Such waiver must be in writing to be effective.

## Carrier Express Termination Service Schedule 8B

This Service Schedule for Carrier Express Termination Service is subject to that Telecommunications Services Agreement No. __________ ("TSA") by and between WilTel Communications, LLC ("WilTel"), and Customer.

**1.1 Carrier Express Termination Service**. Customer may order from Williams Carrier Express Termination Service pursuant to the terms and conditions set forth in Schedule 8 of the TSA, Carrier Voice Services, and subject to credit approval and availability.

**1.2 Service Description**. Carrier Express Termination utilizes dedicated access lines ("Z-DALs"), to provide low grade / low cost LATA-wide termination for facilities-based carriers ("Carrier Express Termination" ). Carrier Express Termination will be provided to Customer via Z-DALs connecting Customer's facility and Williams' facility for the termination of voice minutes to specific LATAs as defined by Williams. Termination of voice minutes via the Z-DAL to LATA's other then those specified by Williams is allowed, however termination of voice minutes to such other LATAs is subject to higher rates as set forth in the Carrier Express Termination pricing schedule. Carrier Express Termination to specific LATAs is subject to availability.

**1.3 Limitations**. Carrier Express Termination is subject to the following limitations:

a. Carrier Express Termination is limited to dedicated interstate termination in Williams defined LATAs.
b. All Carrier Express Termination trunk groups will be provisioned under a customer specific account solely for the purpose of utilizing Carrier Express Termination. It is Customer's responsibility to order trunk groups and maintain routing for Carrier Express Termination pricing under the appropriate account. Customer errors are not valid for dispute purposes.
c. Carrier Express Termination does not support DTMF.
d. Carrier Express Termination does not guarantee Caller ID delivery.
e. Customer uses SS7 signaling on Z-DALs, Customer may not perform LNP dips.

**2.1 Traffic Forecast.** Before issuing its first Service Request and on a quarterly basis through the Term of the TSA, Customer shall provide Williams with a rolling one-year forecast for Carrier Express Termination by LATA.

**2.2 Traffic Jurisdiction Determination.** Williams shall be entitled to determine the jurisdiction (interstate and intrastate) of traffic to the extent Williams can make such a determination as described in Schedule 8 of the TSA. Carrier Express Termination traffic jurisdiction determination shall be separate and shall not impact Carrier Termination traffic ordered under the terms and conditions of Schedule 8 of the TSA.

**3.1 Usage Charges.** Usage sensitive charges are based on the actual usage of Williams' facilities. Such charges are measured in Conversation Minutes in increments as set forth in Schedule 8 of the TSA based on answer detection time.

**3.2 Call Duration.** Williams will utilize the answer types defined in the table below to determine call duration for the purposes of billing Customer. The Audio Tone Detector ("ATD") cards used for billing Customer may result in slight differences when compared to the hardware answer provided on Customer's Z-DAL. These slight differences (less than 20 seconds per call) are not disputable.

| SupvType | Definition |
|---|---|
| 00 | No answer |
| 01 | Software answer, no voice detected |
| 02 | Software answer, voice detected |
| 03 | Software answer, audio ringback detected |
| 04 | Hardware answer |
| 05 | Software answer, silence detected |
| 08 | Software answer, busy tone detected |
| 09 | Software answer, reorder tone detected |

**3.3 Chargeable Time.** Chargeable time for Customer shall begin when the called party answers, as determined by answer supervision described above. If answer supervision is not available and the duration of the call is at least thirty-three (33) seconds, Williams will bill for such call for the duration of the call less (30) seconds call setup time. Chargeable time for a call shall end upon disconnection by either party.

**3.4 Minimum Usage Charge (per port).**

a. Customer's dedicated ports must have minimum usage as specified in the voice pricing schedules, attached hereto. These minimums are restricted to usage charges only; ancillary and installation charges do not count toward the minimum. Usage charges attributable to Z-DALs apply only toward Carrier Express Termination port minimums and do not include or contribute toward any DAL usage billed as Carrier Termination under Schedule 8.

b. DS-1 - $1,250 per month and DS-3 - $15,000 per month. A national aggregate of Customer's DS-1 and DS-3 Z-DALs, separately, will be calculated of Customer's monthly Z-DAL usage. The aggregate will then be divided by the number of existing Customer Z-DALs to arrive at an average usage per Z-DAL. The average usage per Z-DAL will be used to determine if Customer has met the minimum Z-DAL usage for that month.
c. Customer's total monthly Z-DAL usage must sustain a minimum monthly billing equivalent of ten (10) DS-1s or one (1) DS-3 within a 90 day ramp period effective from the date the first Z-DAL is turned up.
d. In the event that Customer's average monthly usage per Z-DAL is below the minimum usage charge or Customer's total monthly Z-DAL usage is below the minimum monthly billing equivalent, a line item shortfall covering all Z-DALs will be invoiced ("Minimum Usage Charge").

**4.1 Acceptance of Quote.** All rates and/or Revenue Commitments set forth in the attached Voice Services rate schedules identified as quote # 3546a are hereby accepted by Customer. Other Carrier services not specifically defined as Carrier Express Termination, as described herein, will follow the pricing guidelines established for Carrier Termination in Schedule 8 of the TSA.

# Direct Network Access Schedule 13

This Service Schedule is subject to that Telecommunications Services Agreement No. _______________ ("TSA") by and between WilTel Communications, LLC ("WilTel"), and Customer.

1. **Service Description**. WilTel® Direct Network Access℠ ("DNA") is a web-based portal that will provide Customer with a partitioned view into their portion of WilTel nationwide fiber optic network through a GUI ("Graphic User Interface"). Customer may access functionality and supported products through DNA.

2. **Service Request**. In order to receive DNA Service, Customer must have ordered Services from WilTel. Customer must also complete the "Request for WilTel DNA Company Administrator Access" form, attached hereto as Exhibit I, prior to receiving access to DNA.

3. **Availability of Service**. WilTel will provide use of the basic functions of DNA to Customer at no charge. Upon mutual agreement between Customer and WilTel, enhanced functionality or additional features to the base system may be provided to Customer for a fee. WilTel reserves the right to change the base system and/or additional features offered under this Schedule. WilTel will make reasonable efforts to provide thirty (30) days notice to Customer of any such change.

4. **License**. WilTel grants to Customer a non-exclusive, non-transferable license to use DNA for the purposes described herein. This license shall continue for so long as Customer is purchasing Service(s) from WilTel under a TSA. WilTel is granting Customer no other rights or interest in DNA.

5. **Proprietary Nature**. Customer acknowledges that DNA and all modifications thereto are the proprietary property of WilTel. Neither Customer nor its employees, agents or representatives shall allow access to third parties or disclose any information regarding DNA, or any modifications thereto, to any person or entity other than bona fide Customer employees without WilTel specific written permission.

6. **Termination**. Use of DNA for purposes other than those specifically set forth in this Schedule shall entitle WilTel to suspend or terminate Customer's access to DNA. Should Customer or any Customer employee, agent or representative misuse DNA, WilTel shall have the right to immediately terminate this DNA Service Schedule or suspend Customer's use of DNA until Customer can show that such misuse has been identified and corrected to WilTel's satisfaction. Should Customer terminate Service(s) or fail to pay for monthly Service in accordance with Article 4 of the TSA, WilTel shall have the right to immediately terminate this DNA Service Schedule or suspend Customer's use of WilTel DNA Service.

7. **Intellectual Property**. It is understood by the parties that WilTel owns or has certain rights to intellectual property associated with the technologies utilized in DNA and that no rights, except as specifically granted in Section 4, shall transfer to Customer by virtue of any of the activities set forth herein. Customer shall not sell, transfer, publish, disclose, display or otherwise make available DNA to any third party. Customer shall not copy, de-compile, reverse-engineer or otherwise attempt to derive the source code from DNA.

8. **Use of Service**. Customer agrees not to enter into DNA any data that is profane, threatening, indecent, libelous, defamatory or unlawful, or that violates or infringes any trademark, copyright or similar rights of others. Customer agrees not to knowingly enter any data that is false or misleading. WilTel reserves the right to deny access to any user or group of users to DNA, at its sole discretion, at any time, and for any reason or no reason.

9. **No Warranty**. It is understood by Customer that WilTel DNA is provided "as-is" and WilTel makes no representations or warranties regarding its use. **WILTEL HEREBY DISCLAIMS ALL OTHER WARRANTIES INCLUDING ANY IMPLIED REPRESENTATIONS OR WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE,** or that the use of DNA or any information relating thereto or contained therein will not infringe any copyright or trademark of any third person. WilTel makes no warranty as to the accuracy of any information contained in WilTel DNA.

