# B

# B-1

2000

Annual certificate of exemption from Federal Excise Tax on Communication services or facilities furnished by

ITC, Inc.

The undersigned represents that he or she is authorized to execute this certification and hereby claims exemption from taxes imposed by Section 4251 of the Internal Revenue Code under the following provisions. (Check the appropriate category and provide required information where applicable.)

*** Any modification to this certificate renders it null and void. ***

☐ NO LONGER ENTITLED TO TAX EXEMPTION EFFECTIVE ____________

☐ CHARGES PAID BY GOVERNMENTAL ORGANIZATION

The undersigned claims exemption from the tax imposed on all local telephone service, toll telephone or radiotelephone messages or conversations billed or to be billed the undersigned. The undersigned certifies that such exemption is allowable by law for the reason that such services are being and will be furnished to and charges will be paid from funds of (check one):

☐ The United States (Section 4293), a state or political subdivision thereof [Section 4253(I)].
☐ A public international organization [Section 4253(c); 7701(a)(18)].
☐ An organization created by Act of Congress which is tax exempt.
Exempting statute under which claim is made: ____________

☐ Paid from the funds of: ____________
*Name of exempt organization

* Must be recognizable as government agency, i.e., U.S. Department of Agriculture, State of Michigan, City of Detroit, etc.

☐ CONSULAR OFFICER OF THE GOVENRMENT OF ____________

The undersigned certifies that such exemption is allowable by law under the terms of a treaty between the United States and the country which the undersigned represents, and that he or she is not engaged in professional business, trade, manufacture, or commerce and is not a citizen of the United States.

☑ COMMON CARRIER, TELEPHONE AND TELEGRAPH COMPANY, RADIO AND TELEVISION BROADCASTING STATIONS AND NETWORKS

The undersigned claims exemption under Section 4253(f) from the tax imposed by Section 4251 of the Code on Wide Area Telephone Service (WATS) [Section 4252(b)(2)]. In making this claim, the undersigned certifies that such service has and will be used exclusively in the conduct of its business as a (check one):

☑ Common Carrier
☐ Telephone Company
☐ Telegraph Company
☐ Radio or TV Broadcasting Station or Network

☐ COMMUNICATION SERVICES USED AS COMPONENTS OF A TAXABLE SERVICE

The undersigned certifies that ____________ will be used
(description of service or facility)
exclusively in the rendering of a communication service upon which tax is imposed by Section 4251 of the Code [Section 4253(e)]. It is understood that no tax will be collected by the telephone company on charges for said services, and it will be the responsibility of the undersigned to collect such tax as may be due from its customers.

(SEE REVERSE SIDE)

☐ NON-PROFIT HOSPITAL

The undersigned claims exemption under Section 4253(h) from the tax imposed by Section 4251 of the Code. The undersigned has received a determination letter (or ruling) from the Internal Revenue Service holding the organization to be exempt from income tax under Section 501(a) (or has received such determination letter (or ruling) under the corresponding provisions of prior revenue laws). The date of such determination letter (or ruling) is ________________ and such determination letter (or ruling) has not been withdrawn or revoked.

☐ NON-PROFIT EDUCATIONAL ORGANIZATION

The undersigned certifies that the communication services or facilities furnished or to be furnished to the organization will be paid from funds of the organization and are for the exclusive use of the organization in the educational activities which qualify it for exemption from tax under Section 4253(j).

The exempt organization's PRIMARY function is the presentation of formal instruction, and it normally maintains a regular facility and curriculum and normally has a regularly enrolled body of pupils or students in attendance at the place where its educational activities are carried on [Section 170(b)(1)(A)(ii)].

☐ NEWS SERVICES

The undersigned certifies that the communication services furnished or to be furnished are used or will be used in the collection or dissemination of news for the public press, or a news ticker service furnishing a general news service similar to that of the public press, or radio broadcasting [Section 4253(b)].

In the event this claim for exemption is disallowed by the Internal Revenue Service, the undersigned agrees to reimburse ________________ for the amount of tax involved plus any applicable interest and penalties. The undersigned agrees to notify ________________ in writing within 30 days when the basis for tax exemption indicated above changes or ceases to exist. The undersigned certifies that the exemption claimed is allowable under applicable laws and understands that the fraudulent use of this certificate for the purpose of securing this exemption will subject each and all guilty parties to a fine of not more than $100,000 ($500,000 for corporations), or to imprisonment for not more than five years, or both, together with costs of prosecution (IRC Section 7201).

[signature]
Authorized Signature (Owner, Partner or Corporate Officer)

Accounting Manager
Title

7/6/00
Date

Locus Telecommunications, Inc.
Account Name

________________
Account Number (s)*

* Please list all applicable account numbers on one form.

2000

Annual certificate of exemption from Federal Excise Tax on Communication services or facilities furnished by

ITXC Corp.

The undersigned represents that he or she is authorized to execute this certification and hereby claims exemption from taxes imposed by Section 4251 of the Internal Revenue Code under the following provisions. (Check the appropriate category and provide required information where applicable.)

*** Any modification to this certificate renders it null and void. ***

☐ NO LONGER ENTITLED TO TAX EXEMPTION EFFECTIVE ______________

☐ CHARGES PAID BY GOVERNMENTAL ORGANIZATION

The undersigned claims exemption from the tax imposed on all local telephone service, toll telephone or radiotelephone messages or conversations billed or to be billed the undersigned. The undersigned certifies that such exemption is allowable by law for the reason that such services are being and will be furnished to and charges will be paid from funds of (check one):

☐ The United States (Section 4293), a state or political subdivision thereof [Section 4253(I)].

☐ A public international organization [Section 4253(c); 7701(a)(18)].

☐ An organization created by Act of Congress which is tax exempt.

Exempting statute under which claim is made: ______________

☐ Paid from the funds of: ______________

*Name of exempt organization

* Must be recognizable as government agency, i.e., U.S. Department of Agriculture, State of Michigan, City of Detroit, etc.

☐ CONSULAR OFFICER OF THE GOVENRMENT OF ______________

The undersigned certifies that such exemption is allowable by law under the terms of a treaty between the United States and the country which the undersigned represents, and that he or she is not engaged in professional business, trade, manufacture, or commerce and is not a citizen of the United States.

☑ COMMON CARRIER, TELEPHONE AND TELEGRAPH COMPANY, RADIO AND TELEVISION BROADCASTING STATIONS AND NETWORKS

The undersigned claims exemption under Section 4253(f) from the tax imposed by Section 4251 of the Code on Wide Area Telephone Service (WATS) [Section 4252(b)(2)]. In making this claim, the undersigned certifies that such service has and will be used exclusively in the conduct of its business as a (check one):

☑ Common Carrier
☐ Telephone Company
☐ Telegraph Company
☐ Radio or TV Broadcasting Station or Network

☐ COMMUNICATION SERVICES USED AS COMPONENTS OF A TAXABLE SERVICE

The undersigned certifies that ______________ will be used
(description of service or facility)
exclusively in the rendering of a communication service upon which tax is imposed by Section 4251 of the Code [Section 4253(e)]. It is understood that no tax will be collected by the telephone company on charges for said services, and it will be the responsibility of the undersigned to collect such tax as may be due from its customers.

(SEE REVERSE SIDE)

☐ NON-PROFIT HOSPITAL

The undersigned claims exemption under Section 4253(h) from the tax imposed by Section 4251 of the Code. The undersigned has received a determination letter (or ruling) from the Internal Revenue Service holding the organization to be exempt from income tax under Section 501(a) (or has received such determination letter (or ruling) under the corresponding provisions of prior revenue laws). The date of such determination letter (or ruling) is ______________________ and such determination letter (or ruling) has not been withdrawn or revoked.

☐ NON-PROFIT EDUCATIONAL ORGANIZATION

The undersigned certifies that the communication services or facilities furnished or to be furnished to the organization will be paid from funds of the organization and are for the exclusive use of the organization in the educational activities which qualify it for exemption from tax under Section 4253(j).

The exempt organization's PRIMARY function is the presentation of formal instruction, and it normally maintains a regular facility and curriculum and normally has a regularly enrolled body of pupils or students in attendance at the place where its educational activities are carried on [Section 170(b)(1)(A)(ii)].

☐ NEWS SERVICES

The undersigned certifies that the communication services furnished or to be furnished are used or will be used in the collection or dissemination of news for the public press, or a news ticker service furnishing a general news service similar to that of the public press, or radio broadcasting [Section 4253(b)].

**In the event this claim for exemption is disallowed by the Internal Revenue Service, the undersigned agrees to reimburse ______________________ for the amount of tax involved plus any applicable interest and penalties. The undersigned agrees to notify ______________________ in writing within 30 days when the basis for tax exemption indicated above changes or ceases to exist. The undersigned certifies that the exemption claimed is allowable under applicable laws and understands that the fraudulent use of this certificate for the purpose of securing this exemption will subject each and all guilty parties to a fine of not more than $100,000 ($500,000 for corporations), or to imprisonment for not more than five years, or both, together with costs of prosecution (IRC Section 7201).**

[signature]
Authorized Signature (Owner, Partner or Corporate Officer)

Accounting Manager
Title

11/8/00
Date

Locus Telecommunications, Inc.
Account Name

______________________
Account Number (s)*

* Please list all applicable account numbers on one form.

# RAI Telecom Inc.

**Reseller's Certificate of Continuing Exemption from Federal Excise Tax, State Taxes on Telecommunications Services, Universal Service Fund (USF), Interstate Telecommunications Relay Services (TRS), North American Numbering Plan (NANPA), Local Number Portability Plan (LNPA), Dial Around Compensation Contributions through Vendor.**

**<u>This form must be returned to Vendor completed, signed and date, along with applicable copies of state certificates.</u>**

The undersigned represents he/she is authorized to execute this certificate and hereby claims exemption from taxes imposed by Section 4251 of the Internal Revenue Code and/or state statute. _The undersigned certifies the communication services furnished by us will be used exclusively in the rendering of communications services to others. It is understood that it is the responsibility of the undersigned to collect such tax and/or regulatory fees as may be due from its customers and to remit the tax and/or regulatory fees to the appropriate governmental authority.

I. TYPE OF RESELLER (*Please check all that apply.*)

Note: If you provide multiple services please list your account numbers by type of service in order that we can determine your exempt status by state

(x) Interexchange Carrier (IXC)
( ) CAP/ CLEC
( ) Cellular/PSC/SMR (Wireless Telephony)
( ) Incumbent LEC
( ) Personal Communications System (PCS)
( ) Shared Tenant Service Provider/ Building LEC
( ) Payphone Service Provider (Note: Alabama, Georgia, Kentucky, South Carolina, and Tennessee do not allow exemptions for Payphone Service Providers)
( ) Paging and Messaging (Note: Federal(IRS), Alabama, Georgia, Kentucky, and Mississippi do not allow exemptions for Paging Companies
(x) Prepaid Calling Arrangements
( ) Internet Provider (Note: Federal (IRS), Alabama, Florida, Georgia, Kentucky, and North Carolina do not allow exemptions for Internet Service Providers

II. GOVERNMENTAL TAXING AUTHORITY - Please check all states and/or Federal tax for which you are claiming exemption and include registration number and/or state certificate where required.

(x) ___NJ_____ State Registration # **223-488-343/000** *Date of registration* **March 1, 2000**

( ) __________ State Registration # ________________ *Date of registration*________________

( ) __________ State Registration # ________________ *Date of registration*________________

( ) __________ State Registration # ________________ *Date of registration*________________

Please include applicable copies of State Resale Registration Certificates. Effective October 1, 2001 a DR700015, Annual Resale Certificate, ***<u>is required</u>*** for State of Florida Communications tax exemption.

(x) FEDERAL Excise Tax (X) exempt ( ) not exempt Federal EIN **22-3488343**

The undersigned agrees to notify the Vendor in writing when the basis for tax exemption indicated above changes or ceases to exist. The undersigned certifies that the exemption claimed is allowable under applicable laws and understands that the fraudulent use of this certificate for the purpose of securing this exemption will subject each and all guilty parties to a fine of not more that $100,000 ($500,000 for corporations), or imprisonment for not more than five years, or both, together with costs of prosecution (IRC Section 7201).

**Customer FCC Registration No. (FRN) 0010729515 FCC Form 499 ID No. 824334**

We hereby request an exemption from payment into the USF, TRS, NANPA, and LPNA through charges assessed by the Vendor because we are an interstate telecommunications provider registered under Section 214 of the Communications Act, will resell the services purchased from vendor to others, we will file FCC Form 499, and will contribute to the USF, TRS, NANPA and LPNA if required.

**State Public Service Commission Registration:**

We hereby state that we are registered with the following State Public Service Commissions (or equivalent):

____________ Registration No. ____________ Date Issued ____________

____________ Registration No. ____________ Date Issued ____________

____________ Registration No. ____________ Date Issued ____________

____________ Registration No. ____________ Date Issued ____________

____________ Registration No. ____________ Date Issued ____________

**Dial Around Compensation:** We will compensate Vendor for any Dial Around Compensation that Vendor may be required to pay over to Pay Phone Service Providers (PSPs) under 47 CFR 64.1300.

**BILLING NAME:** **Locus Telecommunications, Inc.**

**MAILING ADDRESS:** **111 Sylvan Avenue**

**Englewood Cliffs, NJ 07632**

**TITLE Controller** **SIGNATURE** [signature]

**DATE March 9, 2006**

*PLEASE RETURN OR FAX TO:*

**RAI Telecom Inc.**
**10309 Silver Lake Drive**
**Boca Raton, FL. 33428**
**Fax: (585) 777-4019**

**For Our Use Only:**

Received by: ____________ Date Received: ____________

2004

Annual certificate of exemption from Federal Excise Tax on Communication services or facilities furnished by

Broadwing Communications Services, Inc.

The undersigned represents that he or she is authorized to execute this certification and hereby claims exemption from taxes imposed by Section 4251 of the Internal Revenue Code under the following provisions. (Check the appropriate category and provide required information where applicable.)

*** Any modification to this certificate renders it null and void. ***

☐ NO LONGER ENTITLED TO TAX EXEMPTION EFFECTIVE ____________

☐ CHARGES PAID BY GOVERNMENTAL ORGANIZATION

The undersigned claims exemption from the tax imposed on all local telephone service, toll telephone or radiotelephone messages or conversations billed or to be billed the undersigned. The undersigned certifies that such exemption is allowable by law for the reason that such services are being and will be furnished to and charges will be paid from funds of (check one):

☐ The United States (Section 4293), a state or political subdivision thereof [Section 4253(I)].

☐ A public international organization [Section 4253(c); 7701(a)(18)].

☐ An organization created by Act of Congress which is tax exempt.

Exempting statute under which claim is made: ____________

☐ Paid from the funds of: ____________

*Name of exempt organization

* Must be recognizable as government agency, i.e., U.S. Department of Agriculture, State of Michigan, City of Detroit, etc.

☐ CONSULAR OFFICER OF THE GOVENRMENT OF ____________

The undersigned certifies that such exemption is allowable by law under the terms of a treaty between the United States and the country which the undersigned represents, and that he or she is not engaged in professional business, trade, manufacture, or commerce and is not a citizen of the United States.

☑ COMMON CARRIER, TELEPHONE AND TELEGRAPH COMPANY, RADIO AND TELEVISION BROADCASTING STATIONS AND NETWORKS

The undersigned claims exemption under Section 4253(f) from the tax imposed by Section 4251 of the Code on Wide Area Telephone Service (WATS) [Section 4252(b)(2)]. In making this claim, the undersigned certifies that such service has and will be used exclusively in the conduct of its business as a (check one):

☑ Common Carrier

☐ Telephone Company

☐ Telegraph Company

☐ Radio or TV Broadcasting Station or Network

☐ COMMUNICATION SERVICES USED AS COMPONENTS OF A TAXABLE SERVICE

The undersigned certifies that ____________ will be used

(description of service or facility)

exclusively in the rendering of a communication service upon which tax is imposed by Section 4251 of the Code [Section 4253(e)]. It is understood that no tax will be collected by the telephone company on charges for said services, and it will be the responsibility of the undersigned to collect such tax as may be due from its customers.

(SEE REVERSE SIDE)

☐ NON-PROFIT HOSPITAL

The undersigned claims exemption under Section 4253(h) from the tax imposed by Section 4251 of the Code. The undersigned has received a determination letter (or ruling) from the Internal Revenue Service holding the organization to be exempt from income tax under Section 501(a) (or has received such determination letter (or ruling) under the corresponding provisions of prior revenue laws). The date of such determination letter (or ruling) is ____________________ and such determination letter (or ruling) has not been withdrawn or revoked.

☐ NON-PROFIT EDUCATIONAL ORGANIZATION

The undersigned certifies that the communication services or facilities furnished or to be furnished to the organization will be paid from funds of the organization and are for the exclusive use of the organization in the educational activities which qualify it for exemption from tax under Section 4253(j).

The exempt organization's PRIMARY function is the presentation of formal instruction, and it normally maintains a regular facility and curriculum and normally has a regularly enrolled body of pupils or students in attendance at the place where its educational activities are carried on [Section 170(b)(1)(A)(ii)].

☐ NEWS SERVICES

The undersigned certifies that the communication services furnished or to be furnished are used or will be used in the collection or dissemination of news for the public press, or a news ticker service furnishing a general news service similar to that of the public press, or radio broadcasting [Section 4253(b)].

