# In the United States Court of Federal Claims

No. 05-1184T, 06-277T
Filed: August 23, 2011

| | |
|---|---|
| * * * * * * * * | |
| LOCUS TELECOMMUNICATIONS, INC., * | |
| Plaintiff, * | Federal Excise Tax; Application to Telecommunication Carriers; Economic Burden; *Tenneco* |
| v. * | I.R.C. § 4251(a); I.R.C. 4252(b)(1); Common Carrier Exemption; |
| UNITED STATES OF AMERICA, * | I.R.C. § 4253; I.R.S. Notice 2006-50 |
| Defendant. * | |
| * * * * * * * * | |

*Charles H. Helein*, The Helein Group, LLP, McLean, VA, for plaintiff.

*Frederick C. Crombie*, United States Department of Justice, Tax Division, Washington, DC, for defendant.

## ORDER AND OPINION

**Hodges, Judge**

This is a claim for refund of excise taxes. Plaintiff purchases telecommunications services wholesale from facilities-based carriers and sells them to distributors as telephone calling cards. Its claim for a refund of excise taxes arose when a lawsuit against the United States confirmed that the tax did not extend to the type of business in which plaintiff is engaged as a "telecommunications carrier." *See Am. Bankers Ins. Grp. v. United States*, 408 F.3d 1328, 1337 (11th Cir. 2005).

Plaintiff claimed a refund totaling approximately $17,898,889. It reached a partial settlement with the Internal Revenue Service in December 2007, whereby the IRS paid Locus $14,723,330, and interest. The parties filed a joint stipulation for partial dismissal, and we dismissed plaintiff's claims corresponding to the amount refunded by the IRS. Plaintiff has maintained its lawsuit for the difference, approximately $3 million. Locus is entitled to the remaining amount due from the IRS, $3,150,243.18, with interest at the statutory rate.

**BACKGROUND**

Locus purchases telephone network capacity through contracts with facilities-based carriers such as Verizon and AT&T, and sells those services to distributors in the form of prepaid telephone cards. Plaintiff's distributors sell the calling cards to retail outlets, which sell the cards to the general public. Locus has been selling prepaid phone cards to consumers through its distributors since 1994.

The Internal Revenue Code imposes a three percent excise tax on amounts paid for communications services by persons buying those services – in this case, plaintiff's distributors. *See* I.R.C. § 4251(a)-(d).[1] The tax is imposed "when the card is transferred by any telecommunications carrier to any person who is not such a carrier." I.R.C. §4251(d)(1)(B). Plaintiff is not a distributor or other entity that is assessed the excise tax pursuant to these statutes, but it was deemed a

---

[1] Section 4251. Imposition of tax
 (a) Tax imposed
  (1) In general
   There is hereby imposed on amounts paid for communications services a tax equal to the applicable percentage of amounts so paid.
  (2) Payment of tax
   The tax imposed by this section shall be paid by the person paying for such services.
 (b) Definitions
  . . . .
  (2) Applicable percentage
   The term "applicable percentage" means 3 percent.
  . . . .
 (d) Treatment of prepaid telephone cards
  (1) In general
   For purposes of this subchapter, in the case of communications services acquired by means of a prepaid telephone card -
    (A) the face amount of such card shall be treated as the amount paid for such communications services, and
    (B) that amount shall be treated as paid when the card is transferred by any telecommunications carrier to any person who is not such a carrier.
  . . . .
  (3) Prepaid telephone card
   For purposes of this subsection, the term "prepaid telephone card" means any card or any other similar arrangement which permits its holder to obtain communications services and pay for such services in advance.

2

"collector" of the tax.

The collector in this scheme may receive payments from its distributors and pass them along to the Internal Revenue Service, or it may pay the tax liability of its distributors, and seek reimbursement from them. If a refund becomes due because of overpayment, a change in the law, or decisions of federal courts, the statute allows a collector to seek the refund so long as it obtains written consent from those with primary liability for the tax – in this case, the distributors.