10. **Limitation of Liability. IN THE EVENT OF ANY BREACH OF THIS SCHEDULE OR ANY FAILURE OF WILTEL DNA SERVICES, WHATSOEVER, WILTEL SHALL NOT BE LIABLE FOR ANY DIRECT, INDIRECT, CONSEQUENTIAL, SPECIAL, ACTUAL, INCIDENTAL, PUNITIVE OR ANY OTHER DAMAGES, OR FOR ANY LOST PROFITS OF ANY KIND OR NATURE WHATSOEVER, EVEN IF WILTEL HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGE OR LOSS.**

11. **Planned Network Maintenance Activity**. From time to time WilTel may perform maintenance on its operating systems, which may cause WilTel DNA to be unavailable ("planned outage"). Whenever possible, planned outages will occur during non-business hours.

12. **Customer Responsibilities**.

a. Customer shall appoint a "WilTel DNA Administrator" ("Administrator") who will be responsible for setting up the security and administration of Customer's use of DNA. The Administrator shall also be required to complete the "Request for WilTel DNA Company Administrator Access" form, which will be submitted to WilTel. Customer shall assign each of its users a separate ID for entry into WilTel DNA and Customer will control the level of security for each user (i.e. to which accounts/functions/features of DNA each user will have access).

b. Customer shall have sole responsibility for the security, administration and actions of its users of DNA Services.

c. Customer shall use DNA Service only for the purpose of managing and viewing the other Service(s) ordered by Customer from WilTel.

d. Customer shall have the sole responsibility for adequate protection and backup of its data used in connection with DNA Service and Customer shall not have any claim against WilTel for any reason relating to Customer's use of DNA Service, including, but not limited to, claims for lost data, inaccurate data, work delays, or lost profits.

e. WilTel shall not be liable for any lack of action due to failure to receive information from Customer via DNA.

# OneStop Schedule 16

This OneStop Service Schedule is subject to that Telecommunications Services Agreement No. ______________ ("TSA") by and between WilTel Communications, LLC ("WilTel"), and Customer.

1. **Service Description.** WilTel OneStop is a web-based graphic user interface into the WilTel Voice Services order entry system that allows customers to enter new orders as well as search orders and services by ANI or NPANXX. Customers have the ability to view details concerning features, provisioning steps, usage dates and service status. Users are able to submit change, block, re-provision, unblock and disconnect orders at their own convenience. OneStop also has a service area search screen that will allow the user to determine network capability, location of NPANXX, Tandem CLLI, End Office CLLI, servicing LEC and billing City and State.

2. **Service Request.** In order to receive OneStop Service, Customer must have ordered Services from WilTel. Customer must also complete the "Request for WilTel OneStop Company Administrator Access" form and the "OneStop User Profile Information" form for each of Customer's users, both forms shall provided by WilTel's Project Manager samples attached hereto as Exhibits I and II, prior to receiving access to WilTel OneStop. If Customer is going to be the administrator then Customer must also sign up for WilTel DNA service for access to WilTel security database. If WilTel is to act as the administrator, then Customer will be required to use encrypted email software that is compatible with WilTel computer systems.

3. **Availability of Service.** WilTel will provide use of the basic functions of WilTel OneStop to Customer at no charge. Upon mutual agreement between Customer and WilTel, enhanced functionality or additional features to the base system may be provided to Customer for a fee. WilTel reserves the right to change the base system and/or additional features offered under this schedule. WilTel will make reasonable efforts to provide thirty (30) days notice to Customer of any such change. WilTel makes no representation or warranty regarding the hours of availability or operational performance of WilTel OneStop

4. **License.** WilTel grants to Customer a non-exclusive, non-transferable license to use WilTel OneStop for the purposes described herein. This license shall continue for so long as Customer is purchasing Service(s) from WilTel under a TSA. WilTel is granting Customer no other rights or interest in WilTel OneStop.

5. **Proprietary Nature.** Customer acknowledges that WilTel OneStop and all modifications thereto are the proprietary property of WilTel. Neither Customer nor its employees, agents or representatives shall allow access to third parties or disclose any information regarding WilTel OneStop, or any modifications thereto, to any person or entity other than bona fide Customer employees without WilTel specific written permission.

6. **Termination.** Use of WilTel OneStop for purposes other than those specifically set forth in this Schedule shall entitle WilTel to suspend or terminate Customer's license and access to WilTel OneStop. Should Customer or any Customer employee, agent or representative misuse WilTel OneStop, WilTel shall have the right to immediately terminate this WilTel OneStop Service Schedule or suspend Customer's use of WilTel OneStop until Customer can show that such misuse has been identified and corrected to WilTel satisfaction. Should Customer terminate Service(s) or fail to pay for monthly service in accordance with the TSA, WilTel shall have the right to immediately terminate this WilTel OneStop Service Schedule or suspend Customer's use of WilTel OneStop.

7. **Intellectual Property.** It is understood by the parties that WilTel owns or has certain rights to intellectual property associated with the technologies utilized in WilTel OneStop and that no rights, except as specifically granted in Section 4, shall transfer to Customer by virtue of any of the activities set forth herein. Customer shall not sell, transfer, publish, disclose, display or otherwise make available WilTel OneStop to any third party. Customer shall not copy, de-compile, reverse engineer or otherwise attempt to derive the source code from OneStop.

8. **Use of Service.** Customer agrees not to enter into WilTel OneStop any data that is profane, threatening, indecent, libelous, defamatory or unlawful, or that violates or infringes any trademark, copyright or similar rights of others. Customer agrees not to knowingly enter any data which is false or misleading. WilTel reserves the right to deny access to any user or group of users to WilTel OneStop, at its sole discretion, at any time, and for any reason or no reason. Customer agrees to indemnify, defend and hold harmless WilTel from any and all claims arising from Customer use of or access to WilTel OneStop.

9. **No Warranty.** It is understood by Customer that WilTel OneStop is provided "as-is" and WilTel makes no representations or warranties regarding its use. WilTel makes **NO REPRESENTATIONS OR WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE**, or that the use of WilTel OneStop or any information relating thereto or contained therein will not infringe any copyright or trademark of any third person. WilTel makes no warranty as to the accuracy of any information contained in WilTel OneStop.

10. **Limitation of Liability.** **IN THE EVENT OF ANY BREACH OF THIS AGREEMENT OR ANY FAILURE OF WILTEL ONESTOP, WILTEL SHALL NOT BE LIABLE FOR ANY DIRECT, INDIRECT, CONSEQUENTIAL, SPECIAL, ACTUAL, INCIDENTAL, PUNITIVE OR ANY OTHER DAMAGES, OR FOR ANY LOST PROFITS OF ANY KIND OR NATURE WHATSOEVER, EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGE OR LOSS.**

11. **Planned Outages.** From time to time WilTel may perform maintenance on its operating systems, which may cause WilTel OneStop to be unavailable ("planned outage"). Whenever possible, planned outages will occur during non-business hours.

12. **Customer Responsibilities.**

a. Customer shall appoint a "WilTel OneStop Administrator" ("Administrator") who will be responsible for setting up the security and administration of Customer's use of WilTel OneStop, either directly or indirectly through WilTel acting as the Administrator. The Administrator shall also be required to complete the "Request for WilTel OneStop Company Administrator Access" form, which will

be submitted to WilTel. Customer shall assign each of its users a separate ID for entry into WilTel OneStop and Customer will control the level of security for each user (i.e. to which functions/features of WilTel OneStop each user will have access).

b. Customer shall have sole responsibility for the security, administration and actions of its users of WilTel OneStop.

c. Customer shall use WilTel OneStop only for the purpose of ordering, managing and viewing-the Service(s) ordered by Customer from WilTel.

d. Customer shall have the sole responsibility for adequate protection and backup of its data used in connection with WilTel OneStop and Customer shall not have any claim against WilTel for any reason relating to Customer's use of WilTel OneStop, including, but not limited to, claims for lost data, inaccurate data, work delays, or lost profits.

e. WilTel shall not be liable for any lack of action due to failure to receive information from Customer via WilTel OneStop.

f. Customer hereby acknowledges and agrees that all Services ordered by Customer via WilTel OneStop are subject to the terms and conditions of the TSA, that Customer's use of the password to access and order Services via WilTel OneStop shall indicate Customer's intent to accept the electronic record of the Service ordered.

AT&T

Maryann Allen
General Branch Manager
Northeast Carrier Markets

55 Corporate Drive
Bridgewater, NJ 08807
908 658-8511
FAX 908-658-2222
WIRELESS 203 918-5113
cirenza@att.com

October 12, 2003

Mr. Henry Park
Senior Director
Locus Telecommunications, Inc.
111 Sylvan Avenue
Englewood Cliffs, NJ 07632

Dear Mr. Park:

Enclosed is an original, executed Master Carrier Agreement along with a Dedicated Outbound Wholesale Service Terms and Pricing Attachment, a Data Service Terms and Pricing Attachment and a Dedicated Outbound Wholesale Service Description with AT&T.

We will continue to strive toward an excellent business relationship with you and your team.