**In the event this claim for exemption is disallowed by the Internal Revenue Service, the undersigned agrees to reimburse** Broadwing Communications Services Inc. **for the amount of tax involved plus any applicable interest and penalties. The undersigned agrees to notify** Broadwing Communications Services, Inc. **in writing within 30 days when the basis for tax exemption indicated above changes or ceases to exist. The undersigned certifies that the exemption claimed is allowable under applicable laws and understands that the fraudulent use of this certificate for the purpose of securing this exemption will subject each and all guilty parties to a fine of not more than $100,000 ($500,000 for corporations), or to imprisonment for not more than five years, or both, together with costs of prosecution (IRC Section 7201).**

[signature] | Accounting Manager | 4/23/01
Authorized Signature (Owner, Partner or Corporate Officer) | Title | Date

Locus Telecommunications, Inc.
Account Name

____________________
Account Number (s)*

* Please list all applicable account numbers on one form.

# 2000
## Annual certificate of exemption from Federal Excise Tax on Communication services or facilities furnished by

EDCO / USA LLC

The undersigned represents that he or she is authorized to execute this certification and hereby claims exemption from taxes imposed by Section 4251 of the Internal Revenue Code under the following provisions. (Check the appropriate category and provide required information where applicable.)

*** Any modification to this certificate renders it null and void. ***

☐ NO LONGER ENTITLED TO TAX EXEMPTION EFFECTIVE ______________

☐ CHARGES PAID BY GOVERNMENTAL ORGANIZATION

The undersigned claims exemption from the tax imposed on all local telephone service, toll telephone or radiotelephone messages or conversations billed or to be billed the undersigned. The undersigned certifies that such exemption is allowable by law for the reason that such services are being and will be furnished to and charges will be paid from funds of (check one):

- ☐ The United States (Section 4293), a state or political subdivision thereof [Section 4253(I)].
- ☐ A public international organization [Section 4253(c); 7701(a)(18)].
- ☐ An organization created by Act of Congress which is tax exempt.

  Exempting statute under which claim is made: ______________

- ☐ Paid from the funds of: ______________

  *Name of exempt organization

* Must be recognizable as government agency, i.e., U.S. Department of Agriculture, State of Michigan, City of Detroit, etc.

☐ CONSULAR OFFICER OF THE GOVENRMENT OF ______________

The undersigned certifies that such exemption is allowable by law under the terms of a treaty between the United States and the country which the undersigned represents, and that he or she is not engaged in professional business, trade, manufacture, or commerce and is not a citizen of the United States.

☑ COMMON CARRIER, TELEPHONE AND TELEGRAPH COMPANY, RADIO AND TELEVISION BROADCASTING STATIONS AND NETWORKS

The undersigned claims exemption under Section 4253(f) from the tax imposed by Section 4251 of the Code on Wide Area Telephone Service (WATS) [Section 4252(b)(2)]. In making this claim, the undersigned certifies that such service has and will be used exclusively in the conduct of its business as a (check one):

- ☑ Common Carrier
- ☐ Telephone Company
- ☐ Telegraph Company
- ☐ Radio or TV Broadcasting Station or Network

☐ COMMUNICATION SERVICES USED AS COMPONENTS OF A TAXABLE SERVICE

The undersigned certifies that ______________ will be used
(description of service or facility)
exclusively in the rendering of a communication service upon which tax is imposed by Section 4251 of the Code [Section 4253(e)]. It is understood that no tax will be collected by the telephone company on charges for said services, and it will be the responsibility of the undersigned to collect such tax as may be due from its customers.

(SEE REVERSE SIDE)

☐ **NON-PROFIT HOSPITAL**

The undersigned claims exemption under Section 4253(h) from the tax imposed by Section 4251 of the Code. The undersigned has received a determination letter (or ruling) from the Internal Revenue Service holding the organization to be exempt from income tax under Section 501(a) (or has received such determination letter (or ruling) under the corresponding provisions of prior revenue laws). The date of such determination letter (or ruling) is ______________________ and such determination letter (or ruling) has not been withdrawn or revoked.

☐ **NON-PROFIT EDUCATIONAL ORGANIZATION**

The undersigned certifies that the communication services or facilities furnished or to be furnished to the organization will be paid from funds of the organization and are for the exclusive use of the organization in the educational activities which qualify it for exemption from tax under Section 4253(j).

The exempt organization's PRIMARY function is the presentation of formal instruction, and it normally maintains a regular facility and curriculum and normally has a regularly enrolled body of pupils or students in attendance at the place where its educational activities are carried on [Section 170(b)(1)(A)(ii)].

☐ **NEWS SERVICES**

The undersigned certifies that the communication services furnished or to be furnished are used or will be used in the collection or dissemination of news for the public press, or a news ticker service furnishing a general news service similar to that of the public press, or radio broadcasting [Section 4253(b)].

In the event this claim for exemption is disallowed by the Internal Revenue Service, the undersigned agrees to reimburse ______________________ for the amount of tax involved plus any applicable interest and penalties. The undersigned agrees to notify ______________________ in writing within 30 days when the basis for tax exemption indicated above changes or ceases to exist. The undersigned certifies that the exemption claimed is allowable under applicable laws and understands that the fraudulent use of this certificate for the purpose of securing this exemption will subject each and all guilty parties to a fine of not more than $100,000 ($500,000 for corporations), or to imprisonment for not more than five years, or both, together with costs of prosecution (IRC Section 7201).

| | | |
|---|---|---|
| [signature] | Accounting Manager | 9/16/00 |
| Authorized Signature (Owner, Partner or Corporate Officer) | Title | Date |

Locus Telecommunications, Inc.
Account Name

______________________
Account Number (s)*

* Please list all applicable account numbers on one form.

# CERTIFICATE OF EXEMPTION
## FROM FEDERAL EXCISE TAX ON COMMUNICATION SERVICES

DACOM America, Inc.

Account Name LOCUS TELECOMMUNICATIONS, INC. For the tax year 2003

The undersigned represents that he or she is authorized to execute this certification and hereby claims exemption from taxes imposed by Section 4351 of the Internal Revenue Code under the following provisions. (Check the appropriate category and provide required information where applicable.)

(__) NO LONGER ENTITILE TO TAX EXEMPTION, effective ________________

(✓) COMMUNICATION SERVICES TO BE RESOLD AS COMPONENTS OF A TAXABLE SERVICE

The undersigned certifies that the communications services and facilities purchased from DACOM America will be used exclusively in the rendering of a communication service upon which tax is imposed by Section 4251 of the Code (Section 4253(e)). It is understood that no tax will be collected by DACOM America on charges for said services, and it will be the sole responsibility of the undersigned purchaser to collect such tax as may be due from its customers.

(__) CHARGES PAID BY GOVERNMENTAL TAX EXEMPT ORGANIZATION

The undersigned claims exemption from the tax imposed on all communications services. The undersigned certifies that such exemption is allowable by law and that such services are being and will be furnished to and charges will be paid from the funds of (please check one):

(__) The United States (Section 4293), or a state, territory, or political subdivision (Section 4253(i))
(__) A Public International Organization (Section 4253; 7701 (a) (18))
(__) An organization created by Act of Congress which is tax exempt (Public Law No. ____________)

(__) Paid from the funds of (name of exempt organization, must be a recognizable government agency: ________________________)

(__) CONSULAR OFFICER OF THE GOVERNMENT OF ______________

The undersigned certifies that the exemption is allowable by law under the terms of a treaty between the United States and country the undersigned represents, and that he/she is not engaged in professional business, trade, manufacture, or commerce and is not a citizen of the United States

(__) CHARGES PAID BY NON-PROFIT TAX EXEMPT ORGANIZATION

(__) A non-profit educational institution qualified for exemption under Section 4353(j) of the Internal Revenue Code and which normally maintains a regular curriculum, faculty, and a regularly enrolled student body at the place where its educational activities are regularly carried on.

(__) A non-profit hospital qualified for exemption under Section 4253(h) of the Internal Revenue Code. The organization claiming exemption under this section has received a determination letter (or a ruling) from the Internal Revenue Service holding the organization to be exempt from income tax as an organization described in Section 501(c)(3) of the Code (or has received such determination letter or ruling under the corresponding provisions of prior revenue laws). The date of such determination letter (or ruling) is __________ and such determination letter (or ruling) has not been withdrawn or revoked.

(__) COMMUNICATION SERVICES ORGANIZATIONS

The undersigned is exempt under Section 4253(f) of the Internal Revenue Code from tax imposed by Section 4251 of the Code related to Wide Area telephone service. The undersigned claims that such service has been and will be used solely for the conduct of its business as a:

(__) Common Carrier (__) Radio or Television Broadcasting Station or network
(__) Telephone Company (__) Telegraph Company

(__) TRANSPORTATION COMMON CARRIER

The undersigned claims exemption under Section 4253(f) from the tax imposed by Section 4251 of the Code on Wide Area Telephone Service (WATS) (Section 4252(b)(2)). In making this claim, the undersigned certifies that such service has and will be used exclusively in the conduct of its business as a Common Carrier holding itself out to the public as engaged in the business of transportation of persons or property from place to place for compensation and offering its services to the public generally. (Rev. Rul. 76-405)

(__) NEWS SERVICES

The undersigned certifies that the communication services furnished or the be furnished are used or will be used in the collection or dissemination of news for the public press, or a news ticker service furnishing a general news service similar to that of the public press, or radio broadcasting (Section 4253(b))

The undersigned understands that the fraudulent use of this tax exemption form to secure exemption from the Federal Excise Tax imposed by Section 4251 of the Internal Revenue Code may subject the undersigned to fines, imprisonment, or both, together with the cost of prosecution.

The undersigned agrees to notify DACOM America Inc., in writing, of any change in claim status.

Purchaser Name: SAM LEE Authorized signature: [signature]

Address: 111 SYLVAN AVE. Federal ID Number: 22-3488343
ENGLEWOOD CLIFFS, NJ 07632

2001

# Annual certificate of exemption from Federal Excise Tax on Communication services or facilities furnished by

Locus Telecommunications, Inc.

The undersigned represents that he or she is authorized to execute this certification and hereby claims exemption from taxes imposed by Section 4251 of the Internal Revenue Code under the following provisions. (Check the appropriate category and provide required information where applicable.)

*** Any modification to this certificate renders it null and void. ***

☐ NO LONGER ENTITLED TO TAX EXEMPTION EFFECTIVE ________________,

☐ CHARGES PAID BY GOVERNMENTAL ORGANIZATION

The undersigned claims exemption from the tax imposed on all local telephone service, toll telephone or radiotelephone messages or conversations billed or to be billed the undersigned. The undersigned certifies that such exemption is allowable by law for the reason that such services are being and will be furnished to and charges will be paid from funds of (check one):

☐ The United States (Section 4293), a state or political subdivision thereof [Section 4253(I)].
☐ A public international organization [Section 4253(c); 7701(a)(18)].
☐ An organization created by Act of Congress which is tax exempt.

Exempting statute under which claim is made: ________________

☐ Paid from the funds of: ________________
*Name of exempt organization

* Must be recognizable as government agency, i.e., U.S. Department of Agriculture, State of Michigan, City of Detroit, etc.

☐ CONSULAR OFFICER OF THE GOVENRMENT OF ________________

The undersigned certifies that such exemption is allowable by law under the terms of a treaty between the United States and the country which the undersigned represents, and that he or she is not engaged in professional business, trade, manufacture, or commerce and is not a citizen of the United States.

☑ COMMON CARRIER, TELEPHONE AND TELEGRAPH COMPANY, RADIO AND TELEVISION BROADCASTING STATIONS AND NETWORKS

The undersigned claims exemption under Section 4253(f) from the tax imposed by Section 4251 of the Code on Wide Area Telephone Service (WATS) [Section 4252(b)(2)]. In making this claim, the undersigned certifies that such service has and will be used exclusively in the conduct of its business as a (check one):

☑ Common Carrier
☐ Telephone Company
☐ Telegraph Company
☐ Radio or TV Broadcasting Station or Network

☐ COMMUNICATION SERVICES USED AS COMPONENTS OF A TAXABLE SERVICE

The undersigned certifies that ________________ will be used
(description of service or facility)
exclusively in the rendering of a communication service upon which tax is imposed by Section 4251 of the Code [Section 4253(e)]. It is understood that no tax will be collected by the telephone company on charges for said services, and it will be the responsibility of the undersigned to collect such tax as may be due from its customers.

(SEE REVERSE SIDE)

☐ NON-PROFIT HOSPITAL

The undersigned claims exemption under Section 4253(h) from the tax imposed by Section 4251 of the Code. The undersigned has received a determination letter (or ruling) from the Internal Revenue Service holding the organization to be exempt from income tax under Section 501(a) (or has received such determination letter (or ruling) under the corresponding provisions of prior revenue laws). The date of such determination letter (or ruling) is ______________ and such determination letter (or ruling) has not been withdrawn or revoked.

☐ NON-PROFIT EDUCATIONAL ORGANIZATION

The undersigned certifies that the communication services or facilities furnished or to be furnished to the organization will be paid from funds of the organization and are for the exclusive use of the organization in the educational activities which qualify it for exemption from tax under Section 4253(j).

The exempt organization's PRIMARY function is the presentation of formal instruction, and it normally maintains a regular facility and curriculum and normally has a regularly enrolled body of pupils or students in attendance at the place where its educational activities are carried on [Section 170(b)(1)(A)(ii)].

☐ NEWS SERVICES

The undersigned certifies that the communication services furnished or to be furnished are used or will be used in the collection or dissemination of news for the public press, or a news ticker service furnishing a general news service similar to that of the public press, or radio broadcasting [Section 4253(b)].

In the event this claim for exemption is disallowed by the Internal Revenue Service, the undersigned agrees to reimburse Bell South Long Distance for the amount of tax involved plus any applicable interest and penalties. The undersigned agrees to notify Bell South Long Distance in writing within 30 days when the basis for tax exemption indicated above changes or ceases to exist. The undersigned certifies that the exemption claimed is allowable under applicable laws and understands that the fraudulent use of this certificate for the purpose of securing this exemption will subject each and all guilty parties to a fine of not more than $100,000 ($500,000 for corporations), or to imprisonment for not more than five years, or both, together with costs of prosecution (IRC Section 7201).

[signature]
Authorized Signature (Owner, Partner or Corporate Officer)

Accounting Manager
Title

12/4/01
Date

Locus Telecommunications, Inc.
Account Name

______________________
Account Number (s)*

* Please list all applicable account numbers on one form.

2001
Annual certificate of exemption from Federal Excise Tax on
Communication services or facilities furnished by
Forval International Telecom, Inc.

The undersigned represents that he or she is authorized to execute this certification and hereby claims exemption from taxes imposed by Section 4251 of the Internal Revenue Code under the following provisions. (Check the appropriate category and provide required information where applicable.)

*** Any modification to this certificate renders it null and void. ***

☐ NO LONGER ENTITLED TO TAX EXEMPTION EFFECTIVE ____________.

☐ CHARGES PAID BY GOVERNMENTAL ORGANIZATION

The undersigned claims exemption from the tax imposed on all local telephone service, toll telephone or radiotelephone messages or conversations billed or to be billed the undersigned. The undersigned certifies that such exemption is allowable by law for the reason that such services are being and will be furnished to and charges will be paid from funds of (check one):

☐ The United States (Section 4293), a state or political subdivision thereof [Section 4253(I)].
☐ A public international organization [Section 4253(c); 7701(a)(18)].
☐ An organization created by Act of Congress which is tax exempt.

Exempting statute under which claim is made: ____________

☐ Paid from the funds of: ____________
*Name of exempt organization

* Must be recognizable as government agency, i.e., U.S. Department of Agriculture, State of Michigan, City of Detroit, etc.

☐ CONSULAR OFFICER OF THE GOVENRMENT OF ____________

The undersigned certifies that such exemption is allowable by law under the terms of a treaty between the United States and the country which the undersigned represents, and that he or she is not engaged in professional business, trade, manufacture, or commerce and is not a citizen of the United States.

☑ COMMON CARRIER, TELEPHONE AND TELEGRAPH COMPANY, RADIO AND TELEVISION BROADCASTING STATIONS AND NETWORKS

The undersigned claims exemption under Section 4253(f) from the tax imposed by Section 4251 of the Code on Wide Area Telephone Service (WATS) [Section 4252(b)(2)]. In making this claim, the undersigned certifies that such service has and will be used exclusively in the conduct of its business as a (check one):

☑ Common Carrier
☐ Telephone Company
☐ Telegraph Company
☐ Radio or TV Broadcasting Station or Network

☐ COMMUNICATION SERVICES USED AS COMPONENTS OF A TAXABLE SERVICE

The undersigned certifies that ____________ will be used
(description of service or facility)
exclusively in the rendering of a communication service upon which tax is imposed by Section 4251 of the Code [Section 4253(e)]. It is understood that no tax will be collected by the telephone company on charges for said services, and it will be the responsibility of the undersigned to collect such tax as may be due from its customers.