Litigation arose in federal courts a decade ago, claiming that IRS had improperly extended the telecommunications tax to services represented by telephone cards in the circumstances presented here. The Court of Appeals for the Eleventh Circuit ruled that the tax did not apply to toll telephone services that are not charged according to both duration and distance.[2] *Am. Bankers Ins. Grp.*, 408 F.3d at 1337.

Plaintiff brought this action for refund in November 2005. The Government challenged portions of plaintiff's claim on the basis that Locus had not waited the requisite six months before filing a refund action pursuant to I.R.C. § 6532(a)(1). Plaintiff dismissed those claims voluntarily and filed a separate action covering the amounts dismissed in April 2006.

The Department of the Treasury and the Internal Revenue Service announced in May 2006 that they would follow the ruling of *American Bankers Insurance Group* and similar cases holding that telephonic communications that are charged excise taxes that vary according to elapsed transmission time rather than distance are not taxable toll telephone services.[3] *See* I.R.S. Notice 2006-50 (May 25, 2006) (interpreting I.R.C. § 4252(b)(1)). The Government advised this court that it would file a motion to amend its Answer in accordance with the Notice. The parties requested a stay of proceedings in July 2006.

In January 2008, the parties filed a joint stipulation for partial dismissal resulting from a December 2007 settlement. The Government had agreed to pay Locus nearly $15 million plus interest pursuant to I.R.C. § 6415.[4] We granted the parties' request that claims representing this amount be dismissed with prejudice. The parties further agreed to reduce the amount in controversy by $25,316.25 for certain credits issued by the IRS during 2001-2003, after which $3,150,243.18 remained as the total outstanding amount claimed by Locus.

The parties also asked that the stay be continued pending ongoing settlement negotiations.

---

[2] Locus sells its services solely on the basis of time; distance is not a factor.

[3] *Fortis, Inc. v. United States*, 447 F.3d 190 (2d Cir. 2006); *Reese Bros. v. United States*, 447 F.3d 229 (3d Cir. 2006); *Office Max, Inc. v. United States*, 428 F.3d 583 (6th Cir. 2005); *Nat'l R.R. Passenger Corp. v. United States*, 431 F.3d 374 (D.C. Cir. 2005).

[4] Plaintiff claimed $9,287,877.88 in its original suit, CFC case no. 05-1184, and $8,611,011.54 in its second suit, no. 06-277, for a total claim amount of $17,898,889.42.

We granted that motion and plaintiff's unopposed motion to consolidate its two cases. The stay continued until the parties filed cross-motions for summary judgment in September 2008. We denied both motions upon finding that material facts were in dispute concerning whether plaintiff had borne the burden of the excise tax. Trial began in April 2011, after numerous delays from disputes concerning discovery and trial procedure.

We have jurisdiction of plaintiff's lawsuit pursuant to 28 U.S.C. § 1346(a)(1), the Tucker Act. Locus has standing under I.R.C. § 6415 ("Credits or refunds to persons who collected certain taxes") as the entity that established a *prima facie* case of overpayment.[5] *See Locus Telecomms. Inc. v. United States*, No. 05-1184T (Fed. Cl. Dec. 15, 2010) (order denying motion to dismiss).

## DISCUSSION

The business chain in the world of toll telephone service typically has five links: originating suppliers (*e.g.*, Verizon, AT&T), service suppliers (Locus), distributors, retailers (Costco, WalMart), and end users (consumers). Before the reinterpretation of § 4252(b)(1), an entity buying telecommunications services, a distributor, was subject to a three percent tax on the face amount of the telephone cards that it sold to retailers. *See* § 4251(b)(2). The entity selling the telephone services to distributors, Locus, could collect the tax and remit it to the IRS. *See* § 4251. A company such as Locus could have invoiced its customers (distributors) for the tax through a line-item charge, combined the amount of the tax with other services on its invoice, or covered the cost of the tax itself.[6]