Sincerely,

Maryann Allen
General Manager

cc: J. Mastromonaco
T. Umholtz

AT&T

# AT&T Master Carrier Agreement

| | | |
|---|---|---|
| CUSTOMER Name (Full Legal Name): Locus Telecommunications Inc ("CUSTOMER") | AT&T Corp., a New York corporation ("AT&T") | AT&T Sales Representative: J.Jason Mastromonaco |
| CUSTOMER Name (and Title) for Notice: Henry Park | AT&T Name (and Title) for Notice: Maryann Allen, General Mgr | AT&T Contact Telephone Number: 908-658-8380 |
| CUSTOMER Address: 111 Sylvan Avenue | AT&T Address: 55 Corporate Drive | Initial Deposit Amount Required: Waive Deposit |
| City: Englewood Cliffs / State: NJ / Zip Code: 07632 | City: Bridgewater / State: NJ / Zip Code: 08807 | |
| CUSTOMER Fax number for Notice: 201-947-4082 | AT&T Fax number for Notice: 908-658-2222 | |

This AT&T Master Carrier Agreement (the "Agreement") consists of this Cover Sheet and the documents listed in the Table of Documents below (each, an "Attachment"). In the event of any inconsistency, precedence will be given to the documents in the following order: (1) this Cover Sheet; (2) the documents listed in the Table of Documents (excluding the General Terms and Conditions); (3) the General Terms and Conditions. In the event of any inconsistency between this Agreement and an applicable AT&T Service Guide, the terms of this Agreement shall prevail.

This Agreement shall be legally binding when signed by both parties and shall continue in effect until the end of the longest term specified in an Attachment, or until otherwise terminated pursuant to this Agreement. The rates and commitments shall be effective as provided in each Attachment.

**Table of Documents**

| Title | Doc. ID | Date/time stamp |
|---|---|---|
| General Terms and Conditions | MCA 030614.doc | 06/14/03 8:15 am |
| Dedicated Outbound Wholesale Service | LocusDowstp 030811.doc | 10/08/03 3:16 pm |
| Data Service Terms & Pricing | Locus DSTP 030811.doc | 8/11/03 9:51 am |
| DOWS Service Description | DOWS SDA.doc | 08/05/99 6:46 pm |

**AGREED:**

**Locus Telecommunications Inc**

By: [signature]
(Authorized CUSTOMER Signature)

Henry Park - Senior Director
(Typed or Printed Name and Title)

Date: October 9, 2003

**AGREED:**

**AT&T Corp.**

By: [signature]
(Authorized AT&T Signature)

Maryann Allen, General Manager
(Typed or Printed Name and Title)

Date: 10-15-03



*AT&T/CUSTOMER CONFIDENTIAL*
*Subject to Nondisclosure Obligations*

1. **Provision of Services.** AT&T agrees to provide to CUSTOMER the AT&T services described in the Attachment(s) to this Agreement (the "Services"). AT&T is not responsible for the quality of transmission or signaling on CUSTOMER's side of the network interface between AT&T and CUSTOMER. Service is furnished subject to the availability of the service components required, and subject to operational and systems constraints.

2. **Billing and Payment for the Services.** Except as may be provided in an Attachment, AT&T will send a single monthly bill for each of the Services to one location designated by CUSTOMER. CUSTOMER is liable for all amounts due to AT&T under this Agreement. Payment in U.S. currency is due within thirty days after the bill date, except as otherwise provided below with respect to Billing Disputes. Charges set forth in the Attachments are exclusive of any applicable taxes or surcharges.

3. **Non-Payment.** AT&T may add interest charges to any past due amounts at the lower of 1.5% per month or the maximum rate allowed by law. CUSTOMER shall reimburse AT&T for reasonable attorney's fees and any other costs associated with collecting delinquent or dishonored payments. Restrictive endorsements or other statements on checks accepted by AT&T will not apply.

4. **Billing Disputes.** To dispute a charge on a bill, CUSTOMER must identify the specific charge in dispute and provide a full written explanation of the basis for the dispute using a standard AT&T billing dispute form within 90 days after the bill date. CUSTOMER may withhold payment of a charge subject to a good faith dispute provided: (a) CUSTOMER submits the billing dispute, using a standard AT&T billing dispute form, within thirty days after the bill date; (b) CUSTOMER pays the undisputed portion of all charges; and (c) CUSTOMER cooperates reasonably with AT&T's efforts to investigate and resolve the dispute. If AT&T determines a disputed charge was billed in error, AT&T shall issue a credit to reverse the amount incorrectly billed. If AT&T determines a disputed charge was billed correctly, payment shall be due from CUSTOMER within five days after AT&T advises CUSTOMER in writing that the dispute is denied.

5. **Deposits.** Using its Deposit standards, AT&T has assessed and CUSTOMER shall pay the Initial Deposit amount specified on the Cover Sheet before Services are provided. AT&T may require CUSTOMER, during the term of this Agreement, to tender a deposit in an amount to be determined by AT&T in its reasonable discretion. AT&T will rely upon commercially reasonable factors to determine the need for and amount of any deposit. These factors may include, but are not limited to, payment history, number of years in business, history of service with AT&T, bankruptcy history, current account treatment status, financial statement analysis, and commercial credit bureau rating, as well as commitment levels and anticipated monthly charges. Any deposit will be held by AT&T as a guarantee for the payment of charges. A deposit does not relieve CUSTOMER of the responsibility for the prompt payment of bills. Interest (at the rate of 6% per year or such other rate as is applicable by law) will be paid to CUSTOMER for any period that a cash deposit is held by AT&T. AT&T may apply a deposit against past due charges at any time.

6. **Obligations Regarding Taxes.** CUSTOMER shall pay any applicable taxes (excluding those on AT&T's net income), fees, duties, levies and other similar charges (and any related interest and penalties) relating to the sale, transfer of ownership, installation, license, use or provision of the Services, except to the extent customer provides a valid exemption certificate to AT&T prior to the delivery of Services.

7. **CUSTOMER is a Carrier.** CUSTOMER certifies it is a "common carrier" as defined in the Communications Act of 1934 (see 47 USC §§153(10) and 211), with all required operating authority. CUSTOMER further certifies either (a) it has filed an FCC Form 499-A with the Federal Communications Commission (individually or on a consolidated basis) in accordance with the registration requirement of 47 C.F.R. 64.1195, or (b) it will not resell interstate telecommunications service(s) provided by AT&T under this Agreement, unless it first registers with the Federal Communications Commission in accordance with the registration requirement of 47 C.F.R. 64.1195.

8. **Responsibilities of CUSTOMER.** CUSTOMER is responsible for interfacing and communicating with its End Users, for placing any orders, and for assuring that it and any Intermediate Providers comply with the provisions of this Agreement and with all applicable laws and regulatory requirements with respect to the Services. CUSTOMER is responsible for arranging premises access at any reasonable time so that AT&T personnel may install, repair, maintain, inspect or remove service components.

9. **Software.** AT&T grants CUSTOMER a personal, non-transferable and non-exclusive license (without the right to sublicense) to use, in object code form, all software and associated written and electronic documentation and data furnished pursuant to this Agreement (collectively, "Software"), solely in connection with the Services and solely in accordance with applicable written and electronic documentation. CUSTOMER will refrain from taking any steps to reverse assemble, reverse compile or otherwise derive a source code version of the Software. The Software shall at all times remain the sole and exclusive property of AT&T or its suppliers. "Third-Party Software" means Software that bears a copyright notice of a third party. "AT&T Software" means all Software other than Third-Party Software. CUSTOMER shall not copy or download the Software, except that CUSTOMER may make two copies of the Software, one for archive and the other for disaster recovery purposes. Any copy must contain the same copyright notices and proprietary markings as the original Software. CUSTOMER agrees to comply with any additional restrictions that are provided with any Third-Party Software. The term of the license granted with respect to any Software shall be coterminous

with the Attachment which covers the Software and/or related Services. CUSTOMER shall assure that its Users comply with the terms and conditions of this Section.

10. **Warranty with Respect to Software.** AT&T warrants that all AT&T Software will perform substantially in accordance with its applicable published specifications for the term of the Attachment that covers the AT&T Software. If CUSTOMER returns to AT&T, within such period, any AT&T Software that does not comply with this warranty, then AT&T, at its option, will either repair or replace the portion of the AT&T Software that does not comply or refund the amount paid by CUSTOMER for such failed or defective AT&T Software. This warranty will apply only if the AT&T Software is used in accordance with the terms of this Agreement and is not altered, modified or tampered with by CUSTOMER or Users.