(SEE REVERSE SIDE)

☐ NON-PROFIT HOSPITAL

The undersigned claims exemption under Section 4253(h) from the tax imposed by Section 4251 of the Code. The undersigned has received a determination letter (or ruling) from the Internal Revenue Service holding the organization to be exempt from income tax under Section 501(a) (or has received such determination letter (or ruling) under the corresponding provisions of prior revenue laws). The date of such determination letter (or ruling) is ____________ and such determination letter (or ruling) has not been withdrawn or revoked.

☐ NON-PROFIT EDUCATIONAL ORGANIZATION

The undersigned certifies that the communication services or facilities furnished or to be furnished to the organization will be paid from funds of the organization and are for the exclusive use of the organization in the educational activities which qualify it for exemption from tax under Section 4253(j).

The exempt organization's PRIMARY function is the presentation of formal instruction, and it normally maintains a regular facility and curriculum and normally has a regularly enrolled body of pupils or students in attendance at the place where its educational activities are carried on [Section 170(b)(1)(A)(ii)].

☐ NEWS SERVICES

The undersigned certifies that the communication services furnished or to be furnished are used or will be used in the collection or dissemination of news for the public press, or a news ticker service furnishing a general news service similar to that of the public press, or radio broadcasting [Section 4253(b)].

In the event this claim for exemption is disallowed by the Internal Revenue Service, the undersigned agrees to reimburse Forval International Telecom, Inc. for the amount of tax involved plus any applicable interest and penalties. The undersigned agrees to notify Forval International Telecom, Inc. in writing within 30 days when the basis for tax exemption indicated above changes or ceases to exist. The undersigned certifies that the exemption claimed is allowable under applicable laws and understands that the fraudulent use of this certificate for the purpose of securing this exemption will subject each and all guilty parties to a fine of not more than $100,000 ($500,000 for corporations), or to imprisonment for not more than five years, or both, together with costs of prosecution (IRC Section 7201).

[signature] Authorized Signature (Owner, Partner or Corporate Officer)

Accounting Manager
Title

6/1/01
Date

Locus Telecommunications, Inc.
Account Name

____________
Account Number (s)*

* Please list all applicable account numbers on one form.

# B-2

v●ice to the world!

**DIAL-THRU INTERNATIONAL CORPORATION**
17383 West Sunset Boulevard, Suite 350
Los Angeles, CA 90272
Tel: 310.566.1700 Fax: 310.573.9435

# INVOICE

**Bill To:** Locus
**Contact:** Dillon Kim
**Address:** 111 Sylvan Ave
Englewood Cliffs, NJ 07632

**Phone:**

**Invoice Date:** 12/28/2004
**Invoice Number:** 2582
**Billing Period:** 12/20/04-12/26/04
**Due Date:** 01/02/05

| Qty | Description | Unit Price | TOTAL |
|---|---|---|---|
| 1 | Internet Telephony Service | $4,024.70 | $4,024.70 |
| | **PLEASE NOTE NEW WIRE INSTRUCTIONS BELOW** | | |
| | **PAYMENT TERMS: Net 5 Days** | | |
| | | SubTotal | $4,024.70 |
| | | **TOTAL** | **$4,024.70** |

**PLEASE REMIT WIRE PAYMENT TO:**

| | |
|---|---|
| **Beneficiary Name:** | DTI COM, INC. |
| **Beneficiary Address:** | 17383 W. Sunset Blvd., Suite 350<br>Los Angeles, CA 90272 |
| **Beneficiary Bank:** | Bank of the West |
| **Bank Address:** | 10929 Wilshire Blvd.<br>Los Angeles, CA 90024<br>Tel: 310.208.4111<br>Fax: 310.208.4386 |
| **Account#:** | 753003599 |
| **ABA#:** | 121100782 |
| **SWIFT Code:** | BWSTUS66 |

# Invoice

Invoice Number:
CGI0512-4-16

Invoice Date:
Dec 25, 2005

Page:
1

Compass Global Inc.
50 Tice Blvd.
Ground Floor
Woodcliff Lake,, NJ 07677
USA

Voice: 201-802-0600
Fax: 201-802-0601

Sold To:
Locus Telecommunications, Inc.
111 Sylvan Avenue
Englewood, NJ 07632

Customer ID: loc

| Customer PO | Payment Terms | Due Date | Sales Rep ID |
|---|---|---|---|
| | Net 5 Days | 12/30/05 | 003-WP |

| Quantity | Item | Description | Unit Price | Extension |
|---|---|---|---|---|
| 1.00 | Carrier Calls | Calls from 12/19-12/25 | 41,013.77 | 41,013.77 |

| | |
|---|---|
| Subtotal | 41,013.77 |
| Sales Tax | |
| Total Invoice Amount | 41,013.77 |
| Payment Received | |
| **TOTAL** | 41,013.77 |

Check No:

# Invoice

Invoice Number
051225-34

Invoice Date
Dec 25, 2005

Page
1

Symphony Telecommunications, LLC
11439 Stone Mill Court
Oakton, VA 22124
United States

Voice: 703-338-0824
Fax:

Duplicate

Sold To:
Locus Telecommunications, Inc.
111 Sylvan Avenue
Englewood Cliffs, NJ 07632

Ship to:

| Customer ID | Customer PO | Payment Terms | |
|---|---|---|---|
| Locus | | Net 3 Days | |
| Sales Rep ID | Shipping Method | Ship Date | Due Date |
| | Airborne | | 12/28/05 |

| Quantity | Item | Description | Unit Price | Extension |
|---|---|---|---|---|
| 1.00 | | For the traffic period December 19 through December 25, 2005-GMT | 47,060.06 | 47,060.06 |

| | |
|---|---|
| Subtotal | 47,060.06 |
| Sales Tax | |
| Total Invoice Amount | 47,060.06 |
| Payment/Credit Applied | |
| **TOTAL** | 47,060.06 |

Check/Credit Memo No:

T-Systems

**BILL TO:**
Locus
Attn: Accounts Payable
111 Sylvan Ave.
Englewood Cliffs, NJ 07632

**REMIT TO:**
T-Systems North America, Inc.
PO Box 13392
Newark, NJ 07101-3392

Customer Service No. 1-866-833-5204

Invoice no
9450003789
Invoice Date
02/09/2006

# INVOICE

| Our Order no | Your Order no | Tax id no | Cust Account |
|---|---|---|---|
| 45000290 | . | | 12000108 |
| **Contact Person** | **Department** | **Phone** | **Fax** |
| Rebecca Yilma-Kassaye | Controlling TC | +1 212 658-6264 | +1 212 658-6375 |

| Description | Quantity | Unit price | Total (USD) |
|---|---|---|---|
| Monthly Service | | | |
| 0010 Standard Hubbing | 1.000 EA | 8,723.48 USD | 8,723.48 |
| *December 2005 usage* | | | |

Terms of Payment: 30 Days after invoice net

**TOTAL USD** 8,723.48



T-Systems North America, Inc
Address 32 Avenue of the Americas, 20th floor, New York, NY 10013
Main 212.658.6200
Fax 212.658.6250
Web Site www.t-systems.com

Wire transfer: Deutsche Bank, New York, NY, Account # 1045-3837-0008
ABA #:026-003-780, Swift # DEUTUS33
ACH: Deutsche Bank, New York, NY, Account # 601-09-235
ABA # 021-001-033
Send remittance information to: accounting@t-systemsus.com

CODIGO COLECTOR: 04074
CODIGO DE CLIENTE:

TELECAM

**TELECOMUNICACIONES DE AMERICA, S. A. DE C. V.**
*SERVICIOS DE COMUNICACION*
*Colonia Avila Pasaje # 1, Casa # 8, San Salvador, El Salvador, C. A.*
*Tel.: (503) 245-1818 Fax: (503) 245-1820*

**FACTURA**
**DE EXPORTACION** Factura de Exportacion
No. 02274 2274
REGISTRO No. 93437 - 2
NIT: 0614-030195-103-3
AUTORIZACION IMPRENTA No. 0926 D.G.I.I.

CLIENTE: 8205 **LOCUS TELECOMUNICATION INC.** FECHA: 26 de Diciembre del 2005
DIRECCION: 111 SYLVAN AVENUE ENGLEWOOD CLIFFS NJ 07632

| CANT. | DESCRIPCION | PRECIO UNITARIO | VENTAS EXENTAS | VENTAS GRAVADAS |
|---|---|---|---|---|
| 1 | TERMINACION DE TRAFICO INTERNACIONAL FIJO | | 9,176.63 | |
| 1 | TERMINACION DE TRAFICO INTERNACIONAL CELULAR | | 2,721.87 | |
| | FROM 19th TO DECEMBER 25th, 2005 | | | |
| SON: ONCE MIL OCHOCIENTOS NOVENTA Y OCHO 50/100 DOLARES | | SUMAS | [illegible] | |
| | | VENTAS EXENTAS | [illegible] | $11,898.50 |
| | | VENTA TOTAL | | $11,898.50 |

MOORE DE CENTROAMERICA, S.A. DE C.V. REG. No. 61-5
Km. 7 1/2, BLVD. DEL EJERCITO NAC., SOYAPANGO.
TIRAJE DEL 1,001 AL 4,000

**ORIGINAL - CLIENTE**

# INVOICE

**American Resources Group Inc.**
7210 Jordan Avenue, Suite B-81, Canoga Park, CA 91303 USA
Tel/ Fax (866) 583-7331
info@americanresources.net

NO: 240630
12/28/2004

**Bill To:**
**Locus Telecommunications Inc**
111 Sylvan Avenue
Englewood Cliffs, NJ 07632

Attn: Accounts Payable

| BUYER | P.O. NUMBER | DATE SHIPPED | SHIPPED VIA | F.O.B. POINT | TERMS |
|---|---|---|---|---|---|
| Dillon | | N/A | N/A | N/A | Net 3 |

| ITEM | QTY | Date | DESCRIPTION | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| 1 | | - | Termination of Philippine Mobile<br><br>Based on Pacific STD Time<br><br>For the period of 12/20 to 12/26/04 – 87,182.3 | US$0.1280 | US$ 11,159.33 |

**US$ 11,159.33**

THANK YOU FOR YOUR BUSINESS!

**- ORIGINAL -**
**PLEASE PAY FROM THIS INVOICE**

AT&T

# *AT&T Global Hubbing IP Access STATEMENT*

AT&T (Hong Kong) Limited
30/F Shell Tower, Times Square
1 Matheson Street
Causeway Bay, Hong Kong

**Mr. Henry Park**
**Locus Telecommunications**
**111 Sylvan Ave,**
**Englewood Cliffs, NJ 07632,**
**U. S. A.**

| | |
|---|---|
| **Statement Date** | : Jan 10, 2006 |
| **Billing Period** | : Dec 01, 2005 to Dec 31, 2005 |
| **Statement Number** | : GCH-200601000275 |
| **Account Number** | : GCH0000448 |

# ACCOUNT BALANCE SUMMARY

| | Amount (US$) |
|---|---|
| ***Previous Charges Due To AT&T*** | — $ 8,264.11 Dispute |
| Previous Account Balance | $465,769.55 |
| Less:Payment received on Dec 21, 2005 ($ 451,505.44) | 760,505.44 CR |
| Less:Payment received on Dec 30, 2005 CR $ 303,000.00 ✓ A/P | 155,000.00 CR ✓ A/P |
| Previous Balance Carried Forward | 449,735.89 CR |
| ***Current Amount Due To AT&T*** | |
| Current Charges for Originating Traffic (GCH-200601000275-1) Details 526,234.44 | |
| Please Settle Before Feb 9, 2006 | 526,234.44 |
| **Account Balance Outstanding** | 76,498.55 |
| | — Dispute |
| Due | $ 68,234.44 ✓ |

**PAYMENT INSTRUCTIONS:**

Please remit by transfer to:

| | |
|---|---|
| **Bank Name:** | Citibank, N.A. |
| **Bank Address:** | 10/F Two Harbourfront, 22 Tak Fung Street, Hunghom, Kowloon, Hong Kong |
| **Account Name:** | AT&T (Hong Kong) Limited |
| **Account No:** | 1777264008 |
| **Account Type:** | USD |
| **SWIFT:** | CITIHKHX |
| **Reference:** | (Please quote Account Number and Statement Number to your banker when preparing the remittance) |

**ENQUIRY:**

**Please examine this statement** immediately. If no error is reported within 30 days of the Statement Date, this statement considered correct with no recourse for amendment.
For statement information and inquiry please contact the Customer Care Center from 9:00 am to 5:30 pm Hong Kong Time, Monday-Friday, except company holidays, by phone +852 2506 5555 or fax +852 2506 2089, or send an email to eHubbing@att.com.

Legal Notices Copyright © 2003 AT&T.

AT&T

# *AT&T Global Hubbing IP Access* *INVOICE*

AT&T (Hong Kong) Limited
30/F Shell Tower, Times Square
1 Matheson Street
Causeway Bay, Hong Kong

Mr. Henry Park
Locus Telecommunications
111 Sylvan Ave,
Englewood Cliffs, NJ 07632,
U. S. A.

| | |
|---|---|
| Invoice Date | : Jan 10, 2006 |
| Billing Period | : Dec 01, 2005 to Dec 31, 2005 |
| Invoice Number | : GCH-200601000275-1 |
| Account Number | : GCH0000448 |

## CURRENT CHARGES FOR ORIGINATING TRAFFIC

**Current Billing Period: Dec 01, 2005 to Dec 31, 2005**

| | Amount (US$) |
|---|---|
| Usage Related | |
| VOI - Cisco Originating Traffic[2] | 526,234.44 |
| Current Amount Due To AT&T | 526,234.44 |

Note 2- The usage is calculated based on traffic settled by Global Hubbing IP Access, and in accordance with the Global Hubbing Price Schedule and the AT&T Global Hubbing IP Access Settlement Rules.

**PAYMENT INSTRUCTIONS:**

Please remit by transfer to:

| | |
|---|---|
| **Bank Name:** | Citibank, N.A. |
| **Bank Address:** | 10/F Two Harbourfront, 22 Tak Fung Street, Hunghom, Kowloon, Hong Kong |
| **Account Name:** | AT&T (Hong Kong) Limited |
| **Account No:** | 1777264008 |
| **Account Type:** | USD |
| **SWIFT:** | CITIHKHX |
| **Reference:** | (Please quote Account Number and Statement Number to your banker when preparing the remittance) |

**ENQUIRY:**

**Please examine this statement** immediately. If no error is reported within 30 days of the Statement Date, this statement considered correct with no recourse for amendment.
For statement information and inquiry please contact the Customer Care Center from 9:00 am to 5:30 pm Hong Kong Time, Monday-Friday, except company holidays, by phone +852 2506 5555 or fax +852 2506 2089, or send an email to eHubbing@att.com.

Legal Notices Copyright © 2003 AT&T.
AT&T and the AT&T globe design are trademarks of AT&T Corp.

BESTEL USA

| | |
|---|---|
| **Invoice** | 2643 |
| **Issue date** | 12/31/2005 |
| **Contract** | LOCU LD NAL |
| **Customer** | LOCUS |

# Voice Services

| Concept | | Period | Amount |
|---|---|---|---|
| **Long Distance Service** | | | |
| **National Long Distance** | | | |
| Group 1 | | 26/12/2005 al 31/12/2005 | $79.80 |
| Group 10 | | 26/12/2005 al 31/12/2005 | $937.38 |
| Group 11 | | 26/12/2005 al 31/12/2005 | $1,087.84 |
| Group 12 | | 26/12/2005 al 31/12/2005 | $1,647.54 |
| Group 13 | | 26/12/2005 al 31/12/2005 | $2,132.48 |
| Group 14 | | 26/12/2005 al 31/12/2005 | $391.51 |
| Group 15 | | 26/12/2005 al 31/12/2005 | $1,944.57 |
| Group 16 | | 26/12/2005 al 31/12/2005 | $267.58 |
| Group 17 | | 26/12/2005 al 31/12/2005 | $1,102.94 |
| Group 18 | | 26/12/2005 al 31/12/2005 | $245.24 |
| Group 19 | | 26/12/2005 al 31/12/2005 | $1,603.22 |
| Group 2 | | 26/12/2005 al 31/12/2005 | $2,415.54 |
| Group 20 | | 31/12/2005 al 31/12/2005 | $5.83 |
| Group 21 | | 31/12/2005 al 31/12/2005 | $0.11 |
| Group 22 | | 26/12/2005 al 31/12/2005 | $1,717.38 |
| Group 23 | | 26/12/2005 al 31/12/2005 | $3.22 |
| Group 24 | | 26/12/2005 al 31/12/2005 | $1,753.16 |
| Group 25 | | 26/12/2005 al 31/12/2005 | $2,183.95 |
| Group 26 | | 26/12/2005 al 31/12/2005 | $3,405.31 |
| Group 27 | | 31/12/2005 al 31/12/2005 | $0.02 |
| Group 28 | | 26/12/2005 al 31/12/2005 | $232.99 |
| Group 29 | | 26/12/2005 al 31/12/2005 | $877.17 |

BESTEL USA

| | |
|---|---|
| **Invoice** | 2643 |
| **Issue date** | 12/31/2005 |
| **Contract** | LOCU LD NAL |
| **Customer** | LOCUS |