Defendant asserted that Locus might have combined the amount of the tax with charges for other services on its invoice, then obtained a "windfall" by obtaining the refund as well. Locus stated repeatedly in its briefs and at trial that its corporate policy was to pay the tax itself; its witnesses denied that Locus ever collected taxes from its distributors as defendant charged. Defendant's theory was that Locus might have passed along the tax to distributors by reducing

---

[5] Section 6415(a) states, "[c]redit or refund of any overpayment of tax imposed by §§ 4251, 4261, or 4271 may be allowed to the person who collected the tax and paid it to the Secretary if such person establishes . . . that he has repaid the amount of such tax to the person from whom he collected it, or obtains the consent of such person to the allowance of such credit or refund."

[6] This was a technical complication: Locus as collector paid IRS the tax obligation of its distributors, but it did not obtain reimbursement from the distributors; Locus paid all taxes due under section 4251 itself. The Treasury had no reason to object to this procedure, but it gave the Department of Justice an argument that Locus did not act as a "collector" within the statute because it paid the taxes from its own pocket. That is, plaintiff does not qualify for the refund pursuant to section 6415, the consent statute, because it did not reimburse its distributors. The Fifth Circuit Court of Appeals held that the word "taxpayer" in § 6415 may accommodate one who bore the economic burden of the tax. *See See Locus*, No. 05-1184T (Fed. Cl. Dec. 15, 2010) (citing *United States v. Walker*, 234 F.2d 910 (5th Cir. 1956)).

4

services for the same price or adopting a market price that included the tax.

Plaintiff claimed that it is entitled to a refund of the remaining excise tax paid to the Internal Revenue Service because it bore the economic burden of a tax that was invalidated by the courts. Defendant argued that Locus was not the proper entity to receive the refund because it did not comply with applicable regulations establishing a means of showing that it had paid the taxes. Locus responded that it had paid the tax in fact, and that the Government had not shown that anyone else had paid it.

### The Trial

The key factual question was whether plaintiff attempted to pass along the taxes it paid on behalf of its distributors – *i.e.*, whether it made an effort to reimburse itself for the taxes it paid to the IRS. *See, e.g.*, *See Locus Telecomms. Inc. v. United States*, No. 05-1184T (Fed. Cl. Jan. 20, 2011) (pretrial order) ("The issue remaining for trial is whether plaintiff reimbursed itself for the taxes that it paid IRS on behalf of its distributors, such that a tax refund would create a windfall or a double recovery."). It could not reimburse itself those costs by billing distributors, or by adjusting its discount or sales price to distributors. It could not obtain the same end by providing diminished services for the same discount or price. *Tenneco*, a Claims Court case, provided an analog for manufactured products in that the court required the plaintiff to show that it did not set its price on a market that included an excise tax element. *See Tenneco, Inc. v. United States*, 17 Cl. Ct. 345, 350 (1989), *aff'd*, 899 F.2d 1227 (Fed. Cir. 1990).

Plaintiff contended that the central issue was whether it had borne the economic burden, and emphasized repeatedly that the "point of sale" was the only taxable transaction appropriate for court review. Defendant contended that Locus could have included the tax as an implicit or hidden element of its sales price, and that plaintiff should not have the refund unless it could prove that it did not recover the tax payments in some implicit way.

The court's pretrial order explained our view of the parties' respective burdens and how testimony and evidence at trial should make the necessary showings for each party. *See Locus*, No. 05-1184T (Fed. Cl. Jan. 20, 2011). We did not believe that the cases require plaintiff to show that it lost money overall; the fact that Locus made a profit during a period covered by the tax did not disqualify plaintiff's claim for refund. The court's pretrial view of determinative issues was:

> whether plaintiff reimbursed itself for the taxes that it paid IRS on behalf of its distributors, such that a tax refund would create a windfall or a double recovery. If plaintiff merely absorbed the cost of paying the taxes through profits from general operations, such a showing [by defendant] likely would be insufficient to deny plaintiff a refund.