11. **Abuse of Service.** The abuse of Service is prohibited. Using Service or permitting Service to be used in the following ways constitutes abuse:(a) interfering unreasonably with the use of AT&T service by others or the operation of the AT&T network; (b) with respect to Services that include the provision of terminating switched access over local exchange company facilities, carrying calls that originate on the network of a facilities-based interexchange carrier other than AT&T and terminate disproportionately to domestic locations for which AT&T's cost of terminating switched access (based on the published access rates of the incumbent local exchange companies) is above AT&T's price for the call under this Agreement (after application of discounts); (c) subjecting AT&T personnel or non-AT&T personnel to hazardous conditions; (d) attempting to avoid the payment, in whole or in part, of any charges by any means or device (non-payment of billed charges will not be considered abuse of service for purposes of this Section); or (e) using the Services or displaying or transmitting Content in a manner that violates any applicable law or regulation. In any instance in which AT&T believes in good faith that there is abuse of Service as set forth above, AT&T may immediately restrict, suspend or discontinue providing Service or prevent the display or transmission of Content, without liability on the part of AT&T, and then notify CUSTOMER of the action that AT&T has taken and the reason for such action. To the extent doing so does not interfere with its ability to prevent abuse of Service (to be determined in AT&T's reasonable judgment), AT&T will attempt to notify CUSTOMER before taking such action, and will attempt to limit any restriction, suspension or discontinuance under this Section to the locations, Content, or Services with respect to which the abuse is taking place.

12. **Default.** If a party breaches any material term of this Agreement and the breach continues unremedied for 60 days after written notice of default, the other party may terminate for cause any Attachment materially affected by the breach. If CUSTOMER is in breach of its payment obligations (including failure to pay a required deposit), and fails to make payment in full within 5 days after receipt of written notice of default, AT&T may, at its option, terminate the Agreement, terminate affected Attachments, suspend Service under the affected Attachments, and/or require a deposit, advanced payment, or other satisfactory assurances in connection with any or all Attachments as a condition of continuing to provide Services; except that AT&T will not take any such action as a result of CUSTOMER's non-payment of a charge subject to a timely billing dispute, unless AT&T has reviewed the dispute and determined that the charge is correct. An Attachment may be terminated by either party immediately upon written notice if the other party has become insolvent or involved in a liquidation or termination of its business, or adjudicated bankrupt, or been involved in an assignment for the benefit of its creditors. CUSTOMER shall be liable to AT&T for Termination Charges, as specified in a terminated Attachment, in the event that AT&T terminates an Attachment as a result of a breach by CUSTOMER. Termination by either party of an Attachment does not waive any other rights or remedies it may have under this Agreement.

13. **No Other Representations or Warranties.** EXCEPT AS EXPRESSLY PROVIDED IN THIS AGREEMENT, AT&T MAKES NO REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, UNDER THIS AGREEMENT AND SPECIFICALLY DISCLAIMS ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE OR NON-INFRINGEMENT OR ANY WARRANTY ARISING BY USAGE OF TRADE, COURSE OF DEALING OR COURSE OF PERFORMANCE. AT&T DOES NOT REPRESENT OR WARRANT THAT THE SERVICES WILL BE UNINTERRUPTED OR ERROR-FREE, OR THAT THE SERVICES WILL MEET CUSTOMER'S REQUIREMENTS OR THAT THE SERVICES WILL PREVENT UNAUTHORIZED ACCESS BY THIRD PARTIES. AT&T DOES NOT AUTHORIZE ANYONE TO MAKE A REPRESENTATION OR WARRANTY OF ANY KIND ON ITS BEHALF AND CUSTOMER SHOULD NOT RELY ON ANYONE MAKING SUCH STATEMENTS.

14. **Limitation of Liability.** EITHER PARTY'S ENTIRE LIABILITY, AND THE OTHER PARTY'S EXCLUSIVE REMEDIES, FOR ANY DAMAGES CAUSED BY ANY SERVICE DEFECT OR FAILURE, OR FOR OTHER CLAIMS ARISING IN CONNECTION WITH ANY SERVICE OR OBLIGATIONS UNDER THIS AGREEMENT SHALL BE:

(a) FOR BODILY INJURY OR DEATH TO ANY PERSON, OR REAL OR TANGIBLE PROPERTY DAMAGE, NEGLIGENTLY CAUSED BY A PARTY, OR DAMAGES ARISING FROM THE WILLFUL MISCONDUCT OF A PARTY OR A BREACH OF THE PROVISIONS OF SECTION 17 (USE OF MARKS), THE OTHER PARTY'S RIGHT TO PROVEN DIRECT DAMAGES;

(b) FOR DEFECTS OR FAILURES OF SOFTWARE, THE REMEDIES SET FORTH ABOVE UNDER THE

HEADING WARRANTY WITH RESPECT TO SOFTWARE;

(c) FOR INDEMNITY, THE REMEDIES SET FORTH BELOW UNDER THE HEADING INDEMNIFICATION;

(d) FOR DAMAGES OTHER THAN THOSE SET FORTH ABOVE AND NOT EXCLUDED UNDER THIS AGREEMENT, EACH PARTY'S LIABILITY SHALL BE LIMITED TO PROVEN DIRECT DAMAGES NOT TO EXCEED PER CLAIM (OR IN THE AGGREGATE DURING ANY 12-MONTH PERIOD) AN AMOUNT EQUAL TO THE TOTAL NET PAYMENTS PAYABLE BY CUSTOMER FOR THE APPLICABLE SERVICE UNDER THE APPLICABLE ATTACHMENT DURING THE 3 MONTHS PRECEDING THE MONTH IN WHICH THE DAMAGE OCCURRED.

THE LIMITATIONS IN THIS SECTION 14 SHALL NOT PRECLUDE A PARTY FROM OBTAINING INJUNCTIVE RELIEF FROM A COURT OF COMPETENT JURISDICTION IN THE EVENT OF A VIOLATION OF SECTION 9 (SOFTWARE), SECTION 11 (ABUSE OF SERVICE), ARTICLE 17 (USE OF MARKS), OR ARTICLE 20 (CONFIDENTIALITY OBLIGATIONS).

EXCEPT TO THE EXTENT PROVIDED UNDER THIS AGREEMENT WITH RESPECT TO INDEMNIFICATION, NEITHER PARTY SHALL BE LIABLE TO THE OTHER PARTY FOR ANY INDIRECT, INCIDENTAL, CONSEQUENTIAL, PUNITIVE, RELIANCE OR SPECIAL DAMAGES, INCLUDING WITHOUT LIMITATION DAMAGES FOR LOST PROFITS, ADVANTAGE, SAVINGS OR REVENUES OF ANY KIND, OR INCREASED COST OF OPERATIONS, WHETHER OR NOT SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. IN NO EVENT SHALL AT&T BE LIABLE FOR ANY CLAIM OR DAMAGES CAUSED BY OR ARISING OUT OF:

(i) ANY ACT OR OMISSION (INCLUDING WITHOUT LIMITATION UNAUTHORIZED USE, THEFT, ALTERATION, LOSS OR DESTRUCTION OF SERVICE OR THE APPLICATIONS, CONTENT, DATA, PROGRAMS, INFORMATION, NETWORK OR SYSTEMS OF CUSTOMER, AN END USER OR ANY THIRD PARTY) OF CUSTOMER, AN INTERMEDIATE PROVIDER, OR AN END USER,

(ii) EXCEPT AS OTHERWISE PROVIDED IN AN ATTACHMENT, SERVICE LEVELS, DELAYS OR INTERRUPTIONS OR LOST OR ALTERED MESSAGES OR TRANSMISSIONS, OR

(iii) INTEROPERABILITY, INTERACTION OR INTER-CONNECTION OF THE SERVICES WITH APPLICATIONS, EQUIPMENT, SERVICES, CONTENT OR NETWORKS PROVIDED BY CUSTOMER OR THIRD PARTIES.

THE LIMITATIONS OF LIABILITY SET FORTH IN THIS AGREEMENT SHALL SURVIVE FAILURE OF AN EXCLUSIVE REMEDY, AND SHALL APPLY REGARDLESS OF THE FORM OF ACTION, WHETHER IN CONTRACT, TORT, WARRANTY, STRICT LIABILITY, OR NEGLIGENCE (INCLUDING WITHOUT LIMITATION ACTIVE AND PASSIVE NEGLIGENCE). NOTHING IN THIS SECTION LIMITS CUSTOMER'S RESPONSIBILITY FOR THE PAYMENT OF CHARGES DUE AS PROVIDED IN THIS AGREEMENT, OR AT&T'S OBLIGATION TO PROVIDE CREDITS DUE AS PROVIDED IN THIS AGREEMENT.

For purposes of all remedies and limitations of liability set forth in this Agreement or any Attachment, (i) "AT&T" shall mean AT&T Corp., its Affiliates, and its and their employees, directors, officers, agents, representatives, subcontractors, interconnection service providers and suppliers and (ii) "CUSTOMER" shall mean Customer, its Affiliates, and its and their employees, directors, officers, agents, and representatives.

15. **Force Majeure.** Neither party nor its Affiliates or subcontractors shall be liable to the other party for any delay, failure in performance, loss or damage due to force majeure conditions such as fire, explosion, power blackout, earthquake, volcanic action, flood, hurricane, the elements, strike, embargo, labor disputes, civil or military authority, war, acts of God, acts or omissions of other carriers (except, for CUSTOMER, the acts or omissions of its Intermediate Providers), acts of regulatory or governmental agencies, or other causes beyond their reasonable control, except that CUSTOMER's obligation to pay for services provided shall not be excused. Changes in economic, business or competitive conditions are not force majeure conditions. If CUSTOMER is unable to meet its commitments as a direct result of a force majeure condition, CUSTOMER may suspend its commitments for one full billing month (or longer, with AT&T's written consent, which shall not be unreasonably withheld). The effect of such a suspension of commitment will be to exclude the affected month(s) from all calculations affecting the CUSTOMER's commitments and to extend the term of this Agreement by the same number of months. CUSTOMER must provide notice to AT&T of the force majeure condition giving rise to the right to suspend commitments within 30 days after its occurrence.