# Voice Services

| Concept | Period | Amount |
|---|---|---|
| Group 3 | 26/12/2005 al 31/12/2005 | $47.90 |
| Group 30 | 26/12/2005 al 31/12/2005 | $229.69 |
| Group 31 | 26/12/2005 al 31/12/2005 | $1,361.22 |
| Group 33 | 26/12/2005 al 31/12/2005 | $0.57 |
| Group 34 | 26/12/2005 al 31/12/2005 | $227.88 |
| Group 35 | 26/12/2005 al 31/12/2005 | $952.81 |
| Group 36 | 26/12/2005 al 31/12/2005 | $2.75 |
| Group 37 | 26/12/2005 al 31/12/2005 | $223.25 |
| Group 38 | 26/12/2005 al 31/12/2005 | $19.38 |
| Group 39 | 26/12/2005 al 31/12/2005 | $652.02 |
| Group 4 | 26/12/2005 al 31/12/2005 | $279.83 |
| Group 40 | 26/12/2005 al 31/12/2005 | $58.90 |
| Group 43 | 26/12/2005 al 31/12/2005 | $0.25 |
| Group 45 | 28/12/2005 al 28/12/2005 | $0.02 |
| Group 46 | 31/12/2005 al 31/12/2005 | $1.97 |
| Group 47 | 26/12/2005 al 31/12/2005 | $275.00 |
| Group 48 | 26/12/2005 al 31/12/2005 | $13.56 |
| Group 5 | 26/12/2005 al 31/12/2005 | $2.00 |
| Group 50 | 31/12/2005 al 31/12/2005 | $0.21 |
| Group 51 | 26/12/2005 al 31/12/2005 | $17.63 |
| Group 52 | 31/12/2005 al 31/12/2005 | $1.26 |
| Group 53 | 27/12/2005 al 31/12/2005 | $6.83 |
| Group 54 | 27/12/2005 al 31/12/2005 | $1,372.03 |

BESTEL USA

| | |
|---|---|
| **Invoice** | 2643 |
| **Issue date** | 12/31/2005 |
| **Contract** | LOCU LD NAL |
| **Customer** | LOCUS |

# Voice Services

| Concept | Period | Amount |
|---|---|---|
| Group 55 | | |
| | 26/12/2005 al 31/12/2005 | $57.67 |
| Group 6 | | |
| | 26/12/2005 al 31/12/2005 | $1,646.62 |
| Group 7 | | |
| | 26/12/2005 al 31/12/2005 | $1,682.45 |
| Group 8 | | |
| | 26/12/2005 al 31/12/2005 | $1,757.93 |
| Group 9 | | |
| | 26/12/2005 al 31/12/2005 | $1,051.93 |
| | **National Long Distance** | $35,978.32 |
| | **ENTIRE CONSUMPTION** | **$35,978.32** |

BESTEL USA

520 Iturbide Street
Laredo, TX
Zip Code 78040, USA

INVOICE 2643
Issue date 12/31/2005

**Contract: LOCU LD NAL**
Customer code: LOCUS

**Locus Telecommunications, Inc.**

**Address:** 111 Sylvan Av. Englewood Cliffs
**State:** New Jersey ZIP Code 07632
**Country:** United States

**$325,425.09 USD**
**Amount due**

**Due Date**
**01/03/2006**

**Please Notify to Customer Service the invoice payment**

| Previous balance | Your payments | Credits and adjustments | Initial balance |
|---|---|---|---|
| $289,446.77 | $0.00 | $0.00 | $289,446.77 |

*Summary*

| Description | Service period 12/26/2005 to 12/31/2005 | |
|---|---|---|
| Usage charges | | $35,978.32 |
| | subtotal | $35,978.32 |
| | **Current net charge** | **$35,978.32** |

**(- THIRTY FIVE THOUSAND NINE HUNDRED SEVENTY EIGHT DOLLAR 32/100 USD -)**

**CUSTOMER SERVICE : +52 (55) 9114-2800. Fax +52 (55) 5354-2190. customerservice@bestel.com.mx**

**Your payment shall be credited four days later in the next invoice.**

**$325,425.09 USD**
**Amount due**

Comercial Information

**With the best rates and service in the Market, Bestel is now introducing local telephony services.**

***If you are interested, please contact your account manager or call 01-800-200-BEST***

Locus Telecommunications, Inc.
Adress: 111 Sylvan Av. Englewood Cliffs
Telephone: 201-585-3617 Zip Code 07632
City: New Jersey
Country: United States

# C

# C-1

LOCUS

COPY

# CARRIER SERVICE AGREEMENT

This Carrier Service Agreement is entered into on April____, 2000, between Locus Telecommunications Inc., a Delaware corporation ("Provider"), having its principal place of business at 2160 North Central Road, Fort Lee, New Jersey 07024 and TotalTel Communications, Inc. ("Purchaser") a private corporation, with its principal office located at 150 Clove Rd. Little Falls, NJ 07424. The General Terms and Conditions for Carrier Agreements attached hereto are part of this Agreement.

---

## ORDER INFORMATION SECTION

**Initial Term:** One (1) year, month to month after initial term.

**Rates:** (per minute except for Directory Assistance, T-1 Port Charges and Billing Options)

Domestic Inbound, Domestic Outbound and International Outbound:
See attached schedule entitled: Domestic and International rates

Directory Assistance: Locus's then-standard per-call rates
T-1 Port Charges: Monthly Charge per T-1 Port............ $ ______
Non-Recurring Installation Charge per T-1 Port $______
Initial Quantity of T-1 Ports................. ______

**Payment/Security Deposits:**

Payment by Wire Transfer Required No
Letter of Credit Required.............. No
Financial Reports Required............ No
Security Deposit Amount:............ N/A
Payment Due Date:......................... 30 - business days from receipt of monthly invoice

**Minimum Monthly Commitment:**

| | |
|---|---|
| Month | Minimum –0 |
| Month | Minimum –0 |
| Month | Minimum –0 |
| Month | Minimum –0 |

Minimums applies to international usage only; domestic usage shall not contribute towards meeting minimum monthly commitment.

**Locus Telecommunications, Inc.**
Signature: [signature]
Printed Name/Title: CHRISTINE PARK Kim
Date: 5/17/00

**Purchaser: TotalTel Communications, Inc.**
Signature: [signature]
Printed Name/Title: Salvatore M Quadrino
Date: 5/17/00



KP

## General Terms and Conditions for Carrier Agreements:

**Recitals:**

A. Provider provides telecommunications services between its location and the outbound termination points identified on Exhibit A attached hereto and incorporated herein by this reference and

B. Purchaser desires to purchase telecommunications services on a non-exclusive basis upon the terms and conditions set forth in this Agreement from Provider.

**Agreement:**

Now, therefore, intending to be legally bound, the parties agree as follows:

1. Rates, Terms and Conditions: Provider shall provide telecommunications services to Purchaser at the rates, terms and conditions described in Exhibit A, and to the termination points set forth in Exhibit A Rates listed in Exhibit A or any subsequent rate sheet are subject to change by Provider with seven (7) days written notice to Purchaser, either by facsimile and/or overnight courier. Either party may terminate this agreement, on ten (10) days prior written notice to the other party for any reason. In addition, Provider may terminate this Agreement and/or terminate or suspend any service to the other party immediately and without notice or liability in the event that such party reasonably deems such action necessary in order to protect or preserve its network.

2. Period of Service: This Agreement shall become effective and the parties' obligations shall commence upon the date set forth in Exhibit A of this Agreement shall continue for a period of one year (12 months) from such date. This Agreement will be automatically renewed on a month-to month basis after the expiration of the initial term or any subsequent term. If either party desires to cancel this Agreement upon the expiration of the current term or any subsequent term, it shall give the other party written notice of its intent to cancel at least thirty (30) days prior to the expiration of the current term. This Agreement shall continue and remain in full force and effect until canceled by either party upon notice as provided herein.

3. Carrier's Responsibilities: In furtherance of this Agreement, each party shall:

A. Be responsible for and pay any and all local, state, or federal taxes or charges in the nature of taxes imposed by any governmental authority or regulatory agency in addition to the charges required by either party pursuant to this Agreement;

B. Obtain at its own expense any governmental or regulatory consents or approvals with respect to the utilization of the other party's network as contemplated by this Agreement;

C. Examine and review all technical aspects of the other's system in order to assure itself that its transmitting, receiving, and switching equipment is compatible with all of the other's equipment and systems prior to any linkup with the other's system;

D. Upon a party's request, promptly furnish any technical information or specifications relating to its system as may be reasonably required by a party.

E. Use commercially reasonable efforts so as to not permit or suffer the use of the other's system or facilities for any use or purpose not permitted by law; and

F. Be responsible for all charges, materials, equipment, and labor to connect the other's network at the designated POP, subject to a party's prior review of any such plans or arrangements.

4. Billing Increments: All traffic shall be billed with an initial 30 second minimum increment, followed by 6 second additional increments (i.e. a minimum call length 30 seconds with all additional usage rounded up to the nearest 6 second increment). The sole exception to this billing arrangement shall be traffic terminating in Mexico which shall be billed in full minute increments (i.e. a minimum call length 60 seconds with additional usage rounded up to the nearest full minute).

5. Billing Period/Payment Schedule. The Billing Period shall begin from the 1st day to the last day of the month. Provider shall send bill to Purchaser for Service provided during the preceding Billing, via e-mail or facsimile, by close of business the following business day. Payment by check is acceptable and due within 30 days from receipt of invoice.

6. Billing Disputes: If Purchaser, in good faith, disputes any invoiced amount, it must notify Provider in writing of such dispute immediately upon forwarding a payment from which Purchaser has withheld payment based on disputed charges, and in no event more than 45 days from the date of the disputed invoice. Purchaser's notice must include a statement of all reasons for the dispute in sufficient detail for Provider to determine the merit of the dispute, and any documents supporting Purchaser's claim in the dispute. Purchaser remains obligated to pay all undisputed amounts when due and in full. Upon dispute, Provider and Purchaser agree to use their best efforts to resolve the dispute in good faith within forty-five (45) days of Provider's receipt of invoice. In the event that Provider and Purchaser are unable to resolve the dispute within this period, the dispute shall be submitted to arbitration as otherwise provided for in this agreement.

7. Dispute Resolution: In the event of any controversy or claim arising from or related to this Agreement, its performance or interpretation, the parties, in good faith, initially will attempt to resolve the dispute among themselves. Failing such resolution, the parties mutually agree to submit the matter to arbitration before a single arbitrator knowledgeable in telecom matters at the American Arbitration Association ("AAA") at the closest to Fort Lee, NJ. The prevailing party in any arbitration shall be entitled to receive, in addition to any damages or other relief, all costs reasonably incurred, including reasonable attorney's fees.

8. No Warranties: Provider represents and warrants it has facilities to provide services and shall maintain to industry standards. Provider also warrants and represents that it does not infringe on the property rights intellectual or otherwise, of any third party and indemnifies TotalTel in this regard. Provider shall use reasonable efforts to provide telecommunication services to purchaser, however, provider makes no warranty, express or implied, with respect to the transmission services provided hereunder and expressly disclaims any warranty of merchantability, description or fitness for any particular purpose or function. Except for any express warranties stated in this agreement, each party disclaims all warranties including, without limitation, all implied warranties of merchantability and fitness and of fitness for a particular purpose whether such warranties are made before or after the execution hereof. The stated warranties herein are in lieu of all obligations or liabilities on the part of either party for damages including, but not limited to, special, indirect or consequential damages arising out of or in connection with the use or performance of each party's

service. In no event shall either party be liable to the other for special, indirect or consequential damages arising out of either party's performance under this agreement.

9. <u>Waiver of Liability</u>: As a material inducement for Provider to provide the services hereunder at the prices stated, Purchaser agrees that Provider shall in no event, other than its gross negligence or intentional misconduct, be liable for any loss, expense or damage for (i) loss of revenue, profits, savings, business or goodwill, and (ii) exemplary, proximate, consequential, or incidental damages and expenses of any type or nature on account of any breach or default hereunder by Provider or on account of the use or nonuse or the services.

10. <u>Confidentiality</u>: The terms of this Agreement and any confidential information relating to either party or their respective Carriers which are furnished or revealed pursuant to this Agreement are deemed to be confidential. Neither party shall at any time disclose any of the terms of this Agreement nor any such previously described confidential information to any other third party except to the professional advisors of a party or as may be required by applicable law. The parties agree that in the event of breach, the non-breaching party shall be entitled to seek an injunction to prevent the breach or threatened breach, and the breaching party hereby waives any defense that an adequate remedy in law exists and acknowledges that such a breach or threatened breach would result in irreparable injury to the non-breaching party.

11. <u>Indemnity</u>: The Parties shall indemnify and hold harmless the other party's' stockholders, officers, directors, employees and agents from any and all loss, cost damage, expense or liability, including without limitation, court costs and reasonable attorneys' fees, arising out of, in whole or in part, directly or indirectly, the installation, hook-up, maintenance, service or trouble-shooting of the transmission services described in this Agreement including any interruption of transmission service to Purchaser, its employees, agents and customers, except when caused by the gross negligence by the Provider or the intentional violations of any applicable law or governmental regulation by Provider.

12. <u>Severability</u>: This agreement is made expressly subject to all present and future valid orders and regulations of any regulatory body having jurisdiction over the subject matter hereof and to the laws of the United States of America, any of its states, or any foreign governmental agency having jurisdiction. In the event this Agreement, or any of its provisions, shall be found contrary to or in conflict with any such order, rule, regulation, or law, this Agreement shall be deemed modified to the extent necessary to comply with any such order, rule, regulation or law, provided that such modification is consistent with the form, intent and purpose of this Agreement. If any provision or part thereof of this Agreement is stricken in accordance with the provisions of this section, then the stricken provision shall be replaced, to the extent possible, with the a legal, enforceable, and valid provision that is as similar to the stricken provision as is legally possible.

13. <u>No Agency</u>: Neither party is authorized to act as an agent for, or legal representative of, the other party and neither party shall have the authority to assume or create any obligation on behalf of, in the name of, or binding upon the other party.

14. <u>Force Majeure</u>: The parties' obligations under this Agreement are subject to and neither party shall be liable for; delays, failures to perform (except the payment of money by Purchaser), damages, losses or destruction, or malfunction of any equipment or any consequence thereof caused or occasioned by, or due to fire, flood, water, the elements, labor disputes or shortages, utility curtailments, power failures, explosion, civil disturbances, governmental actions, shortages of equipment for supplies, unavailability of transportation, acts or omissions of third parties, or any other cause beyond the party's reasonable control. Purchaser shall not represent that Provider is responsible for the type or quality of Purchaser's services to its customers.

15. <u>No Waiver</u>: The failure of either party to enforce or insist upon compliance with any of the provisions of this Agreement or the waiver thereof, in any instance, shall not be construed as a general waiver or relinquishment of any other provision of this Agreement.

16. <u>Binding Effect</u>: This Agreement shall be binding upon and inure to the benefit of the parties' hereto and their respective heirs, successors and assigns.

17. <u>No Assignment</u>: Neither party shall voluntarily or by operation of law assign, transfer, license, or otherwise transfer all or any part of its right, duties or other interest in the Agreement or the proceeds thereof (collectively, "Assignment"), without the other party's prior written consent, which consent shall not be unreasonably withheld or delayed. Any attempt to make, except an affiliate, an Assignment in violation of this provision shall be null and void. Purchaser and Provider shall provide written notice to the other of any change in ownership or control. Either party's failure to comply with the assignment provisions, as contained in this paragraph, shall give the other, at its sole discretion, the option to either accept the others assignee or terminate this Agreement. No assignment shall release the other of its obligations hereunder.

18. <u>Amendment</u>: This Agreement may not be amended except by an instrument in writing, executed by the parties. The acknowledgment or acceptance hereto shall effect no modification or amendment by either party of any purchaser order, sales acknowledgment or other similar form from the other party.

19. <u>Merger</u>: This Agreement (including its exhibits) supersedes and merges all prior agreements, promises, understandings, statements, representations, warranties indemnities and covenants and all inducements to the making of this Agreement relied upon by either party herein, whether written or oral, and embodies the parties' complete and entire agreement with respect to the subject matter hereof. No statement or agreement, oral or written, made before the execution of this Agreement shall vary or modify the written terms hereof in any way whatsoever.

20. <u>Interpretation</u>: The words and phrases used herein shall have the meaning generally understood in the telecommunications industry. This Agreement shall be construed in accordance with its fair meaning and not for or against either party drafted this Agreement.

21. **Third Party Beneficiaries/Parties in Interest:** This Agreement has been made and is made solely for the benefit of the Provider and Purchaser, and their respective successors and permitted assigns. Nothing in this Agreement is intended to confer any rights/remedies under or by reason of this Agreement on any third party.

22. **Representation of Authority:** Each party represents and warrants to the other that the execution and delivery of this Agreement and the performance of such party's obligations hereunder have been duly authorized and that the Agreement is a valid and legal agreement binding on such parties and enforceable in accordance with its terms.

23. **Further Assurances:** The parties shall at their own cost and expense execute and deliver such further documents and instruments and shall take such other actions as may be reasonably required or appropriate to carry out the intent and purposes of this Agreement.

24. **Governing Law:** This Agreement shall be in all respects, governed by and construed and enforced in accordance with the laws of the State of New Jersey, including all matters of construction, validity and performance.

25. **Counterparts:** This Agreement may be executed in several counterparts, each of which shall constitute an original, but all of which shall constitute one and the same instrument.