*Id.*

Plaintiff had the initial burden of proving that it did not charge its distributors for the tax, or

otherwise pass along its costs. *See Tenneco*, 17 Cl. Ct. at 350 ("Plaintiff must show, by at least a preponderance of the evidence, that it absorbed the tax.") The Government would then be expected to demonstrate how Locus had reimbursed itself for the cost of the tax.

The law requires that a plaintiff show by a preponderance of the evidence that it is entitled to the refund. If defendant could show that plaintiff billed its customers for the tax or obtained it by reducing services for the same price, for example, an IRS refund could constitute a double recovery for plaintiff. The January Order stated that defendant could not defeat plaintiff's showing with speculative theories or hypothetical scenarios. Thus, defendant would not succeed by showing generally how Locus *might* have passed along the tax to its distributors.

### Accounting Testimony

Sang H. Pak is a partner at KPMG, and plaintiff's primary contact for tax purposes. He consulted with Locus on federal tax compliance and prepared its tax returns. Locus had become a client in 2001. Mr. Pak was not involved in the process of filing excise tax returns, however. He testified that he was aware from KPMG's audit that plaintiff had filed the Forms 720 and excise tax remittances, but he did not assist in preparing them.

Mr. Pak testified that he discussed the excise tax issue with Sam Lee, plaintiff's Chief Executive Officer, when the Locus-KPMG client relationship began in 2001. He understood from conversations with Mr. Lee that Locus was interested in expert advice on how to minimize the cost of the excise tax to the company. No one was aware of a possibility that Locus might be due a refund of the excise taxes then, according to Mr. Pak.

KPMG was following a court case involving federal excise taxes and refunds in 2004. During that period, KPMG presented to Locus the possibility of obtaining an excise tax refund for the company. It conducted additional meetings with Locus as the litigation progressed. Mr. Pak testified that KPMG extended an engagement proposal to Locus dated March 15, 2004, offering Locus assistance in obtaining a refund of the federal excise tax. Mr. Pak noted that plaintiff did not hire KPMG to obtain a refund for Locus, but to provide consultation on how Locus could obtain the refund.

Chong-Yun Park is an audit partner with KPMG.[7] Mr. Park testified that KPMG began auditing Locus in 1998, in part to insure that its financial statements were accurate. KPMG reviewed plaintiff's 2000-2001 tax statements, and determined that no modifications were needed for the financial statements to comply with generally accepted accounting principals. A review of the following tax year reported the same conclusion. KPMG's audits of plaintiff's accounts from 2004-2007 likewise determined that no modifications were needed.

---

[7] A review entails inquiry into management and performance of some analytical procedures to provide assurance that financial statements are not materially misstated. An audit includes performance of more robust auditing procedures to provide an opinion on whether the financial statements are prepared in accordance with generally accepted accounting principles.

KPMG's approval of plaintiff's accounting records supports Locus' contention that it did not pass through the excise tax expense to its distributors. Locus identified the tax as a general operating expense in its accounting records rather than a cost of goods sold. Operating expenses are costs the company bears, whereas cost of goods sold denotes expenses passed on to customers. Mr. Park approved treatment of the FET as an operating expense and not a cost of goods sold. He agreed that Locus had not collected the tax from its customers.

The IRS did not object to Locus' treatment of the excise tax as an operating expense. It audited plaintiff's 2000 corporate tax return in which Locus reported the excise tax as a general expense. Locus reported cost of goods sold expenses separately. The IRS did not question Locus' treatment of the excise tax and did not require any material modification to its tax reporting.