16. **Indemnification.** CUSTOMER shall indemnify, defend, and hold harmless AT&T and its Affiliates, directors, officers, employees, agents, successors and assigns from any and all claims, damages and expenses whatsoever (including reasonable attorneys' fees) arising on account of or in connection with CUSTOMER's use, resale or sharing of the Services, including but not limited to: (a) claims for libel, slander, invasion of privacy; (b) claims for infringement of copyright arising from any communication using the Services; (c) claims arising from any failure, breakdown, interruption or deterioration of service provided by AT&T to CUSTOMER or by CUSTOMER to End Users or Intermediate Providers; (d) claims arising from CUSTOMER's marketing efforts; and (e) claims of patent infringement arising from combining or using services or equipment furnished by AT&T in connection with services or equipment furnished by others. CUSTOMER's indemnification obligations do not

apply to claims for damages to real or tangible personal property or for bodily injury or death negligently caused by AT&T.

AT&T shall indemnify, defend, and hold harmless CUSTOMER and its Affiliates, directors, officers, employees, agents, successors and assigns from all claims of patent infringement arising solely from the use of the Services. (Whenever AT&T is responsible under the preceding sentence, AT&T may at its option either procure the right for CUSTOMER to continue using, or may replace or modify the alleged infringing Service so that the Service becomes noninfringing. If those alternatives are not reasonably achievable, AT&T may terminate the affected Attachment without termination liability to either party.)

The indemnified party under this Section 16: (i) must notify the other party in writing promptly upon learning of any claim or suit for which indemnification may be sought, provided that failure to do so shall have no effect except to the extent the other party is prejudiced thereby; (ii) shall have the right to participate in such defense or settlement with its own counsel and at its sole expense, but the other party shall have control of the defense or settlement; and (iii) shall reasonably cooperate with the defense.

17. **Use of Marks.** Nothing in this Agreement creates in a party any rights in the other party's trade names, trademarks, service marks or any other intellectual property. Either party may use the other party's trade names, trademarks, or service marks only to the extent such use is not prohibited by this Agreement and is otherwise permitted by law (including but not limited to the Lanham Act). In no event shall either party use or display, in advertising or otherwise, any of the other party's logos, trade dress, trade devices or other indicia of origin, or any confusingly similar logos, trade dress, trade devices or indicia of origin. CUSTOMER will not conduct business under any AT&T corporate or trade name, trademark, service mark, logo, trade dress, trade device, indicia of origin or other symbol that serves to identify and distinguish AT&T from its competitors, or under any confusingly similar corporate or trade name, trademark, service mark, logo, trade dress, trade device, indicia of origin or other symbol. CUSTOMER will not indicate or imply to any other party that CUSTOMER is affiliated with AT&T, that CUSTOMER is authorized by AT&T to sell or provide service to them, that CUSTOMER is providing (or will provide) service to such party jointly or in collaboration or partnership with AT&T, or as the agent of AT&T, or that service provided by CUSTOMER or another carrier is provided by AT&T. Except to the limited extent (if any) as may be required under law, neither CUSTOMER nor an Intermediate Provider shall indicate or imply to any existing or potential End User (or Intermediate Provider) that any portion of the service provided to the End User (or Intermediate Provider) by CUSTOMER or the Intermediate Provider is provided by AT&T or is carried over the AT&T network or AT&T facilities.

18. **Relationship of the Parties.** The relationship between the parties shall be that of independent contractors and not of principal and agent, employer and employee, franchiser and franchisee, partners or joint venturers. This Agreement does not establish CUSTOMER as a dealer, distributor or franchisee of AT&T, and no fee is being paid to AT&T to enter into this Agreement.

19. **Confidential Information Defined.** "Confidential Information" consists of the following: all information disclosed by one party or its agent or representative (the "Disclosing Party") to the other party or its agent or representative (the "Receiving Party") in connection with this Agreement regarding the telecommunications needs of CUSTOMER and/or the telecommunications offerings of AT&T, to the extent that (a) for information disclosed in written, graphic or other tangible form, it is designated by appropriate markings to be confidential or proprietary or (b) for information disclosed orally, it is both identified as proprietary or confidential at the time of disclosure and summarized in a writing so marked within 15 business days following the oral disclosure. Notwithstanding the foregoing, all written or oral pricing and contract proposals exchanged between the parties shall be Confidential Information, whether or not so designated. Confidential Information is the property of the Disclosing Party and shall be returned to the Disclosing Party upon request. This Agreement is Confidential Information as to which each party is both a Disclosing Party and a Receiving Party. Information that (i) is independently developed by the Receiving Party, (ii) is lawfully received by the Receiving Party free of any obligation to keep it confidential, or (iii) becomes generally available to the public other than by breach of this Agreement, shall not be Confidential Information.

20. **Confidentiality Obligations.** A Receiving Party shall hold all Confidential Information in confidence from the time of disclosure until at least 3 years following its disclosure (except with respect to Software, which shall be held in confidence indefinitely). During that period, the Receiving Party: (a) shall use such Confidential Information only for the purposes of performing this Agreement and using the Services; (b) shall reproduce such Confidential Information only to the extent necessary for such purposes; (c) shall restrict disclosure of such Confidential Information to employees that have a need to know for such purposes; (d) shall advise those employees of the obligations of this Agreement; (e) shall not disclose Confidential Information to any third party without prior written approval of the Disclosing Party except as expressly provided in this Agreement; and (f) shall use at least the same degree of care (in no event less than reasonable care) as it uses with regard to its own proprietary or confidential information to prevent the disclosure, unauthorized use or publication of Confidential Information.

21. **Publicity.** No public statements or announcements relating to this Agreement shall be issued by either party without the prior written consent of the other party.

22. **Alternative Dispute Resolution.** The parties will attempt to settle any claim for non-payment of charges or recovery of overpayment of charges for the Services (hereinafter a "Billing Dispute"), through good faith negotiations. The parties may agree to submit a Billing Dispute to non-binding mediation. At any time, the party seeking payment may submit a notice of arbitration of a Billing Dispute for arbitration under the United States Arbitration Act pursuant to the terms of this Section and the Non-Administered Arbitration Rules of the CPR Institute for Dispute Resolution ("CPR"), to the extent such rules do not conflict. The Arbitration will be held in New York, New York, or any other location selected by mutual agreement of the parties. The arbitrator shall not have the power to award any damages in excess of the limits set forth in or excluded under the limitations of liability provided in this Agreement. The arbitrator may not limit, expand or otherwise modify the terms of this Agreement. The arbitrator shall strictly limit discovery to the production of documents directly relevant to the facts alleged in the notices of arbitration and defense. If depositions are required, the arbitrator shall permit each Party to conduct an equal number of depositions (not to exceed five per side), with equal limits on the number of deposition hours for each Party (not to exceed 7 per deposition). If an evidentiary hearing is held, each Party's presentation of its case shall be limited to three (3) days. Requests for temporary injunctive relief may be submitted to a court of competent jurisdiction if the arbitrator has not yet been appointed, but the arbitrator shall have the authority to modify any injunctive relief granted by such a court. The arbitration award shall be made final within eight months of filing of the notice of arbitration and judgment upon the award may be entered in any court having competent jurisdiction. All participants and the arbitrator shall hold the existence, content and results of mediation and arbitration in confidence, except as necessary to enforce a final settlement agreement or to enforce an arbitration award. Each party shall bear its own expenses and equally share expenses related to the compensation of the arbitrator. The arbitrator's award shall be in writing and shall state the reasons for the award.

23. **Time to Bring Claims.** Any initial demand for arbitration pursuant to this Agreement, and any legal action arising under this Agreement, must be initiated within two years after the cause of action arises.

24. **Notices.** All notices under this Agreement shall be in writing and shall be made: (a) by personal delivery; (b) by certified or registered mail, postage prepaid return receipt requested, (c) by overnight delivery, or (d) by facsimile transmission. Notice shall be sent to the individuals identified on the Cover Sheet (at the address and/or fax number designated for notice), or to such other individual, address or fax number as a party may designate by notice to the other party.

25. **Equipment.** AT&T shall retain title to all of its equipment and facilities used to provide service under this Agreement. CUSTOMER will pay reasonable shipping charges for delivery to CUSTOMER's premises of AT&T equipment used to provide Service under this Agreement. CUSTOMER is liable to AT&T for the replacement cost of any AT&T-provided equipment installed at CUSTOMER's premises in the event of loss of said equipment for any reason, including but not limited to theft.