26. **Notices:** All notices, demands, requests and other communications required or permitted hereunder shall be in writing and shall be deemed to be delivered on the earlier of: (a) the date of actual receipt; (b) three days after the date of mailing, by first class mail, duly addressed and with proper postage to the last known place of business of either party; or (c) the day after being sent via a nationally recognized overnight courier service such as Federal Express. Notices will be delivered as follows:

**To Provider:** **Locus Telecommunications, Inc.**
2160 N. Central Rd.
Fort Lee, NJ 07024
Attn: Dillon Kim
Phone: 201-947-6882
Fax: 201-947-4082

**To Purchaser: Totaltel Communications, Inc.**
Address:

Attn:
Phone:
Fax:

IN WITNESS WHEREOF the parties have executed this Agreement as of the day and year first written above.

**PROVIDER:** Locus Telecommunications, Inc
By: [signature]
Printed Name: Christine Park Kim
Title: Senior Manager

**PURCHASER:** TotalTel Communications, Inc.
By: Salvatore M Quadrini [signature]
Printed Name: Salvatore M Quadrino
Title: VP + CFO

**Exhibit A**

1. **Locus Telecommunications, Inc. Gateway Location**: For all services rendered by Provider to Purchaser under this Agreement, the Gateway Location shall be the facilities maintained at:

165 Halsey Street, Newark, NJ

Purchaser is responsible for all connection fees, circuit costs of local loop fees necessary for connection to Provider. If Purchaser does not fulfill the monthly minimum minutes per T-1 (100,000 minutes monthly aggregate or 200,000 minutes to one termination destination), a monthly charge of $___N/A_____ per DS-1 will be separately billed to Purchaser by Provider on the first of the following month.

2. **Rate Change Notice**: Rates are subject to change with five (5) days written notice for price increased. Rate decreases will be effective immediately.

3. **Rates:** The following rates shall apply to the Services rendered by Provider:

**Order:**

4. **Deposit Amount/Letter of Credit:** The amount of the initial deposit will be: _N/A___________

5. **Letter of Credit** verbiage shall be as follows and presented on bank letterhead: N/A

To: Locus Telecommunications, Inc.

Re: Irrevocable Standby Letter of Credit #________ in the amount of $____________________
Expiration Date: (one year minimum)_________________________

Gentlemen:

We hereby issue this Irrevocable Standby Letter of Credit in favor of Locus Telecommunications, Inc. for the account of ____________________________________(Customer Name and Address) for the sum not to exceed the aggregate of $______________ Thousand US Dollars available by your draft(s) drawn at sight on us.

Drafts under this Irrevocable Standby Letter of Credit must be marked "Drawn under (Bank Name), Irrevocable Standby Letter of Credit Number (# ), dated ( ). Drafts must be accompanied by a signed statement of Locus Telecommunications, Inc. that invoice(s) to __________________________ remain unpaid past the due date(s) and that payment thereof has been requested and not received. Partial drawings are permitted.

This Irrevocable Standby Letter of Credit is, except as otherwise expressly stated, subject to the Uniform Customs and Practice for Documentary Credits, 1933 Revision, International Chamber of Commerce, Publication No. 500. We hereby agree with you that all drafts drawn under, and in compliance with, the terms of this credit will be duly honored if drawn and presented to us on or before (Expiration date of Irrevocable Standby Letter of Credit).

(Bank Name)

(Authorized Signature)

**Exhibit B**

Wiring Instructions:

For: Locus Telecommunications, Inc.
2160 North Central Road
Fort Lee, New Jersey 07024

Bank Name: **Chase Manhattan Bank, NA**

Address: 460 Bergen Blvd.
Palisades Park, NJ 07650

Tel No: 201 947-2372

Contact: Ms. Lena Del'Rosso

Act No.: **007212521965**

Routing No.: **021000021**

LOCUS

## CUSTOMER TRAFFIC FORECAST

Customer Name:______________________ Date:__________

| Destination Country | Estimated Min. / Mo. | Target Rate |
|---|---|---|
| 1.____ | ____ | ____ |
| 2.____ | ____ | ____ |
| 3.____ | ____ | ____ |
| 4.____ | ____ | ____ |
| 5.____ | ____ | ____ |
| 6.____ | ____ | ____ |
| 7.____ | ____ | ____ |
| 8.____ | ____ | ____ |
| 9.____ | ____ | ____ |
| 10.____ | ____ | ____ |
| 11.____ | ____ | ____ |
| 12.____ | ____ | ____ |
| 13.____ | ____ | ____ |
| 14.____ | ____ | ____ |
| 15.____ | ____ | ____ |

NOTE: Estimates are for use in provisioning only and will not be considered as a volume commitment.

Locus Telecommunications, Inc.
2160 NORTH CENTRAL ROAD
FORT LEE, NJ 07024
TEL (201) 947-6100 FAX (201) 947-4082

LOCUS

## CUSTOMER TECHNICAL PROFILE

NOTE: Please complete the following information as thoroughly as possible in order to expedite our service provisioning process.

### A. CUSTOMER INFORMATION

**Customer Name:** ____________________

Mailing Address: ____________________

Switch Location: ____________________

**Primary Contact Name:** ____________________ **Phone # ( )** ____________

**Email:** ____________ **Fax # ( )** ____________

### B. SWITCHED SERVICE PROFILE

1) No. of Facilities Requested: _____DS1 _____DS3

2) Point(s) or Origination: ____________________

3) Switch Type: ____________Model No. ____________ ____________

4) Signaling Type: _____MF ___DTMF

5) Framing and Line Coding: a) ____ESF____SF, b) _____AMI _____B8ZS

Requested Start Date: ____________

INBOUND__________ OUTBOUND__________ BOTH__________

Additional Comments: ____________________

### C. Locus CONTACTS

Salesperson: ____________________ Phone # ( ) ____________

Sales Engineer: ____________________ Phone # ( ) ____________

Locus Telecommunications, Inc.
2160 NORTH CENTRAL ROAD
FORT LEE, NJ 07024
TEL (201) 947-6100 FAX (201) 947-4082

# CREDIT APPLICATION

LOCUS

| DATE | DIV | BR | SLM |
|---|---|---|---|
| | | | |

| | |
|---|---|
| LEGAL NAME | PHONE |
| TRADE STYLE | FAX |
| BILLING ADDRESS | CITY/STATE/ZIP |
| STREET ADDRESS | CITY/STATE ZIP |

PLEASE CHECK ONE: ☐PARTNERSHIP ☐CORPORATION: ☐ PUBLIC ☐ PRIVATE

## CONTACT NAMES

| | | |
|---|---|---|
| A/P SUPVR | DIRECT TEL | E-MAIL |
| CFO | DIRECT TEL | E-MAIL |
| PURCHASING MGR | DIRECT TEL | E-MAIL |

## BANK REFERENCES

| | |
|---|---|
| NAME | OFFICER |
| CITY, STATE | PHONE |
| ACCTS: ☐ CHECKING# | ☐ LOAN# |
| NAME | OFFICER |
| CITY, STATE | PHONE |
| ACCTS: ☐ CHECKING# | ☐ LOAN# |

## CARRIER REFERENCES

| COMPANY NAME | ADDRESS | CITY/STATE/ZIP | PHONE/ FAX/CONTA |
|---|---|---|---|
| | | | FAX |
| | | | FAX |
| | | | FAX |
| | | | FAX |

In consideration for the extension of credit, I, on behalf of my firm, acknowledge and agree to the following: (1) PAY YOUR INVOICES IN ACCORDANCE WITH THE TERMS AND AT THE ADDRESS FIXED BY THE INVOICE; (2) PAY INTEREST ON PAST DUE ACCOUNTS AT THE MAXIMUM LEGAL RATE PROVIDED FOR UNDER APPLICABLE LAW; (3) PAY ATTORNEY FEES AND COSTS OF COLLECTION; (4) ACKNOWLEDGE AND AGREE TO THE GENERAL TERMS AND CONDITONS ON THE ATTACHED CONTRACT.

I HEREBY REPRESENT AND WARRANT THAT THE ABOVE INFORMATION AS WELL AS THAT GIVEN ON ANY ATTACHMENTS IS TRUE AND THAT IN MY CAPACITY I AM AUTHORIZED TO BIND MY FIRM ACCORDINGLY.

Initial

I HEREBY AUTHORIZE Locus Telecommunications, Inc. TO INVESTIGATE MY FIRM'S CREDIT AND FINANCIAL RESPONSIBILITY.

SIGNATURE______________________ TITLE______________________
DATE__________

**PARTNERSHIP**, PLEASE PROVIDE THE FOLLOWING INFORMATION.

OWNER NAME______________________
SS#______________________

PRIMARY HOME ADDRESS ______________________CITY, STATE, ZIP______________________

☐ ATTACHMENT(S)

LOCUS

MUTUAL NON-DISCLOSURE AGREEMENT

This Mutual Non-disclosure Agreement ("Agreement"), effective __________, 200__ is entered into between Locus Telecommunications, Inc. ("Locus"), a Delaware corporation, and - ________________________________ corporation ("COMPANY"), and governs all Confidential Information (defined below) received by either party before, during and after the effective date set forth above.

The parties intend to explore the possibility of entering into one or more transactions and may enter into one or more mutually beneficial transactions (collectively, the "Transaction") and in connection with any Transaction, whether currently existing, proposed, or not yet contemplated, the parties may desire to disclose to each other Confidential Information or the parties may otherwise come into possession of Confidential Information.

The parties agree as follows:

1. **Confidential Information:** As used in this Agreement, "Confidential Information" means all non-public information of either party, in any format, whether of a technical, business or other nature, including, without limitation, any trade secrets, findings, specifications, processes, inventions, designs, pictures, programs, source codes, budgets, business or marketing plans, financial information, work in progress, price lists, price lists, product descriptions, customer lists, prospective customer lists, or supplier lists, that has been identified as being proprietary and/or confidential or that by the surrounding circumstances ought to be treated as confidential. Confidential Information also includes all information concerning the existence and progress of the parties' dealings.

2. **Non-Disclosure Obligation:** Each party receiving or acquiring Confidential Information ("Receiving Party") of the other party ("Disclosing Party") must take all reasonable measures to avoid disclosure or unauthorized use of the Confidential Information, including, at a minimum, those measures it takes to protect its own Confidential Information, and Receiving Party must:

(a) hold all Confidential Information in strict confidence, and not use or disclose this information, or help another to do so, except for the limited purpose of advancing the mutually beneficial objective of the Transaction;

(b) limit disclosure of the Confidential Information to its employees and agents to a "need to know" basis to further the parties' mutual interests, and inform all of these people of the obligations under this Agreement; and

(c) immediately return to the Disclosing Party all Confidential Information obtained and all copies and excerpts thereof within 3 days of the earlier of (i) the Disclosing Party's request, or (ii) termination of all discussions and Transactions between the parties, or (iii) completion of the review of the Confidential Information.

3. **Exceptions to Non-Disclosure Obligations:** The provisions of section 2 of this Agreement do not apply to any information that:

(a) can be shown by documentation to have been either in the rightful possession of the Receiving Party prior to the receipt of the Confidential Information from the Disclosing Party, or to have been independently developed by the Receiving Party's personnel without knowledge of the Confidential Information;

(b) is now or later becomes part of the public domain through no wrongful act or breach of this Agreement;

(c) was rightfully received by the third party who was rightfully in the possession of it;

(d) must be disclosed because of any applicable governmental or judicial law, rule, regulation, directive, or order, as long as the Receiving Party uses its reasonable best efforts to give the Disclosing Party prompt written notice sufficient to allow it to contest any disclosure, and that the Receiving Party disclose only the legally required information and uses its reasonable best efforts to obtain confidential treatment for any Confidential Information that is disclosed; or

(e) the Disclosing Party expressly agrees, in writing, can be free of the obligation to treat confidential.

4. **Term**: This Agreement remains in effect until the completion of all discussions and Transactions between Locus and COMPANY, at which time this Agreement will automatically terminate, except that the Receiving Party's obligations with respect to Confidential Information will survive the termination of this Agreement.

5. **No licenses Granted**: All Confidential Information remains the property of the Disclosing Party, and nothing contained in this Agreement may be construed as granting or conferring any rights by license or otherwise in any Confidential Information.

6. **No Commitment:** No furnishing of Confidential Information by either party and no obligation under this Agreement obligates either party to enter into any further agreement or negotiation with the other or to refrain from entering into an agreement or negotiation with any other party.

7. **No Representations**: Neither party makes any representation, warranty, assurance, or guarantee with respect to any Confidential Information disclosed under this Agreement, including, without limitation, any representation concerning non-infringement of intellectual property or other rights.

8. **Enforcement:** Regardless of the extent or nature of the discussions to be held between Locus and COMPANY, or the success or failure to enter into any Transaction as a result of these discussions, if any breach or alleged breach of this Agreement by the Receiving Party occurs, then the Disclosing Party will suffer irreparable injury for which monetary damages will be inadequate to compensate. Accordingly, in addition to all other rights and remedies at law and in equity that might be available to the Disclosing Party, the Disclosing Party is entitled to injunctive relief to prevent or to restrain any such breach by the Receiving Party, or any other persons, directly or indirectly acting for or with the Receiving Party.

9. **Government Law:** This Agreement is to be governed by and construed in accordance with the laws of the State of New Jersey, without reference to its choice of law rules.

10. **Headings:** The headings and captions set forth in this Agreement are for convenience only and do not affect the meaning of any terms.

11. **Severability:** A determination by a court of competent jurisdiction that part or all of any provision of this Agreement is unenforceable does not cancel or invalidate the remainder of that provision or of this Agreement, which remain in full effect.

12. **Waiver:** All waivers must be in writing and signed by the waiving party. The expressed waiver by a party to this Agreement of any right or remedy in a particular instance does not constitute a waiver of any right or remedy in any other instance.

No delay or failure by either party to insist on the strict performance of any provision of this Agreement, and no course of dealing or performance regarding any provision, constitute a waiver of its right to subsequently enforce that provision or any other provision of this Agreement.

13. **Scope:** References in this Agreement to Locus and COMPANY also refer to each of Locus' and COMPANY's respective officers, directors, shareholders, employees, agents, licensees, subsidiaries, affiliates, and other related entities. Further, this Agreement is binding upon each party's successors in interest and assigns and inures to the benefit of each party's successors in interest and assigns.

14. **Entire Agreement/Modification:** This Agreement constitutes the entire agreement between the parties and supersedes all prior agreements between the parties with respect to the matters discussed in it. No amendment or modification of this Agreement is valid or binding upon the parties unless made in writing and signed by both parties. Any modification is effective only in the specific instance and for the specific purpose for which given. Course of dealing or usage of trade may not be invoked to modify the terms and conditions of this Agreement.

15. **Notices:** Any notices given under this Agreement must be in writing and must be delivered in person or mailed by overnight courier or by certified or registered mail, postage prepaid, return receipt requested,

addressed to the intended recipient as set forth below the signature section, or to another address that has been given to the other party in writing. Notice is effective when properly sent and received, refused or returned undelivered.

16. **Limited Relationship:** This Agreement does not create a joint venture, partnership, or other formal business relationship of any kind. Each party is an independent contractor and not an agent of the other party for any purpose, and neither has authority to bind the other.

17. **Export Laws:** Each party will, to the extent applicable, comply with all provisions of the Export Administration Regulations of the United States Department of Commerce, as they currently exist and as they may be amended from time to time, with respect to the export of Confidential Information.

The parties, by their fully authorized representatives, have signed this Agreement on the dates below, and have therefore agreed to and accepted the terms and conditions of this Agreement effective as of the date first written above.

| | |
|---|---|
| Total Tel Communications Inc | Locus Telecommunications, Inc. |
| By: [signature] | By: [signature] |
| Name: Salvatore M Quadrino | Name: Christine Park Kean |
| Title: VP & CFO | Title: Sr Mgr. |
| Date: 5/10/00 | Date: 5/17/00 |

LOCUS
TELECOMMUNICATIONS, INC.

# WIRELESS DISTRIBUTOR AGREEMENT

This non-exclusive Distributor Agreement for Locus Prepaid Services pursuant to the Terms and Conditions attached hereto and incorporated herein (the "Agreement") is by and between **Locus Telecommunications Inc.** ("LOCUS"), a Delaware corporation, with offices at 111 Sylvan Avenue, Englewood Cliffs, New Jersey and ______________________________ ("Distributor"), a ____________________ Corporation whose principal place of business is

________________________, __________, ________

(LOCUS and the Distributor are hereinafter sometimes referred to as the "Parties" and individually as a "Party").

## RECITALS

**WHEREAS**, LOCUS is a corporation duly organized, validly existing, and in good standing under the laws of the State of Delaware; and

**WHEREAS**, LOCUS is a service entity providing a wide range of telecommunications products and services, including prepaid wireless telecommunication services (the "Service") under the brand names CallPlus® Wireless, Locus Mobile™, LOCUS Platinum℠, $O_2$ Wireless℠, Oxygen Wireless Services℠, Viva, POP™, and desires to appoint authorized distributors to perform specified business duties on behalf of LOCUS, and;

**WHEREAS**, Distributor is a corporation duly organized, validly existing, and in good standing under the laws of the State of ________________ authorized to transact the business contemplated herein, having sufficient expertise in the area of marketing, promoting, and reselling telecommunications products and services; and

**WHEREAS**, LOCUS desires to contract with Distributor to sell wireless telecommunications products and services along with other products and services to Distributor in such quantity and at such price as set forth hereinafter and Distributor desires to market, promote, and distribute said telecommunications products or services; and

**WHEREAS**, It is hereby understood and agreed by the parties hereto that the **RECITALS** to this agreement are inseparable parts of this agreement.