Mr. Park testified that determining whether the client absorbed the cost of its excise taxes or chose to charge them to its customers is a part of the audit and review process. KPMG's audit and review teams concluded that Locus paid the excise tax from its own funds. Mr. Park stated that the teams first reached this conclusion in 2000 or 2001 and reported the same for each year they examined plaintiff's excise tax returns.

Mr. Park and his team reached their conclusion that Locus had not passed along the tax after making inquiries to plaintiff's management about its handling of the tax and by consulting plaintiff's invoices. Mr. Park explained KPMG's verification process in response to questions about KPMG's means of confirming plaintiff's representations concerning its treatment of the excise tax. Their findings were examined and cleared by a KPMG excise tax expert, an engagement team, and another partner.

Locus recorded excise tax expenses of $17.9 million from 2001 to 2005. KPMG advised Locus in 2005 not to submit an FET payment to the IRS because the Service's policy had changed. Locus thus began accruing money for the taxes but not submitting it to the Government. KPMG knew as of May 2006 that plaintiff had sued for an excise tax refund, and that the IRS had begun to issue refunds to qualified taxpayers. Locus had accrued $9.3 million for excise taxes by then, and was continuing to hold it in escrow.

The IRS action prompted KPMG to consider the treatment of both the accrued money and the sum already remitted to the Government. KPMG circulated a "Subsequent Event on Federal Excise Tax" memorandum that raised two issues: whether Locus could reverse the FET expenses of $17.9 million for the period from January 2001 to March 2005 and record that sum as income; and whether the company could reverse the $9.3 million from expenses payable and record that amount as income in the 2005 financial statements.

KPMG decided not to book the $17.9 million as revenue in the 2005 financial statements. KPMG explained that because the outcome of the lawsuit was undecided, it was not appropriate to record that amount as income. However, the $9.3 million listed as expenses payable as of December 31, 2005 was reversed and recorded as income. KPMG stated in the memo that Locus had absorbed

the excise tax, and had not passed along the taxes to its customers.[8]

As explained above, from 2001 to 2005 KPMG authorized Locus to list the FET as an operating expense on its income statement. Mr. Park explained that KPMG would not have authorized Locus to list the tax as an expense on the income statement had the company collected the tax from its customers. Instead, KPMG would have suggested that Locus record that amount on their balance sheet as a cash receivable to be remitted to the Government.

Locus received a refund of $14,723,329.98 in 2007. KPMG reviewed plaintiff's invoices for further information on how Locus treated the excise tax. Mr. Park testified that he saw no line item charge for the tax, nor any other indication that plaintiff had charged its distributor-customers for the tax.

Henry Park served as Director of Carrier Business for Locus; currently he is Vice President of Carrier Business and Operations. His role as director required that Mr. Park help negotiate the wholesale rate with carriers. Mr. Park testified that the pre-paid calling card industry is highly competitive and that companies like Locus rely on negotiation to determine per minute rates. Rates vary from carrier to carrier and are based on the destination of a given call and the overall volume of calls to that destination. A larger volume of calls to a destination usually results in a better rate for calls to that location. Mr. Park negotiates a rate with the domestic carriers and many international carriers. He relays that information to Locus' sales department; Mr. Park never discussed the FET in conversations with the sales department. The sales department uses the rate to negotiate its distributors' discount.

Mr. Park acknowledged that plaintiff's net profits decreased from 2005 to 2006 despite a greater volume of traffic because of increased costs of services. Mr. Park testified that he was not involved in activities or discussions concerning the federal excise tax, as the FET was not within his area of responsibility.

Jae Hong Choi serves as the head of plaintiff's telephone calling card sales department, and he sets Locus' prices. He began working for Locus in 1997 and first learned of the excise tax in 2000. He testified that he is and has always been under the impression that Locus pays the tax from its own funds. Mr. Choi sets a price by learning of the carrier rates from Mr. Park, and using that information to negotiate the distributor discount. Distributors receive a discount of twenty to fifty percent on the face value of the cards. The main factor he considers when setting the discount rate is carrier cost. Excise taxes are not at issue in Mr. Choi's discussions with Mr. Park nor in setting distributor discounts.