26. **Export Regulations.** The parties acknowledge that the Services and Software may be subject to U.S. export laws and regulations. If requested, CUSTOMER will sign assurances and other export-related documents required for AT&T to comply with U.S. export regulations.

27. **Quality Monitoring.** CUSTOMER authorizes AT&T to monitor and record calls to AT&T concerning the Services for training and quality control purposes.

28. **Assignment.** This Agreement may not be assigned by either party except that either party may assign its rights or delegate its duties under this Agreement to an Affiliate of that party, and either party may assign this Agreement to a successor, provided that an assignee of CUSTOMER must satisfy the requirements of Section 7 of these General Terms and Conditions.

29. **No Third Party Beneficiaries.** This Agreement does not expressly or implicitly provide any third party (including but not limited to End Users and Intermediate Providers) with any remedy, claim, liability, reimbursement, cause of action or other right or privilege.

30. **Non-Waiver.** The failure of a party to enforce any right under this Agreement at any particular point in time shall not constitute a continuing waiver of any such right with respect to the remaining term of this Agreement, or the waiver of any other right under this Agreement.

31. **Severability.** If any portion of this Agreement is found to be invalid or unenforceable, the remaining provisions shall remain in effect and the parties shall immediately begin negotiations to replace any invalid or unenforceable portions that are essential parts of this Agreement.

32. **Survival of Terms.** The rights and obligations of either party that by their nature would continue beyond the termination or expiration of this Agreement shall survive termination or expiration of this Agreement. For example, the provisions of this Agreement regarding Confidentiality shall remain in effect following termination of this Agreement and the provisions of this Agreement regarding arbitration, use of Marks, indemnification, and/or limitation of liability shall survive termination of this Agreement as to any cause of action arising under the Agreement.

33. **Choice of Law.** The domestic law of the State of New York, except its conflict-of-laws rules, shall govern the construction, interpretation, and performance of this Agreement, except to the extent superceded by federal

law. The United Nations Convention on Contracts for International Sale of Goods shall not apply.

34. **Amendment**. No amendment, supplement, modification or waiver of any provision of this Agreement shall be effective unless in writing and signed by authorized representatives of both parties.

35. **Entire Agreement**. This Agreement constitutes the entire agreement between the parties with respect to the Services. This Agreement supersedes all prior agreements, proposals, representations, statements or understandings, whether written or oral, concerning the Services or the parties' rights or obligations relating to the Services. Any prior representations, promises, inducements or statements of intent regarding the Services that are not embodied in this Agreement are of no effect.

36. **Definitions**. The following definitions apply in addition to the definitions set forth elsewhere in this Agreement:

"Affiliate" means any entity that controls, is controlled by or is under common control with a party.

"Content" means information made available, displayed or transmitted (including information made available by means of an HTML "hot link", a third party posting or similar means) in connection with a Service including all trademarks, service marks and domain names contained therein, Customer and User data, and the contents of any bulletin boards or chat forums, and, all updates, upgrades, modifications and other versions of any of the foregoing.

"End User" or "User" means the entity that uses the service furnished under this Agreement for its own use, and not for purposes of providing telecommunications services to others.

"Intermediate Provider" means any provider or other intermediary (other than CUSTOMER or its agents or employees) in the sales chain between CUSTOMER and an End User.

"Master Agreement" means the Agreement.

"Service Guide" means the AT&T Business Service Guide, as amended from time to time, accessible via the Internet at http://serviceguide.att.com, unless otherwise defined in an Attachment. With respect to Service provided by AT&T under tariff, "Service Guide" means the tariffs applicable to the provision of such Service, as amended from time to time. Any references in the Attachments to "Tariffs", with respect to services that are no longer provided under tariff, will be deemed reference to the Service Guide, which is the successor document to interexchange tariffs that have been withdrawn as a result of detariffing.

If not otherwise defined, capitalized terms shall be defined as provided in the Service Guide.

End of Terms and Conditions

**AT&T Dedicated Outbound Wholesale Service**
**<u>Terms and Pricing Attachment</u>**

CUSTOMER Name (Full Legal Name): Locus Telecommunications Inc.

Date of execution of Agreement: October 9, 2003 (by CUSTOMER)

Oct. 15, 2003 MA (by AT&T)

---

1. **<u>Services Provided</u>.** AT&T will provide the following Services to CUSTOMER under this Attachment and pursuant to the terms of the Agreement and the applicable Tariffs specified below.

   A. **<u>AT&T Dedicated Outbound Wholesale Service</u>.** AT&T Dedicated Outbound Wholesale Service as described in the AT&T Dedicated Outbound Wholesale Service – Service Description Attachment, which may be amended by AT&T upon thirty (30) days' notice to CUSTOMER.

   B. **<u>Access Connections</u>.** AT&T Private Line Service (AT&T Tariff F.C.C. No. 9, as amended from time to time) consisting of AT&T *ACCUNET*® T1.5 Service and AT&T *ACCUNET* T45 Service Access Connections. As provided under this Attachment, an Access Connection provides the physical connection, at an AT&T central office, of an AT&T Local Channel or other access to AT&T Dedicated Outbound Wholesale Service or to an AT&T office function (such as M28 Multiplexing) connected to AT&T Dedicated Outbound Wholesale Service. One access connection applies for each AT&T Local Channel or other access connected.

   C. **<u>AT&T Local Channel Services.</u>** AT&T Local Channel Services (AT&T Tariff F.C.C. No.11, as amended from time to time) consisting of AT&T Terrestrial 1.544 Mbps and Terrestrial 45 Mbps Local Channel Services.

   D. **<u>AT&T Maritime Mobile Service</u>.** AT&T Maritime Mobile Service (AT&T Tariff FCC No.1, as amended from time to time).

   E. **<u>AT&T Commercial Satellite Mobile Service No. 1</u>.** AT&T Commercial Satellite Mobile Service No. 1 (AT&T Tariff FCC No.1, as amended from time to time).

2. **<u>Term</u>.** The Term of this Attachment is month to month. The Term begins on the first day of the first full billing month for AT&T Dedicated Outbound Wholesale Service provided under this Attachment, which day is referred to as the Customer's Initial Service Date (CISD). Either party may terminate this Attachment upon thirty days' written notice.

3. **Minimum Revenue Commitments**. There are no Minimum Revenue Commitments under this Attachment.

4. **Rates and Charges**. The Rates and Charges for the Services provided under this Attachment other than AT&T Dedicated Outbound Wholesale Service are the same as the undiscounted rates and charges under the applicable Tariffs, as amended from time to time, except as specified in this Attachment. AT&T Dedicated Outbound Wholesale Service is not available under Tariff, but is governed exclusively by the Agreement and this Attachment. AT&T reserves the right to change from time to time the rates for Services under this Agreement on five days' prior written notice.

A. **AT&T Dedicated Outbound Wholesale Service**

1. Domestic Rates.

The domestic Usage Rates are set forth in Rate Schedule A. The Select Usage Rates apply if the Operating Company ("OC") is listed on the OC Table below; otherwise the Basic Usage Rates apply. Although the rates in the Rate Schedule A are set forth as per minute rates, the Usage Rates are billed with an initial period of 18 seconds and additional periods of 6 seconds. The applicable Usage Rate for the initial 18 seconds (or fraction thereof) will be 30% of the per minute rate set forth in the Rate Schedule A, and the applicable Usage Rate for each additional six seconds (or fraction thereof) will be 10% of the per minute rate.

| OC TABLE | |
|---|---|
| **OC NUMBER** | **ABBREVIATED NAME:** |
| 9102 | VERIZON |
| 9104 | VERIZON |
| 9147 | SO NEW ENGLAND TEL |
| 9206 | VERIZON |
| 9208 | VERIZON |
| 9210 | VERIZON |
| OC TABLE | |

| OC TABLE | ABBREVIATED NAME: |
|---|---|
| 9211 | VERIZON |
| 9212 | VERIZON |
| 9213 | VERIZON |
| 9214 | VERIZON |
| 9321 | AMERITECH |
| 9323 | AMERITECH |
| 9325 | AMERITECH |
| 9327 | AMERITECH |
| 9329 | AMERITECH |
| 9348 | CINCINNATI BELL |
| 9417 | BELLSOUTH |
| 9419 | BELLSOUTH |
| 9533 | SOUTHWESTERN BELL |
| 9631 | QWEST CORPORATION |
| 9636 | QWEST CORPORATION |
| 9638 | QWEST CORPORATION |
| 9740 | PACIFIC BELL |
| 9742 | NEVADA BELL |

2. International Rates.

The international Usage Rates are set forth in Rate Schedule B. For Mexico, the peak rate applies from 7:00 AM to 7:00 PM, for all days of the week including holidays, and the off-peak rate applies for all other time periods.

3. Universal Connectivity Charge.

AT&T Dedicated Outbound Wholesale Service is subject to an undiscountable Universal Connectivity Charge as provided in AT&T Tariff F.C.C. No. 1, Section 2.5.9.C.1., as amended from time to time, subject to the resale waiver described therein.