**NOW, therefore**, in consideration of these promises and of the mutual representations, warranties and covenants contained in this Agreement, the parties agree as follows:

1. **TERM**

   The term of this agreement shall be 1 year from the date of last signature. The contract will automatically be renewable for an additional one year unless either party sends notice to the contrary at least ninety (90) days prior to the expiration of the initial or any consecutive period (the initial and consecutive periods shall hereinafter collectively be referred to as "Term").

2. **APPOINTMENT**

**A.** LOCUS hereby appoints the Distributor, and the Distributor hereby accepts appointment, as a non-exclusive independent Distributor for LOCUS to promote, market, purchase and sell LOCUS' services subject to the terms and conditions set forth in this Agreement. It is understood that the Distributor has no rights whatsoever hereunder with respect to any products or services of LOCUS other than those products or services subject to this Agreement.

**B.** Distributor may, at its sole option and discretion, appoint or hire employees, sub distributors, independent contractors, etc., in the course and scope of Distributor's business. Distributor understands and acknowledges that any such appointment or hiring shall be Distributor's sole responsibility.

3. **INDEPENDENT CONTRACTOR**

The relationship between LOCUS and the Distributor during the term of this Agreement shall be that of independent contractors. Neither the Distributor nor its owners, agents, representatives, managers or other employees shall under any circumstances be, nor shall they in any manner represent themselves as, owners, agents, representatives or directors, officers, employees, partners or joint ventures of or with LOCUS. The Distributor shall have no right to enter into any contracts or commitments in the name of or on behalf of LOCUS or to obligate LOCUS in any respect whatsoever.

4. **DISTRIBUTOR OBLIGATIONS**

**A.** Distributor will not enter into an agreement with another reseller of GSM wireless services.

**B.** Distributor, recognizing the importance and value of LOCUS's customer base, further agrees not to directly or indirectly convert any customer or subscriber that was activated through LOCUS to another wireless service during the term of this Agreement and for a minimum of 6 months after this Agreement has been terminated.

**C.** Distributor agrees to maintain a minimum volume commitment of activations as detailed in Appendix D to maintain its distributor status with LOCUS. If Distributor fails to meet the minimum requirement, LOCUS may, in its sole discretion, reduce the discount offered or refer said Distributor to another qualified distributor for fulfillment.

**D.** Distributor agrees to sell and distribute LOCUS products: handsets, SIMs, and Airtime for purchase by a customer only in the territories that are listed in Appendix A.

**E.** Distributor must maintain reasonably accurate records concerning all handset and SIM sales to other distributors, retailers, etc purchased from LOCUS. This report is to include, but is not limited to ESN numbers, IMEI, SIM, and handset type. Distributor agrees to comply with any LOCUS request to review these records upon seven (7) days notice.

**F.** Distributor will be responsible for its tax liabilities related to the sales and/or distribution of all products and services offered by LOCUS.

**G.** Distributor will be responsible for all shipping charges.

**H.** Be responsible for all costs, charges, or penalties arising directly as a result of Distributor's actions under this Agreement.

**I.** Distributor agrees to abide by the return authorization policy set forth in Appendix B.

**J.** Distributor shall be responsible for providing customer service to its sub-distributors, retailers, and end users for any hardware issues pertaining to handsets not obtained from LOCUS. This may include, but is not limited to, customer problems and inquiries related to handsets, airtime cards or other related services and provisions. LOCUS shall be responsible for providing customer support to end-users concerning, but not limited to, activation and time usage issues. It shall be the Distributor's responsibility to make best efforts to maintain its customers' satisfaction.

5. **LOCUS POLICIES**

**A.** LOCUS' obligation to provide Service shall be binding to the extent provided in this Agreement, conditioned upon receipt by LOCUS of orders in a format acceptable to LOCUS.

**B.** LOCUS shall provision and ship within a mutually agreeable time frame after receipt by LOCUS of a complete and accurate order form provided that

1) Distributor is not in breach of any covenants of this Agreement; and
2) LOCUS receives payment in accordance with this Agreement and the attached Exhibits attached hereto and made part hereof by this reference; and
3) LOCUS may, in its sole discretion, due to reasonable business circumstances, require delay or denial of processing orders; and
4) No order will be binding upon LOCUS unless accepted and approved by LOCUS in its sole discretion. In the event LOCUS does not accept an order, it shall notify Distributor within a reasonable amount of time concerning the rejection of the order, and shall identify the order not accepted.

**C.** LOCUS reserves the right to modify any of its telecommunications services and/or its provisions including, but not limited to, adjustments in rates to customers and handset pricing without notice.

**D.** LOCUS reserves, and Distributor agrees to grant, the first right of refusal to offer a competitive "free nights and weekends" program to Distributor within twenty-one days after the underlying GSM carrier notifies LOCUS of its availability.

**E.** All sales of airtime cards and handsets are final. LOCUS will only accept returns that are in accordance with the return policy in Appendix B.

**F.** Any disputes concerning but not limited to credits, returns, payments and charges must be addressed in writing to LOCUS within 30 days of the occurrence.

6. **PRICING, DISCOUNT RATE**

**A.** LOCUS will provide price protection on any unused merchandise that was purchased up to 14 days prior to new pricing effective date. All refunds will be issued in the form of a credit memo that may only be used for future purchases.

**B.** Refer to **Appendix C** for retail airtime pricing, card denominations and minutes.

**C.** Refer to **Appendix D** for tiered volume discount rate.

7. **PAYMENT FOR SERVICES AND SECURITY**

**A.** Distributor shall pay LOCUS for Services in accordance with the terms and conditions set forth in the attached Exhibits, appendices, and addendums, each one of which is incorporated by reference and made a part hereof.
Distributor shall be notified of the credit line and terms of payment prior to acceptance of the first order. Extension of credit terms is at sole discretion of LOCUS.

**B.** At LOCUS' option and upon LOCUS' written request, Distributor shall provide security for performance of its obligations hereunder in the form of (a) cash deposit, (b) an irrevocable bank letter of credit, surety bond, or (c) personal guaranty all in an amount designated by LOCUS.

**C.** In consideration of any financial accommodations given by LOCUS, and as collateral security for the payment of all debts of Distributor to LOCUS, pursuant to the provisions of the UCC, Distributor hereby grants LOCUS a purchase money security interest in all inventory of any products now held or hereinafter acquired by Distributor from LOCUS, together with all additions and accessions thereto and all accounts, contract rights, documents, instruments, general intangibles, and chattel papers of Distributor now existing or hereinafter arising out of or relating to such inventory and all proceeds of all the foregoing (collectively, the "Collateral").

Until a default, Distributor may have possession of the Collateral and use it in any lawful manner. Upon a default under this Agreement or in payment or performance of any obligation to LOCUS including, without limitation, any invoice, or other evidence of indebtedness of Distributor to LOCUS, or any insolvency, inability to pay debts as they mature, making an assignment for the benefit of creditors, bankruptcy, appointment ore receiver or cessation of business, LOCUS may declare all indebtedness immediately due and payable and will have all remedies of a secured party under the UCC. LOCUS shall also have the right to reclaim Collateral upon any Distributor default and Distributor shall return same upon LOCUS demand.

Distributor hereby authorizes LOCUS to file record(s) (as defined in Article 9 of the UCC), including, without limitation, financing statements, in all jurisdictions and with all filing offices as

LOCUS may determine, in its sole discretion, is (are) necessary to perfect the purchase money security interest granted to it hereunder.

8. **INDUSTRIAL PROPERTY RIGHTS**

A. The Distributor acknowledges that all trademarks, trade names, container designs and other trade dress appearing on or used by LOCUS in connection with any of the products or services and any other trade and service marks owned or licensed by LOCUS or any Affiliates (collectively the "Trademarks") are good and valid and are exclusively owned by LOCUS or an Affiliate, as the case may be. The benefit of any use of the Trademarks by the Distributor pursuant hereto shall inure to the benefit of LOCUS or the Affiliate that owns the involved Trademark. If, as a result of the Distributor's use, the Distributor is deemed, by operation of law or otherwise, to have acquired any title or other rights to any of the Trademarks or any of their components, the Distributor shall forthwith assign the same to LOCUS or an Affiliate designated by it without consideration.

B. The Distributor shall not at any time do, or knowingly suffer to be done, any act or thing which will impair the ownership and rights of LOCUS or any of its Affiliates in and to the Trade names or Trademarks. The Distributor shall immediately report to LOCUS any infringement by third parties of any Trade names or Trademarks whenever any such infringement shall have become known to the Distributor and will fully cooperate with LOCUS and/or the owner thereof in connection with the prosecution of any infringement action or other proceeding for the protection of the Trade names and Trademarks.

C. Distributor agrees to submit to LOCUS for review and pre-approval all advertisements, business cards, signage and any other use of LOCUS's names or marks.

D. LOCUS acknowledges that all trademarks, trade names, container designs and other trade dress appearing on or used by Distributor in connection with any of the products or services and any other trade and service marks owned or licensed by Distributor or any Affiliates (collectively the "Trademarks") are good and valid and are exclusively owned by Distributor or an Affiliate, as the case may be. The benefit of any use of the Trademarks by LOCUS pursuant hereto shall inure to the benefit of Distributor or the Affiliate that owns the involved Trademark. If, as a result of the LOCUS's use, LOCUS is deemed, by operation of law or otherwise, to have acquired any title or other rights to any of the Trademarks or any of their components, LOCUS shall forthwith assign the same to Distributor or an Affiliate designated by it without consideration.

E. LOCUS shall not at any time do, or knowingly suffer to be done, any act or thing which will impair the ownership and rights of Distributor or any of its Affiliates in and to the Trade names or Trademarks. LOCUS shall immediately report to Distributor any infringement by third parties of any Trade names or Trademarks whenever any such infringement shall have become known to the LOCUS and will fully cooperate with Distributor and/or the owner thereof in connection with the prosecution of any infringement action or other proceeding for the protection of the Trade names and Trademarks.

9. **BREACH**

A. Breach is defined, but not limited to, any circumstances where
   1. Distributor fails to make payments or replenish inadequate receipts of payment, or
   2. Distributor fails to achieve minimum sales requirements, if any; or
   3. Distributor fails to comply with any material representation, obligation or covenant set forth in this Agreement, or
   4. Distributor is suspected of abuse or fraudulent use of any product or service provided by LOCUS.
   5. Distributor sells or distributes LOCUS products: handsets, SIMs, and Airtime for purchase by a customer in territories other than the territories listed in Appendix A.

B. If Distributor commits breach other than 9.A.1 above, Distributor will have 10 days to remedy the said breach. If the remedy is unresolved, LOCUS reserves the right to immediately terminate this Agreement after remedy period is expired. Distributor shall be liable for all charges or other costs or damages resulting from said breach. LOCUS reserves the right to immediately suspend order processing for breach of 9.A.1 above without notice or liability to Distributor.

10. **TERMINATION**

A. Either party may terminate this agreement upon 90 days written notice.

B. LOCUS may terminate this Agreement immediately upon notice via telephone call, facsimile transmission, or courier to Distributor in the event of any of the following.

1. Distributor's failure to maintain its open account in good standing or to make payment under the terms of this Agreement as set forth herein, or
2. If Distributor purchases handsets from LOCUS and either 1) activates the handsets through another carrier, distributor, reseller or other entity that would prohibit LOCUS from being credited with the activation, or 2) ships handsets overseas, or 3) sells handsets to a market not approved by LOCUS in Appendix A.

C. Either party may terminate this Agreement, upon five (5) days written notice to the other party, for any of the reasons below.

1. A breach by the other party of any covenant, term, or condition of this Agreement and the failure to cure such breach within five (5) days after receipt of written notice of such breach from the non-breaching party, or within fifteen (15) days in the event Distributor's agents are in violation of this Agreement.
2. Distributor misrepresents LOCUS business products or Services, fails to achieve 80% of minimum Distributor Sales Level in any ninety day period during initial term or during any subsequent six (6) month renewal period, or engages in any fraudulent activity relating thereto; or
3. Distributor institutes any proceeding for relief under the Bankruptcy Code, or if Distributor becomes insolvent, or if a receiver (permanent or temporary) is appointed by court of competent authority, or if Distributor makes general assignment for benefit of creditors, or if execution is levied against Distributor's benefits or property, or suit to foreclose any lien or mortgage against Distributor's assets is instituted and such levy or suit is not dismissed within thirty (30) days thereafter; or
4. LOCUS' Underlying Transport Providers or any carrier for whom LOCUS resells services modifies or changes Tariff(s) or contract(s) that make it unreasonable for LOCUS to offer the Services contemplated herein.

D. LOCUS may terminate this Agreement in its entirety without liability by giving Distributor 14 days notice if LOCUS' service provider exercises its clause for early termination to LOCUS. Notwithstanding, if this agreement is terminated between Distributor and LOCUS for reasons other than breach or default as defined hereafter, LOCUS agrees to offer a phase out period to Distributor of one hundred eighty days (180) days, starting on the date of termination, to continue to service end users that have not disconnected service prior to termination date. Distributor will not be able to add any additional end users from the date of termination. If LOCUS and service provider terminate their agreement, either during or after agreement with Distributor terminates, the phase out period will be reduced to thirty (30) days upon written notice to Distributor.

E. LOCUS may terminate this Agreement immediately and without notice in order to prevent damage to or degradation of its network, or to comply with any law, regulation, court order, or other governmental request or order which requires immediate action, for behavior that in LOCUS' sole discretion may be deemed illegal, or as otherwise necessary to protect LOCUS from legal liability. LOCUS will endeavor to give Distributor notice regarding the reason(s) for termination as soon as is reasonably practicable after such termination.

F. Termination of this Agreement shall become effective upon receipt of written notice via facsimile transmission, electronic mail, or courier or upon expiration of the applicable cure period if said breaching party fails to cure such breach.

G. All obligations to make payments for charges incurred prior to the termination of this Agreement hereunder shall survive termination and, immediately upon receipt of invoice, any and all amounts owed through the Termination date shall be paid. LOCUS, at its sole option and discretion, will immediately suspend Service for all products that has been delivered but not paid within twenty-four hours of notice to Distributor that this agreement has or will be terminated.

11. **CONFIDENTIAL INFORMATION**

A. "Confidential Information" shall mean any competitively sensitive or secret business, marketing, or technical information of LOCUS or Distributor, including the terms of this Agreement. Confidential Information shall not include information which is (i) generally known to the public or readily ascertainable from public sources (other than as a result of a breach of confidentiality hereunder), (ii) independently developed by the receiving party without reference to or reliance on any Confidential Information of the disclosing party, as demonstrated by written records of the receiving party, or (iii) obtained from an independent third party who created or acquired such information without reference to or reliance on Confidential Information.

B. Confidentiality. Each party agrees to maintain the complete confidentiality of the Confidential Information of the other. Neither party shall disclose or supply the Confidential Information of the other to any non-employee third party without the prior written approval of the other party. Either party may disclose portions of the Confidential Information of the other to governmental regulatory authorities if such disclosure is required by applicable laws, provided the party required to make such disclosure notifies the other party of the applicable legal requirements before such disclosure occurs and assists the other party to obtain such protection as may be available to preserve the confidentiality of such information.

C. Disposal. Prior to disposal of any media or materials that contain any part of the Confidential Information of the other, each party shall obliterate or otherwise destroy all Confidential Information, for example, by erasing, incinerating, or shredding such materials.

D. Upon termination of this agreement, each party will cease use of the other party's trademarks for advertising and promotional purposes. All advertising and promotional materials utilizing said trademarks must be returned to each respective company within 10 days.

12. **NON-SOLICITATION**

During the term of this Agreement and for a period of six (6) months thereafter, both Distributor and LOCUS (1) will refrain from directly or indirectly employing, attempting to employ, recruiting or otherwise soliciting, inducing or influencing any person to leave the employment of the other, and (2) will refrain from directly or indirectly soliciting or encouraging any known customer or supplier to terminate or otherwise modify adversely its business relationship with the other. Distributor will provide a list of established customers and/or suppliers.

Both parties understand that the restrictions set forth in this Section 12 are intended to protect each other's interest in each of its respective proprietary information and established customer and supplier relationships and goodwill, and agree that such restrictions are reasonable and appropriate for this purpose.

13. **WARRANTIES**

A. LOCUS makes no warranties, expressed or implied, concerning the services offered by LOCUS including network issues and hereby expressly disclaims all implied warranties, including warranties of merchantability or fitness for a particular use or purpose. Under no circumstances shall LOCUS be liable to the Distributor or any other Person, including, without limitation, Subscribers, for any loss, injury or damage, of whatever kind or nature, resulting from or arising out of any mistakes, errors, omissions, delays or interruptions in the receipt, transmission or storage of any messages, signals or information arising out of or in connection with the Services or use of LOCUS' network.

B. Without limiting the generality of the foregoing, in no event shall LOCUS be liable to the Distributor or any other person including, without limitation, subscribers, for indirect, incidental or special damages, lost profits, lost savings or any other form of consequential damages, regardless of the form of action, even if LOCUS has been advised of the possibility of such damages, whether resulting from breach of its obligations under this agreement or otherwise.