Mr. Choi examined standard invoices issued by Locus to its distributor-customers and showed that the invoices do not include a line item charge for the excise tax. He testified that no

---

[8] KPMG also relied on a legal opinion drafted by plaintiff's attorneys in deciding to list the accrued amount and refund as income. Mr. Park testified, however, that KPMG believed prior to the refund opportunity that Locus had borne the burden of the FET.

conditions affecting Locus' pricing methodology changed at any time between 2001 and 2005. Mr. Choi stated that Locus allocated a portion of its refund money to a promotion for its distributors.[9] Locus spent $4.155 million of the refund on its distributors. Mr. Choi explained the use of the "rate deck" in Locus' business. Essentially, it is a list of permanent rates to various countries. Locus sets rate decks to make profits in the long term. For that reason, it may suffer losses initially and in the short term. The FET is not an element of the rate deck.

### Expert Testimony

The parties presented learned expert witnesses who have impressive and lengthy careers in economics. Dr. Selwyn was defendant's economist. He addressed one of the key issues in the trial – what it means to bear the economic burden.

Dr. Selwyn's testimony showed that determining the economic burden of a tax is more complex and layered than a layperson might suppose. He thinks it important to ask how the impact of the tax is captured at various stages from production to ultimate consumption. Dr. Selwyn testified that the end user of the prepaid sector of the telecommunications market ultimately bears the economic burden of an excise tax. The burden is shifted along the distribution chain from service providers through intermediaries to the ultimate consumer.[10]

Dr. Selwyn discussed other attributes of the market that affect how and whether the economic burden is distributed throughout the distribution chain. One variable relates to conditions of supply in the market. If a firm is able to expand its output indefinitely at a constant or decreasing average cost, it will have an incentive to expand. Given the right demand and supply conditions, the consumer rather than the producer bears the economic burden.

Dr. Selwyn noted that after Locus stopped paying the FET in 2005, its net profits decreased,

---

[9] The parties stipulated that the court would not consider the issue of distributor consents at trial.

[10] Dr. Selwyn explained that a producer confronted with a cost that also confronts its competitors will flow the cost through the chain "without fear that its rivals might somehow not be in a position to flow it through." When a tax confronts everyone in plaintiff's position, the competitive condition in the market becomes important. For example, if a market is highly competitive, prices in the market tend to approach lower-end marginal cost – opportunities arise for limited profits, but those opportunities are constrained by competitive marketplace forces in a highly competitive market. One would expect to see all firms in the market setting their prices slightly above cost. If a firm pushed its price too far above cost, a competitor would enter the market and force prices down. The result of this is a combination of a cost condition that affects the whole market and a market condition under which competitors are forced to set their prices competitively in response to other marketplace forces; they will set their prices relatively close to cost. As applied to this case, the cost of excise taxes will be flowed through where everyone is confronted with the same cost and is forced to set the price relative to that cost.

a result consistent with his theory. If Locus had been absorbing the excise tax and the tax went away, one would expect profits to increase, according to Dr. Selwyn. *See Tenneco*, 17 Cl. Ct. at 354 ("[T]he fact that a firm is making a profit or loss does not in itself determine whether or not it has passed on the tax." (quoting *Worthington Pump & Mach. Corp. v. United States*, 122 F.Supp. 843, 847 (Ct. Cl. 1954)).

Dr. Pearce was an equally experienced and qualified economist who testified for Locus. He examined plaintiff's records, and he found no data to indicate that Locus passed the excise tax along to its distributors. The calling card market is a niche market made up of complex business relationships, Dr. Pearce explained, and in this type of market, the tax is borne by the least strong link in the chain. In this case, that was Locus. Verizon and AT&T are powerful entities, and plaintiff's distributors are also stronger economic forces than Locus.