**5.** **Discounts.** The following discounts are the only discounts for the Services provided under this Agreement.

**A.** **Domestic Discount**

The discount applicable to domestic AT&T Dedicated Outbound Wholesale Service will be determined each month based on the Gross Qualified Usage Charges, which are the total combined undiscounted usage charges billed in that month for domestic and international AT&T Dedicated Outbound Wholesale Service.

| Gross Qualified Usage Charges | Discount |
|---|---|
| less than $100,000 | 0% |
| $100,000 or more, but less than $250,000 | 5% |
| $250,000 or more, but less than $500,000 | 10% |
| $500,000 or more | 12% |

**6.** **Credits and Waivers.** The following credits and waivers are the only credits and waivers that apply to the Services provided under this Attachment. No other promotions, credits or waivers apply.

**A.** **Installation Charge Waiver.** AT&T will waive the Nonrecurring Installation Charges associated with the installation of certain Services or service components provided under this Attachment as described below. No waiver applies to Services or service components that are disconnected and reconnected after this Attachment is made part of the Agreement.

1. Minimum In-Service Period. A twelve-month Minimum In-Service Period applies for any service components installed subject to a waiver of Installation Charges. If any such service component is disconnected prior to the end of the Minimum In-Service Period, CUSTOMER will be billed for the Installation Charges previously waived for that service component.

2. Charges Covered by Waiver. This Installation Charge Waiver applies only to the following charges that would otherwise be incurred for Services provided under this Attachment:

   (a) Access Connections - Installation Charges for AT&T *ACCUNET* T1.5 Service or AT&T *ACCUNET* T45 Service Access Connections ordered to connect to another service provided under this Attachment.

   (b) AT&T Nodal Local Channel Services - Installation Charges for AT&T Terrestrial 1.544 Mbps and Terrestrial 45 Mbps Local Channel Services, and associated Access Coordination Functions, when the Local Channel is ordered to connect to another service provided under this Attachment.

**7.** **Monitoring Condition**. During each billing month, if the Average Length of Call (ALOC) for AT&T Dedicated Outbound Wholesale Service is less than 2.0 minutes, CUSTOMER will pay a Non-compliance Charge equal to 20% of the undiscounted usage charges incurred under this Attachment during that month.

**8.** **Classifications, Practices and Regulations.** Except as otherwise provided in this Attachment, the rates and regulations that apply to the Services provided under this Attachment (other than AT&T Dedicated Outbound Wholesale Service) are as set forth in the applicable Tariffs.

**A.** **Detariffing.** If, during the Term of this Attachment, any of the tariffs of AT&T referenced herein are canceled, in whole or in part, pursuant to a statutory change, order or requirement of a governmental or judicial authority of competent jurisdiction requiring detariffing, then, following such cancellation, any rates, terms and conditions of such tariffs that had been applicable to the Services provided under this Agreement will continue to apply, based on the language of the tariffs in effect as of the date of cancellation.

**9.** **Rate Schedules**

**A.** **Rate Schedule A (domestic)**

| LATA | Interstate Rate (per minute) | | Intrastate Rate (per minute) | |
|---|---|---|---|---|
| | Select | Basic | Select | Basic |
| 120 | 0.0363 | 0.0917 | 0.0337 | 0.1563 |
| 122 | 0.0324 | 0.0799 | 0.0545 | 0.0641 |
| 124 | 0.0348 | 0.0793 | 0.1049 | 0.1049 |

| LATA | Interstate Rate (per minute) | | Intrastate Rate (per minute) | |
|---|---|---|---|---|
| | Select | Basic | Select | Basic |
| 126 | 0.0307 | 0.0773 | 0.0628 | 0.0631 |
| 128 | 0.0301 | 0.0302 | 0.0626 | 0.0626 |
| 130 | 0.0296 | 0.0300 | 0.0386 | 0.0386 |
| 132 | 0.0297 | 0.0590 | 0.0787 | 0.0787 |
| 133 | 0.0337 | 0.0627 | 0.0418 | 0.0785 |
| 134 | 0.0318 | 0.0763 | 0.0401 | 0.0851 |
| 136 | 0.0321 | 0.0998 | 0.0400 | 0.0863 |
| 138 | 0.0329 | 0.0703 | 0.0407 | 0.1384 |
| 140 | 0.0305 | 0.0933 | 0.0395 | 0.3645 |
| 220 | 0.0245 | 0.0245 | 0.0368 | 0.0368 |
| 222 | 0.0224 | 0.0235 | 0.0337 | 0.0393 |
| 224 | 0.0226 | 0.0281 | 0.0295 | 0.1101 |
| 226 | 0.0232 | 0.0749 | 0.0423 | 0.1198 |
| 228 | 0.0231 | 0.0884 | 0.0424 | 0.1488 |
| 230 | 0.0257 | 0.0798 | 0.0427 | 0.1114 |
| 232 | 0.0250 | 0.0846 | 0.0425 | 0.1414 |
| 234 | 0.0240 | 0.0855 | 0.0424 | 0.1288 |
| 236 | 0.0231 | 0.0534 | 0.0680 | 0.0680 |
| 238 | 0.0237 | 0.0631 | 0.0439 | 0.0883 |
| 240 | 0.0294 | 0.0422 | 0.0603 | 0.0989 |
| 242 | 0.0277 | 0.0277 | 0.0446 | 0.0446 |
| 244 | 0.0245 | 0.0931 | 0.0682 | 0.1303 |
| 246 | 0.0246 | 0.0530 | 0.0686 | 0.0769 |
| 248 | 0.0232 | 0.0746 | 0.0683 | 0.1175 |
| 250 | 0.0245 | 0.0702 | 0.0724 | 0.1072 |
| 252 | 0.0231 | 0.0530 | 0.0680 | 0.1204 |
| 254 | 0.0275 | 0.0779 | 0.0599 | 0.1050 |

| LATA | Interstate Rate (per minute) | | Intrastate Rate (per minute) | |
|---|---|---|---|---|
| | Select | Basic | Select | Basic |
| 256 | 0.0263 | 0.0862 | 0.0597 | 0.3820 |
| 320 | 0.0250 | 0.0773 | 0.0248 | 0.1195 |
| 322 | 0.0260 | 0.0514 | 0.0265 | 0.1006 |
| 324 | 0.0258 | 0.0707 | 0.0262 | 0.1058 |
| 325 | 0.0255 | 0.0774 | 0.0257 | 0.1189 |
| 326 | 0.0265 | 0.1669 | 0.0274 | 0.1287 |
| 328 | 0.0255 | 0.0692 | 0.0260 | 0.1107 |
| 330 | 0.0273 | 0.0843 | 0.0303 | 0.0893 |
| 332 | 0.0250 | 0.0745 | 0.0274 | 0.0796 |
| 334 | 0.0253 | 0.0733 | 0.0268 | 0.0783 |
| 336 | 0.0260 | 0.1533 | 0.0283 | 0.1555 |
| 338 | 0.0301 | 0.0855 | 0.0315 | 0.0906 |
| 340 | 0.0252 | 0.0908 | 0.0252 | 0.0934 |
| 342 | 0.0281 | 0.0953 | 0.0287 | 0.1115 |
| 344 | 0.0268 | 0.0773 | 0.0274 | 0.0762 |
| 346 | 0.0260 | 0.0824 | 0.0263 | 0.0767 |
| 348 | 0.0261 | 0.0817 | 0.0261 | 0.0843 |
| 350 | 0.0259 | 0.0894 | 0.0260 | 0.1918 |
| 352 | 0.0280 | 0.0989 | 0.0287 | 0.1518 |
| 354 | 0.0254 | 0.1094 | 0.0256 | 0.2287 |
| 356 | 0.0250 | 0.0766 | 0.0253 | 0.1163 |
| 358 | 0.0262 | 0.1195 | 0.0282 | 0.1055 |
| 360 | 0.0252 | 0.0521 | 0.0251 | 0.0353 |
| 362 | 0.0258 | 0.1136 | 0.0256 | 0.0971 |
| 364 | 0.0255 | 0.1977 | 0.0256 | 0.1709 |
| 366 | 0.0250 | 0.1082 | 0.0246 | 0.4772 |
| 368 | 0.0258 | 0.1016 | 0.0260 | 0.0834 |