14. **EXCLUSIVE REMEDIES, LIMITATIONS OF LIABILITY**

A. LOCUS shall not be responsible for any damages, whether or not foreseeable, that are sustained by Distributor or any third party and arise from either the carrier's or LOCUS' performance or non-performance of any work or services (including the provision or non-provision of reports or services), regardless of the form of action, whether in contract, tort (including negligence), strict liability or otherwise. LOCUS shall not be liable for any incidental, indirect, special or consequential damages (including, but not limited to, lost profits or revenues or increased cost of operations), whether or not LOCUS has been advised of the possibility of such damages.

B. This Agreement shall not create for, and not give to, any third party any claim or right of action against LOCUS that would not arise without this Agreement.

15. **NOTICE**

Any notice or demand which, by any provision of this Agreement or any agreement, document or instrument pursuant hereto or thereto, except as otherwise provided therein, is required or provided to be given shall be deemed to have been sufficiently given or served and received for all purposes when delivered by hand, telecopy, or other method of receipt confirmed facsimile or five (5) days after being sent by certified or registered mail, postage and charges prepaid, return receipt requested, or two (2) days after being sent by overnight delivery providing receipt of delivery, to the following addresses: if to LOCUS, at the address stated above, or at any other address designated by LOCUS to Distributor in writing; and if to Distributor, at the address stated above or any other address so designated in writing to LOCUS.

16. **FORCE MAJEURE**

LOCUS shall not be responsible for any damages sustained by Distributor for any failure to deliver or perform, or any delay in the delivery which shall be caused, directly or indirectly, in whole or in part, by any carrier event; fire, flood, rain or windstorm; civil disturbances; voluntary or mandatory compliance with law or a regulation, policy or requirement of an governmental department or agency, or the order of any court; Act of God; or any other cause of similar or dissimilar nature beyond the reasonable control of LOCUS.

17. **INDEMNIFICATION**

In the event LOCUS shall, without fault on its part, be made or become a party to any suit, claim or demand directly as a result of any act or omission of Distributor, its stockholders, officers, directors, employees, and agents, Distributor shall hold LOCUS harmless from and against any and all damages, claims, losses, costs, expenses, or liabilities, including, without limitation, court costs and reasonable attorney's fees, incurred by or imposed on LOCUS or in connection with any such suit, claim or demand.

18. **ARBITRATION**

Any controversy, claim or dispute arising out of or relating to the Agreement, or any breach, termination or invalidity thereof, shall be settled by binding arbitration at the American Arbitration Association in accordance with its then applicable rules, and judgment upon any award rendered may be entered in any court having jurisdiction. In accordance with such Rules, each party shall designate one arbitrator, and these two arbitrators shall designate a third arbitrator. The place of arbitration shall be Newark, NJ, USA.

19. **MISCELLANEOUS**

A. Each party hereby represents and warrants that each has the right to enter into this Agreement and that neither is a party to any agreement, arrangement or understanding with any third party which would inhibit or prohibit a right and/or ability to perform the services called for by this Agreement. All warranties, covenants, representations and guarantees shall survive the execution of this document.

B. Applicable Laws. This Agreement shall be construed and enforced in accordance with the laws of the State of New Jersey.

C. Waiver. No term or provision of this Agreement shall be deemed waived and no breach or default shall be deemed excused unless such waiver or consent shall be in writing and signed by the Party to be charged. No consent by any Party to, or waiver of, a breach or default by the other, whether express or implied, shall constitute a consent to waiver of, or excuse for any different or subsequent breach or default.

D. Entire Agreement. This Agreement represents the entire agreement between the parties with respect to the transactions contemplated herein and may be modified only by a subsequent written document signed by the parties. This Agreement may be executed in one or more duplicate originals, all of which shall constitute but one agreement between the parties hereto. This Agreement supercedes any previous agreement between the parties.

E. Partial Invalidity. The invalidity or unenforceability of any particular provision of this Agreement shall not affect the other provisions hereof, and this Agreement shall be construed in all respects as if such invalid or unenforceable provisions were omitted.

F. Headings. All headings contained herein are inserted for convenience only and do not constitute a part of the Agreement and these General Terms.

G. Assignment. This either party without the other party's prior written approval, which shall not be unreasonably withheld, may not assign Agreement and any rights or obligations arising under it.

H. Benefit. This Agreement shall be binding upon and inure to the benefit of each party to this Agreement and their successors and assigns (to the extent permitted herein).

IN WITNESS WHEREOF, the parties have executed this Agreement as of this the

_______ Day of _____________, 2006,

| By: **Locus Telecommunications, Inc.** | | By: | |
|---|---|---|---|
| Signature: | ________________ | Signature: | ________________ |
| Name: | ________________ | Name: | ________________ |
| Title: | ________________ | Title: | ________________ |
| Date: | ________________ | Date: | ________________ |
| Signature: | ________________ | Signature: | ________________ |
| Name: | ________________ | Name: | ________________ |
| Title: | ________________ | Title: | ________________ |
| Date: | ________________ | Date: | ________________ |

# APPENDIX A

## TERRITORIES AVAILABLE FOR DISTRIBUTION

All states or markets where distribution of handsets and airtime will occur must be listed in this Appendix A .
Based on the markets listed, a minimum number of activations of new customers will be required per month by market. (This will be discussed during the market rollout plan between LOCUS and Distributor and will become part of a separate Promotional Agreement).

Activation of new customers via handsets, airtime sales, <u>and</u> starter kits is required for all markets listed.

| | | | | |
|---|---|---|---|---|
| | | | | |
| | | | | |

At its sole discretion, Locus Telecommunications, Inc. may add or delete markets from the above list. Distributor must receive prior written approval from LOCUS to enter any additional markets.

Initial ________

**APPENDIX B**

## Return Policy – Terms & Conditions

1. The Distributor has the discretion of accepting returns from the end-user. If the Distributor accepts returns, then the return policy **must be followed** in order for Locus Telecommunications, Inc. ("LOCUS") to recognize the return.
2. **LOCUS will allow returns on defective merchandise only**. Distributor will have **120 Days** from the invoice date of handsets. The invoice date is the date LOCUS sold the handsets to the Distributor. The Distributor must contact LOCUS and receive a return authorization number. (RA#). Distributor must fill out the RA form completely including an explanation of the problem or defect. **After 120 Days no RA# will be issued.**
3. If the product is deemed defective by LOCUS, then LOCUS will repair or replace the product. In this scenario, **LOCUS** will pay for shipping back to customer.
   - If the defective product is returned **with** full promotional minutes, then LOCUS **will not** charge for resetting the Service.
   - If the defective product is returned **without** full promotional minutes, then LOCUS **will** charge the standard airtime rate for replacement minutes, minus the discount margin.
4. If the product returned is deemed **not** defective by LOCUS, then LOCUS will send back the product with a new MDN and minutes back to full promotional value. In this scenario, **Customer pays for all shipping charges.**
   - If the non-defective product is returned **with** full promotional minutes, then LOCUS **will not** charge for unused minutes, but **will** apply a re-processing fee of $5.00 (for each handset).
   - If the non-defective product is returned **without** full promotional minutes, then LOCUS **will** charge the standard airtime rate for replacement minutes, minus the discount margin and apply a re-processing fee of $5.00 (for each handset).
5. There are no returns or exchanges on Airtime cards or Non-defective SIMs.
6. LOCUS must receive the defective product within 14 days of the issuance of the RA #. LOCUS will not accept any additional handsets once the RA# has been issued. **After 14 days no returns will be accepted.**
7. If this product fails to operate under normal use and service, due to improper materials or workmanship, LOCUS will, at its option **repair or replace** the product in accordance with the terms and conditions stipulated herein.
8. This return policy does not cover any failure of the product due to misuse and/or normal wear and tear (including but not limited to use in other than the normal and customary manner in accordance with the manufacturer's instructions for use and maintenance of the product, accident, modification or adjustment, acts of God, improper ventilation and damages resulting from liquid).
9. This return policy does not cover product failures due to repair installations, modifications or improper service performed by any workshop other than the manufacturer's authorized service center, opening of the product by unauthorized persons, or use of generic-brand accessories that are not provided by LOCUS.
10. Distributor is responsible for all shipping charges when returning products to LOCUS. Additional shipping charges may apply. (Please see points 3 & 4)
11. All returns must be in original packaging and with all accessories. (Charger, User Guide, etc.)
12. Any changes or modifications to the return authorization form must be communicated back to LOCUS after the RA # is issued or LOCUS will have the right to reject the return.

Initial ________

# APPENDIX C

## Airtime Pricing

[Insert product rate table below for CallPlus Wireless®, and/or Locus Mobile™, Locus Platinum℠, $O_2$ Wireless℠, Oxygen Wireless Services℠, Viva, POP™, whatever is applicable]

Airtime Rates

| Product | Discount Rate | Denomination |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |

Airtime expiration: 90 days after replenishment provided

Initial ________

## APPENDIX D

## VOLUME DISCOUNT RATE

| NEW ACTIVATIONS PER MONTH (Includes owner handset) | AIRTIME CARD DISCOUNT |
|---|---|
| Minimum _______ | _______ |

Distributor must reach the minimum commitment in order to be eligible for the assigned discount. Distributor must maintain the minimum commitment on a monthly basis to receive the allotted discount. If Distributor volume falls below the minimum commitment, the discount will change to the appropriate tier for the following month.

Distributor will be given 3 months from the agreement execution date to hit the targeted volume. During the ramp up period the Distributor must reach the following tiers per month to be entitled to receive the given discount. Failure to reach the minimum activation level will result in the discount level being lowered to the appropriate tier.

Month 1 activations ____

Month 2 activations ____

Month 3 activations ____

Initial ________

APPENDIX E

## Dealer-Provided Handsets

LOCUS acknowledges that Distributor may provide its own handsets ("DP Handsets") and activate them on the Locus Network for the purpose of promoting LOCUS airtime sales.

LOCUS may provide Locus-branded packaging (e.g. CallPlus® Wireless, Locus Mobile™, Locus Platinum℠, $O_2$ Wireless℠, Oxygen Wireless Services℠, Viva, POP™) materials and/or packaging for DP handsets subject to the following conditions.

1. Distributor agrees to obtain prior written approval from Locus for any DP Handsets to be placed in Locus packaging. This can be done for a specific quantity of specific model(s) over a specific period of time through a *DP Agreement*.
2. Distributor agrees to reimburse Locus for all out-of-pocket costs (including shipping costs). Locus will provide receipts to Distributor evidencing such costs.
3. Distributor agrees to hold Locus harmless for any liability relating to any DP Handsets ever in Locus's possession.
4. Distributor agrees not to tamper with any "Dealer Provided Handset" indicator or label that Locus may have placed either outside or inside the packaging.
5. Distributor agrees to indemnify and hold LOCUS harmless from any liability and resulting damages, if any, which may arise as a result of defective DP Handset.

Initial ________

# DISTRIBUTOR AGREEMENT FOR LOCUS PREPAID SERVICE

This non-exclusive Distributor Agreement for Locus Prepaid Services pursuant to the Terms and Conditions attached hereto and incorporated herein (the "Agreement") is by and between **Locus Telecommunications Inc.** ("Locus"), a Delaware corporation, with offices at 111 Sylvan Avenue, Englewood Cliffs, New Jersey and ____________________ **Inc.** ("Distributor"), a _________ Corporation with offices at ____________________________________.
(Locus and the Distributor are hereinafter sometimes referred to as the "Parties" and individually as a "Party").

## RECITALS

**WHEREAS**, Locus is a corporation duly organized, validly existing, and in good standing under the laws of the State of Delaware with the power to operate as a provider of long distance telecommunications and related services, as contemplated herein (the "Service"); and

**WHEREAS**, Distributor is a corporation duly organized, validly existing, and in good standing under the laws of the **State of** __________ authorized to transact the business contemplated herein, having sufficient expertise in the area of marketing, promoting, and reselling telecommunications services.

**WHEREAS**, Locus desires to contract with Distributor to sell telecommunications services along with other services to Distributor in such quantity and at such quantity and at such price as set forth hereinafter and Distributor desires to market, promote, and distribute said telecommunications products or services; and

**NOW THEREFORE**, in consideration of the premises set forth hereinabove and the mutual covenants and agreements hereinafter set forth, the Parties hereby agree as follows:

**1. APPOINTMENT**

Locus hereby appoints the Distributor, and the Distributor hereby accepts appointment, as a non-exclusive independent Distributor for Locus, and to promote, market, purchase and sell Locus' services to Distributors subject to the terms and conditions set forth in this Agreement. It is understood that the Distributor has no rights whatsoever hereunder with respect to any products or services of Locus other than those products or services subject to this Agreement.

**2. TERM**

The initial term of this Agreement will commence on the date of last execution below and continue in effect for a period of one year from the date thereof, unless sooner terminated as provided herein. This Agreement shall automatically renew for consecutive six (6) month periods, unless notice is sent to the contrary by either party at least ninety (90) days prior to the expiration of the initial or any consecutive period (the initial and consecutive periods shall hereinafter collectively be refereed to as "Term").

## 3. INDEPENDENT CONTRACTOR

The relationship between Locus and the Distributor during the term of this Agreement shall be that of independent contractors. Neither the Distributor nor its owners, agents, representatives, managers or other employees shall under any circumstances be, nor shall they hold themselves out as, owners, agents, representatives or directors, officers, employees, partners or joint ventures of or with Locus. The Distributor shall have no right to enter into any contracts or commitments in the name of or on behalf of Locus or to obligate Locus in any respect whatsoever.

## 4. DISTRIBUTOR RESPONSIBILITIES

The Distributor shall throughout the term of this Agreement:

A. Effectively and continuously promote, market, distribute and sell Locus products and services, cause its managers and employees to use all commercially reasonable efforts to achieve Distributor Sales Level as detailed in the attached exhibits, each one of which is incorporated by reference and made a part hereof, maintain a place of business staffed by sufficiently competent and well-trained employees, including sales personnel, for such purpose, and not purchase Locus products and services other than from Locus.

B. In respect of its activities related hereto, comply with, and cause its agents, employees and representatives to comply with, all federal, state and local laws (including tax laws), ordinances, rules and regulations including without limitation, all rules and regulation established by the various state Public Service Commissions or Public Utilities Commissions, and Federal Communications Commission.

C. Apply for, and obtain all licenses and other authorizations and approvals from the appropriate local, state, and federal governments necessary to enable the Distributor to promote, market, distribute and sell the products and services in the Territory.

D. Within 90 days of date of Agreement, achieve a specific Distributor Sales Level as per attached Exhibit A. Distributor agrees that Locus may, in its sole discretion, modify the Level of Distributor Discount offered to the Distributor if the Distributor Sales Level is not achieved.

E. Conduct only such advertising of the products and services as Locus may approve in writing in the exercise of its absolute discretion.

F. Maintain an account, or deposit (if so required) in good standing which meets Locus' credit terms and policies at all times.

G. Upon request, deliver to Locus an original order form, in a format reasonably approved by Locus, executed by Distributor.

H. Properly and completely procure the necessary data on all orders submitted by Distributor to Locus in connection with the fulfillment of orders. Assure that all information on the order form is complete and accurate.

I. Pay shipping costs for all items shipped to or from Locus.

J. Be responsible for all costs, charges, or penalties arising directly as a result of Distributor's actions under this Agreement.

## 5. RESPONSIBILITIES OF LOCUS

A. Locus' obligation to provide Service shall be binding to the extent provided in this Agreement, conditioned upon receipt by Locus of orders in a format acceptable to Locus.

B. Locus shall provision and ship within one (1) business day of receipt by Locus of a complete and accurate order form provided that

1) Distributor is not in breach of any covenants of this Agreement, and

2) Locus receives payment in accordance with this Agreement and the attached Exhibits attached hereto and made part hereof by this reference.

3) Locus may, in its sole discretion, due to reasonable business circumstances, require delay or denial of processing Orders.

## 6. ORDERS

No Order will be binding upon Locus unless accepted and approved by Locus in its sole discretion. In the event Locus does not accept an order, it shall notify Distributor within a reasonable amount of time concerning the rejection of the order, and shall identify the order not accepted.

## 7. PAYMENT FOR SERVICES AND SECURITY

A. Distributor shall pay Locus for Services in accordance with the terms and conditions set forth in the attached Exhibits, each one of which is incorporated by reference and made a part hereof.
Distributor shall be notified of the credit line and terms of payment prior to acceptance of the first order. Extension of credit terms is at sole discretion of Locus.

B. At Locus' option and upon Locus' written request, Distributor shall provide security for performance of its obligations hereunder in the form of (a) Cash deposit, (b) an irrevocable bank letter of credit, surety bond, or (c) personal guaranty all in an amount designated by Locus.

C. In consideration of any financial accommodations given by Locus, and as collateral security for the payment of all debts of Distributor to Locus, pursuant to the provisions of the UCC, Distributor hereby grants Locus a purchase money security interest in all inventory of any products now held or hereinafter acquired by Distributor from Locus, together with all additions and accessions thereto and all accounts, contract rights, documents, instruments, general intangibles, and chattel papers of Distributor now existing or hereinafter arising out of or relating to such inventory and all proceeds of all the foregoing (collectively, the "Collateral").