Locus absorbed the tax in the sense that all profitable companies recover their expenses of labor, income tax, and rent. Companies do not recover these costs as a percentage of the prices of their products, Dr. Pearce noted. Instead, they look at their overall costs in general terms, and try to make a profit over time.

Dr. Pearce's response to Dr. Selwyn's testimony was reasonable and logical, and therefore credible. He showed that the tax may be passed along to consumers in theory, in a state of perfect competition. Perfect competition might exist where multiple suppliers serve multiple consumers at known prices. Perfect competition does not exist in the telephone calling card market, however. Locus relies on two primary network providers. Further, Locus was a relatively new player in the prepaid calling card business, and it had to woo distributors with discounts and other promotions. Dr. Pearce testified that Locus would not necessarily have recovered all of its costs during the years at issue in this case.

### *Tenneco*

Defendant asserted that the issues in this case are controlled by the analysis in *Tenneco*. 17 Cl. Ct. 345. However, the procedure for obtaining an excise tax refund in *Locus* is governed by a statute different from the controlling statute in *Tenneco*. Moreover, most of the concepts that were important in *Tenneco* have little application in *Locus*.

Tenneco manufactured motor parts. *See* I.R.C. § 4061 (repealed 1984). It paid excise taxes for approximately five years on various exhaust system parts that it produced. Tenneco's claim for a refund arose when it turned out that exhaust system parts were not subject to the excise tax because of their nature and use. When Tenneco sued for a refund in the Claims Court, the sole issue was whether Tenneco bore the burden of the excise tax or shifted the burden to its customers. The court limited its inquiry to whether Tenneco included federal excise taxes in the price of the manufactured replacement parts for which it claimed a refund. *See Tenneco*, 17 Cl. Ct. at 349.

The Internal Revenue Code provided this general rule for seeking a refund of the excise tax applicable to manufactured goods such as those in *Tenneco*:

10

> No credit or refund of any overpayment of tax . . . shall be allowed or made unless the person who paid the tax establishes, under regulations prescribed by the Secretary, that he . . . has not included the tax in the price of the article with respect to which it was imposed and has not collected the amount of the tax from the person who purchased such article.[11]

I.R.C. § 6416(a).

The *Tenneco* court found that this statute controlled the plaintiff's burden and required Tenneco to show that it did not pass on the tax to its customers in the pricing of its product. *See Tenneco*, 17 Cl. Ct. at 349. The court looked at factors such as the reference to taxes in invoices, the existence of negotiated contracts including excise taxes, the methods of accounting for the tax, and Tenneco's profitability. The court found that Tenneco's price lists included the designation "Federal Excise Tax included." *Id.* at 348. Plaintiff's contracts included reference to the excise tax, stating for example, that an "eight percent [Federal Excise Tax would be] included where applicable" in the sales price. *Id.* Tenneco's invoices reflected the federal excise tax as a separate item. *Id.* Defendant had no such evidence in Locus, and credible evidence at trial established that such factors were not present in this case.

*Tenneco* and similar cases decided in this court and the Court of Claims have addressed manufacturers' excise taxes, where the tax burden would have been passed along at the point of sale. The *Tenneco* court asked whether plaintiff's prices were cost-based or competitive based as a threshold issue. Locus executives demonstrated that their price decisions did not depend on cost or the competitive framework.

Governing law does not limit the court's inquiry to plaintiff's pricing of its services. Locus seeks recovery under a statute different from that controlling refunds of the manufacturer's excise tax. Such refunds are made pursuant to Section 6415(a) of the Internal Revenue Code, for taxes paid pursuant to I.R.C. § 4251. Section 6415(a) states:

> Credit or refund of any overpayment of tax imposed by section 4251 . . . may be allowed to the person who collected the tax and paid it to the Secretary if such person establishes, under such regulations as the Secretary may prescribe, that he has repaid the amount of such tax to the person from whom he collected it, or obtains the consent of such person to the allowance of such credit or refund.