| LATA | Interstate Rate (per minute) | | Intrastate Rate (per minute) | |
|---|---|---|---|---|
| | Select | Basic | Select | Basic |
| 370 | 0.0274 | 0.0495 | 0.0270 | 0.0270 |
| 374 | 0.0264 | 0.1671 | 0.0260 | 0.1875 |
| 376 | 0.0250 | 0.0881 | 0.0250 | 0.0874 |
| 420 | 0.0239 | 0.0547 | 0.0722 | 0.1276 |
| 422 | 0.0248 | 0.0826 | 0.0674 | 0.1711 |
| 424 | 0.0236 | 0.0980 | 0.0723 | 0.1537 |
| 426 | 0.0236 | 0.0392 | 0.0722 | 0.1320 |
| 428 | 0.0234 | 0.0737 | 0.0722 | 0.1419 |
| 430 | 0.0258 | 0.0776 | 0.0679 | 0.1103 |
| 432 | 0.0273 | 0.0784 | 0.0682 | 0.1088 |
| 434 | 0.0250 | 0.0789 | 0.0677 | 0.1116 |
| 436 | 0.0241 | 0.0726 | 0.0671 | 0.1159 |
| 438 | 0.0254 | 0.0819 | 0.0329 | 0.1434 |
| 440 | 0.0258 | 0.0761 | 0.0272 | 0.1375 |
| 442 | 0.0267 | 0.0438 | 0.0279 | 0.0762 |
| 444 | 0.0240 | 0.0812 | 0.0267 | 0.1349 |
| 446 | 0.0242 | 0.0867 | 0.0268 | 0.1547 |
| 448 | 0.0245 | 0.0508 | 0.0516 | 0.1179 |
| 450 | 0.0238 | 0.0525 | 0.0517 | 0.1186 |
| 452 | 0.0256 | 0.0710 | 0.0524 | 0.0957 |
| 454 | 0.0241 | 0.0421 | 0.0520 | 0.0940 |
| 456 | 0.0239 | 0.0239 | 0.0515 | 0.0515 |
| 458 | 0.0237 | 0.0392 | 0.0515 | 0.1115 |
| 460 | 0.0240 | 0.0582 | 0.0516 | 0.0906 |
| 462 | 0.0307 | 0.0849 | 0.0319 | 0.1855 |
| 464 | 0.0263 | 0.0858 | 0.0502 | 0.1582 |
| 466 | 0.0253 | 0.0813 | 0.0494 | 0.2169 |

| LATA | Interstate Rate (per minute) | | Intrastate Rate (per minute) | |
|---|---|---|---|---|
| | Select | Basic | Select | Basic |
| 468 | 0.0241 | 0.0907 | 0.0274 | 0.1437 |
| 470 | 0.0240 | 0.0885 | 0.0358 | 0.1882 |
| 472 | 0.0243 | 0.0733 | 0.0363 | 0.1302 |
| 474 | 0.0239 | 0.0803 | 0.0357 | 0.1249 |
| 476 | 0.0238 | 0.0833 | 0.0328 | 0.1303 |
| 477 | 0.0242 | 0.0954 | 0.0328 | 0.1213 |
| 478 | 0.0239 | 0.0919 | 0.0330 | 0.1247 |
| 480 | 0.0239 | 0.0712 | 0.0332 | 0.1219 |
| 482 | 0.0246 | 0.0943 | 0.0279 | 0.2120 |
| 484 | 0.0241 | 0.0241 | 0.0274 | 0.0274 |
| 486 | 0.0241 | 0.0888 | 0.0317 | 0.1079 |
| 488 | 0.0258 | 0.0837 | 0.0321 | 0.1162 |
| 490 | 0.0270 | 0.0823 | 0.0324 | 0.1084 |
| 492 | 0.0274 | 0.0725 | 0.0323 | 0.0894 |
| 520 | 0.0277 | 0.1616 | 0.0667 | 0.2365 |
| 521 | 0.0284 | 0.0724 | 0.0683 | 0.1907 |
| 522 | 0.0270 | 0.0972 | 0.0644 | 0.2469 |
| 524 | 0.0273 | 0.3764 | 0.0552 | 0.2603 |
| 526 | 0.0276 | 0.0802 | 0.0651 | 0.1181 |
| 528 | 0.0300 | 0.1542 | 0.0655 | 0.1544 |
| 530 | 0.0296 | 0.1176 | 0.0661 | 0.1544 |
| 532 | 0.0280 | 0.1929 | 0.0557 | 0.2365 |
| 534 | 0.0273 | 0.1650 | 0.0559 | 0.1703 |
| 536 | 0.0294 | 0.3010 | 0.0435 | 0.2618 |
| 538 | 0.0293 | 0.0881 | 0.0430 | 0.1703 |
| 540 | 0.0269 | 0.0571 | 0.0846 | 0.0846 |
| 542 | 0.0281 | 0.0912 | 0.0851 | 0.1184 |

| LATA | Interstate Rate (per minute) | | Intrastate Rate (per minute) | |
|---|---|---|---|---|
| | Select | Basic | Select | Basic |
| 544 | 0.0274 | 0.0948 | 0.0853 | 0.1412 |
| 546 | 0.0270 | 0.0992 | 0.0848 | 0.1540 |
| 548 | 0.0275 | 0.0927 | 0.0852 | 0.1378 |
| 550 | 0.0265 | 0.0802 | 0.0848 | 0.1261 |
| 552 | 0.0266 | 0.0950 | 0.0849 | 0.2931 |
| 554 | 0.0286 | 0.0750 | 0.0849 | 0.1096 |
| 556 | 0.0291 | 0.0801 | 0.0855 | 0.1129 |
| 558 | 0.0264 | 0.0581 | 0.0848 | 0.0848 |
| 560 | 0.0282 | 0.0809 | 0.0850 | 0.1865 |
| 562 | 0.0293 | 0.0807 | 0.0852 | 0.0991 |
| 564 | 0.0278 | 0.0933 | 0.0850 | 0.1143 |
| 566 | 0.0264 | 0.0990 | 0.0847 | 0.2592 |
| 568 | 0.0290 | 0.0802 | 0.0852 | 0.0968 |
| 570 | 0.0282 | 0.0770 | 0.0867 | 0.1009 |
| 620 | 0.0272 | 0.1903 | 0.0620 | 0.2318 |
| 624 | 0.0279 | 0.0963 | 0.0626 | 0.2113 |
| 626 | 0.0278 | 0.1094 | 0.0619 | 0.2276 |
| 628 | 0.0249 | 0.1041 | 0.0611 | 0.1408 |
| 630 | 0.0623 | 0.2214 | 0.1171 | 0.2055 |
| 632 | 0.0252 | 0.2870 | 0.0388 | 0.1520 |
| 634 | 0.0281 | 0.1152 | 0.0272 | 0.1321 |
| 635 | 0.0240 | 0.1135 | 0.0393 | 0.1403 |
| 636 | 0.0287 | 0.1335 | 0.0779 | 0.2373 |
| 638 | 0.0257 | 0.1398 | 0.0644 | 0.2285 |
| 640 | 0.0257 | 0.2940 | 0.0888 | 0.1720 |
| 644 | 0.0258 | 0.1371 | 0.0376 | 0.1403 |
| 646 | 0.0309 | 0.1202 | 0.0459 | 0.1713 |

| LATA | Interstate Rate (per minute) | | Intrastate Rate (per minute) | |
|---|---|---|---|---|
| | Select | Basic | Select | Basic |
| 648 | 0.0244 | 0.1015 | 0.0627 | 0.1525 |
| 650 | 0.0254 | 0.1091 | 0.0624 | 0.1230 |
| 652 | 0.0268 | 0.2789 | 0.0756 | 0.3178 |
| 654 | 0.0255 | 0.2122 | 0.0268 | 0.3457 |
| 656 | 0.0249 | 0.0960 | 0.0781 | 0.2456 |
| 658 | 0.0253 | 0.1067 | 0.0773 | 0.1790 |
| 660 | 0.0243 | 0.2040 | 0.0432 | 0.1439 |
| 664 | 0.0251 | 0.1032 | 0.0941 | 0.5319 |
| 666 | 0.0244 | 0.1475 | 0.0811 | 0.2700 |
| 668 | 0.0247 | 0.0959 | 0.0810 | 0.1574 |
| 670 | 0.0240 | 0.0767 | 0.0585 | 0.1453 |
| 672 | 0.0249 | 0.1191 | 0.0266 | 0.3496 |
| 674 | 0.0242 | 0.0861 | 0.0267 | 0.1689 |
| 676 | 0.0252 | 0.1110 | 0.0586 | 1.0904 |
| 720 | 0.0358 | 0.1435 | 0.0268 | 0.2063 |
| 721 | 0.0292 | 0.0692 | 0.0398 | 0.0782 |
| 722 | 0.0259 | 0.0570 | 0.0261 | 0.0904 |
| 724 | 0.0287 | 0.0969 | 0.0265 | 0.0524 |
| 726 | 0.0268 | 0.0714 | 0.0262 | 0.0576 |
| 728 | 0.0273 | 0.0845 | 0.0261 | 0.0433 |
| 730 | 0.0256 | 0.0805 | 0.0255 | 0.2446 |
| 732 | 0.0245 | 0.0322 | 0.0262 | 0.0262 |
| 734 | 0.0279 | 0.0331 | 0.0264 | 0.0319 |
| 736 | 0.0283 | 0.0793 | 0.0267 | 0.0267 |
| 738 | 0.0289 | 0.0850 | 0.0267 | 0.0315 |
| 740 | 0.0277 | 0.0345 | 0.0263 | 0.0430 |
| 820 | 0.1087 | 0.1087 | 0.1170 | 0.1170 |