Until a default, Distributor may have possession of the Collateral and use it in any lawful manner. Upon a default under this Agreement or in payment or performance of any obligation to Locus including, without limitation, any invoice, or other evidence of indebtedness of Distributor to Locus, or any insolvency, inability to pay debts as they mature, making an assignment for the benefit of creditors, bankruptcy, appointment ore receiver or cessation of business, Locus may declare all indebtedness immediately due and payable and will have all remedies of a secured party under the UCC. Locus shall also have the right to reclaim Collateral upon any Distributor default and Distributor shall return same upon Locus demand.

Distributor hereby authorizes Locus to file a record(s) (as defined in Article 9 of the UCC), including, without limitation, financing statements, in all jurisdictions and with all filing offices as Locus may determine, in its sole discretion are necessary to perfect the purchase money security interest granted to it hereunder.

## 8. INDUSTRIAL PROPERTY RIGHTS

A. The Distributor acknowledges that all trademarks, trade names, container designs and other trade dress appearing on or used by Locus in connection with any of the products or services and any other trade and service marks owned or licensed by Locus or any Affiliates (collectively the "Trademarks") are good and valid and are exclusively owned by Locus or an Affiliate, as the case may be. The benefit of any use of the Trademarks by the Distributor pursuant hereto shall inure to the benefit of Locus or the Affiliate that owns the involved Trademark. If, as a result of the Distributor's use, the Distributor is deemed, by operation of law or otherwise, to have acquired any title or other rights to any of the Trademarks or any of their components, the Distributor shall forthwith assign the same to Locus or an Affiliate designated by it without consideration.

B. The Distributor shall not at any time do, or knowingly suffer to be done, any act or thing which will impair the ownership and rights of Locus or any of its Affiliates in and to the Trade names or Trademarks. The Distributor shall immediately report to Locus any infringement by third parties of any Trade names or Trademarks whenever any such infringement shall have become known to the Distributor and will fully cooperate with Locus and/or the owner thereof in connection with the prosecution of any infringement action or other proceeding for the protection of the Tradenames and Trademarks.

C. Distributor agrees to submit to Locus for review and pre-approval all advertisements, business cards, signage and any other use of Locus's names or marks.

## 9. TERMINATION

Locus may terminate this Agreement immediately upon notice via telephone call, facsimile transmission, or courier to Distributor for Distributor's failure to maintain its open account in good standing or to make payment under the terms of this Agreement as set forth herein. Upon default of Distributor, Locus further reserves the right, subject to local public utility commission regulations, to suspend service to any prepaid service products sold to Distributor.

**A.** Either party may terminate this Agreement, upon written notice to the other party, for any of the reasons below.

1. A breach by the other party of any covenant, term, or condition of this Agreement and the failure to cure such breach within five (5) days after receipt of written notice of such breach from the non-breaching party, or within fifteen (15) days in the event Distributor's agents are in violation of this Agreement.
2. Distributor misrepresents Locus business products or Services, fails to achieve 80% of Distributor Sales Level in any ninety day period during initial term or during any subsequent six (6) month renewal period, or engages in any fraudulent activity relating thereto; or
3. Distributor institutes any proceeding for relief under the Bankruptcy Code, or if Distributor becomes insolvent, or if a receiver (permanent or temporary) is appointed by court of competent authority, or if Distributor makes general assignment for benefit of creditors, or if execution is levied against Distributor's benefits or property, or suit to foreclose any lien or mortgage against Distributor's assets is instituted and such levy or suit is not dismissed within thirty (30) days thereafter; or
4. Locus' Underlying Transport Providers modify or change Tariff(s) or contract(s) which make it unreasonable for Locus to offer the Services contemplated herein; or

**B.** Termination of this Agreement shall become effective upon receipt of written notice via facsimile transmission, electronic mail, or courier or upon expiration of the applicable cure period if said breaching party fails to cure such breach.

**C.** Locus may terminate this Agreement immediately and without notice in order to prevent damage to or degradation of its network, or to comply with any law, regulation, court order, or other governmental request or order which requires immediate action, for behavior that in Locus' sole discretion may be deemed illegal, or as otherwise necessary to protect Locus from legal liability. Locus will endeavor to give Distributor notice regarding the reason(s) for termination as soon as is reasonably practicable after such termination.

**D.** All obligations to make payments for charges incurred prior to the termination of this Agreement hereunder shall survive termination and, immediately upon receipt of invoice, any and all amounts owed through the Termination date shall be paid. Locus, at its sole option and discretion, will immediately suspend Service for all product that has been delivered but not paid within twenty-four hours of notice to Distributor that this agreement has or will be terminated.

## 10. RISK OF LOSS, SECURITY AND FRAUD CONTROL

Delivery shall be effected when, when product is accepted by a carrier or a Distributor representative. Upon delivery by Locus, Distributor shall:

**A.** Bear risk of loss for Locus products and shall be responsible for the proper handling, security, all risks of physical damage, protection from theft and misuse of Locus prepaid products including PINs and card numbers.

**B.** Be responsible for all losses, damages, claims resolution and liability associated with Locus prepaid products distributed by Distributor, its agents or distributors, including, but not limited to replacement costs for Locus Prepaid and any liabilities owed or credits issued to bona fide purchasers for the value of Locus Prepaid.

**C.** Locus shall be responsible for the proper handling, all risks of physical damage, protection from theft, security of the Locus Prepaid until the Delivery of Locus Prepaid products to Distributor.

**D.** Distributor grants Locus a security interest in all products delivered by Locus to Distributor until the related invoices have been paid in full.

**E.** Distributor agrees that Locus shall have the right to immediately deactivate particular cards and their respective PINs in the event Locus reasonably believes these cards have been improperly activated or are the subject of fraud.

**F.** Distributor shall have the right to request Locus to deactivate cards in the event that Distributor reasonably believes such cards have been improperly activated or are the subject of fraud. Locus shall retain final discretion on all deactivation decisions.

## 11. CONFIDENTIAL INFORMATION

A. "Confidential Information" shall mean any competitively sensitive or secret business, marketing, or technical information of Locus or Distributor, including the terms of this Agreement. Confidential Information shall not include information which is (i) generally known to the public or readily ascertainable from public sources (other than as a result of a breach of confidentiality hereunder), (ii) independently developed by the receiving party without reference to or reliance on any Confidential Information of the disclosing party, as demonstrated by written records of the receiving party, or (iii) obtained from an independent third party who created or acquired such information without reference to or reliance on Confidential Information.

B. Confidentiality. Each party agrees to maintain the complete confidentiality of the Confidential Information of the other. Neither party shall disclose or supply the Confidential Information of the other to any non-employee third party without the prior written approval of the other party. Either party may disclose portions of the Confidential Information of the other to governmental regulatory authorities if such disclosure is required by applicable laws, provided the party required to make such disclosure notifies the other party of the applicable legal requirements before such disclosure occurs and assists the other party to obtain such protection as may be available to preserve the confidentiality of such information.

C. Disposal. Prior to disposal of any media or materials that contain any part of the Confidential Information of the other, each party shall obliterate or otherwise destroy all Confidential Information, for example, by erasing, incinerating, or shredding such materials.

## 12. NON-SOLICITATION

During the term of this Agreement and for a period of six (6) months thereafter, both Distributor and Locus (1) will refrain from directly or indirectly employing, attempting to employ, recruiting or otherwise soliciting, inducing or influencing any person to leave the employment of the other, and (2) will refrain from directly or indirectly soliciting or encouraging any known customer or supplier to terminate or otherwise modify adversely its business relationship with the other. Distributor will provide a list of established customers and /or suppliers. Both parties understand that the restrictions set forth in this Section 12 are intended to protect each other's interest in each of its respective proprietary information and established customer and supplier relationships and goodwill, and agree that such restrictions are reasonable and appropriate for this purpose.

## 13. WARRANTY EXCLUSIONS

A. The services provided under this Agreement including, but not limited to, the reports and services are provided on an "as is" basis. Locus and its subsidiaries, affiliates, subcontractors and suppliers make no warranties, expressed or implied, and specifically disclaim any warranty of merchantability or fitness for a particular purpose or use. In no event shall Locus be liable for any loss, expense or damage for revenue, profits, savings, or goodwill or exemplary, proximate, consequential or incidental damages and expenses of any type or nature due to failure to provide telecommunications services.

B. Locus makes no guarantees, promises, or any other representations regarding the accuracy or completeness of any information contained in reports and services beyond its control; nor the date or time of delivery of the reports and services. Not withstanding the foregoing, Locus will make reasonable and diligent efforts to comply with industry standards, and in no case, without the express written authorization from the Distributor, shall reports that would otherwise be due, be detained for an unreasonable time period.

C. The telecommunications services contemplated herein are subject to all present and future valid tariffs, orders and regulations of any regulatory body having appropriate jurisdiction.

## 14. EXCLUSIVE REMEDIES, LIMITATIONS OF LIABILITY

A. Locus shall not be responsible for any damages, whether or not foreseeable, that are sustained by Distributor or any third party and arise from either the carrier's or Locus' performance or non-performance of any work or services (including the provision or non-provision of reports or services), regardless of the form of action, whether in contract, tort (including negligence), strict liability or otherwise. Locus shall not be liable for any incidental, indirect, special or consequential damages (including, but not limited to, lost profits or revenues or increased cost of operations), whether or not Locus has been advised of the possibility of such damages.

B. This Agreement shall not create for, and not give to, any third party any claim or right of action against Locus that would not arise without this Agreement.

## 15. NOTICE

Any notice required or permitted hereunder shall be in writing and shall be delivered by registered mail, return receipt requested or by nationally recognized courier service, to the respective address set forth under the signatures of the parties, or to such other address as either party may designate in writing from time to time, and such notice shall be deemed given on date received.

## 16. FORCE MAJEURE

Locus shall not be responsible for any damages sustained by Distributor for any failure to deliver or perform, or any delay in the delivery which shall be caused, directly or indirectly, in whole or in part, by any carrier event; fire, flood, rain or windstorm; civil disturbances; voluntary or mandatory compliance with law or a regulation, policy or requirement of an governmental department or agency, or the order of any court; Act of God; or any other cause of similar or dissimilar nature beyond the reasonable control of Locus.

## 17. INDEMNIFICATION

In the event Locus shall, without fault on its part, be made or become a party to any suit, claim or demand directly as a result of any act or omission of Distributor, its stockholders, officers, directors, employees, and agents, Distributor shall hold Locus harmless from and against any and all damages, claims, losses, costs, expenses, or liabilities, including, without limitation, court costs and reasonable attorney's fees, incurred by or imposed on Locus or in connection with any such suit, claim or demand.

## 18. ARBITRATION

Any controversy, claim or dispute arising out of or relating to the Agreement, or any breach, termination or invalidity thereof, shall be settled by binding arbitration at the American Arbitration Association in accordance with its then applicable rules, and judgment upon any award rendered may be entered in any court having jurisdiction. In accordance with such Rules, each party shall designate one arbitrator, and these two arbitrators shall designate a third arbitrator. The place of arbitration shall be Newark, NJ, USA.

**19 MISCELLANEOUS**

A. Applicable Laws. This Agreement shall be construed and enforced in accordance with the laws of the State of New Jersey.

B. Waiver. No term or provision of this Agreement shall be deemed waived and no breach or default shall be deemed excused unless such waiver or consent shall be in writing and signed by the Party to be charged. No consent by any Party to, or waiver of, a breach or default by the other, whether express or implied, shall constitute a consent to waiver of, or excuse for any different or subsequent breach or default.

C. Entire Agreement. This Agreement represents the entire agreement between the parties with respect to the transactions contemplated herein and may be modified only by a subsequent written document signed by the parties. This Agreement may be executed in one or more duplicate originals, all of which shall constitute but one agreement between the parties hereto. This Agreement supercedes any previous agreement between the parties.

D. Partial Invalidity. The invalidity or unenforceability of any particular provision of this Agreement shall not affect the other provisions hereof, and this Agreement shall be construed in all respects as if such invalid or unenforceable provisions were omitted.

E. Headings. All headings contained herein are inserted for convenience only and do not constitute a part of the Agreement and these General Terms.

F. Assignment. This Agreement and any rights or obligations arising under it may not be assigned by either party without the other party's prior written approval, which shall not be unreasonably withheld.

G. Benefit. This Agreement shall be binding upon and inure to the benefit of each party and their successors and assigns (to the extent permitted herein).

IN WITNESS WHEREOF, the parties have executed this Agreement as of this the

____ day of ___________, 2006,

| | | | |
|---|---|---|---|
| By: | **Locus Telecommunications, Inc.** | By: | ______________ |
| | ______________ | Signature: | ______________ |
| Name: | ______________ | Name: | ______________ |
| Title: | ______________ | Title: | ______________ |
| Date: | ______________ | Date: | ______________ |

**Exhibit A**

Distributor Sales Level

Minimum quantity required for all orders is twenty-five (25) cards per denomination.

Month 1 $ ____________

Month 2 $ ____________

Month 3 $ ____________ Quarter Target $ ____________

Month 4 $ ____________

Month 5 $ ____________

Month 6 $ ____________ Quarter Target $ ____________

| | TYPE CARD: | ACCESS | AREAS | DISCOUNT |
|---|---|---|---|---|
| 1 | | | | |
| 2 | | | | |
| 3 | | | | |
| 4 | | | | |
| 5 | | | | |
| 6 | | | | |
| 7 | | | | |
| 8 | | | | |
| 9 | | | | |
| 10 | | | | |

PAYMENT TERMS

Distributor agrees to pay invoices submitted by Locus within the following terms: ______Days

Terms are contingent upon Distributor maintaining account in good standing with Locus. Terms may change at Locus' sole discretion upon reasonable notice to Distributor. Distributor grants Locus a security interest on all unpaid phonecards, PINs and proceeds thereof. Late charges in the amount of eighteen (18%) percent per annum or the highest rate permitted by law, whichever is the lesser, of the outstanding amount of Distributor's account shall be payable monthly on any past due amount and shall continue to accrue and remain due and payable until all amounts due have been paid in full. In the event that Locus shall retain an agency or attorney for the purpose of collecting amounts owed by Distributor, Distributor shall be obligated to pay all such amounts, any accumulated late payment charge, and each other's expenses of collection, including but not limited to reasonable attorneys' fees which attorney fees may be based on a percentage of the amount due not to exceed thirty-three (33%) percent thereof.

**LOCUS TELECOMUNICATIONS, INC.** ____________

Signature: ____________ Signature: ____________

Name: ____________ Name: ____________

Title: ____________ Title: ____________

Date: ____________ Date: ____________

# RATE DECK AGREEMENT

Distributor: ____________________

Distributor Agreement date: ____________________

Product name: (Code : ________ )

Service Commencement date: ____________________

Quantity of PINs: ____________________

| Destination | Rate | Destination | Rate | Destination | Rate |
|---|---|---|---|---|---|
| FULL RATE DECK IS ATTACHED | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

**Each party understands and agrees that rates and charges may be adjusted to the extent mandated by any regulatory authority to which a party is subject. Additionally, Locus may adjust the rates set forth on the respective Schedules at any time upon five (5) days' written notice to the Company.**

**LOCUS TELECOMUNICATIONS, INC.**

Signature: ____________________ Signature: ____________________

Name: ____________________ Name: ____________________

Title: ____________________ Title: ____________________

Date: ____________________ Date: ____________________

For office use only:

Serial # from ____________________ to ____________________ by ____________________

# C-2

**The Helein Law Group, P.C.**
Distributor Contract Excerpts on Responsibility for Taxes
December 2006

Purpose: The following excerpts on the tax provisions from Locus' representative contracts with its customers (distributors) provides a convenient reference to more supporting documentation that Locus bore the economic burden of the FET and did not pass the tax on to its customers. This synopsis quotes provisions on taxes that demonstrate the uniformity in which Locus and its customers agreed to handle the responsibility for taxes on the services Locus sold.

Contract Title: General Terms and Conditions for Carrier Agreements
Customer: TotalTel Communications, Inc.
Dates: May 2000
Tax Provisions:

Sec. 3. In furtherance of this Agreement, each party shall:
A. Be responsible for and pay any and all local, state, or federal taxes or charges in the nature of taxes imposed by any governmental authority or regulatory agency in addition to the charges required by either party pursuant to this Agreement.

18. This Agreement … embodies the parties' complete and entire agreement with respect to the subject matter hereof.

Contract Title: Distributor Agreement for Locus Prepaid Service
Customer: Locus' "Call Plus" Form Agreement
Dates: 2000 -2005
Tax Provisions:

Sec. 4. The Distributor shall throughout the term of this Agreement:
B. In respect of its activities related hereto, comply with, and cause its agents, employees and representatives to comply with, all federal, state and local laws (including tax laws) …

Sec. 19. C. This Agreement represents the entire agreement between the parties with respect to the transactions contemplated herein …

Contract Title: Wireless Distributor Agreement
Customer: Locus' Form Agreement
Dates: 2000 -2005
Tax Provisions:

Sec. 4. Distributor Obligations
F. Distributor will be responsible for its tax liabilities related to the sales and/or distribution of all products and services offered by Locus.

Sec. 19. C. This Agreement represents the entire agreement between the parties with respect to the transactions contemplated herein ...

END