I.R.C. § 6415(a). These are self-enforcing rules to insure that the person applying for a refund has not already billed those for whom it paid the tax – here, Locus is applying for the refund and those for whom it paid the tax are its distributors. In the circumstances presented during trial, however, Locus as collector paid the tax to IRS for its distributors with no intention of being reimbursed by them. It sought and received consent forms from distributors who knew Locus had paid their excise

---

[11] The language referring to prices of manufactured products is not a part of the statute that applies to Locus.

11

Case 1:05-cv-01184-RHH   Document 225   Filed 08/23/11   Page 12 of 13

taxes, and knew that Locus was entitled to any refund that might apply.

We accepted defendant's argument that the tax could have been passed on by means other than the point of sale. Plaintiff could have reimbursed itself for the tax in various ways and at various times beyond the time of purchase. We ruled against the parties' cross motions for summary judgment in part because such were questions of fact.

The Fifth Circuit ruling did not address the question how Locus should prove that it bore the economic burden. Plaintiff's argument was always to "limit our inquiry to the point of sale." Locus was insistent that we could not impose upon plaintiff the burden of proving a negative. We advised plaintiff that its burden was to demonstrate that it did not use any means to reimburse itself for the tax. If it could make such a showing, defendant would have the opportunity argue otherwise and to attack plaintiff's credibility, including the presentation of testimony and other evidence demonstrating that plaintiff omitted the possibility that it was repaid by indirect means.

Locus did not reimburse itself directly by invoicing distributors for the taxes, for example, as Tenneco did – but that left open the possibility that it did so by indirect means. The testimony of Mr. Pak, Mr. Chong-Yun Park, Mr. Henry Park, Mr. Choi, and Dr. Pearce persuaded the court that Locus did not attempt to reimburse itself for the tax. We have no evidence that Locus shifted the burden of the excise tax to its distributors. Tenneco listed the excise tax as a separate item on its price lists, in its contracts, and on invoices accompanying these transactions. Defendant could point to nothing in this case that approached such important evidence, so relevant to the plaintiff's burden as in *Tenneco*.

Plaintiff's testimony and other evidence at trial demonstrated that Locus paid the tax and did not attempt to recover it by improper means. Plaintiff met its burden of proof, and defendant offered only speculation and economic theory in response.

## CONCLUSION

The Internal Revenue Service collected money for a tax that courts invalidated later. Defendant relied on economic theory at trial to argue that only consumers of telephone services bear the economic burden of the excise tax. Presumably, only they would qualify for a refund as defendant sees it. The Government alleged that Locus passed along its cost of paying the distributors' taxes by attempting to recover the payments in other ways. For example, plaintiff might have provided its distributors fewer services for the same cost shown on their invoices. We were satisfied from plaintiff's testimony and other evidence at trial that it did not use such indirect means to recover its tax payments, or by any of the other methods speculated upon by the Government.

Locus did not attempt to obligate its distributors contractually to pay the tax, nor was the tax present on distributor invoices as a line item charge. *See Tenneco*, 17 Cl. Ct. 345. Plaintiff's auditors confirmed that Locus treated the tax on its books as an operating expense. Competent evidence showed that Locus paid the excise taxes from its own funds and did not recover them

directly or indirectly. Plaintiff met its burden of showing entitlement to a refund of the taxes it paid on behalf of its distributors. Defendant's contentions in response had no support other than economic theory advanced by Dr. Selwyn.

Locus has not sought a refund of the excise taxes it paid for its distributors from any source other than the entity holding those taxes – the Internal Revenue Service. The Clerk of Court will enter judgment for Locus Telecommunications, Inc., in the amount of $3,150,243.18, plus interest at the statutory rate. No costs.

SO ORDERED.

s/Robert H. Hodges, Jr.
Robert H. Hodges, Jr.
Judge